ACCEPTED
15-25-00108-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
6/20/2025 4:46 PM
CHRISTOPHER A. PRINE
CLERK

NO. _____

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
6/20/2025 4:46:31 PM
CHRISTOPHER A. PRINE
Clerk

## IN THE COURT OF APPEALS
## FOR THE FIFTEENTH JUDICIAL DISTRICT
## AUSTIN, TEXAS

IN RE BRIGHT HEALTH MANAGEMENT, INC.

*Relator.*

Original Proceeding Arising from the
455th Judicial District Court,
Travis County, Texas
Cause No. D-1-GN-23-008361
The Honorable Catherine Mauzy, Presiding

## PETITION FOR WRIT OF MANDAMUS

Carlos R. Soltero
csoltero@maynardnexsen.com
State Bar No. 00791702
Brytne D. Kitchin
bkitchin@maynardnexsen.com
State Bar No. 24079973
Lisa Poole Alcantar
lalcantar@maynardnexsen.com
State Bar No. 24069284
**MAYNARD NEXSEN**
2500 Bee Caves Road
Bldg. 1, Suite 150
Austin, Texas 78746

**Attorneys for Relator**

# IDENTITY OF PARTIES AND COUNSEL

Relator certifies that the following is a complete list of all parties and the names and addresses of all counsel in the trial court and court of appeals:

1. **Relator:**

   Bright Health Management, Inc. (Non-Party)

   **Trial & Appellate Counsel for Relator**

   Carlos Soltero
   csoltero@maynardnexsen.com
   State Bar No. 00791702
   Brytne D. Kitchin
   bkitchin@maynardnexsen.com
   State Bar No. 24079973
   Lisa Poole Alcantar
   lalcantar@maynardnexsen.com
   State Bar No. 24069284
   **MAYNARD NEXSEN**
   2500 Bee Caves Road
   Bldg. 1, Suite 150
   Austin, Texas 78746

2. **Respondent**

   Hon. Catherine Mauzy
   Judge, 455th Judicial District Court
   1700 Guadalupe, 11th Floor
   Austin, Texas 78701
   (512) 854-4023
   Fax: (512) 854-2224

   **Counsel for Respondent**

   None known at this time by Relator

**3.** **Real Party in Interest**

Special Deputy Receiver of Bright Health Care Insurance Company of Texas, on behalf of the Texas Department of Insurance

**Trial & Appellate Counsel**

Gregory A. Pierce
gpierce@gpiercelaw.com
State Bar No. 15994250
P.O. Box 40
Austin, Texas 78767
(512) 474-2154

Christopher Fuller
cfuller@fullerlaw.org
State Bar No. 07515500
**FULLER LAW GROUP**
4612 Ridge Oak Drive
Austin, Texas 78731
(512) 470-9544

Jane Webre
jwebre@scottdoug.com
Scott Douglas & McConnico
303 colorado St., Suite 2400
Austin, Texas 78701
(512) 465-6300

**Attorneys for CANTILO & BENNET, L.L.P.,**
**Specialty Deputy Receiver of**
**Bright Health Insurance Company of Texas**

**3.     Other Interested Parties:**

Bright Health Care Insurance Company of Texas

> **Trial & Appellate Counsel**
>
> Gregory A. Pierce
> gpierce@gpiercelaw.com
> State Bar No. 15994250
> P.O. Box 40
> Austin, Texas 78767
> (512) 474-2154
>
> Christopher Fuller
> cfuller@fullerlaw.org
> State Bar No. 07515500
> **FULLER LAW GROUP**
> 4612 Ridge Oak Drive
> Austin, Texas 78731
> (512) 470-9544
>
> **Attorneys for CANTILO & BENNET, L.L.P.,**
> **Specialty Deputy Receiver of**
> **Bright Health Insurance Company of Texas**

Texas Department of Insurance

**Counsel for the Texas Department of Insurance**

Edwin Hartsfield
Vane Hugo
John Walker
RLO MC-FRD
PO Box 12030
Austin, TX 78711-2030

Shawn Martin
Sandra Salazar
General Counsel Division
Office of Financial Counsel
PO Box 12030
Austin, TX 78711-2030

Assistant Attorney General
General Litigation Division
Office of the Texas Attorney General
P.O. Box 12548, Mail Stop 01901
Austin, TX 78711-2548

Texas Life and Health Insurance Guaranty Association

**Counsel for Texas Life and Health Insurance Guaranty Association**

Dan Price
**SHANLEY PRICE**
5501A Balcones Drive, Suite 218
Austin, TX 78731

Centers for Medicare & Medicaid Services Center for Consumer Information and Insurance Oversight

**Counsel for Centers for Medicare & Medicaid Services Center for Consumer Information and Insurance Oversight**

Milan Shah
Kelly Drury
Centers for Medicare & Medicaid Services Center for Consumer Information and Insurance Oversight
7501 Wisconsin Ave
Bethesda, MD 21814

THC Houston, LLC d/b/a Kindred Hospital Houston Northwest

**Counsel for THC Houston, LLC d/b/a Kindred Hospital Houston Northwest**

Adrianne J. Simon
Blake Gould
**Fultz Maddox Dickens PLC**
101 South Fifth Street, 27th Floor
Louisville, KY 40202

Internal Revenue Service

**Counsel for Internal Revenue Service**

Internal Revenue Service
Special Procedures Branch
300 East 8th Street, Suite 352
Mail Stop 5026AUS
Austin, Texas 78701

# RECORD REFERENCES

Because of the uncertainty as to whether the proper procedure here is an interlocutory appeal or an original proceeding, and because there is already both a robust Clerk's Record ("CR") and Reporter's Record ("RR"), and for simplicity and consistency, Relator hereby adopts those records from the related appeal filed under case number 15-25-00092-CV with this Court on the same day. Accordingly, the CR and RR cites should be identical in both submissions.

"App'x ____" refers to the place where the document is included as part of the Appendix.

"____ CR ____" refers to the Clerk's Record at the indicated page. The number before "CR" is the volume of the Clerk's Record since there are four. The number after "CR" is the page in that volume of the Clerk's Record.

"____ RR ____" refers to the Reporter's Record. The number before "RR" is the volume of the Reporter's Record since there are three. The number after "RR" is the page in that volume of the Reporter's Record. Any further references like page numbers are in that part of the Reporter's Record at the indicated page.

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL..............................................i

RECORD REFERENCES ...............................................................vi

TABLE OF CONTENTS .............................................................vii

INDEX OF AUTHORITIES .............................................................x

STATEMENT OF THE CASE ............................................................1

    1. The Parties ..................................................................4

    2. The Prior Legal Proceedings................................................7

    3. The Dispute ..................................................................8

        A. BHM does not dispute the SDR's entitlement to copies of documents and information belonging or related to BHICOT and in BHM's possession. ......................8

        B. Consistent with industry standards, BHM, through its employees, provides management and administration services to all its insurance company affiliates.................................................................10

        C. The SDR refused BHM's reasonable requests to confer and identify agreed search terms to facilitate the expeditious and efficient production of the BHICOT Records. .................................................................11

        D. The Special Master and District Court erroneously concluded that the SDR is not required to cooperate with BHM and that BHICOT does not have to bear any of the costs of producing the BHICOT Records. ....................13

SUMMARY OF ARGUMENT ...................................................15

ARGUMENT AND AUTHORITIES ..................................................15

1.    The District Court abused its discretion in denying BHM's ESI Cross-Motion and confirming the R&R, giving the SDR unfettered access to records and information beyond the BHICOT Records...........................18

    A.  The fact that the SDR's request for the BHICOT Records is pursuant to the Texas Insurance Receivership Act does not override the constraints generally applicable to discovery requests made to a non-party in civil litigation. ................................................19

    B.  Proportionality and reasonableness are polestars in litigation discovery, including the production of ESI..........21

    C.  As a non-party to the receivership, Texas discovery jurisprudence provides BHM the right to protect its own interests and documents. ............................................23

    D.  The fact that BHM digitally stored BHICOT-related documents and information alongside documents and information for BHM's other clients does not eliminate the applicability of Texas discovery constraints.....................................................................26

    E.  This Court should protect BHM's right to be free from burdensome and intrusive discovery requests and require the District Court to issue an order applying ESI Protocols to the SDR's request for the BHICOT Records. ..............................................................................29

2.    The District Court further abused its discretion in denying BHM its contractual and statutory right to reimbursement from BHICOT for the cost of identifying and producing the BHICOT Records. ................31

    A.  The fact that BHM digitally stored BHICOT-related documents and information alongside documents and information for BHM's other clients does not relieve BHICOT of its contractual and

statutory obligation to reimburse BHM for the cost of identifying and producing the BHICOT Records. ................ 32

B. The MSA requires BHICOT to reimburse BHM for all costs associated with identifying and producing the BHICOT Records. ................................................................. 34

C. Texas law requires BHICOT to reimburse BHM for all costs associated with identifying and producing the BHICOT Records. ................................................................. 35

D. This Court must require BHICOT to comply with its obligations under the MSA and Texas law to reimburse BHM for the reasonable cost of identifying and producing the BHICOT Records. .................................. 38

PRAYER ........................................................................... 39

RULE 52.3(j) CERTIFICATION ........................................ 40

CERTIFICATE OF COMPLIANCE ................................... 41

CERTIFICATE OF SERVICE ........................................... 42

ix

# INDEX OF AUTHORITIES

## CASES

*ACP Ins. Intermediate, LLC v. Cantilo & Bennet, LLP*,
 No. 03-19-00724-CV, 2021 WL 2273460 (Tex. App.—Austin
 June 4, 2021, no pet.) (mem. op.) ........................................... 19, 20

*Embark Holdco Mgmt., LLC v. Cantilo & Bennett, L.L.P.*,
 No. 03-19-00721-CV, 2021 WL 1010950, (Tex. App.—Austin
 Mar. 17, 2021, no pet.) (mem. op.) ................................................20

*Goin v. Crump*,
 No. 05-18-00307-CV, 2020 WL 90919 (Tex. App.—Dallas
 Jan. 8, 2020, no pet.) (mem. op.) ...................................................20

*In re 4X Indus., LLC*,
 683 S.W.3d 916 (Tex. App.—Houston [14th Dist.] 2024, orig.
 proceeding....................................................................................24

*In re CI Host, Inc.*,
 92 S.W.3d 514 (Tex. 2002) (orig. proceeding) ...............................28

*In re Contract Freighters, Inc.*,
 646 S.W.3d 810 (Tex. 2022) (orig. proceeding) (per curiam) .........18

*In re CSX Corp.*,
 124 S.W.3d 149 (Tex. 2003) (orig. proceeding) (per curiam) .........16

*In re Eurecat US, Inc.*,
 425 S.W.3d 577 (Tex. App.—Houston [14th Dist.] 2017, orig.
 proceeding) ..................................................................................36

*In re Ford Motor Co.*,
 988 S.W.2d 714 (Tex. 1998) (orig. proceeding) ........................15, 17

*In re K & L Auto Crushers, LLC*,
627 S.W.3d 239 (Tex. 2021) (orig. proceeding) ..............................24

*In re Methodist Primary Care Grp.*,
553 S.W.3d 709 (Tex. App.—Houston [14th Dist.] 2018, orig.
proceeding) .................................................................................24

*In re Pinnacle Eng'g, Inc.*,
405 S.W.3d 835 (Tex. App.—Houston [1st Dist.] 2013, orig.
proceeding..................................................................................24

*In re Raizada*,
No. 14-23-00941-CV, 2024 WL 178140 (Tex. App.—Houston
[14th Dist.] Jan. 17, 2024, orig. proceeding) (per curiam)
(mem. op.) ..................................................................................16

*In re Shipman*,
540 S.W.3d 562 (Tex. 2018) (orig. proceeding) (per curiam) ... 16, 17

*In re State Farm Lloyds*,
520 S.W.3d 595 (Tex. 2017)....................................................16, 22

*In re UPS Ground Freight, Inc.*,
646 S.W.3d 828 (Tex. 2022) (orig. proceeding) (per curiam) .........18

*In re Weekley Homes*,
295 S.W.3d 309 (Tex. 2009) (orig. proceeding) ..............................16

*Paxton v. Annunciation House, Inc.*,
No. 24-0573, 2025 WL 1536224 (Tex. May 30, 2025) ....................15

*Philadelphia Indem. Ins. Co. v. White*,
490 S.W.3d 468 (Tex. 2016)..........................................................34

*Rich v. Cantilo & Bennett, L.L.P.*,
492 S.W.3d 755 (Tex. App.—Austin 2016, pet. denied).................30

*Russell v. Young*,
452 S.W.2d 434 (Tex. 1970)..........................................................17

*S.E.C. v. Stanford Int'l Bank, Ltd,*
    927 F.3d 830 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2567
    (2020) ................................................................................................20

*Tex. Educ. Agency v. Houston ISD,*
    660 S.W.3d 108 (Tex. 2023) ..............................................................15

*Texaco, Inc. v. Sanderson,*
    898 S.W.2d 813 (Tex. 1995) (per curiam) .......................................30

*Walker v. Packer*,
    827 S.W.2d 833 (Tex. 1992) ..............................................................15

*WC 4th & Colo., LP v. Colo. Third St.*,
    No. 03-22-00781-CV, 2024 WL 3841676 (Tex. App.—Austin
    Aug. 15, 2024, pet. denied) (mem. op.) ......................................29, 30

*Whitcomb v. Chavis,*
    403 U.S. 124, 91 S. Ct. 1858, 29 L.Ed.2d 363 (1971) ....................20

*Wichita Cnty. v. Env't Eng'g & Geotechnics, Inc.*,
    576 S.W.3d 851 (Tex. App.—Austin 2019, no pet.) ........................36

## STATUTES

28 Tex. Admin. Code § 7.204(a)(1) .........................................................6

28 Tex. Admin. Code § 7.204(a)(2)(D) ....................................................6

28 Tex. Admin. Code § 7.212 ..................................................................6

Tex. Const. art. V, § 6 (amended 2001) ..................................................2

Tex. Gov't Code § 22.220(d)(1) ...............................................................2

Tex. Gov't Code § 22.221(c-1) .................................................................2

Tex. Ins. Code § 443.001-.402 ...............................................................22

Tex. Ins. Code § 823.101 ........................................................................35

TEX. INS. CODE § 823.101(b-1) ...............................................................6

TEX. INS. CODE § 823.103(a)(4) .............................................................6

TEX. INS. CODE § 823.103(c)...................................................................6

TEX. INS. CODE § 823.106(a) .................................................................35

## OTHER AUTHORITIES

NAIC Model Regulation 450 (2021) ("Insurance Holding Company
    System Model Regulation")............................................................6

Nat'l Ass'n of Ins. Comm'rs ("NAIC") Model Law 440 (2021)
    ("Insurance Holding Company System Regulatory Act")................6

## RULES

TEX. R. APP. P. 52.....................................................................................2

TEX. R. CIV. P. 1 .....................................................................................22

TEX. R. CIV. P. 192.3(a) ........................................................................21

TEX. R. CIV. P. 205.3(f)..........................................................................36

## STATEMENT OF THE CASE

*Nature of the Case:*   This is a dispute over an order compelling a third party to an insurance company receivership to produce, at its sole cost, electronically stored information ("ESI") without any guidelines to protect the third party's privacy and privileges, or the confidentiality of non-responsive information, as required by *Weekley Homes*. *See* Appendix A.

*Course of Proceedings:*   Bright Health Insurance Company of Texas ("BHICOT") is a Texas-domiciled insurance company in receivership. Relator, Bright Health Management, Inc. ("BHM"), is an affiliate of BHICOT and management services company that provided management services to BHICOT. The special deputy receiver ("SDR") filed a motion to compel BHM to "turnover [all] BHICOT records held by BHM." BHM filed a cross-motion requesting the District Court implement ESI protocols with respect to the requested production. Adopting the Special Master's recommendation, the District Court entered an order granting the SDR's motion and denying BHM's cross-motion.

*Respondent:*   The Hon. Catherine Mauzy, 455th Judicial District Court, Travis County, Texas

*Action from which Relief is Requested:*   Respondent's May 6, 2025, order granting the SDR's motion and denying BHM's ESI cross-motion.

## STATEMENT OF JURISDICTION

The Court of Appeals has jurisdiction to grant the writ of mandamus sought in this Petition under Tex. Const. art. V, § 6 (amended 2001); TEX. GOV'T CODE §§ 22.220(d)(1) and 22.221(c-1); and TEX. R. APP. P. 52.

## ISSUES PRESENTED

1. Whether the District Court abused its discretion in holding that the legal principles underlying Texas' well-established and robust ESI jurisprudence and protocol do not apply to a court-appointed receiver's requests from a non-party to an insurance receivership for books and records related to the insurer in receivership.

2. Whether the District Court abused its discretion in holding that a non-party to an insurance receivership loses its contractual and statutory rights to reimbursement for the reasonable costs of producing books and records related to the insurer in receivership, simply because those books and records are stored on a system also used for the non-party's other clients.

3

**STATEMENT OF FACTS**

## 1. The Parties

Bright Health Management, Inc. ("BHM") is a Minnesota-based corporation with 14 subsidiaries that issue insurance products in different states in accordance with the various laws and regulations applicable to those jurisdictions.[1]



Bright Health Insurance Company of Texas ("BHICOT") is a Texas-domiciled insurance company and BHM subsidiary that was established to serve the Texas market.[2]

---

[1] 2 CR 387. A chart depicting the corporate structure is at 3 RR 672–673 and at Appendix D.
[2] 1 CR 5.

The Texas Department of Insurance ("TDI") is an agency of the State of Texas primarily responsible for regulating the business of insurance in Texas.

BHM and BHICOT's relationship is governed by the Management Services Agreement, effective January 1, 2022 (the "MSA"), pursuant to which BHM provides certain management and administrative services to BHICOT.[3] BHM operates as a shared-services entity, providing management and administrative services to all its insurance company subsidiaries pursuant to separate management services agreements.[4] The suite of services offered by BHM includes providing BHM employees to serve as officers and/or directors of an insurance company client as well as "claims administration, accounting, legal services, financial services, actuarial services. Effectively everything."[5]

The nature and scope of the shared-services arrangement embodied in the MSA is standard in the industry as it allows affiliated insurers to achieve economies of scale that lower operational costs, helping reduce

---

[3] The MSA is at 3 RR 674–695 and at Appendix C.
[4] 3 RR 760, p. 156:11–18; 3 RR 762, p. 162:24–163:15.
[5] 3 RR 762, p. 162:24–163:7.

member premiums.[6] Indeed, every U.S. jurisdiction has insurance laws and/or regulations that specifically apply to this type of affiliate transaction. *See, e.g.*, TEX. INS. CODE § 823.101(b-1); 28 TEX. ADMIN. CODE § 7.204(a)(2)(D). *See also* Nat'l Ass'n of Ins. Comm'rs ("NAIC") Model Law 440 (2021) ("Insurance Holding Company System Regulatory Act")[7] & NAIC Model Regulation 450 (2021) ("Insurance Holding Company System Model Regulation").[8] Every U.S. jurisdiction requires insurers to file a copy of this type of affiliate agreement with the respective jurisdiction's insurance department for review at least 30 days prior to the desired effective date of the agreement (known as a "Form D filing"). *See, e.g.*, TEX. INS. CODE §§ 823.103(a)(4) & (c); 28 TEX. ADMIN. CODE §§ 7.204(a)(1) & 7.212. Pursuant to the above requirements, a Form D filing for the MSA was submitted to and reviewed and not disapproved of by TDI prior to implementation of the MSA.

---

[6] 3 RR 764, p. 173:1 to 3 RR 765, p.174:15. As noted by the Special Master in his Memorandum Report and Recommendation, there is an "obvious advantage" to shared-service arrangements like the MSA, and "saving money by having one entity run [multiple] subsidiary or affiliated companies" is not problematic. 3 RR 1263.

[7] A copy is attached at Appendix E.

[8] A copy is attached at Appendix F.

## 2. The Prior Legal Proceedings

On November 15, 2023, TDI filed an Original Petition in the Travis County District Court seeking to place BHICOT in liquidation.[9] As a result, the District Court (1) issued an agreed order placing BHICOT into liquidation (the "Liquidation Order" and the "Liquidation," respectively) which, in relevant part, vested TDI "with title to all of [BHICOT's] property," including its "books, records, [and] documents"; (2) appointed Cantilo & Bennet, L.L.P. as Special Deputy Receiver ("SDR"), to act as Liquidator of BHICOT on behalf of TDI; (3) referred the matter to a Special Master; and (4) issued a Permanent Injunction against BHICOT's agents and affiliates, including BHM (the "Permanent Injunction") which, among other things, required BHM to "promptly surrender [BHICOT's] property to the Liquidator."[10]

Importantly, BHM is not itself the subject of the Liquidation or any other liquidation or receivership proceedings. BHM is subject to the Permanent Injunction and affected by the Liquidation Order as the holder of certain of BHICOT's books and records, which were created and

---

[9] 1 CR 3–18.

[10] 2 CR 316–329 (Liquidation Order); 2 CR 318 (books, records, documents); 2 CR 323 (promptly surrender); 2 CR 331 (appointment of SDR).

maintained by BHM pursuant to its obligations under the MSA, and which books and records are now the property of TDI.[11]

## 3. The Dispute

### A. BHM does not dispute the SDR's entitlement to copies of documents and information belonging or related to BHICOT and in BHM's possession.

BHM has never disputed that documents and information in BHM's possession that are part of the "books and records" of BHICOT or belong to BHICOT are now the property of TDI, or that the SDR is entitled to copies. Hence, following entry of the Permanent Injunction, BHM immediately cooperated with the SDR to make available all such information that was in BHM's possession, and has already produced nearly all that information.[12] Significantly, BHM has consistently cooperated with the SDR, even when the SDR's counsel flew up from Texas to Minnesota, barged into BHM's general counsel's office, and demanded immediate production of the lawyer's laptop and to go through his file cabinets.[13] At the evidentiary hearing, the SDR could not identify

---

[11] 2 CR 321–323.

[12] To date, BHM has provided the SDR with BHICOT's board minutes, accounting records, physical files, claims information, contracts, and targeted e-mails. 3 RR 772, p. 204:9 to 3 RR 773, p. 209:17. This includes BHM having already produced all BHICOT-related e-mail communications with the Centers for Medicare & Medicaid Services ("CMS") and TDI.

[13] 3 RR 765, p. 174:16 to 3 RR 755, p. 180:2.

any specific request that BHM had not complied with or any specific document(s) belonging to BHICOT that had not been produced by BHM.[14]

The scope of the instant dispute is limited to e-mails stored in BHM's integrated e-mail system and responsive to the SDR's requests for (1) "[a]ll records maintained in the Office 365 data suite: SharePoint, OneDrive, and Teams for all BHICOT officers and directors" (the "O&D E-Mails"); and (2) "[a]ll BHICOT related emails from any BHM employee, affiliate, agent or vendor" (the "BHM E-Mails," and together with the O&D E-Mails, the "BHICOT Records").[15]

Again, BHM agrees with the proposition that the SDR is entitled to the BHICOT Records and fully intends to continue to cooperate in the production of these. However, the central issues underlying this Petition are whether the District Court abused its discretion in (1) refusing to mandate an ESI Protocol process outlining the appropriate means and method of identifying and retrieving the BHICOT Records from BHM's integrated e-mail system; and (2) concluding that BHICOT should not bear any of the costs of identifying, retrieving, and producing the

---

[14] 3 RR 738, p. 67:6 to 3 RR 739, p. 73:5 ("I'm not aware of any document they have that I—that should be given to—").
[15] 3 CR 346; 3 CR 398–399.

BHICOT Records, even though the MSA and Texas law require BHICOT to reimburse BHM for these costs.

### B. Consistent with industry standards, BHM, through its employees, provides management and administration services to all its insurance company affiliates.

BHM, through its employees, provided and/or continues to provide management and administration services for all 14 of its affiliated insurers, including BHICOT. These services include having certain BHM's employees serving as officers and/or directors and/or legal advisors of BHICOT which is not uncommon in business generally and in the insurance industry specifically.[16]

Like the employees of many service providers, BHM employees use a single e-mail address to communicate with all BHM clients.[17] This includes BHM employees who provide officer and/or director services and/or legal advice to BHM clients. Thus, in addition to the BHICOT Records, BHM's integrated e-mail system contains a significant number of e-mails and other documents wholly unrelated to BHICOT, including e-mails and documents created and maintained by BHM employees in

---

[16] 3 RR 762, p.162:24–164:1.
[17] 3 RR 767, p.183:13–21.

their capacity as officers and/or directors—i.e., fiduciaries—of, and/or legal advisors to, other insurers affiliated with BHM.[18]

## C. The SDR refused BHM's reasonable requests to confer and identify agreed search terms to facilitate the expeditious and efficient production of the BHICOT Records.

To balance the SDR's right to receive the BHICOT Records with BHM's fiduciary, professional, and contractual obligations to protect the confidentiality and privileged status of e-mails and ESI related to its other non-BHICOT clients, counsel for the SDR and BHM conferred multiple times beginning in late 2023 regarding a process for identifying the BHICOT Records maintained on BHM's integrated e-mail system.[19] In those discussions, BHM proposed utilizing mutually agreed-upon search terms so that both parties would be confident that all BHICOT Records were accurately identified and produced, improving the efficiency and affordability of the process by eliminating the need for additional or repeat searches.[20] BHM's proposed process was consistent with legal protocols concerning the production of electronically stored information ("ESI" and "ESI Protocols") that are well-settled under Texas

---

[18] 3 RR 762 p.162:10–15.
[19] 3 RR 41–60; 3 RR 696–713.
[20] 3 RR 696–699, 702, 704–707, 712–713.

11

law. *See generally In re Weekley Homes, L.P.*, 295 S.W.3d 309 (Tex. 2009) (orig. proceeding).[21]

Despite these initial discussions, for reasons that remain unclear to BHM, the SDR ultimately refused to agree to any search terms or guidelines for identifying the BHICOT Records. The SDR's position—adopted by the Special Master and the District Court—is that if BHM cannot identify easily the BHICOT Records, BHM should produce or allow the SDR access to the entirety of BHM's integrated e-mail system, which contains a multitude of data completely unrelated to BHICOT. According to this view, because BHM has adopted the ubiquitous practice of having its employees use one e-mail address for all client interactions and storing those e-mails on an integrated e-mail system,[22] as permitted by the MSA, any challenges in the process of providing the BHICOT Records should be considered, dismissively, as "BHM's problem."[23]

---

[21] 3 RR 774, p. 210:15–213:13.

[22] 3 RR 767, p. 183:1–23; 3 RR 760, p. 154:12–156:10.

[23] According to the R&R: "In sum, [BHM] created the substantial problem on records we now have notwithstanding its admitted knowledge of the MSA's terms. [BHICOT's] policy holders and creditors do not pay for a situation of [BHM's] own making. The Special Master accordingly recommends that [BHM's] Cross-Motion should be denied." 3 RR 1282.

**D.** **The Special Master and District Court erroneously concluded that the SDR is not required to cooperate with BHM and that BHICOT does not have to bear any of the costs of producing the BHICOT Records.**

Doubling down on its unreasonable refusal to follow standard ESI Protocols or a similar process, on June 28, 2024, the SDR filed its Motion to Enforce Permanent Injunction Against BHM (the "Motion to Enforce").[24] BHM responded on July 12, 2024, and filed a Cross-Motion for Entry of Order Governing Electronically Stored Information (the "ESI Cross-Motion").[25]

An evidentiary hearing was held before the Special Master, Tom Collins, on September 30, 2024.[26] On December 17, 2024, the Special Master issued his Memorandum Recommendation and Report (the "R&R").[27]

---

[24] 3 CR 339–425.

[25] 3 CR 426–459.

[26] 3 RR 721–795.

[27] 3 RR 1261–1285; 3 CR 612–636; Appendix B. Due to clerical oversight, a copy of the R&R was not served on BHM or the SDR. After the deadline to file objections to the R&R had passed, the Special Master submitted the R&R to the District Court, which signed an order adopting and affirming the R&R on January 22, 2025 (the "January Order"). 3 CR 637–638. Due to a separate clerical oversight, neither party was served with or notified of the January Order. Thus, on January 27, 2025, the Special Master issued a supplement to the R&R, extending the deadlines for the parties to file objections to the R&R. 3 CR 637–638.

In relevant part, the R&R concluded that "[t]he SDR is not required to assist [BHM] in its effort to retrieve the [BHICOT Records] off its commingled system that it created for its own economic benefit," and BHM "must now pay for the time and expense required to 'un-commingle' [BHICOT's] separate records and information."[28]

On February 7, 2025, BHM filed objections to the R&R.[29] And on March 25, 2025, the SDR filed a motion to confirm the R&R.[30] BHM subsequently filed a motion to reject the R&R and requested a de novo hearing in front of the District Court.[31]

The District Court conducted a de novo hearing on April 16, 2025.[32] On May 6, 2025, the District Court signed an order adopting and affirming the R&R without modification.[33] BHM timely filed a notice of appeal on May 16, 2025.[34]

---

[28] 3 RR 1281; 3 CR 632.
[29] 3 CR 639–650.
[30] 3 CR 652–661.
[31] 3 CR 735–748.
[32] 2 RR 1–64.
[33] 4 CR 1705–1708; Appendix A. The order is titled, "Order Granting Special Deputy Receiver's Motion to Confirm Special Master's Recommendation and for Entry of Order Granting the Motion to Enforce Permanent Injunction Against Bright Health Management, Inc.," and will hereafter be referred to as the "Enforcement Order."
[34] 4 CR 1710–1714. As it is not entirely clear whether BHM's appellate remedies are through a direct appeal or an original proceeding, BHM has filed both.

14

## SUMMARY OF ARGUMENT

The District Court abused its discretion in refusing to apply guidelines akin to the polestars of ESI production—protocols and proportionality—which are central to Texas jurisprudence and necessary to protect BHM's rights and interests as a non-party to the Liquidation. This abuse of discretion was compounded by the District Court's refusal to make BHICOT bear any of the cost of this massive ESI production request in contravention of the terms of the MSA and Texas law.

## ARGUMENT AND AUTHORITIES

Mandamus relief is appropriate when the petitioner establishes that (1) the "trial court clearly abuse[d] its discretion;" and (2) "there is no adequate remedy on appeal." *In re Ford Motor Co.*, 988 S.W.2d 714, 718 (Tex. 1998) (orig. proceeding) (citing *Walker v. Packer*, 827 S.W.2d 833, 840–44 (Tex. 1992)).

Even under the abuse of discretion standard, a trial court has no discretion to misapply the law, and thus legal determinations are reviewed de novo. *Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224, *25 (Tex. May 30, 2025) quoting *Tex. Educ. Agency v. Houston ISD*, 660 S.W.3d 108, 116 (Tex. 2023).

15

Mandamus relief is appropriate "when the trial court compels production beyond the permissible bounds of discovery." *In re Weekley Homes*, 295 S.W.3d 309, 322 (Tex. 2009) (orig. proceeding). "The scope of discovery is generally within the trial court's discretion, but the court 'must make an effort to impose reasonable discovery limits.'" *In re State Farm Lloyds*, 520 S.W.3d 595, 604 (Tex. 2017) (orig. proceeding) (quoting *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003) (orig. proceeding) (per curiam)). "Intrusive discovery measures"—like ordering a party to produce all its electronically stored files, irrespective of their relevance— "require[s], at minimum, that the benefits of the discovery measure outweigh the burden imposed upon the discovered party." *See Weekley Homes*, 295 S.W.3d at 322; *In re Shipman*, 540 S.W.3d 562, 570 (Tex. 2018) (orig. proceeding) (per curiam).

Orders compelling production of information without following the procedure outlined in *Weekley Homes* have routinely been found to constitute an abuse of discretion. *See, e.g., In re Raizada*, No. 14-23-00941-CV, 2024 WL 178140, at *5 (Tex. App.—Houston [14th Dist.] Jan. 17, 2024, orig. proceeding) (per curiam) (mem. op.) (finding trial court abused its discretion by ordering production of cell phone for inspection

16

"without providing any mechanism through which [relator] can withhold from discovery any documents or information that is privileged or confidential and by failing to consider less intrusive means") (internal citations omitted); *Shipman*, 540 S.W.3d at 570 (finding that real party in interest's "skepticism about [relator's] production of the relevant records" did not justify trial court's "extraordinarily intrusive order" requiring production of all of relator's "electronically stored files of every kind, whether business or personal, and regardless of whether they are related to the issues in the lawsuit").

Further, mandamus relief is commonly granted when a non-party, like BHM, is ordered to produce information that is not material to the underlying dispute and/or overly broad in scope. *See, e.g., Russell v. Young*, 452 S.W.2d 434, 435 (Tex. 1970) (directing trial court to vacate order requiring non-party potential witness to produce private financial records not directly related to the subject matter of the underlying suit); *Ford Motor Co.*, 427 S.W.3d at 397–98 (granting mandamus relief from trial court order requiring non-party expert witnesses to produce "detailed financial and business information for **all** cases" the witnesses handled for Ford over a 12-year period) (emphasis added); *In re Contract*

*Freighters, Inc.*, 646 S.W.3d 810, 815 (Tex. 2022) (orig. proceeding) (per curiam) (granting mandamus relief from trial court order requiring non-party regulatory body to conduct a nationwide search of collision records over a 5-year period and produce documents related to same); *In re UPS Ground Freight, Inc.*, 646 S.W.3d 828, 832–33 (Tex. 2022) (orig. proceeding) (per curiam) (granting mandamus relief from trial court order requiring production of confidential drug-test records of non-party UPS employees with no alleged involvement in the accident that precipitated the underlying suit).

1. **The District Court abused its discretion in denying BHM's ESI Cross-Motion and confirming the R&R, giving the SDR unfettered access to records and information beyond the BHICOT Records.**

The primary issue in this Petition is whether the legal principles underlying Texas' well-established and robust ESI jurisprudence and protocol apply to a court-appointed receiver's requests to a non-party to an insurance company receivership for books and records related to the insurer in receivership. For the reasons below, these principles do apply, and the District Court abused its discretion in finding otherwise.

18

**A.** **The fact that the SDR's request for the BHICOT Records is pursuant to the Texas Insurance Receivership Act does not override the constraints generally applicable to discovery requests made to a non-party in civil litigation.**

BHM has never disputed the legal bases for the SDR's entitlement to the BHICOT Records. Rather, BHM's contention is that the nature of the underlying proceeding—an insurance company receivership—does not somehow give the SDR *carte blanche* to sort through all the records and information unrelated to BHICOT that BHM maintains on its integrated e-mail system, nor does it negate the well-established principles of relevance and reasonableness that govern document requests or other procedural controls germane to the discovery process. *See ACP Ins. Intermediate, LLC v. Cantilo & Bennet, LLP*, No. 03-19-00724-CV, 2021 WL 2273460, at \*4 (Tex. App.—Austin June 4, 2021, no pet.) (mem. op.) ("The fact that [an] SDR's lawsuit was 'related' to a delinquent insurer that was in receivership does not, however, eliminate the requirement" to comply with "state and federal due process requirements.").

As the Fifth Circuit has explained, "[n]either a receiver's nor a receivership court's power is unlimited." *S.E.C. v. Stanford Int'l Bank,*

*Ltd,* 927 F.3d 830, 840 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2567 (2020) (citing *Whitcomb v. Chavis*, 403 U.S. 124, 161, 91 S. Ct. 1858, 1878, 29 L.Ed.2d 363 (1971) ("The remedial powers of an equity court must be adequate to the task, but they are not unlimited.")). Rather, "[a] receiver is an officer of the court, the medium through which the court acts." *Goin v. Crump*, No. 05-18-00307-CV, 2020 WL 90919, *10 (Tex. App.—Dallas Jan. 8, 2020, no pet.) (mem. op.) (internal quotations omitted). Thus, the SDR's privilege to serve and conduct activities is necessarily constrained and limited by the delegation provided to the SDR in the order of appointment and all applicable law, including the U.S. and Texas Constitutions. *See, e.g., Embark Holdco Mgmt., LLC v. Cantilo & Bennett, L.L.P.*, No. 03-19-00721-CV, 2021 WL 1010950, *1, *6–7 (Tex. App.—Austin Mar. 17, 2021, no pet.) (mem. op.) (dismissing SDR's claims against non-resident defendant because of the lack of minimum contacts to confer constitutionally permissible personal jurisdiction complying with due process); *ACP Ins. Intermediate*, 2021 WL 2273460, at *7 (same).

Here, the **only reason** the SDR has a right to even ask BHM to spend hundreds of thousands of dollars parsing through millions of pages

20

of electronic files to look for potentially responsive ESI "related to BHICOT" is because a district court presiding over civil litigation initiated by TDI issued orders that placed BHICOT in liquidation, and later receivership. Consequently, the SDR's request for the BHICOT Records on BHM's integrated e-mail system, and the District Court's Order requiring BHM to identify and produce same, cannot be completely untethered from the discovery procedures generally applicable to civil litigation.

### B.   Proportionality and reasonableness are polestars in litigation discovery, including the production of ESI.

The Enforcement Order requires BHM to produce to the SDR "all business records in the possession or control of BHM that refer to or relate to, in any manner to [sic] BHICOT," excluding documents "BHM withholds . . . based on an assertion of privilege."[35] This directive mirrors Texas law on the general scope of permissible discovery, which permits a party to "obtain discovery regarding any matter that **is not privileged** and **is relevant** to the subject matter of the pending action." TEX. R. CIV. P. 192.3(a) (emphasis added). Given this similarity, in the absence of any

---

[35] 4 CR 1707–1708, Appendix A.

specific contrary guidelines for production in the Texas Insurance Receivership Act ("TIRA"),[36] Texas legal precedent governing discovery is highly relevant and should control.

By denying BHM's ESI Cross-Motion and providing the SDR *carte blanche* access to all records on BHM's integrated e-mail system, the District Court completely disregarded proportionality and reasonableness—the polestars of all discovery, including the court-compelled production of ESI. *See In re State Farm Lloyds*, 520 S.W.3d at 599 (explaining it is well-settled that in Texas, "all discovery is subject to the proportionality overlay embedded in our discovery rules and inherent in the reasonableness standard to which our electronic-discovery rule is tethered."). These guardrails ensure that all discovery serves its intended purpose, which is "obtaining a just, fair, equitable and impartial adjudication for the litigants with as great expedition and dispatch at the least expense as may be practicable." *Id.* (internal alterations omitted) (quoting TEX. R. CIV. P. 1).

Over 15 years ago, the Texas Supreme Court held that with respect to ESI, the principles of reasonableness and proportionality require

---

[36] TEX. INS. CODE §§ 443.001–.402.

application of a reasonable ESI Protocol. *See Weekley Homes*, 295 S.W.3d at 314–23 (detailing the protocols applicable to ESI discovery). As the Court explained in *Weekley Homes*, providing full access to all ESI maintained by a party "is particularly intrusive and should be generally discouraged, just as permitting open access to a party's file cabinets for general perusal would be." *Id.* at 317. Here, the SDR quite literally sought open access to BHM's file cabinets.[37] Thus, if the Liquidation were "normal" civil litigation, there would be no good-faith basis for denying BHM's request that a reasonable ESI Protocol be implemented with respect to whatever BHICOT-related information the SDR may seek from BHM's integrated e-mail system.

### C. As a non-party to the receivership, Texas discovery jurisprudence provides BHM the right to protect its own interests and documents.

Apart from the Texas Supreme Court's extensive and explicit guidelines for ESI production, the Court has been equally clear that proportionality dictates that courts "must protect" non-parties to litigation "from undue burden or expense in answering [discovery]." *See In re K & L Auto Crushers, LLC*, 627 S.W.3d 239, 252 (Tex. 2021) (orig.

---

[37] 3 RR 765, p. 174:16 to 3 RR 755, p. 180:2.

proceeding). This means that there is no automatic entitlement to "all communications or all documents" possessed by a third party that are or might be "tangentially related" to the underlying claims. *Id.* at 251. Rather, "[p]roportionality must control the extent to which [any] relevant information [is] discoverable." *Id.* "To put it succinctly, the simple fact that requested information is discoverable . . . does not mean that discovery must be had." *In re State Farm Lloyds*, 520 S.W.3d at 609, 612–15.

Adherence to the tenet of proportionality with respect to non-party production demands that orders compelling production of ESI "contain provisions to protect the responding party's privacy and privileges, as well as the confidentiality of non-responsive information." *In re 4X Indus., LLC*, 683 S.W.3d 916, 926 (Tex. App.—Houston [14th Dist.] 2024, orig. proceeding) (citing *Weekley Homes*, 295 S.W.3d at 318–19); *see also In re Pinnacle Eng'g, Inc.*, 405 S.W.3d 835, 846 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding). Further, the trial court must consider whether less intrusive means of production would suffice. *See Weekley Homes*, 295 S.W.3d at 318–19; *In re Methodist Primary Care Grp.*, 553 S.W.3d 709, 720 (Tex. App.—Houston [14th Dist.] 2018, orig. proceeding).

Here, while subject to the Permanent Injunction, BHM and its non-BHICOT affiliates are not parties to the Liquidation. The SDR has not disputed or presented evidence controverting BHM's unequivocal testimony and evidence that its integrated e-mail system contains ESI wholly unrelated to BHICOT, some of which is confidential and/or legally privileged, and belongs solely to BHM and/or the non-BHICOT affiliates.[38] Indeed, as established at the evidentiary hearing before the Special Master, BHM's initial search of its integrated e-mail system for records for BHICOT's officers and directors, limited by the terms "Texas," "TX," and Tex.," returned over 61,000 documents.[39] A cursory review of those documents identified numerous non-responsive documents belonging to BHM or the non-BHICOT affiliates, including privileged and confidential information and protected health information ("PHI").[40]

Even the SDR acknowledges that it should not have access to the privileged and confidential documents belonging to BHM and the non-

---

[38] 3 RR 717–719 (Exhibit 10, Privilege Log from sample search, a copy of which is also attached at Appendix H); 4 CR 1694–1695; 3 RR 770, p. 196:24 to 3 RR 771, p. 201:4; 3 RR 772, p. 202:7–204:8. *See also* 3 RR 762, p. 162:10–23; 3 RR 769, p. 192:2 to 3 RR 770, p. 194:18.

[39] 3 RR 696–697; 3 RR 670; Appendix G.

[40] 3 RR 717–719 (Exhibit 10, Privilege Log from sample search, a copy of which is also attached at Appendix H); 4 CR 1694–1695; 3 RR 770, p. 196:24 to 3 RR 771, p. 201:4; 3 RR 772, p. 202:7–204:8. *See also* 3 RR 762, p. 162:10–23; 3 RR 769, p. 192:2 to 3 RR 770, p. 194:18.

BHICOT affiliates, conceding at the evidentiary hearing that BHM should be able to withhold that unrelated ESI.[41] Under these circumstances, the District Court abused its discretion in not providing relief to BHM in the form of an ESI Protocol consistent with Texas law.

**D. The fact that BHM digitally stored BHICOT-related documents and information alongside documents and information for BHM's other clients does not eliminate the applicability of Texas discovery constraints.**

In the Enforcement Order, the District Court approved the R&R's opinion that because BHM "made the decision to set up a single electronic system for the numerous companies it operated, . . . [t]he SDR is not required to assist [BHM] in its effort to retrieve the documents and information off its commingled system that [BHM] created for its own economic benefit."[42] The Order further reasons that the application of ESI Protocols is unnecessary because the review of the information stored on BHM's integrated e-mail system "is to protect and benefit [BHM], and not [BHICOT]."[43] Consequently, the SDR can "voluntarily" agree to ESI Protocols, but has "no duty . . . at all to do so."[44]

---

[41] 3 RR 744, p. 90:23–92:19.
[42] 3 CR 632; Appendix B.
[43] *Id.*
[44] *Id.*

26

As an initial matter, the primary purpose of Texas' discovery protections, including ESI Protocols, is to protect the producing party. *See, e.g.*, *K & L Auto Crushers, LLC*, 627 S.W.3d at 252. Second, the District Court's statement that BHM used an integrated e-mail system "for its own economic benefit" ignores that the "economic benefit" associated with an integrated system was and continues to be realized by *BHICOT* and is part of *BHICOT's* "benefit of the bargain" under the MSA.

The MSA contemplates and embodies a shared-services arrangement. By sharing services—including electronic storage systems—with its affiliates, BHICOT enjoys lower operating costs due to the economies of scale created by this type of arrangement. If BHICOT maintained its own separate employees and electronic storage system, or demanded BHM do the same for all BHICOT-related tasks and communications, it is *BHICOT*, *not BHM*, that would incur the cost of separate maintenance. Accordingly, it is completely inaccurate to say that BHM used an integrated e-mail system for its own benefit, and completely inappropriate to essentially conclude that BHM should be subject to discovery sanctions for utilizing such a system.

27

Lastly, and perhaps most importantly, the idea that an entity's decision to utilize a single digital repository for all its clients' documents and information vitiates any privilege or other legal shield from disclosure with respect to that information would have profound implications for not only Texas discovery jurisprudence, but also general principles of confidentiality, data privacy and security, and even attorney-client privilege. For example, under the District Court's reasoning, every lawyer utilizing e-mail would forever waive the privilege of each of their clients because multiple client e-mails are stored in one e-mail account. This outcome would be both ludicrous and contrary to supreme court precedent. *See, e.g., In re CI Host, Inc.*, 92 S.W.3d 514, 517 (Tex. 2002) (orig. proceeding) (explaining the supreme court was "loath to allow [producing party] to unilaterally waive its customers' privacy rights by its failing to adhere to the discovery rules").

At the evidentiary hearing, Jeff Craig, a licensed attorney having worked at several large corporations and in private practice as a transactional attorney at Gibson Dunn, testified unequivocally that maintaining one e-mail account and an integrated e-mail system is common in the corporate world, and that in this specific instance, there

28

is clearly ESI that is completely unrelated to BHICOT on BHM's integrated e-mail system.[45]

BHM acknowledges that on its face, the Enforcement Order correctly holds that BHM did not waive any privileges by "commingling" its clients' records "in electronic storage."[46] But the District Court's refusal to implement any procedural safeguards in connection with the identification and production of the BHICOT Records effectively makes that pronouncement precatory and is thus an abuse of discretion.

### E. This Court should protect BHM's right to be free from burdensome and intrusive discovery requests and require the District Court to issue an order applying ESI Protocols to the SDR's request for the BHICOT Records.

Like any entity or person that exceeds or improperly wields its authority, the SDR's conduct always remains subject to judicial and other review. *See, e.g.*, *WC 4th & Colo., LP v. Colo. Third St.*, No. 03-22-00781-CV, 2024 WL 3841676, *4 (Tex. App.—Austin Aug. 15, 2024, pet. denied) (mem. op.) (trial court's order allegedly in contravention of limitations of receiver's authority reviewed for abuse of discretion). And no matter how worthy or benign the articulated purposes for an exercise of power and

---

[45] 3 RR 760, p. 154:12–156:10; 3 RR 767, p. 183:1–23; 3 RR 762, p.162:10–23.
[46] 3 CR 627–628 (also at Appendix B) incorporated by 4 CR 1705–1708 (also at Appendix A).

authority may be, such exercise must be circumscribed by the applicable legal limits. *See, e.g., Rich v. Cantilo & Bennett, L.L.P.*, 492 S.W.3d 755, 762 (Tex. App.—Austin 2016, pet. denied) (applying different analyses to "actions belonging solely to the Receiver in its representative capacity" and "actions accruing independently of the Receiver's appointment and arising under" an agreement between the insurer in receivership and a third-party service provider).[47]

The Enforcement Order's requirement that BHM single-handedly identify and produce every piece of information on its integrated e-mail system that is or may be "related to BHICOT" is reminiscent of a bygone era in the Texas civil justice system where "trial by discovery" or pressuring parties to pay money or do other things because of the onerous financial burdens of complying with court orders was far too common. *See, e.g., Texaco, Inc. v. Sanderson*, 898 S.W.2d 813, 815 (Tex. 1995) (per curiam).[48] Modern Texas jurisprudence recognizes and embraces the

---

[47] In fact, just last year the Austin Court of Appeals issued an opinion reigning in the overreaching acts of a court-appointed receiver. *See WC 4th and Colo., LP*, 2024 WL 3841676, at *1 ("Because we hold that, on this record, the receiver exceeded his authority, we reverse the challenged orders and remand this cause for further proceedings.").

[48] In *Texaco*, the trial court issued an order compelling production of "all documents written" by defendant's corporate safety director, even though the defendant had already produced 2,500 pages of documents actually relevant to the plaintiffs' claims. In granting mandamus relief, the court explained that the compelled discovery was "well outside the bounds of proper discovery" and

realities of the digital age, providing for reasonable limitations and procedures to ensure relevant ESI is made available while still protecting the legitimate interests of the producing party from undue burden or risking the disclosure of confidential, privileged, or other information outside the scope of what should be produced.

The District Court abused its discretion in denying BHM's ESI Cross-Motion and failing to apply well-established ESI Protocols, or any discovery constraints, to the SDR's demand for all BHICOT-related documents and information on BHM's integrated e-mail system. Therefore, BHM respectfully requests that this Court issue a write of mandamus directing the District Court to apply reasonable ESI Protocols.

**2. The District Court further abused its discretion in denying BHM its contractual and statutory right to reimbursement from BHICOT for the cost of identifying and producing the BHICOT Records.**

In addition to abusing its discretion in finding that Texas' well-established and robust ESI jurisprudence and ESI Protocols do not apply to the SDR's request for the BHICOT Records, the District Court further

---

"not merely an impermissible fishing expedition; [but] an effort to dredge the lake in hopes of finding a fish."

abused its discretion in concluding that BHM's utilization of an integrated e-mail system deprived BHM of its contractual and statutory entitlement to reimbursement from BHICOT for the cost of identifying and producing the BHICOT Records.

**A. The fact that BHM digitally stored BHICOT-related documents and information alongside documents and information for BHM's other clients does not relieve BHICOT of its contractual and statutory obligation to reimburse BHM for the cost of identifying and producing the BHICOT Records.**

In the Enforcement Order, the District Court did not even consider whether the MSA or Texas law related to non-party production requests require BHICOT to reimburse BHM for the reasonable cost of identifying and producing the BHICOT Records.[49] Rather, the District Court simply adopted the R&R's conclusions that, "[w]hether common in the industry or not, [BHM] created and benefitted financially by the single electronic system it created," and thus "it must now pay for the time and expense

---

[49] The Enforcement Order states that "no provision of the Permanent Injunction or the Texas Insurance Code entitles [BHM] to be reimbursed for the cost of searching for and separating" the BHICOT Records. 3 RR 633 (Appendix B) incorporated by 4 CR 1705–1708 (Appendix A). But BHM has never argued that its right to reimbursement stems from the Permanent Injunction or the Insurance Code.

32

required to 'un-commingle'" the BHICOT Records from any other information maintained by BHM.[50]

As discussed in Section 1(D), *supra*, it is *BHICOT* that "benefitted financially" from BHM's integrated e-mail system. By sharing services—including electronic storage systems—with its affiliates, *BHICOT* enjoyed a lower management fee due to the economies of scale created by such an arrangement. If BHICOT maintained its own separate employees and electronic storage system, or demanded BHM do the same for all BHICOT-related tasks and communications, it is *BHICOT*, *not BHM*, that would incur the cost of such separate maintenance. Accordingly, it is completely inaccurate to say that BHM used an integrated e-mail system for its own financial benefit or that the system was "a situation of [BHM's] own making,"[51] and completely inappropriate to essentially conclude that BHM should be subject to discovery sanctions for utilizing such a system.

Moreover, the idea that an entity's decision to utilize a single digital repository for all its clients' documents and information abrogates any

---

[50] 3 RR 614, 633 (Appendix B) incorporated by 4 CR 1705–1708 (Appendix A).
[51] *Id.*

contractual or statutory right to reimbursement is unsupported by law and contrary to the right to contract embodied in both the U.S. and Texas Constitutions.

## B. The MSA requires BHICOT to reimburse BHM for all costs associated with identifying and producing the BHICOT Records.

"As a general rule, parties in Texas may contract as they wish so long as the agreement reached does not violate positive law or offend public policy." *Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 475 (Tex. 2016). Here, the MSA reflects BHICOT's and BHM's express agreement that BHICOT is required to pay for BHM's "actual cost to provide services" under the MSA, with the requirement to adjust the fees payable to BHM under the MSA to the extent costs exceed the fee (the "Actual Cost Provision").[52] The MSA further provides that BHM will defend, at *BHICOT's* expense, any legal or administrative proceedings brought by or against *BHICOT* (the "Defense Provision").[53]

The Enforcement Order suggests that the District Court's refusal to consider the effect of the Actual Cost and Defense Provisions was appropriate because BHICOT's policyholders should "not pay for a

---

[52] 3 RR 630; Appendix C.
[53] 3 RR 635; Appendix C.

situation of [BHM's] own making."[54] Nothing in the TIRA or Texas insurance laws and regulations forbade BHICOT from agreeing to the Actual Cost or Defense Provisions. To the contrary, if TDI considered these Provisions or any other provisions in the MSA to be detrimental to BHICOT's policyholders or otherwise prohibited, unfair, inequitable, or unreasonable, TDI could have simply disapproved BHICOT's Form D filing for the MSA on any of those bases. *See* TEX. INS. CODE § 823.106(a) (allowing TDI to disapprove a Form D filing for an affiliate transaction if the transaction (1) isn't fair, equitable, or reasonable as required by TEX. INS. CODE § 823.101; or (2) would "adversely affect the interest of the insurer's policyholders").

## C. Texas law requires BHICOT to reimburse BHM for all costs associated with identifying and producing the BHICOT Records.

Texas law applicable to the production of information requested from non-parties provides an additional and separate basis for BHICOT's obligation to reimburse BHM for the cost of identifying and producing the BHICOT Records. Specifically, when a production request implicates the rights of non-parties, the default under Texas law is that the requesting

---

[54] 3 RR 614, 633 (Appendix B) incorporated by 4 CR 1705–1708 (Appendix A).

35

party bears the burden of reimbursing the non-party for the reasonable costs of production.

This burden is expressly embodied in the Texas Rules of Civil Procedure, which require that "[a] party requiring production of documents by a nonparty **must** reimburse the nonparty's reasonable costs of production," TEX. R. CIV. P. 205.3(f) (emphasis added), and that an attorney to take "reasonable steps to avoid imposing undue burden or expense on a person served" with a subpoena and permits the Court to impose "reasonable conditions on compliance," including compensating the non-party. TEX. R. CIV. P. 176.7. *See also Wichita Cnty. v. Env't Eng'g & Geotechnics, Inc.*, 576 S.W.3d 851, 867 (Tex. App.—Austin 2019, no pet.) (affirming County obligated to reimburse non-party for substantiated portion of reasonable costs incurred by non-party in producing documents responsive to County's subpoena). Consistent with these laws, Texas courts routinely protect non-party interests in the context of discovery. *See, e.g., In re Eurecat US, Inc.*, 425 S.W.3d 577, 583 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding) (court denied mandamus petition seeking third-party discovery, explaining "it is unclear from the record before the trial court precisely what Eurecat's

36

discovery from [89] other businesses is intended to prove, and Eurecat has not clearly established that other discovery is unavailable to support its claims and defenses.").Ordering BHM to comply with the SDR's demand for all BHICOT-related documents and information on BHM's integrated e-mail system—knowing that the complete absence of any ESI Protocols may result in BHM producing non-BHICOT privileged documents, documents for other entities, and BHM internal documents— is not reasonable.[55] The SDR's insistence upon a document-by-document review—instead of using search parameters pursuant to a reasonable ESI Protocol—will exponentially increase the cost to review, and delay the production of, the BHICOT Records. As this meticulous review is necessitated by the SDR's patent refusal to cooperate and agree to reasonable ESI Protocols in a thinly veiled attempt to obtain full access to the entirety of BHM's integrated e-mail system, all costs associated with the review should be borne by BHICOT.

---

[55] In the R&R, the Special Master expressly acknowledged the validity of BHM's concerns underlying its request for the application of ESI Protocols. 3 RR 632 ("BHM **understandably** seeks to protect from disclosure information and documents on its system that do not relate to [BHICOT] and/or [are] covered by an asserted privilege(s) that applies to a company other than [BHICOT].") (emphasis added).

**D. This Court must require BHICOT to comply with its obligations under the MSA and Texas law to reimburse BHM for the reasonable cost of identifying and producing the BHICOT Records.**

Based on the above, as required by both the MSA and Texas law, BHICOT should reimburse BHM for all reasonable costs associated with identifying and producing the BHICOT Records. This is especially true considering the SDR's insistence that BHM conduct a document-by-document review and refusal to agree to search parameters, both of which will only increase the cost to BHM for identifying, and delay the production of, the BHICOT Records.

Accordingly, BHM respectfully requests that this Court issue a writ of mandamus providing the District Court with instructions that BHM receive reimbursement from BHICOT for all—or at least some—of the reasonable costs associated with identifying and producing the BHICOT Records, whether this Court ultimately requires that the identification and production be made pursuant to an ESI Protocol.

## PRAYER

This Court should issue a writ of mandamus directing the District Court to vacate the Enforcement Order and provide instructions for application of reasonable ESI Protocols and that BHM receive reimbursement from BHICOT for all—or at least some—of the reasonable costs associated with identifying and producing the BHICOT Records.

Respectfully submitted,

*/s/ Carlos R. Soltero*
Carlos R. Soltero
csoltero@maynardnexsen.com
State Bar No. 00791702
Brytne D. Kitchin
bkitchin@maynardnexsen.com
State Bar No. 24079973
Lisa Poole Alcantar
lalcantar@maynardnexsen.com
State Bar No. 24069284
**MAYNARD NEXSEN PC**
2500 Bee Caves Road
Bldg. 1, Suite 150
Austin, Texas 78746

**Attorneys for Relator**

## RULE 52.3(j) CERTIFICATION

I certify that I have reviewed the foregoing Petition for Writ of Mandamus and concluded that every factual statement is supported by competent evidence included in the clerk's and reporter's records.

/s/ Carlos R. Soltero
Carlos R. Soltero

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of TEX. R. APP. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. The document further complies with the word-count limitation in TEX. R. APP. P. 9.4(i) because it contains 7,078 words, excluding any parts exempted by TEX. R. APP. P. 9.4(i)(1).

*/s/ Carlos R. Soltero*
Carlos R. Soltero

## CERTIFICATE OF SERVICE

I certify that on June 20, 2025, a true and correct copy of the foregoing instrument was served on all counsel of record in accordance with the Texas Rules of Appellate Procedure.

*/s/ Carlos R. Soltero*
Carlos R. Soltero

## VERIFICATION/MANDAMUS CERTITFICATION

My name is Carlos R. Soltero, my date of birth is December 27, 1969, and my address is 2500 Bee Caves Road, Building 1, Suite 150, Austin, Texas 78746. I am counsel of record for Relator. Because there is already both a robust Clerk's Record ("CR") and Reporter's Record ("RR") in the related appeal, and for simplicity and consistency, Relator hereby adopts those records from the related appeal filed under case number 15-25-00092-CV with this Court on the same day. Accordingly, the CR and RR cites should be identical in both submissions.

Pursuant to Texas Rule of Appellate Procedure 52.3(j), I certify that I have reviewed this petition and that every factual statement in the petition is supported by competent evidence included in the appendix, the Clerk's Record, or the Reporter's Record in the related appeal. Pursuant to Rule 52.3(k)(1)(A), I certify and declare that every document contained in the appendix is a true and correct copy.

Executed in Travis County, State of Texas, on June 20, 2025.

*Carlos R. Soltero*

Carlos R. Soltero

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Lauren Feldott on behalf of Carlos Ramon Soltero
Bar No. 791702
lfeldott@maynardnexsen.com
Envelope ID: 102263600
Filing Code Description: Original Proceeding Petition
Filing Description: Petition for Writ of Mandamus
Status as of 6/20/2025 5:17 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jane M. Webre | 21050060 | jwebre@scottdoug.com | 6/20/2025 4:46:31 PM | SENT |
| Christopher Fuller | 7515500 | cfuller@fullerlaw.org | 6/20/2025 4:46:31 PM | SENT |
| Gregory Pierce | 15994250 | gpierce@gpiercelaw.com | 6/20/2025 4:46:31 PM | SENT |
| Carlos R.Soltero | | CSoltero@MaynardNexsen.com | 6/20/2025 4:46:31 PM | SENT |
| Max Mendel | | mmendel@maynardnexsen.com | 6/20/2025 4:46:31 PM | SENT |
| Lauren Feldott | | lfeldott@maynardnexsen.com | 6/20/2025 4:46:31 PM | SENT |
| Barbara Chapman | | BChapman@maynardnexsen.com | 6/20/2025 4:46:31 PM | SENT |

NO. _____

IN THE COURT OF APPEALS
FOR THE FIFTEENTH JUDICIAL DISTRICT
AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
6/20/2025 4:46:31 PM
CHRISTOPHER A. PRINE
Clerk

IN RE BRIGHT HEALTH MANAGEMENT, INC.

*Relator.*

Original Proceeding Arising from the
455th Judicial District Court,
Travis County, Texas
Cause No. D-1-GN-23-008361
The Honorable Catherine Mauzy, Presiding

## APPENDIX
## TO
## PETITION FOR WRIT OF MANDAMUS

Carlos R. Soltero
csoltero@maynardnexsen.com
State Bar No. 00791702
Brytne D. Kitchin
bkitchin@maynardnexsen.com
State Bar No. 24079973
Lisa Poole Alcantar
lalcantar@maynardnexsen.com
State Bar No. 24069284
**MAYNARD NEXSEN**
2500 Bee Caves Road
Bldg. 1, Suite 150
Austin, Texas 78746

**Attorneys for Relator**

This Appendix is submitted in accordance with Tex. R. App. P. 52.3(k)

# CERTIFICATE OF SERVICE

I certify that on June 20, 2025, a true and correct copy of the foregoing instrument was served on all counsel of record in accordance with the Texas Rules of Appellate Procedure.

/s/ *Carlos R. Soltero*
Carlos R. Soltero


# TABLE OF CONTENTS

**Judge Mauzy's Order**................................................................................A
**Special Master's Report and Recommendation** ................................... B
**Master Services Agreement** ................................................................ C
**Bright Health Group's Organizational Chart**....................................... D
**NAIC Model Law 440 (2021)** .............................................................. E
**NAIC Model Regulation 450 (2021)**.................................................... F
**Nextra Summary of Search Results**.................................................... G
*In re Weekley Homes, L.P.*, **295 S.W.3d 309 (Tex. 2009)** .......................H
**Compilation of Statutes, Regulations, and Rules** .................................I

**TAB A:**
**Judge Mauzy's Order**
**4 CR 1705–1708**

CAUSE NO. D-1-GN-23-008361

| THE TEXAS DEPARTMENT OF | § | IN THE DISTRICT COURT OF |
| INSURANCE, | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| BRIGHT HEALTHCARE INSURANCE | § | |
| COMPANY OF TEXAS | § | |
| *Defendant.* | § | 455th JUDICIAL DISTRICT |

**ORDER GRANTING SPECIAL DEPUTY RECEIVER'S MOTION TO CONFIRM SPECIAL MASTER'S RECOMMENDATION AND FOR ENTRY OF ORDER GRANTING THE MOTION TO ENFORCE PERMANENT INJUNCTION AGAINST BRIGHT HEALTH MANAGEMENT, INC.**

The Court heard the *Motion to Confirm Special Master's Recommendation and for Entry of Order Granting the SDR's Motion to Enforce Permanent Injunction Against Bright Health Management, Inc.* (the " SDR Motion to Confirm") filed by CANTILO & BENNETT, L.L.P., Special Deputy Receiver of Bright Healthcare Insurance Company of Texas (the "SDR" and "BHICOT," respectively) and the Motion to Reject Special Master's Recommendations, For Entry of a Reasonable ESI Order, and For a Trial De Novo ("BHM Motion to Reject") and Objections to the Memorandum Recommendation and Report of Special Master (the "BHM Objections") both filed by Respondent Bright Health Management, Inc. ("BHM"). The SDR appeared by and through its counsel. BHM appeared by and through its counsel. When called for hearing, the parties announced ready.

On June 28, 2024, the SDR filed its *Motion to Enforce Permanent Injunction Against Bright Health Management, Inc.* (the "Motion to Enforce"). On July 12, 2024, BHM filed its *Objection and Response to Motion to Enforce Permanent Injunction Against Bright Health*

*Management, Inc. and Cross-Motion for Entry of Order Governing Electronically Stored Information* ("BHM Response and ESI Cross-Motion*").*

The Motion to Enforce was submitted to the Special Master appointed in this cause in accordance with the Order of Reference to Master ("Order of Reference"). The Special Master issued a *Memorandum Recommendation and Report of Special Master Regarding Special Deputy Receiver's Motions to Enforce Permanent Injunction Against Bright Health Management, Inc. and to Strike the Testimony of Angela O'Neal and Bright Health Management, Inc.'s Cross Motion for Entry of Order Governing Electronically Stored Information* (the "Special Master's Recommendation") under Rule 171 of the Texas Rules of Civil Procedure, which is incorporated.

The Court admits into evidence the Special Master's Recommendation, all exhibits admitted into evidence by the Special Master at the hearing on the SDR's Motion to Enforce and BHM's Objections and ESI Cross Motion and the transcript of the hearing.

Having considered the pleadings, the evidence, the exhibits, the arguments of counsel, the Special Master's Recommendation, and the applicable law, the Court finds that the SDR Motion to Confirm should be granted, the BHM Motion to Reject and BHM Objections should be denied, and the SDR's Motion to Enforce should be granted as set forth in the Special Master's Recommendation and hereby issues this Order.

All capitalized terms used herein shall have the same meaning as used in the SDR Motion to Enforce.

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** as follows:

1.      The Master's Recommendation is CONFIRMED;



2.      The SDR's Motion to Enforce against BHM is GRANTED;

3.      BHM's Motion to Reject is DENIED;

4. BHM's Objections are DENIED;

5. The Court orders that the term "BHICOT books and records" shall mean all business records in the possession or control of BHM that refer to or relate to, in any manner to BHICOT, including but not limited to emails;

6. BHM shall produce all BHICOT books and records to the SDR without expense to the SDR within ninety (90) days, including but not limited to, the following specific items or categories of materials:

   a. All BHICOT related emails to or from BHICOT officers and directors Jeff Craig, Jay Matushak, Eric Halverson, and Jeff Scherman;

   b. All records maintained in the Office 365 data suite: SharePoint, OneDrive, and Teams for all BHICOT officers and directors;

   c. All BHICOT related emails from any BHM employee, affiliate, agent, or vendor;

   d. All books and records relating to all debts owed to BHICOT by BMH affiliate, Neuehealth Partners Texas RBE, LLC;

   e. All books and records relating to all debts owed by BHICOT to the federal government;

   f. A complete set of the BHICOT Board of Directors minutes, resolutions, and all other corporate books and records, including but not limited to any informal recordation of Board matters as testified to by Mr. Craig;

   g. An organizational chart identifying those individuals, including job title, dates of employment, and e-mail account(s), and a separate list of all e-mail accounts, including individual accounts and accounts associated with a



business unit or function such as "claims" or "potential security incident;" who provided services under the BHICOT — BHM MSA, regardless of what entity/entities employed the person;

7. The SDR may seek turnover of additional categories of BHICOT books and records not specifically identified in this Order;

8. All costs incurred with the turn over of the records and information described in this Order shall be borne solely by BHM and the SDR shall not be responsible for any expense associated with the production;

9. BHM shall file a Status Report with the Court and Special Master every twenty (20) days during the ninety (90) day period updating the Court in detail of the efforts made in the prior twenty-day period and for the next twenty-day period to comply with the terms of this Order;

10. To the extent BHM withholds documents or information from turnover to the SDR based on an assertion of privilege, it is to maintain a detailed privilege log regarding same. The log must be regularly updated and provided to SDR counsel at least every twenty (20) days from entry of this Order;

11. The SDR's Motion to Strike the Testimony of Angela O'Neal is denied;

12. BHM's ESI Cross-Motion is denied; and

13. This Order constitutes a final order fully resolving all issues relating to the Motion of Enforce and the ESI Cross-Motion.

Signed on May 6, 2025.

_____
JUDGE PRESIDING

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 06/11/2025 03:27:36

VELVA L. PRICE
DISTRICT CLERK
By Deputy: SH

**TAB B:**
**Special Master's Report and Recommendation**
**3 CR 612–636**

CAUSE NO. D-1-GN-23-008361

| | | |
|---|---|---|
| THE TEXAS DEPARTMENT OF INSURANCE, <br> *Plaintiff,* | § <br> § <br> § <br> § | IN THE DISTRICT COURT OF |
| v. | § <br> § | TRAVIS COUNTY, TEXAS |
| BRIGHT HEALTHCARE INSURANCE COMPANY OF TEXAS, <br> *Defendant.* | § <br> § <br> § <br> § | 455th JUDICIAL DISTRICT |

**MEMORANDUM RECOMMENDATION AND REPORT OF SPECIAL MASTER REGARDING**
**SPECIAL DEPUTY RECEIVER'S MOTIONS TO ENFORCE PERMANENT INJUNCTION AGAINST BRIGHT HEALTH MANAGEMENT, INC. AND TO SRTIKE THE TESTIMONY OF ANGELA O'NEAL**
**AND**
**BRIGHT HEALTH MANAGEMENT, INC.'S CROSS-MOTION FOR ENTRY OF ORDER GOVERNING ELECTRONICALLY STORED INFORMATION**

Currently before the Special Master for report and recommendation to the District Court are three motions: CANTILO & BENNETT, L.L.P., Special Deputy Receiver ("SDR") for Bright Healthcare Insurance Company of Texas' Motion to Enforce Permanent Injunction Against Bright Health Management (the "Motion to Enforce"), its Motion to Strike the Testimony of Angela O'Neal (a witness presented by Bright Management), and Bright Health Management's Cross-Motion for Entry of Order Governing Electronically Stored Information (the "ESI Motion"). After consideration of the controlling law, briefing, testimony, and documentary evidence offered by the SDR and Bright Health Management, Inc., the Special Master recommends as follows:

I. **Introduction**

The motions before the Texas Insurance Receivership Court raise issues of first impression for this Court. Frankly, these issues may be relatively new as well with regard to insurance receiverships nationwide.

The State of Texas through its Department of Insurance placed the insurance company, Bright Healthcare Insurance Company of Texas ("Bright Healthcare" or "the Estate") into receivership approximately one year ago. One of the fundamentals of a receivership is that the receiver, here the SDR, suddenly charged with taking over a business has as one of its first orders of business the duty to take immediate possession of all the books and records of the company. For obvious reasons, this is an essential and critical first step. In the days of hard copies in files and filing cabinets for the company's books and records typically physically maintained in its offices and/or at storage locations, taking possession and control of all the receivership estate's books and records was and is a "no brainer."

Here, however, Bright Healthcare was a "virtual insurance company," meaning it had no offices, employees, furniture, etc. It also did not maintain hard copies of most all, if not all, of its books and records generated in operating its business. Rather, all is in an electronic format. If this one company stood alone, that fact in and of itself would not be problematic.

However, such is not the case here. Bright Healthcare and at least 13 other virtual companies operating in 14 states in the United States (Bright Management refers to almost two dozen affiliated companies) were operated under the corporate umbrella of the Bright Health Group by Bright Health Management, Inc. ("Bright Management"). Bright Management used its employees and offices located in Minneapolis, Minnesota, to manage and run the day-to-day operations of not only Bright Healthcare but also the 13 other virtual subsidiary companies under its corporate umbrella (primarily appearing to be insurance companies in other states).

The obvious advantage of such an arrangement, made much easier by modern technology, is the economies-of-scale that are achieved by one set of offices, employees, officers, directors, etc., overseeing and operating at least 14 subsidiary and affiliated companies. As Bright

2

Management notes in its proposed Memorandum Recommendation at page 1: "[F]or operational efficiencies and economies of scale, Bright Healthcare utilized an affiliated administrative entity, Bright Management, to provide services described in the Master Services Agreement ("MSA")."

In and of itself, saving money by having one entity run at least 14 subsidiary or affiliated companies would not cause a problem. But here, Bright Management maintained one single electronic platform(s) where all the books, records, emails, and the other information of all the subsidiary and affiliated companies were and are kept. There was one email box per employee, and an employee might work on matters for all the affiliated companies. But emails were not kept separated by company under the Bright Management umbrella. Because the records were not maintained separately and earmarked by company (whether possible to do that or not, and whether now common in the insurance industry to do that or not), they thus are commingled. Thus, emails of Bright Management employees, officers and directors that relate to the business of Bright Healthcare are embedded in Bright Management's general email servers (with one box per employee) and cannot be retrieved easily as might be the case if they were somehow separately earmarked and stored for easy retrieval by company, including the Bright Healthcare Estate.

The evidence at the hearing made clear that the system that Bright Management set up has caused a practical and costly nightmare to now (1) search for and retrieve off the Bright Management electronic system all the books, records, documents and information that relate to or pertain to or concern Bright Healthcare, and (2) separate them from the records of the other companies. This one key fact plagues this Estate and the turnover to the SDR by Bright Management of all the records and information in its possession, custody or control related to or pertaining to or concerning the receivership estate of Bright Healthcare. The instant motions and relief sought by each side all flow from Bright Management's commingling of the records and

3

information of all the companies it was managing and running when Bright Healthcare was placed into the instant liquidation proceeding by the State of Texas.

There are three main issues. First, the SDR by its Motion to Enforce Permanent Injunction seeks from Bright Management a number of categories of books, records and information. In response, Bright Management seeks protection primarily against turning over records that do not relate in any way to Bright Healthcare and/or are covered by a privilege held by another company. Second, given the acknowledged substantial challenges of searching for, reviewing and turning over documents (and portions of documents) that relate solely to Bright Healthcare versus unrelated or privileged documents belonging to other companies, Bright Management moves the Court to enter an Electronically Stored Information ("ESI") Order compelling the SDR to work with Bright Management to agree on a process including search terms, etc., to try to retrieve all the records related to Bright Healthcare that are commingled with the numerous other virtual companies that Bright Management has operated. And third, Bright Management requests that the Court order the Estate to reimburse it for the extremely substantial cost associated with the search, review, separation and production of the Estate's books, records and information from Bright Management.

## II.    Procedural Background

Bright Healthcare is a Texas-domiciled insurance company. It sold individual health coverage (under the federal Affordable Care Act as well as off the Federal exchange) in the State of Texas during calendar year 2022. As noted above, Bright Management managed Bright Healthcare and a number of other subsidiary companies as "virtual" insurance companies. This was done pursuant to a Management Servies Agreement ("MSA") effective January 1, 2022, that was not actually signed by representatives of the two affiliated companies until May 2, 2022. As

4

already discussed, Bright Healthcare had no employees, offices, fixtures, furniture or equipment. It relied solely on Bright Management to perform all the functions necessary to run the company, including managing its records and data. Bright Healthcare did have officers and directors (who apparently also served in capacities for Bright Management): Jeff Craig, Jay Matushak, Eric Halverson and Jeff Scherman.

The Texas Department of Insurance ("TDI") placed Bright Healthcare into an interim step of Supervision in October 2022. However, on November 15, 2023, TDI filed its Plaintiff's Original Petition, Application for Order Appointing Liquidator, and Request for Permanent Injunction to ultimately place Bright Healthcare into liquidation under the Texas Insurance Code. On November 29, 2023, the Court entered its Permanent Injunction placing Bright Healthcare into receivership. Bright Management is expressly named and enjoined in the Permanent Injunction. Bright Management was served with the Writ for Permanent Injunction on December 6, 2023.

This matter thus arises under the Texas Insurer Receivership Act, Chapter 443 of the Texas Insurance Code ("TIRA"). Movant, the SDR, was appointed by the Commissioner of Insurance in her capacity as the Liquidator of Bright Healthcare. Under TEX. INS. CODE § 443.154 (a), the SDR "has all powers of the liquidator granted by this section, unless specifically limited by the liquidator, and serves at the pleasure of the liquidator."

Bright Management is a "party in interest" in this receivership because it owns one hundred percent of the equity of Bright Healthcare. TEX. INS. CODE § 443.004 (a)(17).

After entry of the Permanent Injunction, the SDR requested that Bright Management turn over the books and records of Bright Healthcare. Bright Management has provided a number of categories of Bright Healthcare books and records to the SDR. The evidence also suggests some earlier delay or lack of cooperation as to certain categories of records (such as certain records of

5

Page 616

third-party administrators as testified by the SDR representative Mr. Marcin). Bright Management makes clear that it does not dispute the SDR's entitlement to the Estate's books and records, and agrees not all records have been produced. As summarized above, the dispute centers on how a search for all additional records, especially emails, is to be conducted; what role, if any, the SDR should play in such efforts as an active participant coordinating with Bright Management in formulating search terms, etc.; and whether the Estate should pay the very substantial cost ahead for Bright Management to do a full, thorough review, sorting out and turning over all books, records, documents, communications and information related to or pertaining to or concerning Bright Healthcare.

The parties spent months starting at the end of 2023 discussing how to resolve these electronic document issues, but to no avail. The SDR eventually filed its Motion to Enforce Permanent Injunction on June 28, 2024. Bright Management responded by filing its Response and ESI Cross-Motion on July 12, 2024. After conferring with the Special Master, the parties agreed to a briefing schedule.

Following briefing, the Special Master heard the competing motions at an evidentiary hearing on September 30, 2024. At this hearing, the Special Master admitted into evidence all the parties' offered exhibits and received into evidence the testimony of four witnesses. The SDR called Michael Marcin and Brian Falligant as witnesses. Bright Management called Jeff Craig and Andrea O'Neal as witnesses. All proffered testimony by the four witnesses was received into evidence. The SDR does now urge by motion that the testimony of Ms. O'Neal be striken (addressed below).

The parties each submitted at the end of October a proposed Memorandum Recommendation for consideration and entry by the Special Master.

6

III.     **Legal Basis for the Turnover of the Estate's Records and Information Relating to or Pertaining to or Concerning Bright Healthcare to the SDR**

The SDR's right to recover all books, records and information in Bright Management's possession, custody or control that pertain to, relate to or concern Bright Healthcare is established by three sources: (1) **legislatively** by the Texas Insurance Code, and in particular the provisions of TIRA; (2) **judicially** by the Court's Permanent Injunction; and (3) **contractually** by the Management Services Agreement between Bright Healthcare and Bright Management.  Bright Management does not challenge the applicability or scope of the provisions in TIRA or the Permanent Injunction, but it nonetheless is important to set out the numerous provisions that the Texas Legislature and the Receivership Court in its Permanent Injunction devote to the receiver's entitlement to the Estate's books, records and information, as well as the duties of compliance and cooperation placed on Bright Management.  Bright Management places too much emphasis on particular definitions with urged narrow readings.  In so doing, it misses the mark because the Texas law set forth  in Section 443.010 of TIRA addresses and emphasizes the special **cooperation** that Bright Management, as the prior owner and manager of Bright Healthcare, and its management and employees must provide the SDR as the SDR takes over the business that had been run by Bright Management.  Going forward, the Special Master intends to closely monitor evidence of cooperation or any lack thereof---as further discussed below.

A. **Legislatively The Texas Insurer Receivership Act Requires Bright Management to Turn Over the Records**

Texas law applicable to this dispute is straightforward.  TIRA governs the receivership of insurance companies in Texas.  *See* TEX. INS. CODE §443.001, *et seq.*  This Court "has exclusive jurisdiction of all property of the insurer, wherever located, including property located outside the territorial limits of the state." TEX. INS. CODE §443.005(c).  The Act explicitly addresses Bright

7

Management's obligation to turn over records of the Bright Healthcare to the SDR. The scope of the obligation to provide "books and records" to the SDR pursuant to the statute is expansive. Tex. Ins. Code §443.004 broadly defines "property of the estate" to include:

> all records and data that are otherwise the property of the insurer, **in whatever form maintained,** within the possession, custody, or control of a ... management company.... (emphasis added).

Thus, "records or data" that are the property of the insurer, in whatever form, are "property of the estate" regardless of who holds them.

Additionally, Tex. Ins. Code §443.017(a) provides:

> Upon entry of an order of rehabilitation or liquidation, the receiver is vested with title to all of the books, documents, papers, policy information, and claim files, and all other records of the insurer, of whatever nature, in whatever medium, and wherever located, regardless of whether the records are in the custody and control of a third-party administrator, managing general agent, attorney, or other representative of the insurer. The receiver may immediately take possession and control of all of the records of the insurer, and of the premises where the records are located. A third-party administrator, managing general agent, attorney, or other representative of the insurer shall release all records described by this subsection to the receiver, or the receiver's designee, at the request of the receiver.

The Act's command that Bright Management turn over records pertaining to or concerning Bright Healthcare to the SDR is broader than merely the turnover of the "business records" of the Bright Healthcare Estate. Section 443.010 of TIRA is a particularly important statute as applies to Bright Management. Given this statutory provision's special relevance to the relationship and dealings between the SDR, on the one hand, and Brright Management, on the other, the Special Master sets forth this critical provision in full:

**"Cooperation of Officers, Owners, and Employees"**

> (a) Any present or former officer, manager, director, trustee, owner, employee, or agent of any insurer, or any other persons with authority over or in charge of any segment of the insurer's affairs, shall cooperate with the commissioner or receiver in any proceeding under this chapter .... For purposes of this section:

(1) "person" includes any person who exercises control directly or indirectly over activities of the insurer through any holding company or other affiliate of the insurer; and

(2) "cooperate" includes:

(A) replying promptly in writing to any inquiry from the commissioner or receiver requesting the reply; and

(B) **promptly** making available to the commissioner or receiver any books, accounts, documents, or other records or information or property of **or pertaining to the insurer and in the person's possession, custody, or control.**

(b) A person may not obstruct or interfere with the commissioner or receiver in the conduct of any delinquency proceeding or any preliminary or incidental investigation.

(c) This section may not be construed to abridge otherwise existing legal rights, including the right to resist a petition for liquidation or other delinquency proceedings, or other orders.

(d) Any persson described by Subsection (a) who fails to cooperate with the commissioner or receiver, or any person who obstructs or interferes with the commissioner or receiver in the conduct of any deliquency proceeding or any preliminary or incidental investigation, or who violates any order validly issued under this chapter:

(1) commits an offense; and

(2) is subject to the imposition by the commissioner of an administrative penalty not to exceed $10,000 and subject to the revocation or suspension of any licenses issued by the commissioner in accordance with Chapters 82 and 84.

(e) An offense under Subsection (d) is punishable by a fine not exceeding $10,000 or imprisonment for not more than one year, or both fine and imprisonment. (emphasis added).

The Special Master emphasizes the following. First, the seriousness of this statutory obligation to cooperate legislatively placed on an entity such as Bright Management and its officers, directors, and employees is made clear by the Texas Legislature's inclusion of fines and even the surprising possibility of imprisonment. Second, Texas law requires the "prompt" making available of books, records or information. Third, the covered "books, accounts, documents, or other records or information or property" include those "pertaining to" Bright Healthcare that are in Bright

9

Management's possession, custody, or control. In other words, the required turnover is not limited to Bright Healthcare's business records. Fourth, as contemplated by subsection (c) above, the Special Master in this Report does address and affirm rights held by Bright Management regarding unrelated or privileged documents of other companies.

Given that the evidence establishes that Bright Management operated every aspect of Bright Healthcare's business prior to receivership, the Special Master in its oversight of hundreds of estates over the past thirty years has never seen an estate where active cooperation by Bright Management and its former and present officers, directors, and employees with the SDR is as essential as it is in this Estate Bright Management's counsel wisely has generally and more recently sought by its briefing and proferred evidence to show efforts at cooperation. Based on Section 443.010, Bright Management must be able to establish throughout the course of this proceeding its cooperation with the SDR, including producing all the information relating to or pertaining to or concerning Bright Healthcare.

## B. Judicially the Permanent Injunction Requires Bright Management to Turn Over Bright Healthcare's Books and Records

The Permanent Injunction, which specifically named and enjoined Bright Management, provides the following:

> The Liquidator shall be vested by operation of law with title to all of Defendant's property as defined in Section 443.004(a)(20). Such property shall include property of any kind or nature, whether real, personal, or mixed, including but not limited to ... books, records, documents and insurance policies, ... intangible assets, whether owned individually, jointly, or severally, wherever located, and all right ... belonging to Defendant, whether asserted or not, .... The Liquidator's title shall extend to Defendant's property regardless of the name in which such items are held, or where such items are located.

> Pursuant to Section 443.151(a), the Liquidator shall be directed to take possession and control of Defendant's property, wherever located.

> The Liquidator may act as it deems necessary or appropriate to perform the Liquidator's duties pursuant to Section 443.151(a). The Liquidator shall have all the powers of

10

Defendant's directors, officers and managers, and the authority of such persons is suspended except as specifically permitted by the Liquidator or the Liquidator's designees.

Defendant and Defendant's present or former officers, managers, directors, trustees, owners, employees, agents, and any other persons with authority over or in charge of Defendant's affairs **shall be required to cooperate with the Liquidator and the Liquidator's designees pursuant to Section 443.010** (emphasis added).

....

Pursuant to Section 443.151(a), title to all of Defendant's property, including but not limited to all the assets and rights described in this Order, is vested in the Liquidator. The Liquidator is authorized to take control and possession of Defendant's property, wherever located, and remove all such property from Defendant's premises.

....

The Clerk of this Court shall issue a Permanent Injunction against the persons and entities named below, with the following force and effect:

TO:     <u>Defendant and its agents, including but not limited to:</u>

Defendant's **current and former officers, directors,** underwriters, **managers** and employees, **including but not limited to, Jeff Craig and Jay Matushak**; owners and affiliates, including but not limited to, Bright Health Group, Inc.; **Bright Health Management, Inc.;** . . . .

Each of you are hereby RESTRAINED and ENJOINED from taking any and all of the following actions:

....

Wasting, disposing of, converting, dissipating, or concealing, in any manner, any of Defendant's property;

Using, releasing, transferring, selling, assigning, canceling, hypothecating, withdrawing, allowing to be withdrawn, offsetting, asserting ownership of, concealing, in any manner, or removing from this Court's jurisdiction or from Defendant's place of business, any of Defendant's property, . . . .

....

Doing anything to prevent the Liquidator or the Liquidator's designees from gaining access to, acquiring, examining, or investigating any of Defendant's property or any other property, books, documents, records, or other materials **concerning Defendant's business, under whatever name they may be found** (emphasis added);

11

EACH OF YOU ARE FURTHER SPECIFICALLY ORDERED to make available and disclose to the Liquidator or the Liquidator's designees the nature, amount, and location of Defendant's property, and promptly surrender all such property to the Liquidator or the Liquidator's designees.

> DEFENDANT AND DEFENDANT'S PRESENT OR FORMER OFFICERS, MANAGERS, DIRECTORS, TRUSTEES, OWNERS, EMPLOYEES, AGENTS, AND ANY OTHER PERSONS WITH AUTHORITY OVER OR IN CHARGE OF DEFENDANT'S AFFAIRS ARE FURTHER ORDERED to cooperate with the Liquidator, or the Liquidator's designees as required by Section 443.010(a).

Again, the Court's Order and Permanent Injunction directing that Bright Management and the other above-named entities and individuals **cooperate** with the SDR is paramount in this Estate.

One final note regarding TIRA and the Permanent Injunction. TIRA in discussing records uses the phrase "pertaining to;" the Permanent Injunction uses the phrase "concerning" Bright Healthcare's business. The Special Master thus is employing the phrase "relating to or pertaining to or concerning" throughout this Report to include both the statutory and judicial duties placed on Bright Management.

### C. Contractually the Management Services Agreement Requires Bright Management to Produce Bright Healthcare's Books and Records Immediately

Bright Management's obligation to turn over the records sought by the SDR is further supported by the MSA which it signed with Bright Healthcare. The MSA broadly defines "books and records" as follows:

> "Books and Records" shall mean all books and records developed or maintained pursuant to or related to this Agreement.

This definition is expansive and not limited to any type of document or record.

Furthermore, the remainder of ¶ 5 of the MSA makes clear that Bright Management was required to keep "sufficient" books and records for the "express purpose of recording therein" the nature and details of the management services and financial transactions undertaken for [Bright

12

Healthcare]" as well as the "nature and details of the transactions." MSA ¶ 5]. This broad obligation is echoed by the MSA's recitation of Bright Management's obligations under the MSA, which include:

The establishment and maintenance on behalf of Insurer of complete and accurate books and records of all Insurer's transactions in form and substance determined by Insurer provided that such form is in all material respects as required by applicable insurance laws and regulations, all other applicable laws and regulations, financial accounting standards and the requirements of federal, state and local taxing authorities;

....

The maintenance for Insurer of all financial and business records required by applicable laws and regulations and generally accepted insurance and statutory accounting practices, and the preparation for and on behalf of Insurer of all reports required by governmental and nongovernmental regulatory and supervisory authorities with adherence to risk based capital requirements;

....

The monitoring of the legal affairs of Insurer, and in each case on behalf of Insurer, complying with applicable legal requirements and making required filings with the Texas Department of Insurance (the "TDI") and all other governmental authorities having jurisdiction over Insurer;

MSA ¶¶ 1.2, 1.4, 1.7.

The MSA further specifies that all such "books and records" are and shall remain the "property" of Bright Healthcare and shall be maintained by Bright Management in a "fiduciary capacity." MSA¶ 5. The broad definition of "books and records" in the MSA echoes that provided in TIRA.

Finally, the MSA expressly incorporates Bright Management's legal obligation to "immediately" turn over records to the SDR upon receivership. Paragraph 9 of the MSA provides:

If [Bright Healthcare] is placed into Rehabilitation or Liquidation by the Texas Insurance Commissioner ... then:

13

All books and records developed or maintained under and related to this Agreement will **immediately** be made available to the receiver or Commissioner and must be turned over to the receiver or Commissioner immediately upon the receiver's or Commissioner's request (emphasis added).

MSA ¶ 9. Frankly, there is no evidence in this record that Bright Management made any meaningful effort at all after the MSA was signed to be able to comply with its obligation to **immediately** make available and turn over the books and records. Based on the electronic system maintained by Bright Management, and its own evidence presented at the hearing, it was and is a practical impossibility for Bright Management to comply with its promise.

### IV. Special Master Recommendations Regarding Various Issues Pertaining to the Required Turnover of the Estate's Books, Records and Information by Bright Management to the SDR

First of all, Bright Management does not contest that the SDR has the right to all of Bright Healthcare's books and records held by it. Based on that acknowledgement, Bright Management has turned over, and as of the evidentiary hearing, is continuing to turn over records in many categories.

The SDR by its motion seeks an Order requiring Bright Management to deliver to the SDR (in ten days) certain categories of documents. Before addressing as necessary these categories, the Special Master recommends the following guidelines should apply (which guidelines address various issues teed up by the parties in their briefing).

### A. Emails

There can be no doubt that emails, generally being the means for corresponding in our modern world, are part of the books and records of a company and are covered by the "books and records" definitions discussed above. The TIRA describes the covered records and data "in whatever form maintained." The internal policies and procedures of Bright Management (as part of the Bright Health Group) defines "records" as "any recorded information, regardless of format

14

or medium." At times it is unclear whether Bright Management is contending that an email per se is not a business record of Bright Healthcare, or whether emails that do not relate to or pertain to or concern Bright Healthcare—but rather relate solely to another company or are otherwise privileged under a privilege umbrella of another company---are not books and records of Bright Healthcare. For now, and subject to the discussions that follow below, suffice it to say that the Special Master recommends that there is no exclusion for emails per se.

## B. Scope of the Documents to be Turned Over

The parties to some extent pass each other in the night arguing past each other what is required to be produced. The Special Master recommends the following general guidelines and rules. There are two general categories of documents that are to be delivered to the SDR. First, any document generated or received by any person or entity in connection with the business of Bright Healthcare constitutes a book/record of the Estate, and is to be turned over. Secondly, whether an actual business record of Bright Healthcare or not, if a document in Bright Management's possession, custody or control (including on its electronic data storage system(s)) "pertains to" Bright Healthcare, regardless of the email's author, purpose, content or whether written for the benefit or detriment of Bright Healthcare from a financial or other standpoint, that document is to be turned over to the SDR based on the legislative edict in Section 443.010(a)(2)(B) previously discussed. Additionally, as noted above, this Court's Permanent Injunction at Paragraph 4.6 enjoins Bright Management and all former and current officers, directors, managers and employees of Bright Healthcare from "[d]oing anything to prevent the Liquidator or the Liquidator's designees [the SDR] from gaining access to, acquiring, examining, or investigating any of Defendant's [Bright Healthcare] property or any other property, books, documents, records, or other materials **concerning Defendant's business, under whatever name they may be**

15

**found.**" (emphasis added). These two applicable provisions expand Bright Management's duty to provide documents in its possession beyond documents that would be defined as the typical business books and records of Bright Healthcare. In other words, given the entities and persons associated with the receivership estate who are named in the Permanent Injunction, the SDR is not required to launch a separate document discovery effort to obtain from the enjoined parties all information that pertains to or concerns Bright Healthcare. Thus, for example, an email between two Bright Management officers/directors discussing in any way Bright Healthcare would be turned over because it "pertains" to or "concerns" Bright Healthcare, whether it is an actual business record of Bright Healthcare or not (subject to any valid claim of privilege).

Any document, including any document relating solely to the business of Bright Management or any of its affiliated entities, that falls outside the above provisions and thus in no way relates to or pertains to or concerns Bright Healthcare is not required to be turned over.

The Special Master recommends that Bright Management be ordered to turn over all documents and information in its possession consistent with the guidelines set forth above, regardless of whether they are covered by the specific categories the SDR seeks by its motion.

### C. Privileged Documents

The SDR succeeds to and holds all privileges held by Bright Healthcare. Bright Management correctly does not contest that the SDR owns and holds all such privileges and is entitled to all of Bright Healthcare's privileged information.

Bright Management has not waived any privilege that applies to its information or that of any affiliated company. The fact that records are commingled in electronic storage does not constitute a waiver of privilege. Any argument by the SDR to that effect should be denied. Bright Management uses the example of an attorney who maintains all his privileged information for all

16

his or her clients on a single email site, and that the attorney does not waive the privilege as to all the information because it is commingled in his single server. The Master agrees.

The Special Master anticipates that issues may arise as to what, if any, privileges apply regarding certain documents. Given the Bright Health overall corporate organization, certain individuals—particularly officers and directors---have worn multiple hats on behalf of multiple companies in the corporate umbrella. Thus, officers/directors of Bright Management apparently also served in similar capacities for Bright Healthcare. And at least one such person, Jeff Craig, has a law degree and would have had an attorney-client relationship with both entities. This creates challenges based on fiduciary obligations. This challenge, for example, is highlighted here by the fact that the receivership estate of Bright Healthcare is shown to be owed by a Neuehealth-related entity, a Bright-affiliated company, an amount over $124,000,000.00. However, there are documents in the record reflecting that the Chief Accounting Officer of Neuehealth indicates the receivable owed to the Estate by a related company is not collectible because there is "0 cash for the Neuehealth RBE to pay it." Clearly the circumstances surrounding this debt, its creation, and its status are important questions that the SDR must assess and answer---and promptly. And there may be issues of privilege that arise relating to this debt.

To the extent Bright Management withholds information from turnover to the SDR based on an assertion of privilege, it is to maintain a detailed privilege log regarding same. This log must be regularly updated and provided to SDR counsel at least every twenty (20) days from entry of a Court Order confirming same. To the extent the SDR briefly has argued that Bright Management and its representatives are not authorized to view any privileged document of Bright Healthcare, this argument (while it may be based on undisputed legal principles) certainly must be denied here

17

based on common sense because documents must be reviewed to determine if they are to be turned over or not.

In the process ahead, counsel should confer as to how to best "tee up" before the Special Master any disputes regarding documents being withheld in whole or in part by way of redactions because of an assertion by Bright Management or other company of privilege.

## V.    Specific Categories of Information Sought by the SDR in its Motion to Enforce

The SDR seeks the following:

A. All Bright Healthcare-related emails to or from Bright Healthcare officers and directors Jeff Craig, Jay Matushak, Eric Halverson and Jeff Scherman;

B. All records maintained in the Office 365 data suite: SharePoint, OneDrive, and Teams for all Bright Healthcare officers and directors;

C. All Bright Healthcare-related emails from any Bright Management employee, affiliate, agent or vendor;

D. All books and records relating to all debts owed to Bright Healthcare by Bright Management affiliate, Neuehealth Partners Texas RBE, LLC;

E. All books and records relating to all debts owed by Bright Healthcare to the federal government;

F. A complete set of the Bright Healthcare Board of Directors minutes, resolutions, and all other corporate books and records; and

G. An organizational chart identifying those individuals, including job titles, dates of employment, and email account(s), and a separate list of all email accounts, including individual accounts and accounts associated with a business unit or function such as "claims" or "potential security incident"; who provided services under the Bright

18

Healthcare and Bright Management Management Services Agreement, regardless of what entity/entities employed the person.

Most of the disputes arising under these categories are addressed above by the Special Master. Bright Management states that it has produced to the SDR the information sought in categories D, E and F. Obviously the duty to turn over documents is a continuing one.

All the categories are reasonable, relevant requests. To the extent information and documents have not been produced based on the disputes addressed above, the process must now commence in earnest to produce and provide all information and documents in all these categories that relate to or pertain to or concern Bright Healthcare---subject to the discussions above as to unrelated and privileged documents.

Category C includes the terms "affiliate, agent or vendor," and it is appropriate for the SDR to require Bright Management to cooperate with it by seeking all Bright Healthcare-related emails from these persons/entities based on the information within the possession of Bright Management. The Permanent Injunction expressly covers "agents" with an extensive listing of persons and entities that might qualify as agents, and thus use of the terms "affiliates, agents and vendors" cannot properly be objected to as inappropriate vague terms. The SDR may, but is in no way required, to provide lists of afffiliates, agents and vendors to Bright Management as it may discover them during the course of this proceeding.

Regarding Category F and Board of Directors minutes and any other records relating to actions of the Board, Bright Management's witness, Mr. Craig, testified that all of these records had been turned over and were admitted into evidence in SDR Exhibit 19. However, he confirmed that much of the work done by Bright Healthcare directors was conducted informally in emails, which have not been turned over to the SDR. It is essential (as to this and all other categories

19

sought by the SDR) that Bright Management conduct a thorough review of all the materials in its possession to confirm that all the Board of Director-related materials, including any emails or other informal discussions, have been turned over to the SDR. Also, it is essential that Bright Management's review of all documents be based on the test of whether the document relates to or pertains to or concerns Bright Healthcare.

Proper and legally-required cooperation by Bright Management with the SDR pursuant to TIRA §443.010 includes producing (and even preparing) information consistent with the SDR's understandable requests in category G for organizational charts and a list of email accounts of employees. Bright Management in its initial Objection and Cross-Motion argued it did not have to create any documents for the SDR, citing a discovery case not relevant to the issue here. Fortunately, Bright Management at the hearing dropped this improper opposition and apparent lack of cooperation as now reflected in its Exhibits 3, 8 and 9. Bright Management is to continue its efforts to cooperate with the SDR and provide the SDR all the information sought by category G.

## VI. Bright Management's Cross-Motion for Order Governing the Production of Electronically Stored Information ("ESI")

Bright Management essentially seeks two things: (a) that the SDR be directed to cooperate and coordinate with Bright Management in the process of identifying and producing the documents and information on Bright Management's integrated system "without impinging upon the protected rights of third parties not before this Court," (Bright Management proposed Memorandum Recommendation at p.11), and (b) a determination as to which party is to bear the costs associated with such review and production.

20

## A. Who is Responsible for the ESI Search, Review, and Production?

The fundamental premise is as follows: Bright Management made the decision to set up a single electronic system for the numerous companies it operated, including Bright Healthcare. Given this fact that we now have the Estate's records and information commingled with numerous other companies, and given Bright Management's legal duty to provide to the SDR all documents and information related to or pertaining to or concerning Bright Healthcare, Bright Management understandably seeks to protect from disclosure information and documents on its system that do not relate to Bright Healthcare and/or is covered by an asserted privilege(s) that applies to a company other than Bright Healthcare. The review that has been necessary thus is to protect and benefit Bright Management, and not the Estate.

Accordingly, it is the sole responsibility of Bright Management to undertake expeditiously this search, review and production process. The SDR is not required to assist Bright Management in its effort to retrieve the documents and information off its commingled system that it created for its own economic benefit. Rather, Bright Management alone is to undertake---or continue to undertake---whatever process insures that every single document or piece of information in its possession, custody or control that relates to or pertains to or concerns Bright Healthcare is turned over. The SDR may voluntarily provide information to Bright Management to assist, but there is no duty on the SDR at all to do so. Bright Management created the system that now regretably confronts us; it must deal with the consequences flowing from the single system it established.

## B. Cost

As to cost, Bright Management's argument that its MSA with Bright Healthcare obligates the Estate to pay the cost of this very substantial review and search effort is without merit. Whether common in the industry or not, Bright Management created and benefitted financially by the single

21

electronic system it created. Having created this fact of commingled records, and now confronted with the fact that one of its managed companies has been placed by the State of Texas into receivership, Bright Management now must comply with the judicial, legislative and contractual duties placed on it no matter the very substantial time and expense that will be required to turn over all the Estate's records it holds. In other words, having established an electronic system(s) of commingled records, it must now pay for the time and expense required to "un-commingle" the Estate's separate records and information that relates to or pertains to or concerns Bright Healthcare, protect unrelated or privileged records from disclosure, and turn over all the Estate's documents and information to the SDR as soon as possible. In addition, no provision of the Permanent Injunction or the Texas Insurance Code entitles Bright Management to be reimbursed for the cost of searching for and separating Bright Management's records and those of other affiliated companies from those of Bright Healthcare.

In sum, Bright Management created the substantial problem on records we now have notwithstanding its admitted knowledge of the MSA's terms. Bright Healthcare's policy holders and creditors do not pay for a situation of Bright Management's own making. The Special Master accordingly recommends that Bright Management's Cross-Motion should be denied.

## VII.    The SDR's Motion to Strike the Testimony of Angela O'Neal

The SDR's Motion to Strike the Testimony of Angela O'Neal is denied because, whether meritoriuos or not, her testimony has not been relied upon by the Special Master in any manner adverse to the SDR for purposes of weighing the evidence and making this Recommendation. If anything, it simply makes clear the extremely substantial effort and expense now required of Bright Management to retrieve and produce all the records and information as directed in this

22

Memorandum Recommendation and Report while preserving its right not to produce commingled records of other companies, including any privileges that would apply for other companies.

## VIII.    The Timetable for a Completed Turn Over of Records and Information

The timetable for Bright Management's required turn over is an extremely problematic issue because Bright Management clearly cannot comply with what the law requires. As discussed, Bright Management in the MSA promised in Section 9(a)(ii) that if Bright Healthcare were placed in Liquidation by the Texas Insurance Commissioner, "all books and records developed or maintained under and related this Agreement will **immediately** be made available to the receiver or Commissioner and must be turned over to th [sic] receiver or Commissioner immediately upon the receiver's or Commisioner's request." The Texas Insurance Code and the Permanent Injunction also express and direct **prompt** compliance with Bright Management's turnover obligations.

But the reality given how Bright Management opted to maintain and store records for all the companies it operates on a single electronic platform is that this promised and ordered performance is impossible in a timely manner. The evidence introduced by Bright Management itself clearly establishes this fact.

The SDR seeks a turnover of all the categories of records and information within ten (10) days of the date of the Court's Order on its Motion to Enforce. While legally supported, it simply cannot be done and would be an exercise in futility.

This Estate now is over one year old. Claims are being filed. The Court has set a claims filing deadline of February 3, 2025. Precious time has been lost regarding turning over the required information. Time thus is of the essence for the categories of records described above to be turned

23

The Special Master appreciates the very substantial time, effort, manpower and cost required for Bright Management to retrieve and sort the Estate's records and information from that of all its other subsidiary companies. Frankly, any time limit recommended and set by the Special Master will appear impractical and naïve given what all has to be done. BUT that time and effort must now occur---and promptly. The Special Master therefore recommends that, no matter the voluminous cost and the amount of manpower in likely short-term hires required, all the records and information addressed in this Memorandum Recommendation and Report be turned over to the SDR within ninety (90) days of the date of entry of a Court Order consistent with this recommendation. Bright Management cannot be heard to complain that this ninety (90) day deadline is unrealistic, because that deadline far exceeds the "immediate" turnover that Bright Management promised, and that the Texas Insurance Code and Permanent Injunction contemplate.

The Master further recommends that Bright Management be ordered to file a Status Report with the Court and Special Master every twenty (20) days during this ninety (90) day period updating the Court in detail of the efforts made in the prior twenty-day period and for the next twenty-day period to comply with the terms of the Court's Order.

IX. **Procedural Process and Timetable Regarding this Memorandum Recommendation and Report**

The Order of Reference to Master in this cause contemplates that any objection to this Memorandum Recommendation and Report is to be filed within ten (10) days of the submission of this recommendation and a proposed order to the Court. The Special Master is not at this time submitting a proposed Order to the Court. Rather, given the approaching holidays the procedure will be as follows: (1) the ten (10) day period to object is not triggered because a proposed Order is not now being submitted to the Court; (2) any objection to this Memorandum Recommendation and Report by either or both sides is be filed by on or before Monday, January 6, 2025; (3) if an

24

objection is filed, the Court will take the motions and this Memorandum Recommendation and Report up in due course and, pursuant to Texas Rule of Civil Procedure 171, the Court may confirm, modify, correct, reject, reverse or recommit the Master's report; (4) if no objections are filed, then counsel for both parties shall work to prepare an Agreed Order as to form consistent with this report and submit it to the Special Master in Word Format by on or before Friday, January 10, 2025, for his review, comment and submission to the Court.

SIGNED this 17th day of December, 2024.

Tom Collins, Special Master

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 06/11/2025 03:27:29

VELVA L. PRICE
DISTRICT CLERK
By Deputy: SH

25

**TAB C:**
**Master Services Agreement**
**3 RR 674–695**

## MANAGEMENT SERVICES AGREEMENT
### Between
### BRIGHT HEALTH MANAGEMENT, INC.
### And
### BRIGHT HEALTHCARE INSURANCE COMPANY OF TEXAS

---

**This Management Services Agreement** (this "Agreement") is made effective as of January 1, 2022, by and among BRIGHT HEALTH MANAGEMENT, INC., a corporation organized under the laws of the State of Delaware, having its place of business in Minneapolis, MN ("Company"), and BRIGHT HEALTHCARE INSURANCE COMPANY OF TEXAS, a corporation organized under the laws of the State of Texas, having its place of business in Texas ("Insurer").  Company and Insurer are each sometimes hereinafter referred to as a "Party" and together as the "Parties".

### Background:

Insurer provides health insurance policies to policyholders domiciled in the State of Texas ("Policies").  Insurer is managed by Company under the terms of this Agreement, which describes the management services that Company provides to Insurer.  Insurer desires that Company, through its employees and approved vendors, provide management services as described in this Agreement to Insurer, and Company is willing to provide such services under the terms and conditions of this Agreement.

In performing management services under this Agreement, Company will be subject to the supervision and authority of the Board of Directors of Insurer.

**Therefore,** the Parties agree as follows:

1.      Management Services.  Company agrees to provide sufficient personnel and supplies for the performance by it of all necessary and appropriate management services and functions to Insurer, as sets forth below.  Such management services shall provide for the

TDI HCS# 1130457

**SDR
Exhibit
2**

operational support to all of Insurer's lines of business, including without limitation benefit plans issued or administered by Insurer in commercial individual and group markets and benefit plans issued by Insurer pursuant to the Medicare Advantage, Part D, or other government programs.

1.1 The administration, operations, and management of the day-to-day operational requirements for Insurer;

1.2 The establishment and maintenance on behalf of Insurer of complete and accurate books and records of all of Insurer's transactions in form and substance determined by Insurer provided that such form is in all material respects as required by applicable insurance laws and regulations, all other applicable laws and regulations, financial accounting standards and the requirements of federal, state and local taxing authorities;

1.3 The collection, receipt and accounting of all funds and receipts of Insurer, and the timely deposit of all such funds and receipts in a bank or banks in the name of Insurer; the establishment and monitoring of Insurer's loss reserves; the maintenance of the funds of Insurer in accordance with applicable law; and on behalf of Insurer, the investment of Insurer's investable assets in accordance with applicable legal requirements;

1.4 The maintenance for Insurer of all financial and business records required by applicable laws and regulations and generally accepted insurance and statutory accounting practices, and the preparation for and on behalf of Insurer of all reports required by governmental and nongovernmental regulatory and supervisory authorities with adherence to risk based capital requirements;

1.5 The maintenance for Insurer of all necessary records and reporting in connection with the reinsurance of Insurer, the taking of all actions or the making of any claims

required or permitted by such reinsurance, and the collection, at the expense of Insurer, of reinsurance recoverable payable to Insurer;

1.6     The provision and maintenance through the Insurer's Claims Service guidelines and manuals of claims supervision and facilities for the timely processing of all claims, notices and proofs of loss against Insurer and for the timely payment of claims on behalf of and at the expense of Insurer, including the employment of claims examiners, attorneys and such other professional and other personnel to handle claims on behalf of Insurer all at the expense of Insurer;

1.7     The monitoring of the legal affairs of Insurer, and in each case on behalf of Insurer, complying with applicable legal requirements and making required filings with the Texas Department of Insurance (the "TDI") and all other governmental authorities having jurisdiction over Insurer;

1.8     The commencement and defense, at the expense of Insurer, of legal and administrative proceedings brought by or against Insurer, including acceptance of service of process on behalf of Insurer, entering legal appearances on behalf of Insurer, and the compromise, prosecution, defense and settlement of losses and claims, including those losses and claims under the Insurer's Claims Service guidelines and manuals;

1.9     On behalf of Insurer, the filing of enterprise risk reports pursuant to the insurance laws of Texas;

1.10    The provision of assistance to the independent accountants for Insurer selected by Insurer, in connection with the annual financial audit of Insurer, and with respect to such other matters as may be reasonably directed by Insurer;

1.11     The provision of assistance to the assigned actuaries of Insurer selected by Insurer in connection with the actuaries' review of the insurance loss reserves of Insurer and with respect to such other matters as may be reasonably directed by Insurer;

1.12     The assistance of Insurer in filing federal, state and local tax returns that Insurer is required to file;

1.13     The provision of other management services as Insurer shall reasonably request; provided, however, if such other management services are not within the scope of this Agreement or the Insurer's Claims Service guidelines and manual, as reasonably determined by Company, such management services shall be at the expense of Insurer; and

1.14     In connection with the provision of any data services or information technology services, Insurer shall provide Company, at no cost to Company, with access to any and all of its information technology systems and databases, including, but not limited to, its existing policyholder services, claims and claims management databases.  The covenant of Insurer in this Section 1.14 to provide Company with access to systems and data and information relating to existing Policies and policyholders shall survive any termination or the expiration of this Agreement to the extent necessary to meet the obligations of this agreement or otherwise required by state or federal law or regulation.  At all times during the Term of this Agreement and thereafter, the Parties shall keep all of such data and information confidential and not disclose any such data or information without the prior written consent of the other Party.

Insurer and its Board of Directors shall maintain oversight of the management services and functions provided to it by Company, and shall monitor such services and functions, at least annually, for quality assurance.The CEO of the Insurer shall report to the Board of Directors of the Insurer, who shall retain the exclusive right to terminate the CEO.  For purposes

of reporting to Insurer, unless otherwise directed by Insurer subsequent to the date hereof, Company will have fulfilled its reporting obligations to Insurer to the extent such reports have been presented to Insurer with a copy to Bright Health, Inc. Insurer hereby appoints the Appointed Chief Executive Officer (CEO) as its representative (i) to receive any and all information and any and all reports required under the terms of this Agreement; and (ii) to provide Company with instructions as to any matter covered by the terms of this Agreement. Company shall be entitled to rely on and act on the instructions of Appointed Chief Executive Officer (CEO) as if such instructions were delivered directly to Company by and pursuant to the authority of Insurer.

1.15  Provide or arrange for the provision of operational support to the MA to include all of the services set forth in this Section 1; and such additional MA services imposed by Centers for Medicare and Medicaid Services ("CMS"), including without limitation the design and implementation of MA plans and preparation of MA bids, establishment and management of a provider network, establishment and maintenance of a medical policy committee to oversee medical utilization and other clinical policies, claims processing and payment, enrollment and other member activities, appeals and grievances, and all other MA services.

Provide or arrange for the provision of operational support to the Part D business to include all of the services set forth in this Section 1; and such additional Part D services imposed by the (CMS), including without limitation the design and implementation of Part D plans and formularies, preparation of Part D bids, establishment and management of a retail and mail order pharmacy network, establishment and maintenance of a pharmacy and therapeutic committee to oversee drug utilization and  other clinical policies, claims processing and payment, enrollment

and other member activities, coordination of True Out-of-Pocket Cost (TrOOP), appeals and grievances, and all other Part D services.

2.      <u>Management Fee</u>.  As compensation for the management services performed by Company, as set forth in Section 1, Insurer agrees to pay Company a management fee (the "Management Fee") as set forth below.  In consideration of the Management Fee, Company shall pay the salaries and benefit expenses of Company's employees, rent and other occupancy expenses, supplies, data processing costs, loss adjustment expenses (LAE), legal expenses, the fees of attorneys, actuaries and accountants, audit and actuarial fees, data processing systems expenses, and costs for the Loomis Company Third Party Administrator (TPA) functions, including electronic data interchange functions.  Insurer shall be responsible for any and all other fees and expenses incurred by Company in connection with the provision of services under this Agreement.

The Management Fee under this Agreement shall be equal to the actual cost to provide services as described herein.  Company will provide all staffing, IT, enrollment, billing and cash collection, claims adjudication, a comprehensive network, utilization management, marketing, office space and other general expenses.  Company will contract for and pass through to Insurer vendor provided services for health improvement costs.  This Agreement is intended to provide for and address functions for local Texas staffing.

Beginning with the calendar year effective 2021, and for each subsequent calendar year while this Agreement is in effect, the Management Fee shall be reviewed by Company and Insurer to determine its reasonableness in relation to the management services provided herein. Upon completion of this review, Company shall provide any proposed adjustment to the

Management Fee to the contact identified in Section 1 not less than sixty (60) days prior to the first day of the calendar year for which the adjusted Management Fee shall apply.

Insurer shall notify Company, in writing, of any objection to the adjusted Management Fee at least thirty (30) days prior to the effective date of the adjusted Management Fee.  If an objection is raised, the adjusted Management Fee shall go into effect as proposed while the Parties make a good faith effort to resolve their differences regarding the adjusted Management Fee.  If those differences are resolved, the agreed to adjusted Management Fee shall be effective retroactive to the first day of that calendar year.

Company shall provide Insurer, on a monthly basis, with itemized financial statements, which shall include line item fees and expenses paid to each third-party vendor.  Company shall further document and make available upon request sufficient detail regarding the actual costs of services rendered on behalf of Insurer to support the reasonableness of the Management Fee. Further, Company and Insurer shall ensure that all books and records will ensure compliance with SSAP No. 70, including with respect to the allocation of expenses.

Any adjusted Management Fee shall be evidenced by a written amendment of this Agreement signed by both Parties hereto.

Monthly Management Fees shall be paid by Insurer to Company not later than 15 days after the end of each calendar month.

Insurer shall not advance any payments or funds to Company except as provided in this Agreement for the purpose of  funding payment of the Management Fee and expenses for the management services performed by Company to Insurer pursuant to Section 1 of this Agreement.

3.　　Payment of Expenses of Insurer.  Company, on behalf of Insurer, shall utilize the funds of Insurer to pay all of the expenses of Insurer, including, without limitation by reason of

specification, the following: losses; investment expenses; damages, court costs, taxes, assessments and license fees; the fees of investment and other advisors; the fees and expenses of the Directors and officers of Insurer; governmental fines and penalties; and any guaranty or similar assessment, if any, imposed by any Governmental Agency. Insurer shall fund a bank account (and grant Company check writing authority on such account) with amounts sufficient to fund the Management Fees and expenses incurred by Company on behalf of Insurer, and to the extent such funding is insufficient to pay such Management Fees and expenses, advance funds to Company to pay for the Management Fees and expenses as specified in this paragraph. This Agreement, and any amendments, will be subject to the approval of the TDI.

All funds and invested assets of Insurer are the exclusive property of Insurer, shall be held for the benefit of Insurer, and, at all times, are subject to the control of Insurer. The expenses incurred and payments received shall be allocated to Insurer in conformity with statutory accounting practices consistently applied.

4. <u>Services Not Covered</u>. Services not intended to be covered by this Agreement are: the actual costs for broker commissions; accrual for claims adjustment expenses; bank and credit card fees; member fulfillment and policyholder communications; premium taxes; exchange fees; risk adjustment fees; and income taxes

5. <u>Records; Right to Audit</u>. Company shall keep sufficient Books and Records for the express purpose of recording therein the nature and details of the management services and financial transactions undertaken for Insurer pursuant to this Agreement. All Books and Records maintained by Company that pertain to the management services performed by Company pursuant to this Agreement are and shall remain the property of Insurer and shall be maintained in a fiduciary capacity by Company for the benefit, and subject to the ultimate control, of

Insurer. "Books and Records" shall mean all books and records developed or maintained pursuant to or related to this Agreement. The Books and Records of shall be so maintained as to clearly and accurately disclose the nature and details of the transactions including such accounting information as is necessary to support the reasonableness of the charges or fees to the respective Parties. In order to fulfill its obligations under this Agreement or state or federal law, Company may, at the discretion of Insurer, during the term of this Agreement and thereafter, have access to such Books and Records. Company shall, at all times during the term of this Agreement and thereafter, keep such Books and Records confidential and not disclose any such Books and Records without the express prior written consent of Company.

Insurer and any regulatory authority having jurisdiction over Insurer shall, during the term of this Agreement and thereafter, have the right to examine and audit, at the Texas offices of Company at all reasonable times, the books and records of Company that pertain solely to the management services performed by Company pursuant to this Agreement. This right of examination and audit shall survive the termination of this Agreement and shall remain in effect for so long as either Company or Insurer has any rights or obligations under this Agreement.

6.     Term and Termination. This Agreement is effective as of the date hereof and shall continue in effect for a period of five (5) years from the date hereof, and thereafter for successive one (1) year terms unless Company or Insurer provides to the other Party written notice of termination not less than six (6) months prior to the expiration of either (i) the initial four (4) year term or (ii) any of the successive one (1) year terms. In addition, this Agreement may be terminated (i) by mutual agreement of the Parties, (ii) for cause, or (iii) upon termination of the Claims Services provisions. Cause shall mean any material violation of the terms or conditions of this Agreement that is not cured within thirty (30) days after notice of such material

violation from a Party to this Agreement. Such notice shall describe in reasonable detail the material violation or violations giving rise to the notice. If the material violation[s] is[are] not cured during such thirty (30) day period, this Agreement may be terminated on the date that is thirty (30) days subsequent to the date that notice of termination is delivered to the Party in violation of this Agreement; provided, however, no termination notice shall be effective if Section 7 (Arbitration) has been invoked until a decision of the arbitrators has been delivered to Company and to Insurer. Orders issued by the TDI, the Texas Courts, or any other state insurance department or any federal, state or local court shall not constitute a material violation so long as any such orders do not affect compensation paid to Company. For purposes of this Agreement, a failure to make any payment due will be a material violation and for which termination may be effected on five (5) days' notice after expiration of any applicable cure period. In addition, this Agreement may be terminated by either Party if the other Party repeatedly fails to perform its duties under this Agreement to the satisfaction of the complaining Party, notwithstanding the fact that such failure does not rise to the level of a material breach; provided, however, that such termination shall not be available to a Party unless the Chief Executive Officer, or appointee, of such Party has provided the Chief Executive Officer, or appointee, of the other Party with notice of such dissatisfaction and the officers have attempted in good faith to resolve any such dissatisfaction; provided, further, however, that no such termination described in this Section 6 may be effected until one hundred and eighty (180) days after the officers have determined that such issues cannot be resolved. Notwithstanding anything to the contrary above, upon ninety (90) days' notice prior to the expiration of the second year of this Agreement, Insurer may provide notice to Company of its intent to terminate this Agreement and such termination shall be effective as of the last day of the second year of this Agreement.

7.     Arbitration.  If any dispute or difference of opinion arises between the Parties with respect to this Agreement, Company and Insurer agree that such dispute or difference of opinion shall be submitted to arbitration before a panel of three arbitrators, each of whom shall be an active or retired disinterested officer of a life and health insurance company. One such arbitrator shall be chosen by Company, one such arbitrator shall be chosen by Insurer and the third arbitrator shall be chosen by the other two arbitrators. If either Party hereto refuses or neglects to appoint an arbitrator within sixty (60) days after the other Party requests it to do so, or if the two arbitrators selected by Company and Insurer fail to agree upon a third arbitrator within thirty (30) days after the appointment of the second arbitrator to be appointed, such arbitrator or arbitrators, as the case may be, shall, upon the application of either Party, be appointed by the Austin, Texas office of the American Arbitration Association and the arbitrators shall thereupon proceed. The arbitration shall proceed under the rules of the American Arbitration Association. The arbitrators shall consider this Agreement as an honorable engagement rather than merely as a legal obligation and they are relieved of all judicial formalities and may abstain from following the strict rules of law and evidence. The decision of the majority of the arbitrators shall be final and binding on both Parties. Said decision shall be a Reasoned Award Decision.  Each Party shall bear the expense of its own arbitrator and shall bear one-half of the expenses of the third arbitrator and of the arbitration. Any such arbitration shall take place in either Austin, Texas or Wilmington, Delaware unless otherwise agreed by the Parties hereto. An arbitration award may be enforced by any court of competent jurisdiction.

8.     Indemnification.

(a)     Insurer shall, jointly and severally, indemnify, defend and hold harmless Company, Bright Health, Inc. ("Parent") and its affiliates, and each member, director, manager,

officer, employee and agent thereof (each a "Company Indemnified Party"), from and against all claims, losses, damages, liabilities and expenses, including, without limitation, settlement costs and any reasonable legal fees and expenses or other expenses for investigation and defending any actions or threatened actions ("Losses"), incurred by such Company Indemnified Party as a result of any threatened, pending or completed action, suit or proceeding, whether civil, criminal or investigative, including an action by or in the right of Insurer, relating to or arising out of the services performed by Company hereunder, except to the extent the act or failure to act giving rise to the claim for indemnification is determined by a court to have constituted the willful misconduct or gross negligence of the Company Indemnified Party. Orders issued by the TDI, the Texas Courts, or any other state insurance department or any federal, state or local court shall be given precedence.

(b) Company (the "Company Indemnifying Party") shall indemnify, defend and hold harmless Insurer and each member, director, manager, officer, employee and agent thereof (each an "Insurer Indemnified Party"), from and against all Losses incurred by such Insurer Indemnified Party as a result of any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative relating to or arising out of (i) a material breach of the representations, warranties or covenants of Company under this Agreement, or (ii) the willful misconduct or gross negligence of any Company Indemnifying Party.

(c) The indemnifying party shall advance expenses incurred by an Indemnified Party in defending any action or proceeding referred to in this Section 8 in advance of the final disposition of such action or proceeding upon receipt of an undertaking by or on

TDI HCS# 1130457                    12

behalf of such indemnified party to repay such amount if it shall ultimately be determined that such indemnified party is not entitled to be indemnified by the indemnifying party.

9.     Receivership, Etc.

(a)     If Insurer is placed into Rehabilitation or Liquidation by the Texas Insurance Commissioner ("Commissioner") applicable Texas law, then:

(i)  all of the rights under this Agreement for management services for Insurer shall belong to the Commissioner; and

(ii) all books and records developed or maintained under and related to this Agreement will immediately be made available to the receiver or Commissioner and must be turned over to th receiver or Commissioner immediately upon the receiver's or Commissioner's request.

(b)     Company will continue to maintain the systems, programs and "other infrastructure" supporting this Agreement notwithstanding a seizure of Insurer by the Commissioner under the Texas Insurance Code, and will make them available to the Commissioner for so long as Company receives timely payment for such services rendered. "Other infrastructure" shall include hard operating assets inclusive of:  claims data system; telephones; computers; furniture; filing cabinets; stationary items; recording devices; fax machines; printers; and monitors.  Such hard operating assets are subject to transfer to Company, or as directed by the Insurance Commissioner.

(c)     The Company shall have no automatic right to terminate this Agreement if Insurer is placed into rehabilitation, receivership or liquidation as described in this Section.  This Agreement may only be terminated as provided in Section 6 herein, or pursuant to a court order.

(d)     The Company acknowledges that the Insurer is a third party beneficiary to material contracts of the Company and as such, the Insurer, and the Insurance Commissioner if the Insurer is placed under rehabilitation, receivership or liquidation, shall at all times retain privity rights to enforce any contract held by Company that may encompass services or goods furnished to Insurer pursuant to this agreement.

10.     Miscellaneous.

(a)     This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

(b)     Company is authorized, from time to time in its discretion, to contract with others for the performance of the management services Company has agreed to provide to Insurer under this Agreement, provided, however, that Company shall remain responsible to Insurer for the proper and timely performance of all management services contemplated by this Agreement. Neither Party may assign this Agreement without the written consent of the other Party, and any attempted assignment without such consent shall be void; provided, however, that Company may assign this Agreement to any company owned or controlled, in each case directly or indirectly, by Parent, Bright Health, Inc.

(c)     Any notice made under this Agreement shall be in writing, shall be delivered either by registered US Mail, return receipt requested, or by a recognized over-night delivery service, and shall be addressed to the receiving party at its principal business address. Notices shall be deemed delivered when received by the Party to whom the notice was addressed.

(d)     Any amendment or revision, and any waiver, of this Agreement shall be in writing and signed by both Parties hereto.

(e)     This Agreement is the entire agreement between the Parties with respect to the subject matter hereof and supersedes any prior or contemporaneous agreement, whether written or oral, with respect to such subject matter.

(f)     This Agreement shall be binding on the successors and permitted assigns of the Parties.

(g)     This agreement shall incorporate the attached Medicare Advantage and Medicare Part D regulatory addendum.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written by the undersigned thereunto duly authorized.

**BRIGHT HEALTH MANAGEMENT, INC.**

By: *CR Smith*
CR Smith (May 2, 2022 08:12 CDT)

Name: CR Smith

Title: EVP CFO/CAO

Date: May 2, 2022

**BRIGHT HEALTHCARE INSURANCE COMPANY OF TEXAS**

By: *Jay Matushak*
Jay Matushak (May 2, 2022 08:15 CDT)

Name: Jay Matushak

Title: CFO BHC

Date: May 2, 2022

**Exhibit A**

**AFFILIATES OF BRIGHT HEALTH MANAGEMENT INC.**

Bright Health, Inc.

Bright Health Insurance Company of Alabama, Inc.

Bright Health Company of Arizona

Bright Health Company of Georgia

Bright Health Company of North Carolina

Bright Health Company of South Carolina, Inc.

Bright Health Insurance Company

Bright Health Insurance Company of Illinois

Bright Health Insurance Company of Florida

Bright Health Insurance Company of New York

Bright Health Insurance Company of Ohio, Inc.

Bright Health Insurance Company of Tennessee

Bright HealthCare Insurance Company of Texas

Universal Care, Inc.

**MEDICARE ADVANTAGE REGULATORY ADDENDUM**

Bright Health Management, Inc., and its affiliates (Bright Health Insurance Company and its other health plan affiliates) are engaged in the business of Medicare Advantage and Part D coverage through a contract with the Center for Medicare & Medicaid Services (CMS) ("MA Plan(s)"). Vendor or Provider provides services to MA Plan Members pursuant to an agreement with MA Plan (Agreement). Accordingly, Vendor or Provider agrees, on behalf of itself and its affiliates performing services to MA Members under the Agreement, to comply with the following provisions.

Any term not defined in this addendum shall have the same meaning as set forth in the Agreement. For purposes of this addendum, "**Member"** shall mean an individual who is enrolled in Bright Health Plans' MA coverage. In the event of a conflict with the Agreement, the terms of this addendum will control.

**General Compliance Provisions**

1. Delegated Activities and Reporting Requirements. The delegated activities and reporting responsibilities are specified in the Agreement. 42 CFR §§ 422.504(i)(4)(i).

2. Compliance with Medicare Laws, Regulations, and CMS Guidance. Vendor or Provider agrees to comply with all applicable Medicare laws, regulations, and CMS guidance. 42 CFR §§ 422.504(i)(4)(v) and 423.505(i)(4)(iv).

3. Compliance with MA Plan's Contract with CMS. Any services or other activity performed in accordance with this Agreement by Vendor or Provider are consistent and comply with the MA Plan's contractual obligations with CMS. 42 C.F.R. § 422.504(i)(3)(iii).

4. Medicare Compliance Program. Vendor or Provider agrees to develop and maintain an effective MA compliance program that meets CMS requirements and that includes without limitation: (a) an effective system for routine monitoring and auditing to identify compliance risks; (b) procedures and systems for prompt response to compliance issues; (c) written policies, procedures, and standards of conduct that articulate the Vendor or Provider's commitment to comply with all applicable Federal and state standards and describes compliance expectations; (d) designation of a compliance office and compliance committee responsible for oversight of the compliance plan; (e) an effective compliance training program that includes fraud, waste, and abuse training; (f) effective lines of communication between the compliance officer and the MA Plan and the compliance officer and Vendor or Provider employees and contractors; (g) published and enforced disciplinary standards for noncompliance by employees and contractors, up to and including termination. Provide Medicare Standards of Conduct and policies and procedures to all employees and contractors who perform services pursuant to the Agreement. 42 CFR 422.503(b).

5. Report Compliance Concerns. Vendor or Provider agrees to report compliance or Fraud, Waste and Abuse ("FWA") concerns to the MA Plan within five (5) calendar days of discovery of an actual, suspected or potential compliance concern or FWA concern. If the matter is emergent, either because beneficiary access to care is affected or because of other critical impacts, Vendor or Provider must notify the MA Plan as soon as reasonably possible, and no later than twenty-four (24) hours from discovery. Vendor or Provider shall coordinate with MA Plan to (a) timely investigate compliance or FWA risk; (b) mitigate the FWA or compliance concern, and (c) implement the appropriate corrective action. 42 CFR § 422.503(b).

6. Exclusion. Vendor or Provider certifies that no member of its governing bodies and advisory boards, individual employed or contracted practitioners, all other employees and contractors, or

affiliated provider organizations has been excluded from participation in federal contracts by: (a) U.S. Treasury Office of Foreign Assets Control; (b) Office of Inspector General of the Department of Health and Human Services; or (c) U.S. General Services Administration (GSA). Vendor or Provider agrees to monitor the exclusion lists published by the above federal agencies and perform background checks prior to hire and monthly thereafter for all employees, independent contractors, volunteers, and members of its governing bodies and advisory boards. Vendor or Provider shall also require any of its subcontracts to include such checks prior to hire and on a monthly basis thereafter. If any of its employees or other individuals are excluded by such federal agencies, Vendor or Provider agrees to notify the MA Plan and immediately remove the individual from any services performed under the Agreement on behalf of the MA Plan. 42 CFR § 422.503(b); 422.752(a); 423.504(d) and (i).

7. Investigations, Legal Actions, and Arbitrations. Vendor or Provider acknowledges to the best of its knowledge, information and belief, there are no past or pending investigations, legal actions, or matters subject to arbitration involving Vendor or Provider or any of its employees, contractors, Governing Body members, Downstream Entities, or any major shareholders (5% or more) on matters relating to payments from governmental entities, both federal and state, for health care and/or prescription drug services.

8. Convictions and Civil Judgements. Vendor or Provider acknowledges to the best of its knowledge, information, and belief that neither Vendor or Provider, nor any of its employees, contractors, Governing Body members, Downstream Entities, or any major shareholders (5% or more) have been criminally convicted nor has a civil judgment been entered against them for fraudulent activities nor are they sanctioned under any Federal program involving the provision of health care and/or prescription drug services.

9. Section 1557 of the Patient Protection and Affordable Care Act (ACA). Vendor or Provider shall comply with the nondiscrimination provisions, meaningful access requirements, language assistance services, and requirements of Section 1557 of the ACA requirements. 45 CFR §§ 92.1 – 92.303.

10. Certifications to Accuracy, Completeness, and Truthfulness of Data. If Vendor or Provider generates data to determine payment on behalf of MA Plan, then Vendor or Provider must certify (based on best knowledge, information and belief) the accuracy, completeness, and truthfulness of the data.

11. Marketing Guidelines. To the extent Vendor or Provider performs services or functions that are governed by the CMS Manual System, Pub. 100-16 Medicare Managed Care, Chapter 3, Medicare Marketing Guidelines for the Department of Health & Human Services Centers for Medicare & Medicaid Services, as amended, Vendor or Provider agrees to comply with such guidelines.

**Records**

12. Record Retention and Audit. Vendor or Provider agrees to retain any books, records, contracts, and other documents related to the MA Plan's MA contract with CMS for a period of ten (10) years from the final date of the MA contract or the completion of any audit, whichever is later. Vendor or Provider agrees to comply at no additional charge with any document requests by the MA Plan pursuant to an audit, for purposes of MA Plan oversight, or for any other reason related to the operation of the MA business. Vendor or Provider agrees to allow HHS, the Comptroller General, or their designees to audit and inspect any books, records, contracts, and other

documents related to the MA Plan's MA contract with CMS for a period of ten (10) years from the final date of the MA contract or the completion of any audit, whichever is later. 42 CFR §§ 422.504(i)(2)(i) - 422.504(i)(2)(iv).

13. <u>Data Privacy and Confidentiality of Records</u>. Vendor or Provider shall establish procedures that comply with the privacy, confidentiality and accuracy of Member record requirements including without limitation,  abiding by all Federal and State laws regarding use and disclosure of medical records, or other protected health and enrollment information, and safeguarding the privacy of information that identifies a particular Member. Vendor or Provider shall have procedures that, (1) specify for what purpose the information is used by Vendor or Provider, 2) specify to whom and for what purpose it discloses the information to third parties, 3) ensure that medical information is released only in accordance with applicable Federal or State law, or pursuant to court orders or subpoenas, (4) specify that the records and information are maintained in an accurate and timely manner, and (5) ensure timely access by Members to the records and information that pertain to them. 42 C.F.R. §§ 422.504(a)(13); 422.118; and 42 C.F.R §423.136

**General Contract Provisions**

14. <u>Vendor Offshore Services</u>. Vendor agrees that it will not perform offshore administrative services, or any other services on behalf of the MA Plan, or delegate to offshore entities without obtaining written prior approval from the MA Plan. If such approval is granted, Vendor agrees to demonstrate compliance with all laws, rules, and CMS guidance related to offshore services and related to the transmission of electronic data and protected health information offshore. MA Plan has the right to conduct an annual audit of the Vendor to evaluate the practices and procedures, including but not limited to PHI privacy and security controls, of the Vendor and the audit results will be used to evaluate the continuation of the offshore relationship.

15. <u>Amendments Required by Law</u>. If Medicare laws, regulations, or CMS guidance require a change to the terms of this addendum, this addendum may be modified by the MA Plan to reflect the changed requirements and such modification will become immediately upon written notice by the MA Plan providing the modified addendum to the Vendor or Provider without the need to amend the Agreement.

16. <u>Monitoring and Termination</u>. The MA Plan will monitor the Vendor or Provider's performance under the Agreement and this addendum on an ongoing basis.  The MA plan and CMS have the right to revoke the delegation activities and may terminate the Agreement with Vendor or Provider if the MA Plan or CMS determines that Vendor or Provider has committed a violation of CMS rules, committed FWA, or has not performed satisfactorily under this addendum.  42 CFR § 422.504(i)(4) ((ii)-(iii).

17. <u>Flow-Down Requirements</u>. Vendor or Provider (where services are delegated) will incorporate these requirements into its agreements with downstream providers, subcontractors, and delegated entities. The MA Plan retains the right to approve, suspend, or terminate Vendor or Provider's agreements with downstream providers, subcontractors, and delegated entities.  42 CFR § 422.504(i)(5), 423.505.

Vendor or Provider shall monitor and audit its downstream providers, subcontractors, and delegated entities ("Downstream Entity(ies)") to ensure that they are in compliance with all applicable laws, regulations, and contractual requirements, including compliance with these Medicare Advantage provisions. If Vendor or Provider determines a Downstream Entity requires corrective action(s), Vendor or Provider shall ensure that such corrective action(s) are taken by its

Downstream Entity. Vendor or Provider shall provide information about its Downstream Entity oversight, including any corrective action plans, to MA Plan upon request.

Notwithstanding any relationships that MA Plan may have with first tier, downstream, and related entities, MA Plan maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS. Vendor or Provider shall participate in and comply with MA Plan's oversight program, including but not limited to, attending meetings; providing attestations; responding to document requests, FWA and General Compliance Training, policy, and procedure review requests; implementing corrective action plans imposed by MA Plan or CMS; participating in monitoring and reviews; and providing MA Plan with similar information about Vendor's or Provider's Downstream Entities.

**Requirements Applicable Only to Providers**

1. <u>Hold Harmless</u>. Provider agrees to accept the MA Plan's MA contracted rate as payment in full and agrees not to hold Members liable for the payment of any fees that are the obligation of the MA Plan. 42 CFR §§ 422.504(i)(3)(i) and § 422.504(g).

2. <u>Medicare-Medicaid Enrollees</u>: For Members eligible for both Medicare and Medicaid, Provider agrees not to hold MA Enrollees liable for Medicare Part A and Part B cost sharing amounts where the Members are eligible for Medicare and Medicaid coverage and the state is responsible for paying such amounts.   The Provider shall not impose cost-sharing that exceeds the amount of cost-sharing that would be permitted with respect to the individual under Title XIX if the individual were not enrolled in such a plan.  Providers will: (1) accept the MA plan payment as payment in full, or (2) bill the appropriate State source.  42 CFR §§ 422.504(i)(3)(i) and § 422.504(g)(1)(iii).

3. <u>Credentialing</u>.   Where MA Plan has delegated credentialing to Provider for provider organizations and/or individual practitioners, Provider agrees to submit its credentialing process and upon reasonable request, the credentials of individual medical professionals and organizations affiliated with Provider, to the MA Plan for review and approval and Provider agrees that the MA Plan may monitor and audit the credentialing process on an ongoing basis.  42 CFR § 422.504(i)(4(iv).

4. <u>Termination Rights.</u>  MA Plan retains the right to approve, suspend, or terminate the selection of provider organizations and individual practitioners and MA Plan also retains the right to revoke the delegation of credentialing to Provider without triggering a termination of the Agreement. 42 CFR § 422(i)(5).

5. <u>Prompt Payment</u>. MA Plan agrees to pay clean claims within the time period required by MA regulations.  If MA Plan reimburses clean claims outside of the time period required by MA regulations, MA Plan agrees to pay interest as set forth by the Department of Treasury pursuant to the federal Prompt Payment Act. Where Provider is responsible for paying claims on behalf of the MA Plan, Provider agrees to include in its contracts and adhere to all applicable federal and state requirements for the prompt payment of claims with respect to downstream providers. 42 CFR § 520(b)(1) & 504(c).

6. <u>Stop-loss Protection</u>. Where Provider accepts financial risk in its Agreement with the MA Plan, Provider agrees to comply with all CMS rules for physician incentive plans applicable to the arrangement, including without limitation obtaining stop-loss protection where required. 42 CFR § 422.208.

7. <u>Non-Covered Services</u>. With the exception of an explicitly excluded service in the Member's MA Evidence of Coverage, Providers may not permit a Member to self-pay for a non-covered service unless the Member, or the Provider on the Member's behalf, has first obtained an organization determination from the MA Plan denying coverage for the service. For an explicitly excluded service, Providers may permit the Member to self-pay for the service without an organization determination.

8. <u>Provider Offshore Services</u>.  Provider agrees that it will notify the MA Plan before performing offshore administrative services, or any other services on behalf of the MA Plan. Provider agrees to demonstrate compliance with all laws, rules, and CMS guidance related to offshore services and related to the transmission of electronic data and protected health information offshore. MA Plan has the right to conduct an annual audit of the Provider to evaluate the practices and procedures.

**TAB D:**
**Bright Health Group's Organizational Chart**
**3 RR 672–673**

# Bright Health Group (as of 11/18/22)

```
                        Bright Health
                        Group, Inc. (DE)
                             (1)
                              |
            +-----------------+------------------+
            |                                    |
    Bright Health                         Bright Health
    Services, Inc.                        Management,
    (DE) (2)                              Inc. (DE)
                                               |
```

- Bright Health Company of Arizona (AZ)
- Bright Health Insurance Company (CO) **(3)**
- Bright Health Insurance Company of New York (NY)
- Bright Health Insurance Company of Tennessee (TN)
- Bright Health Insurance Company of Ohio, Inc. (OH)
- Bright Health Insurance Company of Illinois (IL)
- Bright Health Insurance Company of Florida (FL)
- Bright Health Company of Georgia (GA)
- Bright Health Company of North Carolina (NC)
- Bright Health Company of South Carolina, Inc. (SC)
- Bright Health Company of California, Inc. (CA)
  - Universal Care, Inc. d.b.a. Brand New Day (CA) **(5)**
  - Central Health Plan of California, Inc. (CA) **(6)**
- True Health New Mexico, Inc. (NM) **(4)**
- Bright HealthCare Insurance Company of Texas (TX)
- Bright HealthCare Company of Florida, Inc. (FL)

(1)

(2) See Page 2.

(3) Bright Health Insurance Company of Alabama, Inc. (AL) merged with and into Bright Health Insurance Company on 12/31/2020.

(4) 100% of stock of True Health New Mexico, Inc. acquired on 3/31/2021.

(5) 100% of stock of Universal Care, Inc. acquired on 4/30/2020.

(6) 100% of stock of Central Health Plan of California, Inc. acquired on 4/1/2021.



(1) See Page 1.

(2) **NO OWNERSHIP INTEREST.** Entity owned by physician, Rundeep Gadh, D.O., that is subject to Management Services Agreement and Stockholder Transfer Restriction Agreement with Bright Health Services, Inc.

(3) Medical Practice Holding Company, LLC owns 62% of membership interests. PMA II, LLC owns 38% of membership interest.

(4) **NO OWNERSHIP INTEREST.** Entity owned by physician, Dr. Dinesh Khanna, that is subject to Management Services Agreement and Succession Agreement with Premier Medical Associates of Florida, LLC.

(5) Zipnosis, Inc. merged with and into DocSquad, LLC on 3/31/2021.

(6) Medical Practice Holding Company, LLC owns 75% of membership interests. RRD Healthcare, LLC owns 25% membership interests.

(7) Includes: Centrum Medical Center – Airport, LLC; Centrum Medical Center – East Hialeah, LLC; Centrum Medical Center – West Hialeah, LLC; Centrum Medical Center – Miami Gardens, LLC; Centrum Medical Center – South Dade, LLC; Centrum Medical Center – Westchester, LLC; Centrum Medical Center – Little Havana 27 Ave, LLC; Centrum Medical Center – Little Havana 12 Ave, LLC; Centrum Medical Centers of Coral Springs, LLC; Centrum Medical Centers of Margate, LLC; Centrum Medical Centers of Davie, LLC; Centrum Medical Centers of Hallandale, LLC; Centrum Medical Centers of Lighthouse Point, LLC; Centrum Medical Centers of Fort Lauderdale, LLC; Centrum Medical Centers of Sheridan, LLC; Centrum Medical Centers of Miramar, LLC; Centrum Medical Center – Homestead, LLC

(8) **NO OWNERSHIP INTEREST.** Entity owned by physician, Dr. Manuel Lam, that is subject to Management Services Agreement and Succession Agreement with Centrum Medical Holdings, LLC.

(9) **NO OWNERSHIP INTEREST.** Entity owned by physician, Dr. James Juiming Ho, MD, that is subject to Management Services Agreement and Succession Agreement with Centrum Medical Holdings, LLC. *[subject to confirmation]*.

(10) Centrum Health Franchisor, LLC (DE) merged into Centrum Medical Holdings, LLC on 6/13/2022.

# TAB E:
# NAIC Model Law 440 (2021)

**INSURANCE HOLDING COMPANY SYSTEM REGULATORY ACT**

**Table of Contents**

Section 1.      Definitions
Section 2.      Subsidiaries of Insurers
Section 3.      Acquisitions of Control of or Merger With Domestic Insurer
Section 3.1     Acquisitions Involving Insurers Not Otherwise Covered
Section 4.      Registration of Insurers
Section 5.      Standards and Management of an Insurer Within an Insurance Holding Company System
Section 6.      Examination
Section 7.      Supervisory Colleges
Section 7.1     Group-wide Supervision of Internationally Active Insurance Groups
Section 8.      Confidential Treatment
Section 9.      Rules and Regulations
Section 10.     Injunctions, Prohibitions against Voting Securities, Sequestration of Voting Securities
Section 11.     Sanctions
Section 12.     Receivership
Section 13.     Recovery
Section 14.     Revocation, Suspension, or Nonrenewal of Insurer's License
Section 15.     Judicial Review, Mandamus
Section 16.     Conflict with Other Laws
Section 17.     Separability of Provisions
Section 18.     Effective Date
Appendix.       Alternate Provisions

**Section 1.      Definitions**

As used in this Act, the following terms shall have these meanings unless the context shall otherwise require:

A.      "Affiliate." An "affiliate" of, or person "affiliated" with, a specific person, is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

B.      "Commissioner." The term "commissioner" shall mean the insurance commissioner, the commissioner's deputies, or the Insurance Department, as appropriate.

**Drafting Note**: Insert the title of the chief insurance regulatory official wherever the word "commissioner" appears.

C.      "Control." The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or nonmanagement services, or otherwise, unless the power is the result of an official position with or corporate office held by the person. Control shall be presumed to exist if any person, directly or indirectly, owns, controls, holds with the power to vote, or holds proxies representing, ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by Section 4K that control does not exist in fact. The commissioner may determine, after furnishing all persons in interest notice and opportunity to be heard and making specific findings of fact to support the determination, that control exists in

fact, notwithstanding the absence of a presumption to that effect.

D.      "Group-wide supervisor." The regulatory official authorized to engage in conducting and coordinating group-wide supervision activities who is determined or acknowledged by the commissioner under Section 7.1 to have sufficient significant contacts with the internationally active insurance group.

E.      "Group Capital Calculation instructions" means the group capital calculation instructions as adopted by the NAIC and as amended by the NAIC from time to time in accordance with the procedures adopted by the NAIC.

F.      "Insurance Holding Company System." An "insurance holding company system" consists of two (2) or more affiliated persons, one or more of which is an insurer.

G.      "Insurer." The term "insurer" shall have the same meaning as set forth in Section [insert applicable section] of this Chapter, except that it shall not include agencies, authorities or instrumentalities of the United States, its possessions and territories, the Commonwealth of Puerto Rico, the District of Columbia, or a state or political subdivision of a state.

**Drafting Note**: References in this model act to "Chapter" are references to the entire state insurance code.

**Drafting Note:** States should consider applicability of this model act to fraternal societies and captives.

H.      "Internationally active insurance group." An insurance holding company system that (1) includes an insurer registered under Section 4; and (2) meets the following criteria: (a) premiums written in at least three countries, (b) the percentage of gross premiums written outside the United States is at least ten percent (10%) of the insurance holding company system's total gross written premiums, and (c) based on a three-year rolling average, the total assets of the insurance holding company system are at least fifty billion dollars ($50,000,000,000) or the total gross written premiums of the insurance holding company system are at least ten billion dollars ($10,000,000,000).

I.      "Enterprise Risk." "Enterprise risk" shall mean any activity, circumstance, event or series of events involving one or more affiliates of an insurer that, if not remedied promptly, is likely to have a material adverse effect upon the financial condition or liquidity of the insurer or its insurance holding company system as a whole, including, but not limited to, anything that would cause the insurer's Risk-Based Capital to fall into company action level as set forth in [insert cross reference to appropriate section of Risk-Based Capital (RBC) Model Act] or would cause the insurer to be in hazardous financial condition [insert cross reference to appropriate section of Model Regulation to define standards and commissioner's authority over companies deemed to be in hazardous financial condition].

J.      "NAIC" means the National Association of Insurance Commissioners.

K.      "NAIC Liquidity Stress Test Framework." The "NAIC Liquidity Stress Test Framework" is a separate NAIC publication which includes a history of the NAIC's development of regulatory liquidity stress testing, the Scope Criteria applicable for a specific data year, and the Liquidity Stress Test instructions and reporting templates for a specific data year, such Scope Criteria, instructions and reporting template being as adopted by the NAIC and as amended by the NAIC from time to time in accordance with the procedures adopted by the NAIC.

© 2021 National Association of Insurance Commissioners

L.      "Person." A "person" is an individual, a corporation, a limited liability company, a partnership, an association, a joint stock company, a trust, an unincorporated organization, any similar entity or any combination of the foregoing acting in concert, but shall not include any joint venture partnership exclusively engaged in owning, managing, leasing or developing real or tangible personal property.

M.      "Scope Criteria." The "Scope Criteria," as detailed in the NAIC Liquidity Stress Test Framework, are the designated exposure bases along with minimum magnitudes thereof for the specified data year, used to establish a preliminary list of insurers considered scoped into the NAIC Liquidity Stress Test Framework for that data year.

N.      "Securityholder." A "securityholder" of a specified person is one who owns any security of such person, including common stock, preferred stock, debt obligations and any other security convertible into or evidencing the right to acquire any of the foregoing.

O.      "Subsidiary." A "subsidiary" of a specified person is an affiliate controlled by such person directly or indirectly through one or more intermediaries.

P.      "Voting Security." The term "voting security" shall include any security convertible into or evidencing a right to acquire a voting security.

**Section 2.      Subsidiaries of Insurers**

A.      Authorization. A domestic insurer, either by itself or in cooperation with one or more persons, may organize or acquire one or more subsidiaries. The subsidiaries may conduct any kind of business or businesses and their authority to do so shall not be limited by reason of the fact that they are subsidiaries of a domestic insurer.

**Drafting Note:** This bill neither expressly authorizes noninsurance subsidiaries nor restricts subsidiaries to insurance related activities. It is believed that this is a policy decision which should be made by each individual state. Attached as an appendix are alternative provisions which would authorize the formation or acquisition of subsidiaries to engage in diversified business activity.

B.      Additional Investment Authority. In addition to investments in common stock, preferred stock, debt obligations and other securities permitted under all other sections of this Chapter, a domestic insurer may also:

    (1)      Invest, in common stock, preferred stock, debt obligations, and other securities of one or more subsidiaries, amounts which do not exceed the lesser of ten percent (10%) of the insurer's assets or fifty percent (50%) of the insurer's surplus as regards policyholders, provided that after such investments, the insurer's surplus as regards policyholders will be reasonable in relation to the insurer's outstanding liabilities and adequate to meet its financial needs. In calculating the amount of such investments, investments in domestic or foreign insurance subsidiaries and health maintenance organizations shall be excluded, and there shall be included:

        (a)      Total net monies or other consideration expended and obligations assumed in the acquisition or formation of a subsidiary, including all organizational expenses and contributions to capital and surplus of the subsidiary whether or not represented by the purchase of capital stock or issuance of other securities, and

      (b)      All amounts expended in acquiring additional common stock, preferred stock, debt obligations, and other securities; and all contributions to the capital or surplus of a subsidiary subsequent to its acquisition or formation;

**Drafting Note:** When considering whether to amend its Holding Company Act to exempt health maintenance organizations and other similar entities from certain investment limitations, a state should consider whether the solvency and general operations of the entities are regulated by the insurance department. In addition to, or in place of, the term "health maintenance organizations" in Paragraph (1) above, a state may include any other entity which provides or arranges for the financing or provision of health care services or coverage over which the commissioner possesses financial solvency and regulatory oversight authority.

      (2)      Invest any amount in common stock, preferred stock, debt obligations and other securities of one or more subsidiaries engaged or organized to engage exclusively in the ownership and management of assets authorized as investments for the insurer provided that each subsidiary agrees to limit its investments in any asset so that such investments will not cause the amount of the total investment of the insurer to exceed any of the investment limitations specified in Paragraph (1) or in Sections [insert applicable section] through [insert applicable section] of this Chapter applicable to the insurer. For the purpose of this paragraph, "the total investment of the insurer" shall include:

            (a)      Any direct investment by the insurer in an asset, and

            (b)      The insurer's proportionate share of any investment in an asset by any subsidiary of the insurer, which shall be calculated by multiplying the amount of the subsidiary's investment by the percentage of the ownership of the subsidiary;

      (3)      With the approval of the commissioner, invest any greater amount in common stock, preferred stock, debt obligations, or other securities of one or more subsidiaries; provided that after the investment the insurer's surplus as regards policyholders will be reasonable in relation to the insurer's outstanding liabilities and adequate to its financial needs.

C.      Exemption from Investment Restrictions. Investments in common stock, preferred stock, debt obligations or other securities of subsidiaries made pursuant to Subsection B shall not be subject to any of the otherwise applicable restrictions or prohibitions contained in this Chapter applicable to such investments of insurers [except the following:    ].

**Drafting Note:** The last phrase is optional in those states having certain special qualitative limitations, such as prohibitions on investments in stock of mining companies, which the state may wish to retain as a matter of public policy.

D.      Qualification of Investment; When Determined. Whether any investment made pursuant to Subsection B meets the applicable requirements of that subsection is to be determined before the investment is made, by calculating the applicable investment limitations as though the investment had already been made, taking into account the then outstanding principal balance on all previous investments in debt obligations, and the value of all previous investments in equity securities as of the day they were made, net of any return of capital invested, not including dividends.

      © 2021 National Association of Insurance Commissioners

E.     Cessation of Control. If an insurer ceases to control a subsidiary, it shall dispose of any investment therein made pursuant to this section within three (3) years from the time of the cessation of control or within such further time as the commissioner may prescribe, unless at any time after the investment shall have been made, the investment shall have met the requirements for investment under any other section of this Chapter, and the insurer has so notified the commissioner.

**Section 3.     Acquisition of Control of or Merger with Domestic Insurer**

A.     Filing Requirements.

(1)     No person other than the issuer shall make a tender offer for or a request or invitation for tenders of, or enter into any agreement to exchange securities for, seek to acquire, or acquire, in the open market or otherwise, any voting security of a domestic insurer if, after the consummation thereof, such person would, directly or indirectly (or by conversion or by exercise of any right to acquire) be in control of the insurer, and no person shall enter into an agreement to merge with or otherwise to acquire control of a domestic insurer or any person controlling a domestic insurer unless, at the time the offer, request or invitation is made or the agreement is entered into, or prior to the acquisition of the securities if no offer or agreement is involved, such person has filed with the commissioner and has sent to the insurer, a statement containing the information required by this section and the offer, request, invitation, agreement or acquisition has been approved by the commissioner in the manner prescribed in this Act.

(2)     For purposes of this section, any controlling person of a domestic insurer seeking to divest its controlling interest in the domestic insurer, in any manner, shall file with the commissioner, with a copy to the insurer, confidential notice of its proposed divestiture at least 30 days prior to the cessation of control. The commissioner shall determine those instances in which the party(ies) seeking to divest or to acquire a controlling interest in an insurer, will be required to file for and obtain approval of the transaction. The information shall remain confidential until the conclusion of the transaction unless the commissioner, in his or her discretion determines that confidential treatment will interfere with enforcement of this section. If the statement referred to in Paragraph (1) is otherwise filed, this paragraph shall not apply.

(3)     With respect to a transaction subject to this section, the acquiring person must also file a pre-acquisition notification with the commissioner, which shall contain the information set forth in Section 3.1C(1). A failure to file the notification may be subject to penalties specified in Section 3.1E(3).

(4)     For purposes of this section a domestic insurer shall include any person controlling a domestic insurer unless the person, as determined by the commissioner, is either directly or through its affiliates primarily engaged in business other than the business of insurance. For the purposes of this section, "person" shall not include any securities broker holding, in the usual and customary broker's function, less than twenty percent (20%) of the voting securities of an insurance company or of any person which controls an insurance company.

B. Content of Statement. The statement to be filed with the commissioner shall be made under oath or affirmation and shall contain the following:

(1) The name and address of each person by whom or on whose behalf the merger or other acquisition of control referred to in Subsection A is to be effected (hereinafter called the "acquiring party"), and

(a) If the person is an individual, his or her principal occupation and all offices and positions held during the past five (5) years, and any conviction of crimes other than minor traffic violations during the past ten (10) years;

(b) If the person is not an individual, a report of the nature of its business operations during the past five (5) years or for the lesser period as the person and any predecessors shall have been in existence; an informative description of the business intended to be done by the person and the person's subsidiaries; and a list of all individuals who are or who have been selected to become directors or executive officers of the person, or who perform or will perform functions appropriate to such positions. The list shall include for each individual the information required by Subparagraph (a) of this paragraph;

(2) The source, nature and amount of the consideration used or to be used in effecting the merger or other acquisition of control, a description of any transaction where funds were or are to be obtained for any such purpose (including any pledge of the insurer's stock, or the stock of any of its subsidiaries or controlling affiliates), and the identity of persons furnishing consideration; provided, however, that where a source of consideration is a loan made in the lender's ordinary course of business, the identity of the lender shall remain confidential, if the person filing the statement so requests;

(3) Fully audited financial information as to the earnings and financial condition of each acquiring party for the preceding five (5) fiscal years of each acquiring party (or for such lesser period as the acquiring party and any predecessors shall have been in existence), and similar unaudited information as of a date not earlier than ninety (90) days prior to the filing of the statement;

(4) Any plans or proposals which each acquiring party may have to liquidate the insurer, to sell its assets or merge or consolidate it with any person, or to make any other material change in its business or corporate structure or management;

(5) The number of shares of any security referred to in Subsection A which each acquiring party proposes to acquire, and the terms of the offer, request, invitation, agreement or acquisition referred to in Subsection A, and a statement as to the method by which the fairness of the proposal was arrived at;

(6) The amount of each class of any security referred to in Subsection A which is beneficially owned or concerning which there is a right to acquire beneficial ownership by each acquiring party;

© 2021 National Association of Insurance Commissioners

(7)     A full description of any contracts, arrangements or understandings with respect to any security referred to in Subsection A in which any acquiring party is involved, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, guarantees against loss or guarantees of profits, division of losses or profits, or the giving or withholding of proxies. The description shall identify the persons with whom the contracts, arrangements or understandings have been entered into;

(8)     A description of the purchase of any security referred to in Subsection A during the twelve (12) calendar months preceding the filing of the statement by any acquiring party, including the dates of purchase, names of the purchasers and consideration paid or agreed to be paid;

(9)     A description of any recommendations to purchase any security referred to in Subsection A made during the twelve (12) calendar months preceding the filing of the statement by any acquiring party, or by anyone based upon interviews or at the suggestion of the acquiring party;

(10)    Copies of all tender offers for, requests, or invitations for tenders of, exchange offers for, and agreements to acquire or exchange any securities referred to in Subsection A, and (if distributed) of additional soliciting material relating to them;

(11)    The term of any agreement, contract or understanding made with or proposed to be made with any broker-dealer as to solicitation of securities referred to in Subsection A for tender, and the amount of any fees, commissions or other compensation to be paid to broker-dealers with regard thereto;

**Drafting Note**: An insurer required to file information pursuant to sub-sections 3B(12) and 3B(13) may satisfy the requirement by providing the commissioner with the most recently filed parent corporation reports that have been filed with the SEC, if appropriate.

(12)    An agreement by the person required to file the statement referred to in Subsection A that it will provide the annual report, specified in Section 4L(1), for so long as control exists;

(13)    An acknowledgement by the person required to file the statement referred to in Subsection A that the person and all subsidiaries within its control in the insurance holding company system will provide information to the commissioner upon request as necessary to evaluate enterprise risk to the insurer; and

(14)    Such additional information as the commissioner may by rule or regulation prescribe as necessary or appropriate for the protection of policyholders of the insurer or in the public interest.

If the person required to file the statement referred to in Subsection A is a partnership, limited partnership, syndicate or other group, the commissioner may require that the information called for by Paragraphs (1) through (14) shall be given with respect to each partner of the partnership or limited partnership, each member of the syndicate or group, and each person who controls the partner or member. If any partner, member or person is a corporation or the person required to file the statement referred to in Subsection A is a corporation, the commissioner may require that the information called

for by Paragraphs (1) through (14) shall be given with respect to the corporation, each officer and director of the corporation, and each person who is directly or indirectly the beneficial owner of more than ten percent (10%) of the outstanding voting securities of the corporation.

If any material change occurs in the facts set forth in the statement filed with the commissioner and sent to the insurer pursuant to this section, an amendment setting forth the change, together with copies of all documents and other material relevant to the change, shall be filed with the commissioner and sent to the insurer within two (2) business days after the person learns of the change.

C.      Alternative Filing Materials.

If any offer, request, invitation, agreement or acquisition referred to in Subsection A is proposed to be made by means of a registration statement under the Securities Act of 1933 or in circumstances requiring the disclosure of similar information under the Securities Exchange Act of 1934, or under a state law requiring similar registration or disclosure, the person required to file the statement referred to in Subsection A may utilize the documents in furnishing the information called for by that statement.

D.      Approval by Commissioner: Hearings.

(1)     The commissioner shall approve any merger or other acquisition of control referred to in Subsection A unless, after a public hearing, the commissioner finds that:

(a)     After the change of control, the domestic insurer referred to in Subsection A would not be able to satisfy the requirements for the issuance of a license to write the line or lines of insurance for which it is presently licensed;

(b)     The effect of the merger or other acquisition of control would be substantially to lessen competition in insurance in this state or tend to create a monopoly. In applying the competitive standard in this subparagraph:

(i)     The informational requirements of Section 3.1C(1) and the standards of Section 3.1D(2) shall apply;

(ii)    The merger or other acquisition shall not be disapproved if the commissioner finds that any of the situations meeting the criteria provided by Section 3.1D(3) exist; and

(iii)   The commissioner may condition the approval of the merger or other acquisition on the removal of the basis of disapproval within a specified period of time;

(c)     The financial condition of any acquiring party is such as might jeopardize the financial stability of the insurer, or prejudice the interest of its policyholders;

      © 2021 National Association of Insurance Commissioners

(d)      The plans or proposals which the acquiring party has to liquidate the insurer, sell its assets or consolidate or merge it with any person, or to make any other material change in its business or corporate structure or management, are unfair and unreasonable to policyholders of the insurer and not in the public interest;

(e)      The competence, experience and integrity of those persons who would control the operation of the insurer are such that it would not be in the interest of policyholders of the insurer and of the public to permit the merger or other acquisition of control; or

(f)      The acquisition is likely to be hazardous or prejudicial to the insurance-buying public.

(2)      The public hearing referred to in Paragraph (1) shall be held within thirty (30) days after the statement required by Subsection A is filed, and at least twenty (20) days notice shall be given by the commissioner to the person filing the statement. Not less than seven (7) days notice of the public hearing shall be given by the person filing the statement to the insurer and to such other persons as may be designated by the commissioner. The commissioner shall make a determination within the sixty (60) day period preceding the effective date of the proposed transaction. At the hearing, the person filing the statement, the insurer, any person to whom notice of hearing was sent, and any other person whose interest may be affected shall have the right to present evidence, examine and cross-examine witnesses, and offer oral and written arguments and in connection therewith shall be entitled to conduct discovery proceedings in the same manner as is presently allowed in the [insert title] Court of this state. All discovery proceedings shall be concluded not later than three (3) days prior to the commencement of the public hearing.

(3)      If the proposed acquisition of control will require the approval of more than one commissioner, the public hearing referred to in Paragraph (2) may be held on a consolidated basis upon request of the person filing the statement referred to in Subsection A. Such person shall file the statement referred to in Subsection A with the National Association of Insurance Commissioners (NAIC) within five (5) days of making the request for a public hearing. A commissioner may opt out of a consolidated hearing, and shall provide notice to the applicant of the opt-out within ten (10) days of the receipt of the statement referred to in Subsection A. A hearing conducted on a consolidated basis shall be public and shall be held within the United States before the commissioners of the states in which the insurers are domiciled. Such commissioners shall hear and receive evidence. A commissioner may attend such hearing, in person or by telecommunication.

(4)      In connection with a change of control of a domestic insurer, any determination by the commissioner that the person acquiring control of the insurer shall be required to maintain or restore the capital of the insurer to the level required by the laws and regulations of this state shall be made not later than sixty (60) days after the date of notification of the change in control submitted pursuant to Section 3A(1) of this Act.

(5)     The commissioner may retain at the acquiring person's expense any attorneys, actuaries, accountants and other experts not otherwise a part of the commissioner's staff as may be reasonably necessary to assist the commissioner in reviewing the proposed acquisition of control.

E.      Exemptions. The provisions of this section shall not apply to:

(1)     [Any transaction which is subject to the provisions of Sections [insert applicable section] and [insert applicable section] of the laws of this state, dealing with the merger or consolidation of two or more insurers].

**Drafting Note:** Optional for use in those states where existing law adequately governs standards and procedures for the merger or consolidation of two or more insurers.

(2)     Any offer, request, invitation, agreement or acquisition which the commissioner by order shall exempt as not having been made or entered into for the purpose and not having the effect of changing or influencing the control of a domestic insurer, or as otherwise not comprehended within the purposes of this section.

F.      Violations. The following shall be violations of this section:

(1)     The failure to file any statement, amendment or other material required to be filed pursuant to Subsection A or B; or

(2)     The effectuation or any attempt to effectuate an acquisition of control of, divestiture of, or merger with, a domestic insurer unless the commissioner has given approval.

G.      Jurisdiction, Consent to Service of Process. The courts of this state are hereby vested with jurisdiction over every person not resident, domiciled or authorized to do business in this state who files a statement with the commissioner under this section, and overall actions involving such person arising out of violations of this section, and each such person shall be deemed to have performed acts equivalent to and constituting an appointment by the person of the commissioner to be his true and lawful attorney upon whom may be served all lawful process in any action, suit or proceeding arising out of violations of this section. Copies of all lawful process shall be served on the commissioner and transmitted by registered or certified mail by the commissioner to the person at his last known address.

**Section 3.1     Acquisitions Involving Insurers Not Otherwise Covered**

A.      Definitions. The following definitions shall apply for the purposes of this section only:

(1)     "Acquisition" means any agreement, arrangement or activity the consummation of which results in a person acquiring directly or indirectly the control of another person, and includes but is not limited to the acquisition of voting securities, the acquisition of assets, bulk reinsurance and mergers.

(2)     An "involved insurer" includes an insurer which either acquires or is acquired, is affiliated with an acquirer or acquired, or is the result of a merger.

          © 2021 National Association of Insurance Commissioners

B.    Scope

(1)    Except as exempted in Paragraph (2) of this subsection, this section applies to any acquisition in which there is a change in control of an insurer authorized to do business in this state.

(2)    This section shall not apply to the following:

(a)    A purchase of securities solely for investment purposes so long as the securities are not used by voting or otherwise to cause or attempt to cause the substantial lessening of competition in any insurance market in this state. If a purchase of securities results in a presumption of control under Section 1C, it is not solely for investment purposes unless the commissioner of the insurer's state of domicile accepts a disclaimer of control or affirmatively finds that control does not exist and the disclaimer action or affirmative finding is communicated by the domiciliary commissioner to the commissioner of this state;

(b)    The acquisition of a person by another person when both persons are neither directly nor through affiliates primarily engaged in the business of insurance, if pre-acquisition notification is filed with the commissioner in accordance with Section 3.1C(1) thirty (30) days prior to the proposed effective date of the acquisition. However, such pre-acquisition notification is not required for exclusion from this section if the acquisition would otherwise be excluded from this section by any other subparagraph of Section 3.1B(2);

(c)    The acquisition of already affiliated persons;

(d)    An acquisition if, as an immediate result of the acquisition,

(i)    In no market would the combined market share of the involved insurers exceed five percent (5%) of the total market,

(ii)    There would be no increase in any market share, or

(iii)    In no market would

(I)    The combined market share of the involved insurers exceeds twelve percent (12%) of the total market, and

(II)    The market share increase by more than two percent (2%) of the total market.

For the purpose of this Paragraph (2)(d), a market means direct written insurance premium in this state for a line of business as contained in the annual statement required to be filed by insurers licensed to do business in this state;

(e)    An acquisition for which a pre-acquisition notification would be required pursuant to this section due solely to the resulting effect on the ocean marine insurance line of business;

   (f)  An acquisition of an insurer whose domiciliary commissioner affirmatively finds that the insurer is in failing condition; there is a lack of feasible alternative to improving such condition; the public benefits of improving the insurer's condition through the acquisition exceed the public benefits that would arise from not lessening competition; and the findings are communicated by the domiciliary commissioner to the commissioner of this state.

C.  Pre-acquisition Notification; Waiting Period. An acquisition covered by Section 3.1B may be subject to an order pursuant to Section 3.1E unless the acquiring person files a pre-acquisition notification and the waiting period has expired. The acquired person may file a pre-acquisition notification. The commissioner shall give confidential treatment to information submitted under this subsection in the same manner as provided in Section 8 of this Act.

  (1)  The pre-acquisition notification shall be in such form and contain such information as prescribed by the National Association of Insurance Commissioners (NAIC) relating to those markets which, under Section 3.1B(2)(d), cause the acquisition not to be exempted from the provisions of this section. The commissioner may require such additional material and information as deemed necessary to determine whether the proposed acquisition, if consummated, would violate the competitive standard of Section 3.1D. The required information may include an opinion of an economist as to the competitive impact of the acquisition in this state accompanied by a summary of the education and experience of such person indicating his or her ability to render an informed opinion.

  (2)  The waiting period required shall begin on the date of receipt of the commissioner of a pre-acquisition notification and shall end on the earlier of the thirtieth day after the date of receipt, or termination of the waiting period by the commissioner. Prior to the end of the waiting period, the commissioner on a one-time basis may require the submission of additional needed information relevant to the proposed acquisition, in which event the waiting period shall end on the earlier of the thirtieth day after receipt of the additional information by the commissioner or termination of the waiting period by the commissioner.

D.  Competitive Standard

  (1)  The commissioner may enter an order under Section 3.1E(1) with respect to an acquisition if there is substantial evidence that the effect of the acquisition may be substantially to lessen competition in any line of insurance in this state or tend to create a monopoly or if the insurer fails to file adequate information in compliance with Section 3.1C.

  (2)  In determining whether a proposed acquisition would violate the competitive standard of Paragraph (1) of this subsection, the commissioner shall consider the following:

    (a)  Any acquisition covered under Section 3.1B involving two (2) or more insurers competing in the same market is *prima facie* evidence of violation of the competitive standards.

                        © 2021 National Association of Insurance Commissioners

(i) If the market is highly concentrated and the involved insurers possess the following shares of the market:

| Insurer A | Insurer B |
|-----------|-----------|
| 4% | 4% or more |
| 10% | 2% or more |
| 15% | 1% or more |

(ii) Or, if the market is not highly concentrated and the involved insurers possess the following shares of the market:

| Insurer A | Insurer B |
|-----------|-----------|
| 5% | 5% or more |
| 10% | 4% or more |
| 15% | 3% or more |
| 19% | 1% or more |

A highly concentrated market is one in which the share of the four (4) largest insurers is seventy-five percent (75%) or more of the market. Percentages not shown in the tables are interpolated proportionately to the percentages that are shown. If more than two (2) insurers are involved, exceeding the total of the two columns in the table is *prima facie* evidence of violation of the competitive standard in Paragraph (1) of this subsection. For the purpose of this item, the insurer with the largest share of the market shall be deemed to be Insurer A.

(b) There is a significant trend toward increased concentration when the aggregate market share of any grouping of the largest insurers in the market, from the two (2) largest to the eight (8) largest, has increased by seven percent (7%) or more of the market over a period of time extending from any base year five (5) to ten (10) years prior to the acquisition up to the time of the acquisition. Any acquisition or merger covered under Section 3.1B involving two (2) or more insurers competing in the same market is *prima facie* evidence of violation of the competitive standard in Paragraph (1) of this subsection if:

(i) There is a significant trend toward increased concentration in the market;

(ii) One of the insurers involved is one of the insurers in a grouping of large insurers showing the requisite increase in the market share; and

(iii) Another involved insurer's market is two percent (2%) or more.

(c) For the purposes of Section 3.1D(2):

(i) The term "insurer" includes any company or group of companies under common management, ownership or control;

(ii) The term "market" means the relevant product and geographical markets. In determining the relevant product and geographical markets, the commissioner shall give due consideration to, among other things, the definitions or guidelines, if any, promulgated by the NAIC and to information, if any, submitted by parties to the acquisition. In the absence of sufficient information to the contrary, the relevant product market is assumed to be the direct written insurance premium for a line of business, such line being that used in the annual statement required to be filed by insurers doing business in this state, and the relevant geographical market is assumed to be this state;

(iii) The burden of showing *prima facie* evidence of violation of the competitive standard rests upon the commissioner.

(d) Even though an acquisition is not *prima facie* violative of the competitive standard under Paragraphs (2)(a) and (2)(b) of this subsection, the commissioner may establish the requisite anticompetitive effect based upon other substantial evidence. Even though an acquisition is *prima facie* violative of the competitive standard under Paragraphs (2)(a) and (2)(b) of this subsection, a party may establish the absence of the requisite anticompetitive effect based upon other substantial evidence. Relevant factors in making a determination under this subparagraph include, but are not limited to, the following: market shares, volatility of ranking of market leaders, number of competitors, concentration, trend of concentration in the industry, and ease of entry and exit into the market.

(3) An order may not be entered under Section 3.1E(1) if:

(a) The acquisition will yield substantial economies of scale or economies in resource utilization that cannot be feasibly achieved in any other way, and the public benefits which would arise from such economies exceed the public benefits which would arise from not lessening competition; or

(b) The acquisition will substantially increase the availability of insurance, and the public benefits of the increase exceed the public benefits which would arise from not lessening competition.

E. Orders and Penalties

(1) (a) If an acquisition violates the standards of this section, the commissioner may enter an order:

(i) Requiring an involved insurer to cease and desist from doing business in this state with respect to the line or lines of insurance involved in the violation; or

(ii) Denying the application of an acquired or acquiring insurer for a license to do business in this state.

 © 2021 National Association of Insurance Commissioners

(b)     Such an order shall not be entered unless:

(i)      There is a hearing;

(ii)     Notice of the hearing is issued prior to the end of the waiting period and not less than fifteen (15) days prior to the hearing; and

(iii)    The hearing is concluded and the order is issued no later than sixty (60) days after the date of the filing of the pre-acquisition notification with the commissioner.

Every order shall be accompanied by a written decision of the commissioner setting forth findings of fact and conclusions of law.

(c)     An order pursuant to this paragraph shall not apply if the acquisition is not consummated.

(2)     Any person who violates a cease and desist order of the commissioner under Paragraph (1) and while the order is in effect may, after notice and hearing and upon order of the commissioner, be subject at the discretion of the commissioner to one or more of the following:

(a)     A monetary penalty of not more than $10,000 for every day of violation; or

(b)     Suspension or revocation of the person's license.

(3)     Any insurer or other person who fails to make any filing required by this section, and who also fails to demonstrate a good faith effort to comply with any filing requirement, shall be subject to a fine of not more than $50,000.

F.     Inapplicable Provisions. Sections 10B, 10C, and 12 do not apply to acquisitions covered under Section 3.1B.

**Section 4.     Registration of Insurers**

A.     Registration. Every insurer which is authorized to do business in this state and which is a member of an insurance holding company system shall register with the commissioner, except a foreign insurer subject to registration requirements and standards adopted by statute or regulation in the jurisdiction of its domicile which are substantially similar to those contained in:

(1)     Section 4;

(2)     Section 5A(1), 5B, 5D; and

(3)     Either Section 5A(2) or a provision such as the following: Each registered insurer shall keep current the information required to be disclosed in its registration statement by reporting all material changes or additions within fifteen (15) days after the end of the month in which it learns of each change or addition.

Any insurer which is subject to registration under this section shall register within fifteen (15) days after it becomes subject to registration, and annually thereafter by [insert date] of each year for the previous calendar year, unless the commissioner for good cause shown extends the time for registration, and then within the extended time. The commissioner may require any insurer authorized to do business in the state which is a member of an insurance holding company system, and which is not subject to registration under this section, to furnish a copy of the registration statement, the summary specified in Section 4C or other information filed by the insurance company with the insurance regulatory authority of its domiciliary jurisdiction.

B.     Information and Form Required. Every insurer subject to registration shall file the registration statement with the commissioner on a form and in a format prescribed by the NAIC, which shall contain the following current information:

(1)     The capital structure, general financial condition, ownership and management of the insurer and any person controlling the insurer;

(2)     The identity and relationship of every member of the insurance holding company system;

(3)     The following agreements in force, and transactions currently outstanding or which have occurred during the last calendar year between the insurer and its affiliates:

(a)     Loans, other investments, or purchases, sales or exchanges of securities of the affiliates by the insurer or of the insurer by its affiliates;

(b)     Purchases, sales or exchange of assets;

(c)     Transactions not in the ordinary course of business;

(d)     Guarantees or undertakings for the benefit of an affiliate which result in an actual contingent exposure of the insurer's assets to liability, other than insurance contracts entered into in the ordinary course of the insurer's business;

(e)     All management agreements, service contracts and all cost-sharing arrangements;

(f)     Reinsurance agreements;

(g)     Dividends and other distributions to shareholders; and

(h)     Consolidated tax allocation agreements;

     © 2021 National Association of Insurance Commissioners

(4)     Any pledge of the insurer's stock, including stock of any subsidiary or controlling affiliate, for a loan made to any member of the insurance holding company system;

(5)     If requested by the commissioner, the insurer shall include financial statements of or within an insurance holding company system, including all affiliates. Financial statements may include but are not limited to annual audited financial statements filed with the U.S. Securities and Exchange Commission (SEC) pursuant to the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended. An insurer required to file financial statements pursuant to this paragraph may satisfy the request by providing the commissioner with the most recently filed parent corporation financial statements that have been filed with the SEC;

(6)     Other matters concerning transactions between registered insurers and any affiliates as may be included from time to time in any registration forms adopted or approved by the commissioner;

**Drafting Note**: Neither option below is intended to modify applicable state insurance and/or corporate law requirements.

(7)     Statements that the insurer's board of directors oversees corporate governance and internal controls and that the insurer's officers or senior management have approved, implemented, and continue to maintain and monitor corporate governance and internal control procedures; and

Alternative Section 4B(7):

(7)     Statements that the insurer's board of directors is responsible for and oversees corporate governance and internal controls and that the insurer's officers or senior management have approved, implemented, and continue to maintain and monitor corporate governance and internal control procedures; and

(8)     Any other information required by the commissioner by rule or regulation.

C.     Summary of Changes to Registration Statement. All registration statements shall contain a summary outlining all items in the current registration statement representing changes from the prior registration statement.

D.     Materiality. No information need be disclosed on the registration statement filed pursuant to Subsection B if the information is not material for the purposes of this section. Unless the commissioner by rule, regulation or order provides otherwise; sales, purchases, exchanges, loans or extensions of credit, investments, or guarantees involving one-half of one percent (.5%) or less of an insurer's admitted assets as of the 31st day of December next preceding shall not be deemed material for purposes of this section. The definition of materiality provided in this subsection shall not apply for purposes of the Group Capital Calculation or the Liquidity Stress Test Framework.

E.     Reporting of Dividends to Shareholders. Subject to Section 5B, each registered insurer shall report to the commissioner all dividends and other distributions to shareholders within fifteen (15) business days following the declaration thereof.

F.    Information of Insurers. Any person within an insurance holding company system subject to registration shall be required to provide complete and accurate information to an insurer, where the information is reasonably necessary to enable the insurer to comply with the provisions of this Act.

G.    Termination of Registration. The commissioner shall terminate the registration of any insurer which demonstrates that it no longer is a member of an insurance holding company system.

H.    Consolidated Filing. The commissioner may require or allow two (2) or more affiliated insurers subject to registration to file a consolidated registration statement.

I.    Alternative Registration. The commissioner may allow an insurer which is authorized to do business in this state and which is part of an insurance holding company system to register on behalf of any affiliated insurer which is required to register under Subsection A and to file all information and material required to be filed under this section.

J.    Exemptions. The provisions of this section shall not apply to any insurer, information or transaction if and to the extent that the commissioner by rule, regulation or order shall exempt the same from the provisions of this section.

K.    Disclaimer. Any person may file with the commissioner a disclaimer of affiliation with any authorized insurer or a disclaimer may be filed by the insurer or any member of an insurance holding company system. The disclaimer shall fully disclose all material relationships and bases for affiliation between the person and the insurer as well as the basis for disclaiming the affiliation. A disclaimer of affiliation shall be deemed to have been granted unless the commissioner, within thirty (30) days following receipt of a complete disclaimer, notifies the filing party the disclaimer is disallowed. In the event of disallowance, the disclaiming party may request an administrative hearing, which shall be granted. The disclaiming party shall be relieved of its duty to register under this section if approval of the disclaimer has been granted by the commissioner, or if the disclaimer is deemed to have been approved.

L.    Enterprise Risk Filings.

(1)    The ultimate controlling person of every insurer subject to registration shall also file an annual enterprise risk report. The report shall, to the best of the ultimate controlling person's knowledge and belief, identify the material risks within the insurance holding company system that could pose enterprise risk to the insurer. The report shall be filed with the lead state commissioner of the insurance holding company system as determined by the procedures within the Financial Analysis Handbook adopted by the National Association of Insurance Commissioners;

(2)    Group Capital Calculation. Except as provided below, the ultimate controlling person of every insurer subject to registration shall concurrently file with the registration an annual group capital calculation as directed by the lead state commissioner. The report shall be completed in accordance with the NAIC Group Capital Calculation Instructions, which may permit the lead state commissioner to allow a controlling person that is not the ultimate controlling person to file the group capital calculation. The report shall be filed with the lead state commissioner of the insurance holding company system as determined by the commissioner in accordance with the procedures within the Financial

© 2021 National Association of Insurance Commissioners

Analysis Handbook adopted by the NAIC. Insurance holding company systems described below are exempt from filing the group capital calculation:

(a)     An insurance holding company system that has only one insurer within its holding company structure, that only writes business [and is only licensed] in its domestic state, and assumes no business from any other insurer;

(b)     An insurance holding company system that is required to perform a group capital calculation specified by the United States Federal Reserve Board. The lead state commissioner shall request the calculation from the Federal Reserve Board under the terms of information sharing agreements in effect. If the Federal Reserve Board cannot share the calculation with the lead state commissioner, the insurance holding company system is not exempt from the group capital calculation filing;

(c)     An insurance holding company system whose non-U.S. group-wide supervisor is located within a Reciprocal Jurisdiction as described in [insert cross-reference to appropriate section of Credit for Reinsurance Law] that recognizes the U.S. state regulatory approach to group supervision and group capital;

**Drafting Note:** On September 22, 2017, the United States and the European Union (EU) entered into the "*Bilateral Agreement Between the United States of America and the European Union on Prudential Measures Regarding Insurance and Reinsurance.*" A similar agreement with the United Kingdom (UK) was signed on December 18, 2018. Both agreements are considered to be a "covered agreement" entered into pursuant to Dodd-Frank Wall Street Reform and Consumer Protection Act, 31 U.S.C. §§ 313 and 314, that addresses the U.S. state regulatory approach to group supervision and group capital, and provides that insurers and insurance groups that are domiciled or maintain their headquarters in this state or another jurisdiction accredited by the NAIC shall be subject only to worldwide prudential insurance group supervision including worldwide group governance, solvency and capital, and reporting, as applicable, by the commissioner or the commissioner of the domiciliary state and will not be subject to group supervision at the level of the worldwide parent undertaking of the insurance or reinsurance group. Under the revised Credit for Reinsurance Models, not only are jurisdictions that are subject to the EU and UK Covered Agreements treated as Reciprocal Jurisdictions, but any other Qualified Jurisdiction can also qualify as Reciprocal Jurisdiction if they provide written confirmation that they recognize and accept the U.S. state regulatory approach to group supervision and group capital.

(d)     An insurance holding company system:

(i)      That provides information to the lead state that meets the requirements for accreditation under the NAIC financial standards and accreditation program, either directly or indirectly through the group-wide supervisor, who has determined such information is satisfactory to allow the lead state to comply with the NAIC group supervision approach, as detailed in the NAIC Financial Analysis Handbook, and

(ii)     Whose non-U.S. group-wide supervisor that is not in a Reciprocal Jurisdiction recognizes and accepts, as specified by the commissioner in regulation, the group capital calculation as the world-wide group capital assessment for U.S. insurance groups who operate in that jurisdiction.

**Drafting Note:** The phrase "Recognizes and accepts" does not require the non-U.S. group-wide supervisor to require the U.S. insurance groups to actually file the group capital calculation with the non-U.S. supervisor but rather does not apply its own version of a group capital filing to U.S. insurance groups.

© 2021 National Association of Insurance Commissioners

(e)     Notwithstanding the provisions of Sections 4L(2)(c) and 4L(2)(d), a lead state commissioner shall require the group capital calculation for U.S. operations of any non-U.S. based insurance holding company system where, after any necessary consultation with other supervisors or officials, it is deemed appropriate by the lead state commissioner for prudential oversight and solvency monitoring purposes or for ensuring the competitiveness of the insurance marketplace.

(f)     Notwithstanding the exemptions from filing the group capital calculation stated in Section 4L(2)(a) through Section 4L(2)(d), the lead state commissioner has the discretion  to exempt the ultimate controlling person from filing the annual group capital calculation or to accept a limited group capital filing or report in accordance with criteria as specified by the commissioner in regulation.

(g)     If the lead state commissioner determines that an insurance holding company system no longer meets one or more of the requirements for an exemption from filing the group capital calculation under this section, the insurance holding company system shall file the group capital calculation at the next annual filing date unless given an extension by the lead state commissioner based on reasonable grounds shown.

(3)   Liquidity Stress Test. The ultimate controlling person of every insurer subject to registration and also scoped into the NAIC Liquidity Stress Test Framework shall file the results of a specific year's Liquidity Stress Test. The filing shall be made to the lead state insurance commissioner of the insurance holding company system as determined by the procedures within the Financial Analysis Handbook adopted by the National Association of Insurance Commissioners:

(a)     The NAIC Liquidity Stress Test Framework includes Scope Criteria applicable to a specific data year. These Scope Criteria are reviewed at least annually by the Financial Stability Task Force or its successor. Any change to the NAIC Liquidity Stress Test Framework or to the data year for which the Scope Criteria are to be measured shall be effective on January 1 of the year following the calendar year when such changes are adopted. Insurers meeting at least one threshold of the Scope Criteria are considered scoped into the NAIC Liquidity Stress Test Framework for the specified data year unless the lead state insurance commissioner, in consultation with the NAIC Financial Stability Task Force or its successor, determines the insurer should not be scoped into the Framework for that data year. Similarly, insurers that do not trigger at least one threshold of the Scope Criteria are considered scoped out of the NAIC Liquidity Stress Test Framework for the specified data year, unless the lead state insurance commissioner, in consultation with the NAIC Financial Stability Task Force or its successor, determines the insurer should be scoped into the Framework for that data year.

    © 2021 National Association of Insurance Commissioners

(i) Regulators wish to avoid having insurers scoped in and out of the NAIC Liquidity Stress Test Framework on a frequent basis. The lead state insurance commissioner, in consultation with the Financial Stability Task Force or its successor, will assess this concern as part of the determination for an insurer.

(b) The performance of, and filing of the results from, a specific year's Liquidity Stress Test shall comply with the NAIC Liquidity Stress Test Framework's instructions and reporting templates for that year and any lead state insurance commissioner determinations, in consultation with the Financial Stability Task Force or its successor, provided within the Framework.

**Drafting Note:** The delay included in the change to the NAIC Liquidity Stress Test Framework or to the data year for which the Scope Criteria are to be measured being effective on January 1 of the year following the calendar year when such changes are adopted is present to: 1) allow sufficient time for states needing to adopt by rule the NAIC Liquidity Stress Test Framework for a given data year and 2) to ensure scoped in insurers have adequate time to comply with the requirements for a given data year .

M. Violations. The failure to file a registration statement or any summary of the registration statement or enterprise risk filing required by this section within the time specified for filing shall be a violation of this section.

**Section 5.** **Standards and Management of an Insurer Within an Insurance Holding Company System**

A. Transactions Within an Insurance Holding Company System

(1) Transactions within an insurance holding company system to which an insurer subject to registration is a party shall be subject to the following standards:

(a) The terms shall be fair and reasonable;

(b) Agreements for cost sharing services and management shall include such provisions as required by rule and regulation issued by the commissioner;

(c) Charges or fees for services performed shall be reasonable;

(d) Expenses incurred and payment received shall be allocated to the insurer in conformity with customary insurance accounting practices consistently applied;

(e) The books, accounts and records of each party to all such transactions shall be so maintained as to clearly and accurately disclose the nature and details of the transactions including such accounting information as is necessary to support the reasonableness of the charges or fees to the respective parties; and

(f) The insurer's surplus as regards policyholders following any dividends or distributions to shareholder affiliates shall be reasonable in relation to the insurer's outstanding liabilities and adequate to meet its financial needs.

(g)     If an insurer subject to this Act is deemed by the commissioner to be in a hazardous financial condition as defined by [insert citation for Model Regulation to Define Standards and Commissioner's Authority for Companies Deemed to be in Hazardous Financial Condition] or a condition that would be grounds for supervision, conservation or a delinquency proceeding, then the commissioner may require the insurer to secure and maintain either a deposit, held by the commissioner, or a bond, as determined by the insurer at the insurer's discretion, for the protection of the insurer for the duration of the contract(s) or agreement(s), or the existence of the condition for which the commissioner required the deposit or the bond.

In determining whether a deposit or a bond is required, the commissioner should consider whether concerns exist with respect to the affiliated person's ability to fulfill the contract(s) or agreement(s) if the insurer were to be put into liquidation. Once the insurer is deemed to be in a hazardous financial condition or a condition that would be grounds for supervision, conservation or a delinquency proceeding, and a deposit or bond is necessary, the commissioner has discretion to determine the amount of the deposit or bond, not to exceed the value of the contract(s) or agreement(s) in any one year, and whether such deposit or bond should be required for a single contract, multiple contracts or a contract only with a specific person(s);

**Drafting Note:** This section is intended to apply to a broad range of affiliate managerial and support service contracts including, for example, general managerial services, financial accounting and actuarial services, data management, investment portfolio management and support and policy and policyholder services. (Performance collateralization for reinsurance and other risk transfer or financial contracts with affiliates is typically addressed in the underlying contractual agreements and is beyond the scope of these deposit/bond requirements). The intent of the deposit or bond is to ensure the affiliated services provided under the contract(s) are fulfilled. In determining appropriate circumstances when a commissioner may require a deposit or bond, (deposit vs. bond to be determined by the insurer) and in specifying an amount, the commissioner should evaluate and consider whether an insurer subject to this act is in a hazardous financial condition or a condition that would be grounds for substantial regulatory action, including supervision, conservation or a delinquency proceeding. If it is, the deposit or bond requirement would be available as an additional regulatory remedy at the discretion of the commissioner. Note, the commissioner should consider whether the affiliated person is already required to post a deposit or bond under applicable laws regulating third-party administrators.

(h)     All records and data of the insurer held by an affiliate are and remain the property of the insurer, are subject to control of the insurer, are identifiable, and are segregated or readily capable of segregation, at no additional cost to the insurer, from all other persons' records and data. This includes all records and data that are otherwise the property of the insurer, in whatever form maintained, including, but not limited to, claims and claim files, policyholder lists, application files, litigation files, premium records, rate books, underwriting manuals, personnel records, financial records or similar records within the possession, custody or control of the affiliate. At the request of the insurer, the affiliate shall provide that the receiver can obtain a complete set of all records of any type that pertain to the insurer's business; obtain access to the operating systems on which the data is maintained; obtain the software that runs those systems either through assumption of licensing agreements or otherwise; and restrict the use of the data by the affiliate if it is not operating the insurer's business. The affiliate shall provide a waiver of any landlord lien or other encumbrance to give the insurer access to all records and data in the event of the affiliate's default under a lease or other agreement; and,

     © 2021 National Association of Insurance Commissioners

**Drafting Note:** The "at no additional cost to the insurer" language is not intended to prohibit recovery of the fair and reasonable cost associated with transferring records and data to the insurer. Since records and data of the insurer are the property of the insurer, the insurer should not pay a cost to segregate commingled records and data from other data of the affiliate.

(i) Premiums or other funds belonging to the insurer that are collected by or held by an affiliate are the exclusive property of the insurer and are subject to the control of the insurer. Any right of offset in the event an insurer is placed into receivership shall be subject to [the receivership act of the state].

(2) The following transactions involving a domestic insurer and any person in its insurance holding company system, including amendments or modifications of affiliate agreements previously filed pursuant to this section, which are subject to any materiality standards contained in subparagraphs (a) through (g), may not be entered into unless the insurer has notified the commissioner in writing of its intention to enter into the transaction at least thirty (30) days prior thereto, or such shorter period as the commissioner may permit, and the commissioner has not disapproved it within that period. The notice for amendments or modifications shall include the reasons for the change and the financial impact on the domestic insurer. Informal notice shall be reported, within thirty (30) days after a termination of a previously filed agreement, to the commissioner for determination of the type of filing required, if any.

(a) Sales, purchases, exchanges, loans, extensions of credit, or investments, provided the transactions are equal to or exceed:

(i) With respect to nonlife insurers, the lesser of three percent (3%) of the insurer's admitted assets or twenty-five percent (25%) of surplus as regards policyholders as of the 31st day of December next preceding;

(ii) With respect to life insurers, three percent (3%) of the insurer's admitted assets as of the 31st day of December next preceding;

(b) Loans or extensions of credit to any person who is not an affiliate, where the insurer makes loans or extensions of credit with the agreement or understanding that the proceeds of the transactions, in whole or in substantial part, are to be used to make loans or extensions of credit to, to purchase assets of, or to make investments in, any affiliate of the insurer making the loans or extensions of credit provided the transactions are equal to or exceed:

(i) With respect to nonlife insurers, the lesser of three percent (3%) of the insurer's admitted assets or twenty-five percent (25%) of surplus as regards policyholders as of the 31st day of December next preceding;

(ii) With respect to life insurers, three percent (3%) of the insurer's admitted assets as of the 31st day of December next preceding;

(c) Reinsurance agreements or modifications thereto, including:

(i) All reinsurance pooling agreements;

(ii)    Agreements in which the reinsurance premium or a change in the insurer's liabilities, or the projected reinsurance premium or a change in the insurer's liabilities in any of the next three years, equals or exceeds five percent (5%) of the insurer's surplus as regards policyholders, as of the 31st day of December next preceding, including those agreements which may require as consideration the transfer of assets from an insurer to a non-affiliate, if an agreement or understanding exists between the insurer and non-affiliate that any portion of the assets will be transferred to one or more affiliates of the insurer;

(d)    All management agreements, service contracts, tax allocation agreements, guarantees and all cost-sharing arrangements;

(e)    Guarantees when made by a domestic insurer; provided, however, that a guarantee which is quantifiable as to amount is not subject to the notice requirements of this paragraph unless it exceeds the lesser of one-half of one percent (.5%) of the insurer's admitted assets or ten percent (10%) of surplus as regards policyholders as of the 31st day of December next preceding. Further, all guarantees which are not quantifiable as to amount are subject to the notice requirements of this paragraph;

(f)    Direct or indirect acquisitions or investments in a person that controls the insurer or in an affiliate of the insurer in an amount which, together with its present holdings in such investments, exceeds two and one-half percent (2.5%) of the insurer's surplus to policyholders. Direct or indirect acquisitions or investments in subsidiaries acquired pursuant to Section 2 of this Act (or authorized under any other section of this Chapter), or in non-subsidiary insurance affiliates that are subject to the provisions of this Act, are exempt from this requirement; and

**Drafting Note**: When reviewing the notification required to be submitted pursuant to Section 5A(2)(f), the commissioner should examine prior and existing investments of this type to establish that these investments separately or together with other transactions, are not being made to contravene the dividend limitations set forth in Section 5B. However, an investment in a controlling person or in an affiliate shall not be considered a dividend or distribution to shareholders when applying Section 5B of this Act.

(g)    Any material transactions, specified by regulation, which the commissioner determines may adversely affect the interests of the insurer's policyholders.

Nothing in this paragraph shall be deemed to authorize or permit any transactions which, in the case of an insurer not a member of the same insurance holding company system, would be otherwise contrary to law.

(3)    A domestic insurer may not enter into transactions which are part of a plan or series of like transactions with persons within the insurance holding company system if the purpose of those separate transactions is to avoid the statutory threshold amount and thus avoid the review that would occur otherwise. If the commissioner determines that separate transactions were entered into over any twelve-month period for that purpose, the commissioner may exercise his or her authority under Section 11.

    © 2021 National Association of Insurance Commissioners

(4)     The commissioner, in reviewing transactions pursuant to Subsection A(2), shall consider whether the transactions comply with the standards set forth in Subsection A(1) and whether they may adversely affect the interests of policyholders.

(5)     The commissioner shall be notified within thirty (30) days of any investment of the domestic insurer in any one corporation if the total investment in the corporation by the insurance holding company system exceeds ten percent (10%) of the corporation's voting securities.

(6)     Supervision, seizure, conservatorship or receivership proceedings.

(a)     Any affiliate that is party to an agreement or contract with a domestic insurer that is subject to Subsection 5A(2)(d) shall be subject to the jurisdiction of any supervision, seizure, conservatorship or receivership proceedings against the insurer and to the authority of any supervisor, conservator, rehabilitator or liquidator for the insurer appointed pursuant to [supervision and receivership acts] for the purpose of interpreting, enforcing and overseeing the affiliate's obligations under the agreement or contract to perform services for the insurer that:

(i)     Are an integral part of the insurer's operations, including, but not limited to management, administrative, accounting, data processing, marketing, underwriting, claims handling, investment or any other similar functions; or

(ii)    Are essential to the insurer's ability to fulfill its obligations under insurance policies.

(b)     The commissioner may require that an agreement or contract pursuant to Subsection 5A(2)(d) for the provision of services described in (i) and (ii) above specify that the affiliate consents to the jurisdiction as set forth in this Subsection 5A(6).

**Drafting Note:** Subsection 5A(6) is not intended to subject affiliates, in particular those that may be subject to regulation in other jurisdictions, to the general jurisdiction of pending supervision, seizure, conservation or receivership court proceedings in this state or the general authority of a supervisor, conservator or receiver for a domestic insurer. Rather, the jurisdiction and authority conferred by this provision is limited to ensuring that a domestic insurer continues to receive essential services from an affiliate that it has contracted with to provide such services, in accordance with the terms of the contract and applicable law, during the aforementioned proceedings. Subsection 5A(6)(b) gives the commissioner discretion to require documentation of an affiliate's consent to this jurisdiction in the agreement or contract. In determining appropriate circumstances when a commissioner may require such provision, the commissioner should consider the scope and materiality to the domestic insurer of the contract, the nature of the holding company system, and whether examination or investigation of the domestic insurer warrants requirement of such a provision.

B.     Dividends and other Distributions

No domestic insurer shall pay any extraordinary dividend or make any other extraordinary distribution to its shareholders until thirty (30) days after the commissioner has received notice of the declaration thereof and has not within that period disapproved the payment, or until the commissioner has approved the payment within the thirty-day period.

For purposes of this section, an extraordinary dividend or distribution includes any dividend or distribution of cash or other property, whose fair market value together with that of other dividends or distributions made within the preceding twelve (12) months exceeds the lesser of:

(1)     Ten percent (10%) of the insurer's surplus as regards policyholders as of the 31st day of December next preceding; or

(2)     The net gain from operations of the insurer, if the insurer is a life insurer, or the net income, if the insurer is not a life insurer, not including realized capital gains, for the twelve-month period ending the 31st day of December next preceding, but shall not include pro rata distributions of any class of the insurer's own securities.

In determining whether a dividend or distribution is extraordinary, an insurer other than a life insurer may carry forward net income from the previous two (2) calendar years that has not already been paid out as dividends. This carry-forward shall be computed by taking the net income from the second and third preceding calendar years, not including realized capital gains, less dividends paid in the second and immediate preceding calendar years.

Notwithstanding any other provision of law, an insurer may declare an extraordinary dividend or distribution which is conditional upon the commissioner's approval, and the declaration shall confer no rights upon shareholders until (1) the commissioner has approved the payment of the dividend or distribution or (2) the commissioner has not disapproved payment within the thirty-day period referred to above.

**Drafting Note**: The following Subsection C entitled "Management of Domestic Insurers Subject to Registration" is optional and is to be adopted according to the needs of the individual jurisdiction.

C.     Management of Domestic Insurers Subject To Registration.

(1)     Notwithstanding the control of a domestic insurer by any person, the officers and directors of the insurer shall not thereby be relieved of any obligation or liability to which they would otherwise be subject by law, and the insurer shall be managed so as to assure its separate operating identity consistent with this Act.

(2)     Nothing in this section shall preclude a domestic insurer from having or sharing a common management or cooperative or joint use of personnel, property or services with one or more other persons under arrangements meeting the standards of Section 5A(1).

(3)     Not less than one-third of the directors of a domestic insurer, and not less than one-third of the members of each committee of the board of directors of any domestic insurer shall be persons who are not officers or employees of the insurer or of any entity controlling, controlled by, or under common control with the insurer and who are not beneficial owners of a controlling interest in the voting stock of the insurer or entity. At least one such person must be included in any quorum for the transaction of business at any meeting of the board of directors or any committee thereof.

     © 2021 National Association of Insurance Commissioners

(4)    The board of directors of a domestic insurer shall establish one or more committees comprised solely of directors who are not officers or employees of the insurer or of any entity controlling, controlled by, or under common control with the insurer and who are not beneficial owners of a controlling interest in the voting stock of the insurer or any such entity. The committee or committees shall have responsibility for nominating candidates for director for election by shareholders or policyholders, evaluating the performance of officers deemed to be principal officers of the insurer and recommending to the board of directors the selection and compensation of the principal officers.

(5)    The provisions of Paragraphs (3) and (4) shall not apply to a domestic insurer if the person controlling the insurer, such as an insurer, a mutual insurance holding company, or a publicly held corporation, has a board of directors and committees thereof that meet the requirements of Paragraphs (3) and (4) with respect to such controlling entity.

(6)    An insurer may make application to the commissioner for a waiver from the requirements of this subsection, if the insurer's annual direct written and assumed premium, excluding premiums reinsured with the Federal Crop Insurance Corporation and Federal Flood Program, is less than $300,000,000. An insurer may also make application to the commissioner for a waiver from the requirements of this subsection based upon unique circumstances. The commissioner may consider various factors including, but not limited to, the type of business entity, volume of business written, availability of qualified board members, or the ownership or organizational structure of the entity.

D.    Adequacy of Surplus. For purposes of this Act, in determining whether an insurer's surplus as regards policyholders is reasonable in relation to the insurer's outstanding liabilities and adequate to meet its financial needs, the following factors, among others, shall be considered:

(1)    The size of the insurer as measured by its assets, capital and surplus, reserves, premium writings, insurance in force and other appropriate criteria;

(2)    The extent to which the insurer's business is diversified among several lines of insurance;

(3)    The number and size of risks insured in each line of business;

(4)    The extent of the geographical dispersion of the insurer's insured risks;

(5)    The nature and extent of the insurer's reinsurance program;

(6)    The quality, diversification and liquidity of the insurer's investment portfolio;

(7)    The recent past and projected future trend in the size of the insurer's investment portfolio;

(8)    The surplus as regards policyholders maintained by other comparable insurers;

(9)    The adequacy of the insurer's reserves; and

(10)     The quality and liquidity of investments in affiliates. The commissioner may treat any such investment as a disallowed asset for purposes of determining the adequacy of surplus as regards policyholders whenever in the judgment of the commissioner the investment so warrants.

**Section 6.     Examination**

A.     Power of Commissioner. Subject to the limitation contained in this section and in addition to the powers which the commissioner has under Sections [insert applicable sections] relating to the examination of insurers, the commissioner shall have the power to examine any insurer registered under Section 4 and its affiliates to ascertain the financial condition of the insurer, including the enterprise risk to the insurer by the ultimate controlling party, or by any entity or combination of entities within the insurance holding company system, or by the insurance holding company system on a consolidated basis.

B.     Access to Books and Records.

(1)     The commissioner may order any insurer registered under Section 4 to produce such records, books, or other information papers in the possession of the insurer or its affiliates as are reasonably necessary to determine compliance with this Chapter.

(2)     To determine compliance with this Chapter, the commissioner may order any insurer registered under Section 4 to produce information not in the possession of the insurer if the insurer can obtain access to such information pursuant to contractual relationships, statutory obligations, or other method. In the event the insurer cannot obtain the information requested by the commissioner, the insurer shall provide the commissioner a detailed explanation of the reason that the insurer cannot obtain the information and the identity of the holder of information. Whenever it appears to the commissioner that the detailed explanation is without merit, the commissioner may require, after notice and hearing, the insurer to pay a penalty of $[insert amount] for each day's delay, or may suspend or revoke the insurer's license.

C.     Use of Consultants. The commissioner may retain at the registered insurer's expense such attorneys, actuaries, accountants and other experts not otherwise a part of the commissioner's staff as shall be reasonably necessary to assist in the conduct of the examination under Subsection A above. Any persons so retained shall be under the direction and control of the commissioner and shall act in a purely advisory capacity.

D.     Expenses. Each registered insurer producing for examination records, books and papers pursuant to Subsection A above shall be liable for and shall pay the expense of examination in accordance with Section [insert applicable section].

E.  Compelling Production. In the event the insurer fails to comply with an order, the commissioner shall have the power to examine the affiliates to obtain the information. The commissioner shall also have the power to issue subpoenas, to administer oaths, and to examine under oath any person for purposes of determining compliance with this section. Upon the failure or refusal of any person to obey a subpoena, the commissioner may petition a court of competent jurisdiction, and upon proper showing, the court may enter an order compelling the witness to appear and testify or produce documentary evidence. Failure to obey the court order shall be punishable as contempt of court. Every person shall be obliged to attend as a witness at the place specified in the subpoena, when subpoenaed, anywhere within the state. He or she shall be entitled to the same fees and mileage, if claimed, as a witness in [insert appropriate statutory reference to trial-level court in that state], which fees, mileage, and actual expense, if any, necessarily incurred in securing the attendance of witnesses, and their testimony, shall be itemized and charged against, and be paid by, the company being examined.

**Section 7.    Supervisory Colleges**

A.  Power of Commissioner. With respect to any insurer registered under Section 4, and in accordance with Subsection C below, the commissioner shall also have the power to participate in a supervisory college for any domestic insurer that is part of an insurance holding company system with international operations in order to determine compliance by the insurer with this Chapter. The powers of the commissioner with respect to supervisory colleges include, but are not limited to, the following:

(1)  Initiating the establishment of a supervisory college;

(2)  Clarifying the membership and participation of other supervisors in the supervisory college;

(3)  Clarifying the functions of the supervisory college and the role of other regulators, including the establishment of a group-wide supervisor;

(4)  Coordinating the ongoing activities of the supervisory college, including planning meetings, supervisory activities, and processes for information sharing; and

(5)  Establishing a crisis management plan.

B.  Expenses. Each registered insurer subject to this section shall be liable for and shall pay the reasonable expenses of the commissioner's participation in a supervisory college in accordance with Subsection C below, including reasonable travel expenses. For purposes of this section, a supervisory college may be convened as either a temporary or permanent forum for communication and cooperation between the regulators charged with the supervision of the insurer or its affiliates, and the commissioner may establish a regular assessment to the insurer for the payment of these expenses.

C.  Supervisory College. In order to assess the business strategy, financial position, legal and regulatory position, risk exposure, risk management and governance processes, and as part of the examination of individual insurers in accordance with Section 6, the commissioner may participate in a supervisory college with other regulators charged with supervision of the insurer or its affiliates, including other state, federal and international regulatory agencies. The commissioner may enter into agreements in accordance with Section 8C providing the basis for cooperation between the commissioner and the other regulatory agencies, and the activities of the supervisory college. Nothing in this section shall delegate to the supervisory college the authority of the commissioner to regulate or supervise the insurer or its affiliates within its jurisdiction.

**Section 7.1.    Group-wide Supervision of Internationally Active Insurance Groups**

A.  The commissioner is authorized to act as the group-wide supervisor for any internationally active insurance group in accordance with the provisions of this section.. However, the commissioner may otherwise acknowledge another regulatory official as the group-wide supervisor where the internationally active insurance group:

(1)  Does not have substantial insurance operations in the United States;

(2)  Has substantial insurance operations in the United States, but not in this state; or

(3)  Has substantial insurance operations in the United States and this state, but the commissioner has determined pursuant to the factors set forth in Subsections B and F that the other regulatory official is the appropriate group-wide supervisor.

An insurance holding company system that does not otherwise qualify as an internationally active insurance group may request that the commissioner make a determination or acknowledgment as to a group-wide supervisor pursuant to this section.

B.  In cooperation with other state, federal and international regulatory agencies, the commissioner will identify a single group-wide supervisor for an internationally active insurance group. The commissioner may determine that the commissioner is the appropriate group-wide supervisor for an internationally active insurance group that conducts substantial insurance operations concentrated in this state. However, the commissioner may acknowledge that a regulatory official from another jurisdiction is the appropriate group-wide supervisor for the internationally active insurance group. The commissioner shall consider the following factors when making a determination or acknowledgment under this subsection:

(1)  The place of domicile of the insurers within the internationally active insurance group that hold the largest share of the group's written premiums, assets or liabilities;

(2)  The place of domicile of the top-tiered insurer(s) in the insurance holding company system of the internationally active insurance group;

(3)  The location of the executive offices or largest operational offices of the internationally active insurance group;

(4)  Whether another regulatory official is acting or is seeking to act as the group-wide supervisor under a regulatory system that the commissioner determines to be:

    © 2021 National Association of Insurance Commissioners

    (a)  Substantially similar to the system of regulation provided under the laws of this state, or otherwise sufficient in terms of providing for group-wide supervision, enterprise risk analysis, and cooperation with other regulatory officials; and

  (5)  Whether another regulatory official acting or seeking to act as the group-wide supervisor provides the commissioner with reasonably reciprocal recognition and cooperation.

  However, a commissioner identified under this section as the group-wide supervisor may determine that it is appropriate to acknowledge another supervisor to serve as the group-wide supervisor. The acknowledgment of the group-wide supervisor shall be made after consideration of the factors listed in Paragraphs (1) through (5) above, and shall be made in cooperation with and subject to the acknowledgment of other regulatory officials involved with supervision of members of the internationally active insurance group, and in consultation with the internationally active insurance group.

C.  Notwithstanding any other provision of law, when another regulatory official is acting as the group-wide supervisor of an internationally active insurance group, the commissioner shall acknowledge that regulatory official as the group-wide supervisor. However, in the event of a material change in the internationally active insurance group that results in:

  (1)  The internationally active insurance group's insurers domiciled in this state holding the largest share of the group's premiums, assets or liabilities; or

  (2)  This state being the place of domicile of the top-tiered insurer(s) in the insurance holding company system of the internationally active insurance group, the commissioner shall make a determination or acknowledgment as to the appropriate group-wide supervisor for such an internationally active insurance group pursuant to Subsection B.

D.  Pursuant to Section 6, the commissioner is authorized to collect from any insurer registered pursuant to Section 4 all information necessary to determine whether the commissioner may act as the group-wide supervisor of an internationally active insurance group or if the commissioner may acknowledge another regulatory official to act as the group-wide supervisor. Prior to issuing a determination that an internationally active insurance group is subject to group-wide supervision by the commissioner, the commissioner shall notify the insurer registered pursuant to Section 4 and the ultimate controlling person within the internationally active insurance group. The internationally active insurance group shall have not less than thirty (30) days to provide the commissioner with additional information pertinent to the pending determination. The commissioner shall publish in the [insert name of state administrative record] and on its Internet website the identity of internationally active insurance groups that the commissioner has determined are subject to group-wide supervision by the commissioner.

E.  If the commissioner is the group-wide supervisor for an internationally active insurance group, the commissioner is authorized to engage in any of the following group-wide supervision activities:

  (1)  Assess the enterprise risks within the internationally active insurance group to ensure that:

(a)     The material financial condition and liquidity risks to the members of the internationally active insurance group that are engaged in the business of insurance are identified by management, and

(b)     Reasonable and effective mitigation measures are in place;

(2)     Request, from any member of an internationally active insurance group subject to the commissioner's supervision, information necessary and appropriate to assess enterprise risk, including, but not limited to, information about the members of the internationally active insurance group regarding:

(a)     Governance, risk assessment and management,

(b)     Capital adequacy, and

(c)     Material intercompany transactions;

(3)     Coordinate and, through the authority of the regulatory officials of the jurisdictions where members of the internationally active insurance group are domiciled, compel development and implementation of reasonable measures designed to ensure that the internationally active insurance group is able to timely recognize and mitigate enterprise risks to members of such internationally active insurance group that are engaged in the business of insurance;

(4)     Communicate with other state, federal and international regulatory agencies for members within the internationally active insurance group and share relevant information subject to the confidentiality provisions of Section 8, through supervisory colleges as set forth in Section 7 or otherwise;

(5)     Enter into agreements with or obtain documentation from any insurer registered under Section 4, any member of the internationally active insurance group, and any other state, federal and international regulatory agencies for members of the internationally active insurance group, providing the basis for or otherwise clarifying the commissioner's role as group-wide supervisor, including provisions for resolving disputes with other regulatory officials. Such agreements or documentation shall not serve as evidence in any proceeding that any insurer or person within an insurance holding company system not domiciled or incorporated in this state is doing business in this state or is otherwise subject to jurisdiction in this state; and

(6)     Other group-wide supervision activities, consistent with the authorities and purposes enumerated above, as considered necessary by the commissioner.

F.     If the commissioner acknowledges that another regulatory official from a jurisdiction that is not accredited by the NAIC is the group-wide supervisor, the commissioner is authorized to reasonably cooperate, through supervisory colleges or otherwise, with group-wide supervision undertaken by the group-wide supervisor, provided that:

(1)     The commissioner's cooperation is in compliance with the laws of this state; and

(2)     The regulatory official acknowledged as the group-wide supervisor also recognizes and cooperates with the commissioner's activities as a group-wide supervisor for other internationally active insurance groups where applicable. Where such recognition and cooperation is not reasonably reciprocal, the commissioner is authorized to refuse recognition and cooperation.

G.     The commissioner is authorized to enter into agreements with or obtain documentation from any insurer registered under Section 4, any affiliate of the insurer, and other state, federal and international regulatory agencies for members of the internationally active insurance group, that provide the basis for or otherwise clarify a regulatory official's role as group-wide supervisor.

H.     The commissioner may promulgate regulations necessary for the administration of this section.

I.     A registered insurer subject to this section shall be liable for and shall pay the reasonable expenses of the commissioner's participation in the administration of this section, including the engagement of attorneys, actuaries and any other professionals and all reasonable travel expenses.

**Section 8.     Confidential Treatment**

A.     Documents, materials or other information in the possession or control of the Department of Insurance that are obtained by or disclosed to the commissioner or any other person in the course of an examination or investigation made pursuant to Section 6 and all information reported or provided to the Department of Insurance pursuant to Section 3B(12) and (13), Section 4, Section 5 and Section 7.1 are recognized by this state as being proprietary and to contain trade secrets, and shall be confidential by law and privileged, shall not be subject to [insert open records, freedom of information, sunshine or other appropriate phrase], shall not be subject to subpoena, and shall not be subject to discovery or admissible in evidence in any private civil action. However, the commissioner is authorized to use the documents, materials or other information in the furtherance of any regulatory or legal action brought as a part of the commissioner's official duties. The commissioner shall not otherwise make the documents, materials or other information public without the prior written consent of the insurer to which it pertains unless the commissioner, after giving the insurer and its affiliates who would be affected thereby notice and opportunity to be heard, determines that the interest of policyholders, shareholders or the public will be served by the publication thereof, in which event the commissioner may publish all or any part in such manner as may be deemed appropriate.

(1)     For purposes of the information reported and provided to the Department of Insurance pursuant to Section 4L(2), the commissioner shall maintain the confidentiality of the group capital calculation and group capital ratio produced within the calculation and any group capital information received from an insurance holding company supervised by the Federal Reserve Board or any U.S. group wide supervisor.

(2)     For purposes of the information reported and provided to the [Department of Insurance] pursuant to Section 4L(3), the commissioner shall maintain the confidentiality of the liquidity stress test results and supporting disclosures and any liquidity stress test information received from an insurance holding company supervised by the Federal Reserve Board and non-U.S. group wide supervisors.

**Drafting Note:** This group capital calculation and group capital ratio includes confidential information and filings received from insurance holding companies supervised by the Federal Reserve Board. Similarly, the liquidity stress test may include confidential information and filings received from insurance holding companies supervised by the Federal Reserve Board. The confidential treatment afforded to group capital calculation filings includes any Federal Reserve Board group capital filings and information.

B.      Neither the commissioner nor any person who received documents, materials or other information while acting under the authority of the commissioner or with whom such documents, materials or other information are shared pursuant to this Act shall be permitted or required to testify in any private civil action concerning any confidential documents, materials, or information subject to Subsection A.

C.      In order to assist in the performance of the commissioner's duties, the commissioner:

(1)     May share documents, materials or other information, including the confidential and privileged documents, materials or information subject to Subsection A, including proprietary and trade secret documents and materials with other state, federal and international regulatory agencies, with the NAIC, and with any third-party consultants designated by the commissioner, with state, federal, and international law enforcement authorities, including members of any supervisory college described in Section 7, provided that the recipient agrees in writing to maintain the confidentiality and privileged status of the document, material or other information, and has verified in writing the legal authority to maintain confidentiality.

(2)     Notwithstanding paragraph (1) above, the commissioner may only share confidential and privileged documents, material, or information reported pursuant to Section 4L(1) with commissioners of states having statutes or regulations substantially similar to Subsection A and who have agreed in writing not to disclose such information.

(3)     May receive documents, materials or information, including otherwise confidential and privileged documents, materials or information, including propriety and trade-secret information from the NAIC and its affiliates and subsidiaries and from regulatory and law enforcement officials of other foreign or domestic jurisdictions, and shall maintain as confidential or privileged any document, material or information received with notice or the understanding that it is confidential or privileged under the laws of the jurisdiction that is the source of the document, material or information; and

(4)     Shall enter into written agreements with the NAIC and any third-party consultant designated by the commissioner governing sharing and use of information provided pursuant to this Act consistent with this subsection that shall:

(a)     Specify procedures and protocols regarding the confidentiality and security of information shared with the NAIC or a third-party consultant designated by the commissioner pursuant to this Act, including procedures and protocols for sharing by the NAIC with other state, federal or international regulators. The agreement shall provide that the recipient agrees in writing to maintain the confidentiality and privileged status of the documents, materials or other information and has verified in writing the legal authority to maintain such confidentiality;

          © 2021 National Association of Insurance Commissioners

(b)     Specify that ownership of information shared with the NAIC or a third party consultant pursuant to this Act remains with the commissioner and the NAIC's or a third-party consultant's, as designated by the commissioner, use of the information is subject to the direction of the commissioner;

(c)     Excluding documents, material or information reported pursuant to Section 4L(3), prohibit the NAIC or third-party consultant designated by the commissioner from storing the information shared pursuant to this Act in a permanent database after the underlying analysis is completed;

(d)     Require prompt notice to be given to an insurer whose confidential information in the possession of the NAIC or a third-party consultant designated by the commissioner pursuant to this Act is subject to a request or subpoena to the NAIC or a third-party consultant designated by the commissioner for disclosure or production; and

(e)     Require the NAIC or a third-party consultant designated by the commissioner to consent to intervention by an insurer in any judicial or administrative action in which the NAIC or a third-party consultant designated by the commissioner may be required to disclose confidential information about the insurer shared with the NAIC or a third-party consultant designated by the commissioner pursuant to this Act.

(f)     For documents, material or information reported pursuant to Section 4L(3), in the case of an agreement involving a third-party consultant , provide for notification of the identity of the consultant to the applicable insurers.

D.     The sharing of information by the commissioner pursuant to this Act shall not constitute a delegation of regulatory authority or rulemaking, and the commissioner is solely responsible for the administration, execution and enforcement of the provisions of this Act.

E.     No waiver of any applicable privilege or claim of confidentiality in the documents, materials or information shall occur as a result of disclosure to the commissioner under this section or as a result of sharing as authorized in Subsection C.

F.     Documents, materials or other information in the possession or control of the NAIC or a third-party consultant designated by the commissioner pursuant to this Act shall be confidential by law and privileged, shall not be subject to [insert open records, freedom of information, sunshine or other appropriate phrase], shall not be subject to subpoena, and shall not be subject to discovery or admissible in evidence in any private civil action.

G.     The group capital calculation and resulting group capital ratio required under Section 4L(2) and the liquidity stress test along with its results and supporting disclosures required under Section 4L(3) are regulatory tools for assessing group risks and capital adequacy and group liquidity risks, respectively, and are not intended as a means to rank insurers or insurance holding company systems generally. Therefore, except as otherwise may be required under the provisions of this Act, the making, publishing, disseminating, circulating or placing before the public, or causing directly or indirectly to be made, published, disseminated, circulated or placed before the public in a newspaper, magazine or other publication, or in the form of a notice,

circular, pamphlet, letter or poster, or over any radio or television station or any electronic means of communication available to the public, or in any other way as an advertisement, announcement or statement containing a representation or statement with regard to the group capital calculation, group capital ratio, the liquidity stress test results, or supporting disclosures for the liquidity stress test of any insurer or any insurer group, or of any component derived in the calculation by any insurer, broker, or other person engaged in any manner in the insurance business would be misleading and is therefore prohibited; provided, however, that if any materially false statement with respect to the group capital calculation, resulting group capital ratio, an inappropriate comparison of any amount to an insurer's or insurance group's group capital calculation or resulting group capital ratio, liquidity stress test result, supporting disclosures for the liquidity stress test, or an inappropriate comparison of any amount to an insurer's or insurance group's liquidity stress test result or supporting disclosures is published in any written publication and the insurer is able to demonstrate to the commissioner with substantial proof the falsity of such statement or the inappropriateness, as the case may be, then the insurer may publish announcements in a written publication if the sole purpose of the announcement is to rebut the materially false statement.

**Drafting Note:** In Section 8C(4) above, the exclusion in subitem 4(c) is the result of the Liquidity Stress Test primary purpose, which is to be used as a tool for assessing macroprudential risks by the NAIC Financial Stability Task Force assisted by NAIC staff, including trend analysis over time. Provisions against the NAIC owning the information, databasing the results and disclosures, and obtaining written consent from the insurer when a consultant is involved were deemed inappropriate.

### Section 9.        Rules and Regulations

The commissioner may, upon notice and opportunity for all interested persons to be heard, issue such rules, regulations and orders as shall be necessary to carry out the provisions of this Act.

### Section 10.        Injunctions, Prohibitions Against Voting Securities, Sequestration of Voting Securities

A.      Injunctions. Whenever it appears to the commissioner that any insurer or any director, officer, employee or agent thereof has committed or is about to commit a violation of this Act or of any rule, regulation or order issued by the commissioner hereunder, the commissioner may apply to the [insert title] Court for the county in which the principal officer of the insurer is located or if the insurer has no office in this state then to the [insert title] Court for [insert county] County for an order enjoining the insurer or director, officer, employee or agent thereof from violating or continuing to violate this Act or any rule, regulation or order, and for such other equitable relief as the nature of the case and the interest of the insurer's policyholders, creditors and shareholders or the public may require.

B.      Voting of Securities; When Prohibited. No security which is the subject of any agreement or arrangement regarding acquisition, or which is acquired or to be acquired, in contravention of the provisions of this Act or of any rule, regulation or order issued by the commissioner hereunder may be voted at any shareholder's meeting, or may be counted for quorum purposes, and any action of shareholders requiring the affirmative vote of a percentage of shares may be taken as though the securities were not issued and outstanding; but no action taken at any such meeting shall be invalidated by the voting of the securities, unless the action would materially affect control of the insurer or unless the courts of this state have so ordered. If an insurer or the commissioner has reason to believe that any security of the insurer has been or is about to be acquired in contravention of the provisions of this Act or of any rule, regulation or order issued by the commissioner hereunder; the insurer or the commissioner may apply to the [insert title] Court for the county in which the insurer has its principle place of business to

enjoin any offer, request, invitation, agreement or acquisition made in contravention of Section 3 or any rule, regulation or order issued by the commissioner thereunder to enjoin the voting of any security so acquired, to void any vote of the security already cast at any meeting of shareholders and for such other equitable relief as the nature of the case and the interest of the insurer's policyholders, creditor and shareholders or the public may require.

C.      Sequestration of Voting Securities. In any case where a person has acquired or is proposing to acquire any voting securities in violation of this Act or any rule, regulation or order issued by the commissioner hereunder, the [insert title] Court for [insert county] County or the [insert title] Court for the county in which the insurer has its principal place of business may, on such notice as the court deems appropriate, upon the application of the insurer or the commissioner, seize or sequester any voting securities of the insurer owned directly or indirectly by the person, and issue such order as may be appropriate to effectuate the provisions of this Act.

Notwithstanding any other provisions of law, for the purposes of this Act the situs of the ownership of the securities of domestic insurers shall be deemed to be in this state.

**Section 11.     Sanctions**

A.      Any insurer failing, without just cause, to file any registration statement as required in this Act shall be required, after notice and hearing, to pay a penalty of $[insert amount] for each day's delay, to be recovered by the commissioner of Insurance and the penalty so recovered shall be paid into the General Revenue Fund of this state. The maximum penalty under this section is $[insert amount]. The commissioner may reduce the penalty if the insurer demonstrates to the commissioner that the imposition of the penalty would constitute a financial hardship to the insurer.

B.      Every director or officer of an insurance holding company system who knowingly violates, participates in, or assents to, or who knowingly shall permit any of the officers or agents of the insurer to engage in transactions or make investments which have not been properly reported or submitted pursuant to Section 4A, 5A(2), or 5B, or which violate this Act, shall pay, in their individual capacity, a civil forfeiture of not more than $[insert amount] per violation, after notice and hearing before the commissioner. In determining the amount of the civil forfeiture, the commissioner shall take into account the appropriateness of the forfeiture with respect to the gravity of the violation, the history of previous violations, and such other matters as justice may require.

C.      Whenever it appears to the commissioner that any insurer subject to this Act or any director, officer, employee or agent thereof has engaged in any transaction or entered into a contract which is subject to Section 5 of this Act and which would not have been approved had the approval been requested, the commissioner may order the insurer to cease and desist immediately any further activity under that transaction or contract. After notice and hearing the commissioner may also order the insurer to void any contracts and restore the status quo if the action is in the best interest of the policyholders, creditors or the public.

D. Whenever it appears to the commissioner that any insurer or any director, officer, employee or agent thereof has committed a willful violation of this Act, the commissioner may cause criminal proceedings to be instituted by the [insert title] Court for the county in which the principal office of the insurer is located or if the insurer has no office in this state, then by the [insert county] Court for [insert title] County against the insurer or the responsible director, officer, employee or agent thereof. Any insurer which willfully violates this Act may be fined not more than $[insert amount]. Any individual who willfully violates this Act may be fined in his or her individual capacity not more than $[insert amount] or be imprisoned for not more than one to three (3) years or both.

E. Any officer, director or employee of an insurance holding company system who willfully and knowingly subscribes to or makes or causes to be made any false statements or false reports or false filings with the intent to deceive the commissioner in the performance of his or her duties under this Act, upon conviction shall be imprisoned for not more than [insert amount] years or fined $[insert amount] or both. Any fines imposed shall be paid by the officer, director or employee in his or her individual capacity.

F. Whenever it appears to the commissioner that any person has committed a violation of Section 3 of this Act and which prevents the full understanding of the enterprise risk to the insurer by affiliates or by the insurance holding company system, the violation may serve as an independent basis for disapproving dividends or distributions and for placing the insurer under an order of supervision in accordance with [insert appropriate statutory reference related to orders of supervision.

## Section 12.    Receivership

Whenever it appears to the commissioner that any person has committed a violation of this Act which so impairs the financial condition of a domestic insurer as to threaten insolvency or make the further transaction of business by it hazardous to its policyholders, creditors, shareholders or the public, then the commissioner may proceed as provided in Section [insert applicable section] of this Chapter to take possessions of the property of the domestic insurer and to conduct its business.

## Section 13.    Recovery

A. If an order for liquidation or rehabilitation of a domestic insurer has been entered, the receiver appointed under the order shall have a right to recover on behalf of the insurer, (i) from any parent corporation or holding company or person or affiliate who otherwise controlled the insurer, the amount of distributions (other than distributions of shares of the same class of stock) paid by the insurer on its capital stock, or (ii) any payment in the form of a bonus, termination settlement or extraordinary lump sum salary adjustment made by the insurer or its subsidiary to a director, officer or employee, where the distribution or payment pursuant to (i) or (ii) is made at any time during the one year preceding the petition for liquidation, conservation or rehabilitation, as the case may be, subject to the limitations of Subsections B, C, and D of this section.

No distribution shall be recoverable if the parent or affiliate shows that when paid the distribution was lawful and reasonable, and that the insurer did not know and could not reasonably have known that the distribution might adversely affect the ability of the insurer to fulfill its contractual obligations.

 © 2021 National Association of Insurance Commissioners

C.    Any person who was a parent corporation or holding company or a person who otherwise controlled the insurer or affiliate at the time the distributions were paid shall be liable up to the amount of distributions or payments under Subsection A which the person received. Any person who otherwise controlled the insurer at the time the distributions were declared shall be liable up to the amount of distributions that would have been received if they had been paid immediately. If two (2) or more persons are liable with respect to the same distributions, they shall be jointly and severally liable.

D.    The maximum amount recoverable under this section shall be the amount needed in excess of all other available assets of the impaired or insolvent insurer to pay the contractual obligations of the impaired or insolvent insurer and to reimburse any guaranty funds.

E.    To the extent that any person liable under Subsection C of this section is insolvent or otherwise fails to pay claims due from it, its parent corporation or holding company or person who otherwise controlled it at the time the distribution was paid, shall be jointly and severally liable for any resulting deficiency in the amount recovered from the parent corporation or holding company or person who otherwise controlled it.

**Section 14.    Revocation, Suspension, or Nonrenewal of Insurer's License**

Whenever it appears to the commissioner that any person has committed a violation of this Act which makes the continued operation of an insurer contrary to the interests of policyholders or the public, the commissioner may, after giving notice and an opportunity to be heard, suspend, revoke or refuse to renew the insurer's license or authority to do business in this state for such period as the commissioner finds is required for the protection of policyholders or the public. Any such determination shall be accompanied by specific findings of fact and conclusions of law.

**Section 15.    Judicial Review, Mandamus**

A.    Any person aggrieved by any act, determination, rule, regulation or order or any other action of the commissioner pursuant to this Act may appeal to the [insert title] Court for [insert county] County. The court shall conduct its review without a jury and by trial *de novo*, except that if all parties, including the commissioner, so stipulate, the review shall be confined to the record. Portions of the record may be introduced by stipulation into evidence in a trial *de novo* as to those parties so stipulating.

B.    The filing of an appeal pursuant to this section shall stay the application of any rule, regulation, order or other action of the commissioner to the appealing party unless the court, after giving the party notice and an opportunity to be heard, determines that a stay would be detrimental to the interest of policyholders, shareholders, creditors or the public.

C.    Any person aggrieved by any failure of the commissioner to act or make a determination required by this Act may petition the [insert title] Court for [insert county] County for a writ in the nature of a mandamus or a peremptory mandamus directing the commissioner to act or make a determination.

**Section 16.        Conflict with Other Laws**

All laws and parts of laws of this state inconsistent with this Act are hereby superseded with respect to matters covered by this Act.

**Section 17.        Separability of Provisions**

If any provision of this Act or the application thereof to any person or circumstances is held invalid, the invalidity shall not affect other provisions or applications of this Act which can be given effect without the invalid provisions or application, and for this purpose the provisions of this Act are separable.

**Section 18.        Effective Date**

This Act shall take effect thirty (30) days from its passage.

© 2021 National Association of Insurance Commissioners

**APPENDIX**
**ALTERNATE PROVISIONS**

**Alternative Section 1.    Findings**

A.      It is hereby found and declared that it may not be inconsistent with the public interest and the interest of policyholders and shareholders to permit insurers to:

   (1)      Engage in activities which would enable them to make better use of management skills and facilities;

   (2)      Diversify into new lines of business through acquisition or organization of subsidiaries;

   (3)      Have free access to capital markets which could provide funds for insurers to use in diversification programs;

   (4)      Implement sound tax planning conclusions; and

   (5)      Serve the changing needs of the public and adapt to changing conditions of the social, economic and political environment, so that insurers are able to compete effectively and to meet the growing public demand for institutions capable of providing a comprehensive range of financial services.

B.      It is further found and declared that the public interest and the interests of policyholders and shareholders are or may be adversely affected when:

   (1)      Control of an insurer is sought by persons who would utilize such control adversely to the interests of policyholders or shareholders;

   (2)      Acquisition of control of an insurer would substantially lessen competition or create a monopoly in the insurance business in this state;

   (3)      An insurer which is part of an insurance holding company system is caused to enter into transactions or relationships with affiliated companies on terms which are not fair and reasonable; or

   (4)      An insurer pays dividends to shareholders which jeopardize the financial condition of such insurers.

C.      It is hereby declared that the policies and purposes of this Act are to promote the public interest by:

   (1)      Facilitating the achievement of the objectives enumerated in Subsection A;

   (2)      Requiring disclosure of pertinent information relating to changes in control of an insurer;

   (3)      Requiring disclosure by an insurer of material transactions and relationships between the insurer and its affiliates, including certain dividends to shareholders paid by the insurer; and

4) Providing standards governing material transactions between the insurer and its affiliates.

D. It is further declared that it is desirable to prevent unnecessary multiple and conflicting regulation of insurers. Therefore, this state shall exercise regulatory authority over domestic insurers and unless otherwise provided in this Act, not over nondomestic insurers, with respect to the matters contained herein.

**Alternative Section 2.    Subsidiaries of Insurers**

A. Authorization. Any domestic insurer, either by itself or in cooperation with one or more persons, may organize or acquire one or more subsidiaries engaged in the following kinds of business:

(1) Any kind of insurance business authorized by the jurisdiction in which it is incorporated;

(2) Acting as an insurance broker or as an insurance agent for its parent or for any of its parent's insurer subsidiaries;

(3) Investing, reinvesting or trading in securities for its own account, that of its parent, a subsidiary of its parent, or an affiliate or subsidiary;

(4) Management of an investment company subject to or registered pursuant to the Investment Company Act of 1940, as amended, including related sales and services;

(5) Acting as a broker-dealer subject to or registered pursuant to the Securities Exchange Act of 1934, as amended;

(6) Rendering investment advice to governments, government agencies, corporations or other organizations or groups;

(7) Rendering other services related to the operations of an insurance business, such as actuarial, loss prevention, safety engineering, data processing, accounting, claims, appraisal and collection services;

(8) Ownership and management of assets which the parent corporation could itself own or manage;

**Drafting Note:** The aggregate investment by the insurer and its subsidiaries acquired or organized pursuant to this paragraph should not exceed the limitations applicable to such investments by the insurer.

(9) Acting as administrative agent for a governmental instrumentality that is performing an insurance function;

(10) Financing of insurance premiums, agents and other forms of consumer financing;

(11) Any other business activity determined by the commissioner to be reasonably ancillary to an insurance business; and

(12) Owning a corporation or corporations engaged or organized to engage exclusively in one or more of the businesses specified in this section.

    © 2021 National Association of Insurance Commissioners

_____

*Chronological Summary of Action (all references are to the <u>Proceedings of the NAIC</u>).*

*1969 Proc. II 736, 737, 738-751, 756 (adopted).*
*1972 Proc. I 14, 16, 443, 449 (corrected).*
*1980 Proc. II 22, 26, 29, 42-46 (amended, added Section 3.1).*
*1983 Proc. I 6, 37, 96, 99 (amended).*
*1985 Proc. I 19, 37,178, 183-200 (amended and reprinted).*
*1985 Proc. II 11, 24-25, 74, 75-92 (amended and reprinted).*
*1986 Proc. I 10, 25, 72 (amended).*
*1986 Proc. II 12, 19-20, 93-94, 94-109 (amended and reprinted).*
*1993 Proc. 4th Quarter 16, 31, 57, 61-62 (amended).*
*1995 Proc. 4th Quarter 11, 33, 307, 310, 312-328 (amended and reprinted).*
*1996 Proc. 1st Quarter 124, 270, 272-275 (amendments adopted later printed here).*
*1997 Proc. 4th Quarter 11 (amendments adopted).*
*1999 Proc. 4th Quarter 15, 364, 369, 379-380 (amended).*
*2001 Proc. 2nd Quarter 11, 14, 319, 339, 342-348 (amended).*
*2011 Proc. 1st Quarter I 3-11 (amended).*
*2014 Proc. 3rd Quarter, Vol. I 122, 136, 140, 183, 243-266 (amended).*
*2020 Fall National Meeting (amended).*
*2021 Summer National Meeting (amended).*
*Spring 2024 (technical edit).*

© 2021 National Association of Insurance Commissioners

**TAB F:**
**NAIC Model Regulation 450 (2021)**

**INSURANCE HOLDING COMPANY SYSTEM MODEL REGULATION**
**WITH REPORTING FORMS AND INSTRUCTIONS**

**Table of Contents**

Section 1.       Authority
Section 2.       Purpose
Section 3.       Severability Clause
Section 4.       Forms - General Requirements
Section 5.       Forms - Incorporation by Reference, Summaries and Omissions
Section 6.       Forms - Information Unknown or Unavailable and Extension of Time to Furnish
Section 7.       Forms - Additional Information and Exhibits
Section 8.       Definitions
Section 9.       Subsidiaries of Domestic Insurers
Section 10.      Acquisition of Control - Statement Filing (Form A)
Section 11.      Amendments to Form A
Section 12.      Acquisition of Section 3A(4) Insurers
Section 13.      Pre-Acquisition Notification (Form E)
Section 14.      Annual Registration of Insurers -Statement Filing (Form B)
Section 15.      Summary of Changes to Registration - Statement Filing (Form C)
Section 16.      Amendments to Form B
Section 17.      Alternative and Consolidated Registration
Section 18.      Disclaimers and Termination of Registration
Section 19.      Transactions Subject to Prior Notice - Notice Filing (Form D)
Section 20.      Enterprise Risk Report
Section 21.      Group Capital Calculation
Section 22.      Extraordinary Dividends and Other Distributions
Section 23.      Adequacy of Surplus
Form A           Statement Regarding the Acquisition of Control of or Merger with a Domestic Insurer
Form B           Insurance Holding Company System Annual Registration Statement
Form C           Summary of Changes to Registration Statement
Form D           Prior Notice of a Transaction
Form E           Pre-Acquisition Notification Form
Form F           Enterprise Risk Report

**Section 1.       Authority**

These regulations are promulgated pursuant to the authority granted by Sections [insert applicable sections] and [insert applicable section] of the Insurance Law.

**Drafting Note:** Optional for those states in which similar provisions are normally used.

**Section 2.       Purpose**

The purpose of these regulations is to set forth rules and procedural requirements which the Commissioner deems necessary to carry out the provisions of the NAIC Insurance Holding Company System Regulatory Act [insert applicable sections] of the Insurance Code hereinafter referred to as "the Act." The information called for by these regulations is hereby declared to be necessary and appropriate in the public interest and for the protection of the policyholders in this State.

**Drafting Note:** Insert the title of the chief insurance regulatory official wherever the term "commissioner" appears.

**Drafting Note:** Optional for those states in which similar provisions are normally used.

## Section 3.        Severability Clause

If any provision of these regulations, or the application thereof to any person or circumstance, is held invalid, such determination shall not affect other provisions or applications of these regulations which can be given effect without the invalid provision or application, and to that end the provisions of these regulations are severable.

**Drafting Note:** Optional for those states in which similar provisions are normally used.

## Section 4.        Forms - General Requirements

A.       Forms A, B, C, D, E and F are intended to be guides in the preparation of the statements required by Sections 3, 3.1, 4, and 5 of the Act. They are not intended to be blank forms which are to be filled in. The statements filed shall contain the numbers and captions of all items, but the text of the items may be omitted provided the answers thereto are prepared in such a manner as to indicate clearly the scope and coverage of the items. All instructions, whether appearing under the items of the form or elsewhere therein, are to be omitted. Unless expressly provided otherwise, if any item is inapplicable or the answer thereto is in the negative, an appropriate statement to that effect shall be made.

B.       [Insert number] complete copies of each statement including exhibits and all other papers and documents filed as a part thereof, shall be filed with the Commissioner by personal delivery or mail addressed to: Insurance Commissioner of the State of [insert state and address], Attention: [insert name - title]. At least one of the copies shall be signed in the manner prescribed on the form. Unsigned copies shall be conformed. If the signature of any person is affixed pursuant to a power of attorney or other similar authority, a copy of the power of attorney or other authority shall also be filed with the statement.

C.       If an applicant requests a hearing on a consolidated basis under Section 3D(3) of the Act, in addition to filing the Form A with the commissioner, the applicant shall file a copy of Form A with the National Association of Insurance Commissioners (NAIC) in electronic form.

D.       Statements should be prepared electronically. Statements shall be easily readable and suitable for review and reproduction. Debits in credit categories and credits in debit categories shall be designated so as to be clearly distinguishable as such on photocopies. Statements shall be in the English language and monetary values shall be stated in United States currency. If any exhibit or other paper or document filed with the statement is in a foreign language, it shall be accompanied by a translation into the English language and any monetary value shown in a foreign currency normally shall be converted into United States currency.

**Drafting Note:** Section 4 may be omitted if it is included as instructions on Forms A, B, C, D, E and F.

                                                    © 2021 National Association of Insurance Commissioners

**Section 5.          Forms - Incorporation by Reference, Summaries and Omissions**

    A.       Information required by any item of Form A, Form B, Form D, Form E or Form F may be incorporated by reference in answer or partial answer to any other item. Information contained in any financial statement, annual report, proxy statement, statement filed with a governmental authority, or any other document may be incorporated by reference in answer or partial answer to any item of Form A, Form B, Form D, Form E or Form F provided the document is filed as an exhibit to the statement. Excerpts of documents may be filed as exhibits if the documents are extensive. Documents currently on file with the Commissioner which were filed within three (3) years need not be attached as exhibits. References to information contained in exhibits or in documents already on file shall clearly identify the material and shall specifically indicate that such material is to be incorporated by reference in answer to the item. Matter shall not be incorporated by reference in any case where the incorporation would render the statement incomplete, unclear or confusing.

    B.       Where an item requires a summary or outline of the provisions of any document, only a brief statement shall be made as to the pertinent provisions of the document. In addition to the statement, the summary or outline may incorporate by reference particular parts of any exhibit or document currently on file with the Commissioner which was filed within three (3) years and may be qualified in its entirety by such reference. In any case where two (2) or more documents required to be filed as exhibits are substantially identical in all material respects except as to the parties thereto, the dates of execution, or other details, a copy of only one of the documents need be filed with a schedule identifying the omitted documents and setting forth the material details in which the documents differ from the documents, a copy of which is filed.

**Drafting Note:** Section 5 may be omitted if it is included as instructions on Forms A, B, D, E and F.

**Section 6.          Forms-Information Unknown or Unavailable and Extension of Time to Furnish**

If it is impractical to furnish any required information, document or report at the time it is required to be filed, there shall be filed with the Commissioner a separate document:

    A.       Identifying the information, document or report in question;

    B.       Stating why the filing thereof at the time required is impractical; and

    C.       Requesting an extension of time for filing the information, document or report to a specified date. The request for extension shall be deemed granted unless the Commissioner within [XX] days after receipt thereof enters an order denying the request.

**Drafting Note:** Section 6 may be omitted if it is included as instruction on Forms A, B, C, D, E and F.

**Section 7.** **Forms - Additional Information and Exhibits**

In addition to the information expressly required to be included in Form A, Form B, Form C, Form D, Form E and Form F, the Commissioner may request such further material information, if any, as may be necessary to make the information contained therein not misleading. The person filing may also file such exhibits as it may desire in addition to those expressly required by the statement. The exhibits shall be so marked as to indicate clearly the subject matters to which they refer. Changes to Forms A, B, C, D, E or F shall include on the top of the cover page the phrase: "Change No. [insert number] to" and shall indicate the date of the change and not the date of the original filing.

**Drafting Note:** Section 7 may be omitted if it included as instructions on Forms A, B, C, D, E and F.

**Section 8.** **Definitions**

A. "Executive officer" means chief executive officer, chief operating officer, chief financial officer, treasurer, secretary, controller, and any other individual performing functions corresponding to those performed by the foregoing officers under whatever title.

B. "Ultimate controlling person" means that person which is not controlled by any other person.

C. Unless the context otherwise requires, other terms found in these regulations and in Section 1 of the Act are used as defined in the Act. Other nomenclature or terminology is according to the Insurance Code, or industry usage if not defined by the Code.

**Drafting Note:** If regulation Section 2 is not adopted by the state, the following definition should be added to this section: "The Act" means the Insurance Holding Company System Regulatory Act [insert applicable sections of the Insurance Code].

**Section 9.** **Subsidiaries of Domestic Insurers**

The authority to invest in subsidiaries under Section 2B of the Act is in addition to any authority to invest in subsidiaries which may be contained in any other provision of the Insurance Code.

**Section 10.** **Acquisition of Control - Statement Filing**

A person required to file a statement pursuant to Section 3 of the Act shall furnish the required information on Form A, hereby made a part of this regulation. Such person shall also furnish the required information on Form E, hereby made a part of this regulation and described in Section 13 of this regulation.

**Section 11.** **Amendments to Form A**

The applicant shall promptly advise the Commissioner of any changes in the information furnished on Form A arising subsequent to the date upon which the information was furnished but prior to the Commissioner's disposition of the application.

 © 2021 National Association of Insurance Commissioners

**Section 12.      Acquisition of Section 3A(4) Insurers**

      A.      If the person being acquired is deemed to be a "domestic insurer" solely because of the provisions of Section 3A(4) of the Act, the name of the domestic insurer on the cover page should be indicated as follows:

           "ABC Insurance Company, a subsidiary of XYZ Holding Company."

      B.      Where a Section 3A(4) insurer is being acquired, references to "the insurer" contained in Form A shall refer to both the domestic subsidiary insurer and the person being acquired.

**Section 13.      Pre-Acquisition Notification**

If a domestic insurer, including any person controlling a domestic insurer, is proposing a merger or acquisition pursuant to Section 3A(1) of the Act, that person shall file a pre-acquisition notification form, Form E, which was developed pursuant to Section 3.1C(1) of the Act.

Additionally, if a non-domiciliary insurer licensed to do business in this state is proposing a merger or acquisition pursuant to Section 3.1 of the Act, that person shall file a pre-acquisition notification form, Form E. No pre-acquisition notification form need be filed if the acquisition is beyond the scope of Section 3.1 as set forth in Section 3.1B(2).

In addition to the information required by Form E, the Commissioner may wish to require an expert opinion as to the competitive impact of the proposed acquisition.

**Section 14.      Annual Registration of Insurers - Statement Filing**

An insurer required to file an annual registration statement pursuant to Section 4 of the Act shall furnish the required information on Form B, hereby made a part of these regulations.

**Section 15.      Summary of Registration - Statement Filing**

An insurer required to file an annual registration statement pursuant to Section 4 of the Act is also required to furnish information required on Form C, hereby made a part of these regulations.

**Section 16.      Amendments to Form B**

      A.      An amendment to Form B shall be filed within fifteen (15) days after the end of any month in which there is a material change to the information provided in the annual registration statement.

      B.      Amendments shall be filed in the Form B format with only those items which are being amended reported. Each amendment shall include at the top of the cover page "Amendment No. [insert number] to Form B for [insert year]" and shall indicate the date of the change and not the date of the original filings.

**Drafting Note:** Section 16 may be omitted if Section 5A(2) of the Model Act has been adopted and amendments to the registration statement are therefore not required by the Act.

**Section 17.        Alternative and Consolidated Registrations**

A.      Any authorized insurer may file a registration statement on behalf of any affiliated insurer or insurers which are required to register under Section 4 of the Act. A registration statement may include information not required by the Act regarding any insurer in the insurance holding company system even if the insurer is not authorized to do business in this State. In lieu of filing a registration statement on Form B, the authorized insurer may file a copy of the registration statement or similar report which it is required to file in its State of domicile, provided:

(1)      The statement or report contains substantially similar information required to be furnished on Form B; and

(2)      The filing insurer is the principal insurance company in the insurance holding company system.

B.      The question of whether the filing insurer is the principal insurance company in the insurance holding company system is a question of fact and an insurer filing a registration statement or report in lieu of Form B on behalf of an affiliated insurer, shall set forth a brief statement of facts which will substantiate the filing insurer's claim that it, in fact, is the principal insurer in the insurance holding company system.

C.      With the prior approval of the Commissioner, an unauthorized insurer may follow any of the procedures which could be done by an authorized insurer under Subsection A above.

D.      Any insurer may take advantage of the provisions of Section 4H or 4I of the Act without obtaining the prior approval of the Commissioner. The Commissioner, however, reserves the right to require individual filings if he or she deems such filings necessary in the interest of clarity, ease of administration or the public good.

**Section 18.        Disclaimers and Termination of Registration**

A.      A disclaimer of affiliation or a request for termination of registration claiming that a person does not, or will not upon the taking of some proposed action, control another person (hereinafter referred to as the "subject") shall contain the following information:

(1)      The number of authorized, issued and outstanding voting securities of the subject;

(2)      With respect to the person whose control is denied and all affiliates of such person, the number and percentage of shares of the subject's voting securities which are held of record or known to be beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly;

(3)      All material relationships and bases for affiliation between the subject and the person whose control is denied and all affiliates of such person;

(4)      A statement explaining why the person should not be considered to control the subject.

                                                    © 2021 National Association of Insurance Commissioners

B.  A request for termination of registration shall be deemed to have been granted unless the Commissioner, within thirty (30) days after receipt of the request, notifies the registrant otherwise.

**Section 19.  Transactions Subject to Prior Notice - Notice Filing**

A.  An insurer required to give notice of a proposed transaction pursuant to Section 5 of the Act shall furnish the required information on Form D, hereby made a part of these regulations.

B.  Agreements for cost sharing services and management services shall at a minimum and as applicable:

(1)  Identify the person providing services and the nature of such services;

(2)  Set forth the methods to allocate costs;

(3)  Require timely settlement, not less frequently than on a quarterly basis, and compliance with the requirements in the Accounting Practices and Procedures Manual;

(4)  Prohibit advancement of funds by the insurer to the affiliate except to pay for services defined in the agreement;

(5)  State that the insurer will maintain oversight for functions provided to the insurer by the affiliate and that the insurer will monitor services annually for quality assurance;

(6)  Define records and data of the insurer to include all records and data developed or maintained under or related to the agreement that are otherwise the property of the insurer, in whatever form maintained, including, but not limited to, claims and claim files, policyholder lists, application files, litigation files, premium records, rate books, underwriting manuals, personnel records, financial records or similar records within the possession, custody or control of the affiliate;

(7)  Specify that all records and data of the insurer are and remain the property of the insurer, and:

(a)  Are subject to control of the insurer;

(b)  Are identifiable; and

(c)  Are segregated from all other persons' records and data or are readily capable of segregation at no additional cost to the insurer;

**Drafting Note:** The "at no additional cost to the insurer" language is not intended to prohibit recovery of the fair and reasonable cost associated with transferring records and data to the insurer. Since records and data of the insurer are the property of the insurer, the insurer should not pay a cost to segregate commingled records and data from other data of the affiliate.

(8)  State that all funds and invested assets of the insurer are the exclusive property of the insurer, held for the benefit of the insurer and are subject to the control of the insurer;

(9)  Include standards for termination of the agreement with and without cause;

(10)     Include provisions for indemnification of the insurer in the event of gross negligence or willful misconduct on the part of the affiliate providing the services and for any actions by the affiliate that violate provisions of the agreement required in Subsections 19B(11), 19B(12), 19B(13), 19B(14) and 19B(15) of this regulation;

(11)     Specify that if the insurer is placed in supervision, seizure, conservatorship or receivership pursuant to [supervision and receivership acts]:

    (a)     All of the rights of the insurer under the agreement extend to the receiver or commissioner to the extent permitted by [law of the state];

    (b)     All records and data of the insurer shall be identifiable and segregated from all other persons' records and data or readily capable of segregation at no additional cost to the receiver or the commissioner;

**Drafting Note:** The "at no additional cost to the receiver or the commissioner" language is not intended to prohibit recovery of the fair and reasonable cost associated with transferring records and data to the receiver or the commissioner. Since records and data of the insurer are the property of the insurer, the receiver or commissioner should not pay a cost to segregate commingled records and data from other data of the affiliate.

    (c)     A complete set of records and data of the insurer will immediately be made available to the receiver or the commissioner, shall be made available in a usable format and shall be turned over to the receiver or commissioner immediately upon the receiver or the commissioner's request, and the cost to transfer data to the receiver or the commissioner shall be fair and reasonable; and,

**Drafting Note:** The fair and reasonable cost to transfer data to the receiver or commissioner refers to the cost associated with physically or electronically transferring records and data files to the receiver or commissioner. This cost does not include costs to separate comingled data and records that should have been segregated or readily capable of segregation.

    (d)     The affiliated person(s) will make available all employees essential to the operations of the insurer and the services associated therewith for the immediate continued performance of the essential services ordered or directed by the receiver or commissioner;

(12)     Specify that the affiliate has no automatic right to terminate the agreement if the insurer is placed into supervision, seizure, conservatorship or receivership pursuant to [supervision and receivership acts];

(13)     Specify that the affiliate will provide the essential services for a minimum period of time [specified in the agreement] after termination of the agreement, if the insurer is placed into supervision, seizure, conservatorship or receivership pursuant to [supervision and receivership acts], as ordered or directed by the receiver or commissioner. Performance of the essential services will continue to be provided without regard to pre-receivership unpaid fees, so long as the affiliate continues to receive timely payment for post-receivership services rendered, and unless released by the receiver, commissioner or supervising court;

    © 2021 National Association of Insurance Commissioners

(14)　　Specify that the affiliate will continue to maintain any systems, programs or other infrastructure, notwithstanding supervision, seizure, conservatorship or receivership pursuant to [supervision and receivership acts], and will make them available to the receiver or commissioner as ordered or directed by the receiver or commissioner for so long as the affiliate continues to receive timely payment for post-receivership services rendered, and unless released by the receiver, commissioner or supervising court; and

(15)　　Specify that, in furtherance of the cooperation between the receiver and the affected guaranty association(s) and subject to the receiver's authority over the insurer, if the insurer is placed into supervision, seizure, conservatorship or receivership pursuant to [supervision and receivership acts], and portions of the insurer's policies or contracts are eligible for coverage by one or more guaranty associations, the affiliate's commitments under Subsections 19B(11), 19B(12), 19B(13) and 19B(14) of this regulation will extend to such guaranty association(s).

**Section 20.　　Enterprise Risk Report**

The ultimate controlling person of an insurer required to file an enterprise risk report pursuant to Section 4L(1) of the Act shall furnish the required information on Form F, hereby made a part of these regulations.

**Section 21.　　Group Capital Calculation**

A.　　Where an insurance holding company system has previously filed the annual group capital calculation at least once, the lead state commissioner has the discretion to exempt the ultimate controlling person from filing the annual group capital calculation if the lead state commissioner makes a determination based upon that filing that the insurance holding company system meets all of the following criteria:

(1)　　Has annual direct written and unaffiliated assumed premium (including international direct and assumed premium), but excluding premiums reinsured with the Federal Crop Insurance Corporation and Federal Flood Program, of less than $1,000,000,000;

(2)　　Has no insurers within its holding company structure that are domiciled outside of the United States or one of its territories;

(3)　　Has no banking, depository or other financial entity that is subject to an identified regulatory capital framework within its holding company structure;

(4)　　The holding company system attests that there are no material changes in the transactions between insurers and non-insurers in the group that have occurred since the last filing of the annual group capital; and

(5)　　The non-insurers within the holding company system do not pose a material financial risk to the insurer's ability to honor policyholder obligations.

B.　　Where an insurance holding company system has previously filed the annual group capital calculation at least once, the lead state commissioner has the discretion to accept in lieu of the group capital calculation a limited group capital filing if:

(1)     The insurance holding company system has annual direct written and unaffiliated assumed premium (including international direct and assumed premium), but excluding premiums reinsured with the Federal Crop Insurance Corporation and Federal Flood Program, of less than $1,000,000,000; and all of the following additional criteria are met:

    (a)     Has no insurers within its holding company structure that are domiciled outside of the United States or one of its territories;

    (b)     Does not include a banking, depository or other financial entity that is subject to an identified regulatory capital framework; and

    (c)     The holding company system attests that there are no material changes in transactions between insurers and non-insurers in the group that have occurred since the last filing of the report to the lead state commissioner and the non-insurers within the holding company system do not pose a material financial risk to the insurers ability to honor policyholder obligations.

C.     For an insurance holding company that has previously met an exemption with respect to the group capital calculation pursuant Section 21A or 21B of this regulation, the lead state commissioner may require at any time the ultimate controlling person to file an annual group capital calculation, completed in accordance with the NAIC Group Capital Calculation Instructions, if any of the following criteria are met:

(1)     Any insurer within the insurance holding company system is in a Risk-Based Capital action level event as set forth in [insert cross-reference to appropriate section of Risk-Based Capital (RBC) Model Act] or a similar standard for a non-U.S. insurer; or

(2)     Any insurer within the insurance holding company system meets one or more of the standards of an insurer deemed to be in hazardous financial condition as defined in [insert cross-reference to appropriate section of Model Regulation to Define Standards and Commissioner's Authority for Companies Deemed to be in Hazardous Financial Condition]; or

(3)     Any insurer within the insurance holding company system otherwise exhibits qualities of a troubled insurer as determined by the lead state commissioner based on unique circumstances including, but not limited to, the type and volume of business written, ownership and organizational structure, federal agency requests, and international supervisor requests.

D.     A non-U.S. jurisdiction is considered to "recognize and accept" the group capital calculation if it satisfies the following criteria:

(1)     With respect to the [insert cross-reference to Section 4L(2)(d) of the Model Act]

    (a)     The non-U.S. jurisdiction recognizes the U.S. state regulatory approach to group supervision and group capital, by providing confirmation by a competent regulatory authority, in such jurisdiction, that insurers and insurance groups whose lead state is accredited by the NAIC under the NAIC Accreditation

Program shall be subject only to worldwide prudential insurance group supervision including worldwide group governance, solvency and capital, and reporting, as applicable, by the lead state and will not be subject to group supervision, including worldwide group governance, solvency and capital, and reporting, at the level of the worldwide parent undertaking of the insurance or reinsurance group by the non-U.S. jurisdiction; or

(b)　　Where no U.S. insurance groups operate in the non-U.S. jurisdiction, that non-U.S. jurisdiction indicates formally in writing to the lead state with a copy to the International Association of Insurance Supervisors that the group capital calculation is an acceptable international capital standard. This will serve as the documentation otherwise required in Section 21D(1)(a).

(2)　　The non-U.S. jurisdiction provides confirmation by a competent regulatory authority in such jurisdiction that information regarding insurers and their parent, subsidiary, or affiliated entities, if applicable, shall be provided to the lead state commissioner in accordance with a memorandum of understanding or similar document between the commissioner and such jurisdiction, including but not limited to the International Association of Insurance Supervisors Multilateral Memorandum of Understanding or other multilateral memoranda of understanding coordinated by the NAIC. The commissioner shall determine, in consultation with the NAIC Committee Process, if the requirements of the information sharing agreements are in force.

E.　　A list of non-U.S. jurisdictions that "recognize and accept" the group capital calculation will be published through the NAIC Committee Process:

(1)　　A list of jurisdictions that "recognize and accept" the group capital calculation pursuant to [insert cross-reference to Sections 4L(2)(d)], is published through the NAIC Committee Process to assist the lead state commissioner in determining which insurers shall file an annual group capital calculation. The list will clarify those situations in which a jurisdiction is exempted from filing under [insert cross-reference to Sections 4L(2)(d)]. To assist with a determination under 4L(2)(e), the list will also identify whether a jurisdiction that is exempted under either [insert cross-reference to Sections 4L(2)(c) and 4L(2)(d)] requires a group capital filing for any U.S. based insurance group's operations in that non-U.S. jurisdiction.

(2)　　For a non-U.S. jurisdiction where no U.S. insurance groups operate, the confirmation provided to meet the requirement of Section 21D(1)(b) will serve as support for recommendation to be published as a jurisdiction that "recognizes and accepts" the group capital calculation through the NAIC Committee Process.

(3)　　If the lead state commissioner makes a determination pursuant to Section 4L(2)(d) that differs from the NAIC List, the lead state commissioner shall provide thoroughly documented justification to the NAIC and other states.

(4)　　Upon determination by the lead state commissioner that a non-U.S. jurisdiction no longer meets one or more of the requirements to "recognize and accept" the group capital calculation, the lead state commissioner may provide a recommendation to the NAIC that the non-U.S. jurisdiction be removed from the list of jurisdictions that "recognize and accepts" the group capital calculation.

**Section 22.** **Extraordinary Dividends and Other Distributions**

A. Requests for approval of extraordinary dividends or any other extraordinary distribution to shareholders shall include the following:

(1) The amount of the proposed dividend;

(2) The date established for payment of the dividend;

(3) A statement as to whether the dividend is to be in cash or other property and, if in property, a description thereof, its cost, and its fair market value together with an explanation of the basis for valuation;

(4) A copy of the calculations determining that the proposed dividend is extraordinary. The work paper shall include the following information:

(a) The amounts, dates and form of payment of all dividends or distributions (including regular dividends but excluding distributions of the insurer's own securities) paid within the period of twelve (12) consecutive months ending on the date fixed for payment of the proposed dividend for which approval is sought and commencing on the day after the same day of the same month in the last preceding year;

(b) Surplus as regards policyholders (total capital and surplus) as of the 31st day of December next preceding;

(c) If the insurer is a life insurer, the net gain from operations for the 12-month period ending the 31st day of December next preceding;

(d) If the insurer is not a life insurer, the net income less realized capital gains for the 12-month period ending the 31st day of December next preceding and the two preceding 12-month periods; and

(e) If the insurer is not a life insurer, the dividends paid to stockholders excluding distributions of the insurer's own securities in the preceding two (2) calendar years;

(5) A balance sheet and statement of income for the period intervening from the last annual statement filed with the Commissioner and the end of the month preceding the month in which the request for dividend approval is submitted; and

(6) A brief statement as to the effect of the proposed dividend upon the insurer's surplus and the reasonableness of surplus in relation to the insurer's outstanding liabilities and the adequacy of surplus relative to the insurer's financial needs.

B. Subject to Section 5B of the Act, each registered insurer shall report to the Commissioner all dividends and other distributions to shareholders within fifteen (15) business days following the declaration thereof, including the same information required by Subsection A(4).

 © 2021 National Association of Insurance Commissioners

**Section 23.      Adequacy of Surplus**

The factors set forth in Section 5D of the Act are not intended to be an exhaustive list. In determining the adequacy and reasonableness of an insurer's surplus no single factor is necessarily controlling. The Commissioner instead will consider the net effect of all of these factors plus other factors bearing on the financial condition of the insurer. In comparing the surplus maintained by other insurers, the Commissioner will consider the extent to which each of these factors varies from company to company and in determining the quality and liquidity of investments in subsidiaries, the Commissioner will consider the individual subsidiary and may discount or disallow its valuation to the extent that the individual investments so warrant.

**FORM A**

**STATEMENT REGARDING THE
ACQUISITION OF CONTROL OF OR MERGER WITH A DOMESTIC INSURER**

_____
Name of Domestic Insurer

BY

_____
Name of Acquiring Person (Applicant)

Filed with the Insurance Department of

_____
(State of domicile of insurer being acquired)

Dated:_____, 20_____

Name, Title, address and telephone number of Individual to Whom Notices and Correspondence Concerning this Statement Should be Addressed:

_____

_____

_____

_____

**ITEM 1. METHOD OF ACQUISITION**

State the name and address of the domestic insurer to which this application relates and a brief description of how control is to be acquired.

**ITEM 2. IDENTITY AND BACKGROUND OF THE APPLICANT**

(a)   State the name and address of the applicant seeking to acquire control over the insurer.

(b)   If the applicant is not an individual, state the nature of its business operations for the past 5 years or for such lesser period as such person and any predecessors thereof shall have been in existence. Briefly describe the business intended to be done by the applicant and the applicant's subsidiaries.

                    © 2021 National Association of Insurance Commissioners

(c)     Furnish a chart or listing clearly presenting the identities of the interrelationships among the applicant and all affiliates of the applicant. Indicate in such chart or listing the percentage of voting securities of each such person which is owned or controlled by the applicant or by any other such person. If control of any person is maintained other than by the ownership or control of voting securities, indicate the basis of such control. As to each person specified in such chart or listing indicate the type of organization (e.g. corporation, trust, partnership) and the state or other jurisdiction of domicile. If court proceedings involving a reorganization or liquidation are pending with respect to any such person, indicate which person, and set forth the title of the court, nature of proceedings and the date when commenced.

**ITEM 3. IDENTITY AND BACKGROUND OF INDIVIDUALS ASSOCIATED WITH THE APPLICANT**

On the biographical affidavit, include a third party background check, and state the following with respect to (1) the applicant if (s)he is an individual or (2) all persons who are directors, executive officers or owners of 10% or more of the voting securities of the applicant if the applicant is not an individual.

(a)     Name and business address.

(b)     Present principal business activity, occupation or employment including position and office held and the name, principal business and address of any corporation or other organization in which such employment is carried on.

(c)     Material occupations, positions, offices or employment during the last 5 years, giving the starting and ending dates of each and the name, principal business and address of any business corporation or other organization in which each such occupation, position, office or employment was carried on; if any such occupation, position, office or employment required licensing by or registration with any federal, state or municipal governmental agency, indicate such fact, the current status of such licensing or registration, and an explanation of any surrender, revocation, suspension or disciplinary proceedings in connection therewith.

(d)     Whether or not such person has ever been convicted in a criminal proceeding (excluding minor traffic violations) during the last 10 years and, if so, give the date, nature of conviction, name and location of court, and penalty imposed or other disposition of the case.

**ITEM 4. NATURE, SOURCE AND AMOUNT OF CONSIDERATION**

(a)     Describe the nature, source and amount of funds or other considerations used or to be used in effecting the merger or other acquisition of control. If any part of the same is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding or trading securities, furnish a description of the transaction, the names of the parties thereto, the relationship, if any, between the borrower and the lender, the amounts borrowed or to be borrowed, and copies of all agreements, promissory notes and security arrangements relating thereto.

(b)     Explain the criteria used in determining the nature and amount of such consideration.

(c)     If the source of the consideration is a loan made in the lender's ordinary course of business and if the applicant wishes the identity of the lender to remain confidential, he must specifically request that the identity be kept confidential.

**ITEM 5. FUTURE PLANS OF INSURER**

Describe any plans or proposals which the applicant may have to declare an extraordinary dividend, to liquidate the insurer, to sell its assets to or merge it with any person or persons or to make any other material change in its business operations or corporate structure or management.

**ITEM 6. VOTING SECURITIES TO BE ACQUIRED**

State the number of shares of the insurer's voting securities which the applicant, its affiliates and any person listed in Item 3 plan to acquire, and the terms of the offer, request, invitation, agreement or acquisition, and a statement as to the method by which the fairness of the proposal was arrived at.

**ITEM 7. OWNERSHIP OF VOTING SECURITIES**

State the amount of each class of any voting security of the insurer which is beneficially owned or concerning which there is a right to acquire beneficial ownership by the applicant, its affiliates or any person listed in Item 3.

**ITEM 8. CONTRACTS, ARRANGEMENTS, OR UNDERSTANDINGS WITH RESPECT TO VOTING SECURITIES OF THE INSURER**

Give a full description of any contracts, arrangements or understandings with respect to any voting security of the insurer in which the applicant, its affiliates or any person listed in Item 3 is involved, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, guarantees against loss or guarantees of profits, division of losses or profits, or the giving or withholding of proxies. Such description shall identify the persons with whom the contracts, arrangements or understandings have been entered into.

**ITEM 9. RECENT PURCHASES OF VOTING SECURITIES**

Describe any purchases of any voting securities of the insurer by the applicant, its affiliates or any person listed in Item 3 during the 12 calendar months preceding the filing of this statement. Include in the description the dates of purchase, the names of the purchasers, and the consideration paid or agreed to be paid therefor. State whether any shares so purchased are hypothecated.

**ITEM 10.        RECENT RECOMMENDATIONS TO PURCHASE**

Describe any recommendations to purchase any voting security of the insurer made by the applicant, its affiliates or any person listed in Item 3, or by anyone based upon interviews or at the suggestion of the applicant, its affiliates or any person listed in Item 3 during the 12 calendar months preceding the filing of this statement.

**ITEM 11.        AGREEMENTS WITH BROKER-DEALERS**

Describe the terms of any agreement, contract or understanding made with any broker-dealer as to solicitation of voting securities of the insurer for tender and the amount of any fees, commissions or other compensation to be paid to broker-dealers with regard thereto.

                    © 2021 National Association of Insurance Commissioners

**ITEM 12.**      **FINANCIAL STATEMENTS AND EXHIBITS**

    (a)     Financial statements, exhibits, and three-year financial projections of the insurer(s) shall be attached to this statement as an appendix, but list under this item the financial statements and exhibits so attached.

    (b)     The financial statements shall include the annual financial statements of the persons identified in Item 2(c) for the preceding 5 fiscal years (or for such lesser period as such applicant and its affiliates and any predecessors thereof shall have been in existence), and similar information covering the period from the end of such person's last fiscal year, if the information is available. The statements may be prepared on either an individual basis, or, unless the Commissioner otherwise requires, on a consolidated basis if consolidated statements are prepared in the usual course of business.

             The annual financial statements of the applicant shall be accompanied by the certificate of an independent public accountant to the effect that such statements present fairly the financial position of the applicant and the results of its operations for the year then ended, in conformity with generally accepted accounting principles or with requirements of insurance or other accounting principles prescribed or permitted under law. If the applicant is an insurer which is actively engaged in the business of insurance, the financial statements need not be certified, provided they are based on the Annual Statement of the person filed with the insurance department of the person's domiciliary state and are in accordance with the requirements of insurance or other accounting principles prescribed or permitted under the law and regulations of the state.

    (c)     File as exhibits copies of all tender offers for, requests or invitations for, tenders of, exchange offers for, and agreements to acquire or exchange any voting securities of the insurer and (if distributed) of additional soliciting material relating thereto, any proposed employment, consultation, advisory or management contracts concerning the insurer, annual reports to the stockholders of the insurer and the applicant for the last two fiscal years, and any additional documents or papers required by Form A or regulation Sections 4 and 6.

**ITEM 13.**      **AGREEMENT REQUIREMENTS FOR ENTERPRISE RISK MANAGEMENT**

    Applicant agrees to provide, to the best of its knowledge and belief, the information required by Form F within fifteen (15) days after the end of the month in which the acquisition of control occurs.

**ITEM 14.**        **SIGNATURE AND CERTIFICATION**

Signature and certification required as follows:

SIGNATURE

Pursuant to the requirements of Section 3 of the Act _____ has caused this application to be duly signed on its behalf in the City of _____ and State of on the _____ day of _____, 20_____.

(SEAL)_____
                         Name of Applicant

BY_____
                    (Name) (Title)

Attest:

_____
(Signature of Officer)

_____
(Title)

CERTIFICATION

The undersigned deposes and says that (s)he has duly executed the attached application dated _____, 20_____, for and on behalf of _____(Name of Applicant); that (s)he is the _____(Title of Officer) of such company and that (s)he is authorized to execute and file such instrument. Deponent further says that (s)he is familiar with the instrument and the contents thereof, and that the facts therein set forth are true to the best of his/her knowledge, information and belief.

(Signature)_____

(Type or print name beneath)_____

**FORM B**

**INSURANCE HOLDING COMPANY SYSTEM ANNUAL REGISTRATION STATEMENT**

Filed with the Insurance Department of the State of_____

By

_____
Name of Registrant

On Behalf of Following Insurance Companies

Name          Address

_____

_____

_____

_____

    Date:_____, 20_____

Name, Title, Address and telephone number of Individual to Whom Notices and Correspondence Concerning This Statement Should Be Addressed:

_____

_____

_____

**ITEM 1. IDENTITY AND CONTROL OF REGISTRANT**

Furnish the exact name of each insurer registering or being registered (hereinafter called "the Registrant"), the home office address and principal executive offices of each; the date on which each registrant became part of the insurance holding company system; and the method(s) by which control of each registrant was acquired and is maintained.

**ITEM 2. ORGANIZATIONAL CHART**

Furnish a chart or listing clearly presenting the identities of and interrelationships among all affiliated persons within the insurance holding company system. The chart or listing should show the percentage of each class of voting securities of each affiliate which is owned, directly or indirectly, by another affiliate. If control of any person within the system is maintained other than by the ownership or control of voting securities, indicate the basis of control. As to each person specified in the chart or listing indicate the type of organization (e.g., corporation, trust, partnership) and the state or other jurisdiction of domicile.

© 2021 National Association of Insurance Commissioners  MO-450-19

**ITEM 3. THE ULTIMATE CONTROLLING PERSON**

As to the ultimate controlling person in the insurance holding company system furnish the following information:

(a)      Name;

(b)      Home office address;

(c)      Principal executive office address;

(d)      The organizational structure of the person, i.e., corporation, partnership, individual, trust, etc.;

(e)      The principal business of the person;

(f)      The name and address of any person who holds or owns 10% or more of any class of voting security, the class of such security, the number of shares held of record or known to be beneficially owned, and the percentage of class so held or owned; and

(g)      If court proceedings involving a reorganization or liquidation are pending, indicate the title and location of the court, the nature of proceedings and the date when commenced.

**ITEM 4. BIOGRAPHICAL INFORMATION**

If the ultimate controlling person is a corporation, an organization, a limited liability company, or other legal entity, furnish the following information for the directors and executive officers of the ultimate controlling person: the individual's name and address, his or her principal occupation and all offices and positions held during the past 5 years, and any conviction of crimes other than minor traffic violations. If the ultimate controlling person is an individual, furnish the individual's name and address, his or her principal occupation and all offices and positions held during the past 5 years, and any conviction of crimes other than minor traffic violations.

**ITEM 5. TRANSACTIONS AND AGREEMENTS**

Briefly describe the following agreements in force, and transactions currently outstanding or which have occurred during the last calendar year between the registrant and its affiliates:

(a)      Loans, other investments, or purchases, sales or exchanges of securities of the affiliates by the Registrant or of the Registrant by its affiliates;

(b)      Purchases, sales or exchanges of assets;

(c)      Transactions not in the ordinary course of business;

(d)      Guarantees or undertakings for the benefit of an affiliate which result in an actual contingent exposure of the Registrant's assets to liability, other than insurance contracts entered into in the ordinary course of the registrant's business;

(e)      All management agreements, service contracts and all cost-sharing arrangements;

© 2021 National Association of Insurance Commissioners

(f)     Reinsurance agreements;

(g)     Dividends and other distributions to shareholders;

(h)     Consolidated tax allocation agreements; and

(i)     Any pledge of the registrant's stock and/or of the stock of any subsidiary or controlling affiliate, for a loan made to any member of the insurance holding company system.

No information need be disclosed if such information is not material for purposes of Section 4 of the Act.

Sales, purchases, exchanges, loans or extensions of credit, investments or guarantees involving one-half of 1% or less of the registrant's admitted assets as of the 31st day of December next preceding shall not be deemed material.

**Drafting Note:** Commissioner may by rule, regulation or order provide otherwise.

The description shall be in a manner as to permit the proper evaluation thereof by the Commissioner, and shall include at least the following: the nature and purpose of the transaction, the nature and amounts of any payments or transfers of assets between the parties, the identity of all parties to the transaction, and relationship of the affiliated parties to the registrant.

## ITEM 6. LITIGATION OR ADMINISTRATIVE PROCEEDINGS

A brief description of any litigation or administrative proceedings of the following types, either then pending or concluded within the preceding fiscal year, to which the ultimate controlling person or any of its directors or executive officers was a party or of which the property of any such person is or was the subject; give the names of the parties and the court or agency in which the litigation or proceeding is or was pending:

(a)     Criminal prosecutions or administrative proceedings by any government agency or authority which may be relevant to the trustworthiness of any party thereto; and

(b)     Proceedings which may have a material effect upon the solvency or capital structure of the ultimate holding company including, but not necessarily limited to, bankruptcy, receivership or other corporate reorganizations.

## ITEM 7. STATEMENT REGARDING PLAN OR SERIES OF TRANSACTIONS

The insurer shall furnish a statement that transactions entered into since the filing of the prior year's annual registration statement are not part of a plan or series of like transactions, the purpose of which is to avoid statutory threshold amounts and the review that might otherwise occur.

**ITEM 8. FINANCIAL STATEMENTS AND EXHIBITS**

(a)     Financial statements and exhibits should be attached to this statement as an appendix, but list under this item the financial statements and exhibits so attached.

(b)     If the ultimate controlling person is a corporation, an organization, a limited liability company, or other legal entity, the financial statements shall include the annual financial statements of the ultimate controlling person in the insurance holding company system as of the end of the person's latest fiscal year.

If at the time of the initial registration, the annual financial statements for the latest fiscal year are not available, annual statements for the previous fiscal year may be filed and similar financial information shall be filed for any subsequent period to the extent such information is available. Such financial statements may be prepared on either an individual basis; or, unless the Commissioner otherwise requires, on a consolidated basis if consolidated statements are prepared in the usual course of business.

Other than with respect to the foregoing, such financial statement shall be filed in a standard form and format adopted by the National Association of Insurance Commissioners, unless an alternative form is accepted by the Commissioner. Documentation and financial statements filed with the Securities and Exchange Commission or audited GAAP financial statements shall be deemed to be an appropriate form and format.

Unless the Commissioner otherwise permits, the annual financial statements shall be accompanied by the certificate of an independent public accountant to the effect that the statements present fairly the financial position of the ultimate controlling person and the results of its operations for the year then ended, in conformity with generally accepted accounting principles or with requirements of insurance or other accounting principles prescribed or permitted under law. If the ultimate controlling person is an insurer which is actively engaged in the business of insurance, the annual financial statements need not be certified, provided they are based on the Annual Statement of the insurer's domiciliary state and are in accordance with requirements of insurance or other accounting principles prescribed or permitted under the law and regulations of that state.

Any ultimate controlling person who is an individual may file personal financial statements that are reviewed rather than audited by an independent public accountant. The review shall be conducted in accordance with standards for review of personal financial statements published in the *Personal Financial Statements Guide* by the American Institute of Certified Public Accountants. Personal financial statements shall be accompanied by the independent public accountant's Standard Review Report stating that the accountant is not aware of any material modifications that should be made to the financial statements in order for the statements to be in conformity with generally accepted accounting principles.

(c)     Exhibits shall include copies of the latest annual reports to shareholders of the ultimate controlling person and proxy material used by the ultimate controlling person; and any additional documents or papers required by Form B or regulation Sections 4 and 6.

     © 2021 National Association of Insurance Commissioners

**ITEM 9. FORM C REQUIRED**

A Form C, Summary of Changes to Registration Statement, must be prepared and filed with this Form B.

**ITEM 10.        SIGNATURE AND CERTIFICATION**

Signature and certification required as follows:

SIGNATURE

Pursuant to the requirements of Section 4 of the Act, Registrant has caused this annual registration statement to be duly signed on its behalf of the City of _____ and State of _____ on the _____ day of _____, 20 _____.

(SEAL)_____
Name of Applicant

BY_____
(Name) (Title)

Attest:

_____
(Signature of Officer)

_____
(Title)

CERTIFICATION

The undersigned deposes and says that (s)he has duly executed the attached annual registration statement dated _____, 20_____, for and on behalf of _____(Name of Applicant); that (s)he is the _____(Title of Officer) of such company and that (s)he is authorized to execute and file such instrument. Deponent further says that (s)he is familiar with such instrument and the contents thereof, and that the facts therein set forth are true to the best of his/her knowledge, information and belief.

(Signature)_____

(Type or print name beneath)_____

**FORM C**

**SUMMARY OF CHANGES TO REGISTRATION STATEMENT**

Filed with the Insurance Department of the State of_____

By

_____
Name of Registrant

On Behalf of Following Insurance Companies

Name         Address

_____

_____

_____

_____

Date:_____, 20_____

Name, Title, Address and telephone number of Individual to Whom Notices and Correspondence Concerning This Statement Should Be Addressed:

_____

_____

_____

Furnish a brief description of all items in the current annual registration statement which represent changes from the prior year's annual registration statement. The description shall be in a manner as to permit the proper evaluation thereof by the Commissioner, and shall include specific references to Item numbers in the annual registration statement and to the terms contained therein.

Changes occurring under Item 2 of Form B insofar as changes in the percentage of each class of voting securities held by each affiliate is concerned, need only be included where such changes are ones which result in ownership or holdings of 10% or more of voting securities, loss or transfer of control, or acquisition or loss of partnership interest.

Changes occurring under Item 4 of Form B need only be included where an individual is, for the first time, made a director or executive officer of the ultimate controlling person; a director or executive officer terminates his or her responsibilities with the ultimate controlling person; or in the event an individual is named president of the ultimate controlling person.

                                              © 2021 National Association of Insurance Commissioners

If a transaction disclosed on the prior year's annual registration statement has been changed, the nature of such change shall be included. If a transaction disclosed on the prior year's annual registration statement has been effectuated, furnish the mode of completion and any flow of funds between affiliates resulting from the transaction.

The insurer shall furnish a statement that transactions entered into since the filing of the prior year's annual registration statement are not part of a plan or series of like transactions whose purpose it is to avoid statutory threshold amounts and the review that might otherwise occur.

SIGNATURE AND CERTIFICATION

Signature and certification required as follows:

Pursuant to the requirements of Section 4 of the Act, Registrant has caused this annual registration statement to be duly signed on its behalf of the City of _____ and State of _____ on the _____ day of _____, 20 _____.

(SEAL)_____
Name of Applicant

BY_____
(Name) (Title)

Attest:

_____
(Signature of Officer)

_____
(Title)

CERTIFICATION

The undersigned deposes and says that (s)he has duly executed the attached annual registration statement dated _____, 20_____, for and on behalf of _____(Name of Applicant); that (s)he is the _____(Title of Officer) of such company and that (s)he is authorized to execute and file such instrument. Deponent further says that (s)he is familiar with such instrument and the contents thereof, and that the facts therein set forth are true to the best of his/her knowledge, information and belief.

(Signature)_____

(Type or print name beneath)_____

© 2021 National Association of Insurance Commissioners

**FORM D**

**PRIOR NOTICE OF A TRANSACTION**

Filed with the Insurance Department of the State of_____

By

_____
Name of Registrant


On Behalf of Following Insurance Companies

Name          Address

_____

_____

_____

_____

    Date:_____, 20_____

Name, Title, Address and telephone number of Individual to Whom Notices and Correspondence Concerning This Statement Should Be Addressed:

_____

_____

_____


**ITEM 1. IDENTITY OF PARTIES TO TRANSACTION**

    Furnish the following information for each of the parties to the transaction:

    (a)    Name;

    (b)    Home office address;

    (c)    Principal executive office address;

    (d)    The organizational structure, i.e. corporation, partnership, individual, trust, etc.;

    (e)    A description of the nature of the parties' business operations;

                                              © 2021 National Association of Insurance Commissioners

(f)     Relationship, if any, of other parties to the transaction to the insurer filing the notice, including any ownership or debtor/creditor interest by any other parties to the transaction in the insurer seeking approval, or by the insurer filing the notice in the affiliated parties;

(g)     Where the transaction is with a non-affiliate, the name(s) of the affiliate(s) which will receive, in whole or in substantial part, the proceeds of the transaction.

## ITEM 2. DESCRIPTION OF THE TRANSACTION

Furnish the following information for each transaction for which notice is being given:

(a)     A statement as to whether notice is being given under Section 5A(2)(a), (b), (c), (d), or (e) of the Act;

(b)     A statement of the nature of the transaction;

(c)     A statement of how the transaction meets the 'fair and reasonable' standard of Section 5A(1)(a) of the Act; and

(d)     The proposed effective date of the transaction.

## ITEM 3. SALES, PURCHASES, EXCHANGES, LOANS, EXTENSIONS OF CREDIT, GUARANTEES OR INVESTMENTS

Furnish a brief description of the amount and source of funds, securities, property or other consideration for the sale, purchase, exchange, loan, extension of credit, guarantee, or investment, whether any provision exists for purchase by the insurer filing notice, by any party to the transaction, or by any affiliate of the insurer filing notice, a description of the terms of any securities being received, if any, and a description of any other agreements relating to the transaction such as contracts or agreements for services, consulting agreements and the like. If the transaction involves other than cash, furnish a description of the consideration, its cost and its fair market value, together with an explanation of the basis for evaluation.

If the transaction involves a loan, extension of credit or a guarantee, furnish a description of the maximum amount which the insurer will be obligated to make available under such loan, extension of credit or guarantee, the date on which the credit or guarantee will terminate, and any provisions for the accrual of or deferral of interest.

If the transaction involves an investment, guarantee or other arrangement, state the time period during which the investment, guarantee or other arrangement will remain in effect, together with any provisions for extensions or renewals of such investments, guarantees or arrangements. Furnish a brief statement as to the effect of the transaction upon the insurer's surplus.

No notice need be given if the maximum amount which can at any time be outstanding or for which the insurer can be legally obligated under the loan, extension of credit or guarantee is less than (a) in the case of non-life insurers, the lesser of 3% of the insurer's admitted assets or 25% of surplus as regards policyholders, or (b) in the case of life insurers, 3% of the insurer's admitted assets, each as of the 31st day of December next preceding.

**ITEM 4. LOANS OR EXTENSIONS OF CREDIT TO A NON-AFFILIATE**

If the transaction involves a loan or extension of credit to any person who is not an affiliate, furnish a brief description of the agreement or understanding whereby the proceeds of the proposed transaction, in whole or in substantial part, are to be used to make loans or extensions of credit to, to purchase the assets of, or to make investments in, any affiliate of the insurer making such loans or extensions of credit, and specify in what manner the proceeds are to be used to loan to, extend credit to, purchase assets of or make investments in any affiliate. Describe the amount and source of funds, securities, property or other consideration for the loan or extension of credit and, if the transaction is one involving consideration other than cash, a description of its cost and its fair market value together with an explanation of the basis for evaluation. Furnish a brief statement as to the effect of the transaction upon the insurer's surplus.

No notice need be given if the loan or extension of credit is one which equals less than, in the case of non-life insurers, the lesser of 3% of the insurer's admitted assets or 25% of surplus as regards policyholders or, with respect to life insurers, 3% of the insurer's admitted assets, each as of the 31st day of December next preceding.

**ITEM 5. REINSURANCE**

If the transaction is a reinsurance agreement or modification thereto, as described by Section 5A(2)(c)(ii) of the Act, or a reinsurance pooling agreement or modification thereto as described by Section 5A(2)(c)(i) of the Act, furnish a description of the known and/or estimated amount of liability to be ceded and/or assumed in each calendar year, the period of time during which the agreement will be in effect, and a statement whether an agreement or understanding exists between the insurer and non-affiliate to the effect that any portion of the assets constituting the consideration for the agreement will be transferred to one or more of the insurer's affiliates. Furnish a brief description of the consideration involved in the transaction, and a brief statement as to the effect of the transaction upon the insurer's surplus.

No notice need be given for reinsurance agreements or modifications thereto if the reinsurance premium or a change in the insurer's liabilities, or the projected reinsurance premium or change in the insurer's liabilities in any of the next three years, in connection with the reinsurance agreement or modification thereto is less than 5% of the insurer's surplus as regards policyholders, as of the 31st day of December next preceding. Notice shall be given for all reinsurance pooling agreements including modifications thereto.

**ITEM 6. MANAGEMENT AGREEMENTS, SERVICE AGREEMENTS AND COST-SHARING ARRANGEMENTS.**

For management and service agreements, furnish:

(a)     A brief description of the managerial responsibilities, or services to be performed;

(b)     A brief description of the agreement, including a statement of its duration, together with brief descriptions of the basis for compensation and the terms under which payment or compensation is to be made.

For cost-sharing arrangements, furnish:

                                                    © 2021 National Association of Insurance Commissioners

(a)     A brief description of the purpose of the agreement;

(b)     A description of the period of time during which the agreement is to be in effect;

(c)     A brief description of each party's expenses or costs covered by the agreement;

(d)     A brief description of the accounting basis to be used in calculating each party's costs under the agreement;

(e)     A brief statement as to the effect of the transaction upon the insurer's policyholder surplus;

(f)     A statement regarding the cost allocation methods that specifies whether proposed charges are based on "cost or market." If market based, rationale for using market instead of cost, including justification for the company's determination that amounts are fair and reasonable; and

(g)     A statement regarding compliance with the *NAIC Accounting Practices and Procedure Manual* regarding expense allocation.

**ITEM 7. SIGNATURE AND CERTIFICATION**

Signature and certification required as follows:

SIGNATURE

Pursuant to the requirements of Section 5 of the Act, _____ has caused this application to be duly signed on its behalf in the City of _____ and State of _____ on the _____ day of _____, 20 ____.

(SEAL)_____
Name of Applicant

BY_____
(Name) (Title)

Attest:

_____
(Signature of Officer)

_____
(Title)

CERTIFICATION

The undersigned deposes and says that (s)he has duly executed the attached application dated _____, 20_____, for and on behalf of _____(Name of Applicant); that (s)he is the _____(Title of Officer) of such company and that (s)he is authorized to execute and file such instrument. Deponent further says that (s)he is familiar with such instrument and the contents thereof, and that the facts therein set forth are true to the best of his/her knowledge, information and belief.

(Signature)_____

(Type or print name beneath)_____

                    © 2021 National Association of Insurance Commissioners

**FORM E**

**PRE-ACQUISITION NOTIFICATION FORM**
**REGARDING THE POTENTIAL COMPETITIVE IMPACT**
**OF A PROPOSED MERGER OR ACQUISITION BY A**
**NON-DOMICILIARY INSURER DOING BUSINESS IN THIS**
**STATE OR BY A DOMESTIC INSURER**

_____
Name of Applicant

_____
Name of Other Person
Involved in Merger or
Acquisition

Filed with the Insurance Department of

_____

Dated:_____, 20 _____

Name, title, address and telephone number of person completing this statement:

_____

_____

_____

_____

**ITEM 1. NAME AND ADDRESS**

State the names and addresses of the persons who hereby provide notice of their involvement in a pending acquisition or change in corporate control.

**ITEM 2. NAME AND ADDRESSES OF AFFILIATED COMPANIES**

State the names and addresses of the persons affiliated with those listed in Item 1. Describe their affiliations.

**ITEM 3. NATURE AND PURPOSE OF THE PROPOSED MERGER OR ACQUISITION**

State the nature and purpose of the proposed merger or acquisition.

© 2021 National Association of Insurance Commissioners

**ITEM 4. NATURE OF BUSINESS**

State the nature of the business performed by each of the persons identified in response to Item 1 and Item 2.

**ITEM 5. MARKET AND MARKET SHARE**

State specifically what market and market share in each relevant insurance market the persons identified in Item 1 and Item 2 currently enjoy in this state. Provide historical market and market share data for each person identified in Item 1 and Item 2 for the past five years and identify the source of such data. Provide a determination as to whether the proposed acquisition or merger, if consummated, would violate the competitive standards of the state as stated in Section 3.1D of the Act. If the proposed acquisition or merger would violate competitive standards, provide justification of why the acquisition or merger would not substantially lessen competition or create a monopoly in the state.

For purposes of this question, market means direct written insurance premium in this state for a line of business as contained in the annual statement required to be filed by insurers licensed to do business in this state.

**Drafting Note:** State Insurance Departments may additionally choose to make these calculations using their own data or data provided by the National Association of Insurance Commissioners.

**FORM F**

**ENTERPRISE RISK REPORT**

Filed with the Insurance Department of the State of_____

By

_____
Name of Registrant/Applicant

On Behalf of/Related to Following Insurance Companies

Name                   Address

_____

_____

_____

_____

     Date:_____, 20_____

Name, Title, Address and telephone number of Individual to Whom Notices and Correspondence Concerning This Statement Should Be Addressed:

_____

_____

_____

**ITEM 1.          ENTERPRISE RISK**

The Registrant/Applicant, to the best of its knowledge and belief, shall provide information regarding the following areas that could produce enterprise risk as defined in [insert cross reference to definition of Enterprise Risk in Section 1F of the Act], provided such information is not disclosed in the Insurance Holding Company System Annual Registration Statement filed on behalf of itself or another insurer for which it is the ultimate controlling person:

- Any material developments regarding strategy, internal audit findings, compliance or risk management affecting the insurance holding company system;

- Acquisition or disposal of insurance entities and reallocating of existing financial or insurance entities within the insurance holding company system;

© 2021 National Association of Insurance Commissioners

- Any changes of shareholders of the insurance holding company system exceeding ten percent (10%) or more of voting securities;

- Developments in various investigations, regulatory activities or litigation that may have a significant bearing or impact on the insurance holding company system;

- Business plan of the insurance holding company system and summarized strategies for the next 12 months;

- Identification of material concerns of the insurance holding company system raised by supervisory college, if any, in the last year;
- Identification of insurance holding company system capital resources and material distribution patterns;

- Identification of any negative movement, or discussions with rating agencies which may have caused, or may cause, potential negative movement in the credit ratings and individual insurer financial strength ratings assessment of the insurance holding company system (including both the rating score and outlook);

- Information on corporate or parental guarantees throughout the holding company and the expected source of liquidity should such guarantees be called upon; and

- Identification of any material activity or development of the insurance holding company system that, in the opinion of senior management, could adversely affect the insurance holding company system.

The Registrant/Applicant may attach the appropriate form most recently filed with the U.S. Securities and Exchange Commission, provided the Registrant/Applicant includes specific references to those areas listed in Item 1 for which the form provides responsive information. If the Registrant/Applicant is not domiciled in the U.S., it may attach its most recent public audited financial statement filed in its country of domicile, provided the Registrant/Applicant includes specific references to those areas listed in Item 1 for which the financial statement provides responsive information.

**ITEM 2: OBLIGATION TO REPORT.**

If the Registrant/Applicant has not disclosed any information pursuant to Item 1, the Registrant/Applicant shall include a statement affirming that, to the best of its knowledge and belief, it has not identified enterprise risk subject to disclosure pursuant to Item 1.

_____

*Chronological Summary of Actions (all references are to the <u>Proceedings of the NAIC</u>).*

*1970 Proc. IIB 1055-1066 (printed).*
*1971 Proc. I 54, 58, 134, 149 (adopted).*
*1986 Proc. II 12, 19-20, 93-94, 109-123 (amended).*
*1993 Proc. 1st Quarter 3, 33, 362, 364-370 (amended).*
*2011 Proc. 1st Quarter I 3-11 (amended).*
*2013 3rd Quarter (editorial revision).*
*2020 Fall National Meeting (amended).*
*2021 Summer National Meeting (amended).*

© 2021 National Association of Insurance Commissioners

**TAB G:**
**Nextra Summary of Search Results**
**3 RR 670**



# 068486.00002 Bright Health of Texas (PROCESS)

## Search Terms Report

**Report Name:** Texas _ 20240102          **Searchable Set:** All Documents



## Results Summary

| Documents in searchable set | Total documents with hits | Total documents with hits, including Group | Total documents without hits |
|---|---|---|---|
| 776,369 | 61,084 | 98,677 | 715,285 |



## Terms Summary

| Term | Documents with hits | Documents with hits, including group | Unique hits |
|---|---|---|---|
| Tex | 1,526 | 4,156 | 260 |
| Texas | 39,136 | 67,757 | 23,367 |
| Tx | 36,944 | 63,438 | 21,606 |

**TAB H:**
*In re Weekley Homes, L.P.*, 295 S.W.3d 309 (Tex. 2009)

KeyCite Yellow Flag

Declined to Extend by In re 4X Industrial, LLC, Tex.App.-Hous. (14 Dist.), January 30, 2024

295 S.W.3d 309
Supreme Court of Texas.

In re WEEKLEY HOMES, L.P., Relator.

No. 08–0836
|
Argued March 31, 2009.
|
Decided Aug. 28, 2009.

**Synopsis**

**Background:** Lot warehouser brought action against real estate developer and residential homebuilder, asserting claim against developer for breach of warehouse contract and asserting claims against homebuilder for common law fraud, fraudulent inducement, statutory fraud, fraud by nondisclosure, negligence per se, and negligent misrepresentation. The 134th Judicial District Court, Dallas County, Anne Ashby, J., ordered four of homebuilder's employees to turn over their computer hard drives to forensic experts for imaging, copying, and searching for deleted e-mails regarding slope stability analysis for certain lots. Homebuilder petitioned for writ of mandamus. The Dallas Court of Appeals, 2008 WL 4335183, denied the petition. Homebuilder petitioned for writ of mandamus.

**[Holding:]** The Supreme Court, O'Neill, J., held that lot warehouser was not entitled to production of computer hard drives, in absence of demonstration of the particular characteristics of the electronic storage devices involved, the familiarity of its experts with those characteristics, and a reasonable likelihood that the proposed search methodology would yield the information sought.

Writ conditionally granted.

West Headnotes (12)

**[1]** **Pretrial Procedure** 🗝 Records and reports in general

E-mail messages and deleted e-mail messages that have not been printed out, and instead are stored on a computer hard drive, constitute "electronic or magnetic data," within meaning of civil procedure rule governing discovery requests for production of electronic or magnetic data. Vernon's Ann.Texas Rules Civ.Proc., Rule 196.4.

4 Cases that cite this headnote

**[2]** **Pretrial Procedure** 🗝 Request, notice, or motion and response or objection

Purpose of civil procedure rule's specificity requirement for discovery requests for production of electronic information is to ensure that requests for electronic information are clearly understood and disputes avoided. Vernon's Ann.Texas Rules Civ.Proc., Rule 196.4.

15 Cases that cite this headnote

**[3]** **Pretrial Procedure** 🗝 Request, notice, or motion and response or objection

While a discovery request for production of e-mail messages implies a request for deleted e-mail messages, parties seeking production of deleted e-mail messages should expressly request them, to ensure compliance with the civil procedure rule governing discovery requests for production of electronic or magnetic data, and to avoid confusion. Vernon's Ann.Texas Rules Civ.Proc., Rule 196.4.

2 Cases that cite this headnote

**[4]** **Pretrial Procedure** 🗝 Request, notice, or motion and response or objection

Was motion properly construed as motion to compel production?**Yes**
Even if lot warehouser's "motion for limited access to [homebuilder's] computers" was not

a permissible discovery device, the trial court could treat the motion as a permissible motion to compel production of electronic or magnetic data. Vernon's Ann.Texas Rules Civ.Proc., Rule 196.4.

3 Cases that cite this headnote
More cases on this issue

**[5]** **Pretrial Procedure** 🔑 Affidavits and Showing

In light of highly intrusive nature of a computer storage search and the sensitivity of the subject matter, defendant homebuilder was not required to comply with plaintiff lot warehouser's request for production of the computer hard drives of four of defendant's employees, to be turned over to plaintiff's forensic experts for imaging, copying, and searching for deleted e-mails regarding slope stability analysis for certain lots, which deleted e-mail messages were not otherwise reasonably available, and which deleted e-mail messages were sought by plaintiff to show the misleading nature of representations that defendant made in estoppel certificate on which plaintiff allegedly relied before it executed warehouse contract with real estate developer, in absence of demonstration by plaintiff of the particular characteristics of the electronic storage devices involved, the familiarity of its experts with those characteristics, and a reasonable likelihood that the proposed search methodology would yield the information sought. Vernon's Ann.Texas Rules Civ.Proc., Rules 192.4(b), 196.4.

10 Cases that cite this headnote
More cases on this issue

**[6]** **Pretrial Procedure** 🔑 Request, notice, or motion and response or objection

Prior to promulgating requests for production of electronic or magnetic data, parties and their attorneys should share relevant information concerning electronic systems and storage methodologies so that agreements regarding protocols may be reached, or if not, trial courts have the information necessary to craft

discovery orders that are not unduly intrusive or overly burdensome. Vernon's Ann.Texas Rules Civ.Proc., Rule 196.4.

6 Cases that cite this headnote

**[7]** **Pretrial Procedure** 🔑 Affidavits and Showing

If the trial court determines that electronic or magnetic data, for which production has been requested, is not reasonably available, the court may nevertheless order production upon a showing by the requesting party that the benefits of production outweigh the burdens imposed. Vernon's Ann.Texas Rules Civ.Proc., Rules 192.4(b), 196.4.

10 Cases that cite this headnote

**[8]** **Pretrial Procedure** 🔑 Protective Orders

If the benefits of ordering production of electronic or magnetic data are shown to outweigh the burdens of production and the trial court orders production of information that is not reasonably available, sensitive information should be protected and the least intrusive means should be employed. Vernon's Ann.Texas Rules Civ.Proc., Rules 192.4(b), 192.6(b), 196.4.

9 Cases that cite this headnote

**[9]** **Pretrial Procedure** 🔑 Protective Orders

When determining the means by which the sources, for electronic or magnetic data for which production is sought, should be searched and information produced, direct access to another party's electronic storage devices is discouraged, and courts should be extremely cautious to guard against undue intrusion. Vernon's Ann.Texas Rules Civ.Proc., Rule 196.4.

28 Cases that cite this headnote

**[10]** **Mandamus** 🔑 Proceedings in civil actions in general

Mandamus relief is available when the trial court compels production beyond the permissible bounds of discovery.

57 Cases that cite this headnote

**[11]** **Mandamus** 🔑 Modification or vacation of judgment or order

If an appellate court cannot remedy a trial court's discovery error, then an adequate appellate remedy does not exist, as element for mandamus relief.

27 Cases that cite this headnote

**[12]** **Mandamus** 🔑 Modification or vacation of judgment or order

**Mandamus** 🔑 Proceedings in civil actions in general

Defendant homebuilder was entitled to mandamus relief, with respect to trial court's order compelling four of defendant's employees to turn over their computer hard drives to plaintiff lot warehouser's forensic experts for imaging, copying, and searching for deleted e-mails regarding slope stability analysis for certain lots; plaintiff failed to make the good-cause showing necessary to justify trial court's order, and the harm defendant would suffer from being required to relinquish control of its employees' hard drives for forensic inspection, and the harm that might result from revealing private conversations, trade secrets, and privileged or otherwise confidential communications, could not be remedied on appeal. Vernon's Ann.Texas Rules Civ.Proc., Rules 192.4(b), 196.4.

8 Cases that cite this headnote
More cases on this issue

**Attorneys and Law Firms**

**\*311** Craig T. Enoch, Winstead PC, Austin, TX, Joel Wilson Reese, Winstead PC, Dallas, TX, David Fowler Johnson, Winstead PC, Fort Worth, TX, for Relator.

Christopher H. Rentzel, Robert Marvin Castle III, Bracewell & Guiliani, Dallas, TX, for Real Party in Interest.

**Opinion**

Justice O'NEILL delivered the opinion of the Court.

In this mandamus proceeding, we must decide whether the trial court abused its discretion by ordering four of the defendant's employees to turn over their computer hard drives to forensic experts for imaging, copying, and searching for deleted emails. Because the plaintiff failed to demonstrate the particular characteristics of the electronic storage devices involved, the familiarity of its experts with those characteristics, or a reasonable likelihood that the proposed search methodology would yield the information sought, and considering the highly intrusive nature of computer storage search and the sensitivity of the subject matter, we hold that the trial court abused its discretion.

**I. Background**

In October 2002, relator Weekley Homes, L.P., a homebuilder, entered into an agreement with Enclave at Fortney Branch, Ltd. (Enclave), a residential real estate developer, to purchase 136 developed lots in a subdivision pursuant to a take-down schedule [1] (the Builder Contract). In November 2004, after Weekley had purchased some of the lots from Enclave pursuant to the Builder Contract, Enclave and HFG Enclave Land Interests, Ltd. (HFG) [2] entered into an agreement whereby Enclave would sell and convey seventy-four of the remaining developed lots to HFG (the Warehouse Contract). Under the Warehouse Contract, Enclave also assigned to HFG its rights to those seventy-four lots under the Builder Contract such that Weekley would be obligated to purchase those lots from HFG.

One day before the Warehouse Contract's execution, Weekley executed a Consent to Assignment and Estoppel Certificate (the Estoppel Certificate), in which Weekley made various express representations, warranties, and covenants to HFG about the state of Enclave's performance under the Builder Contract up to that point. According to HFG, it relied upon the Estoppel Certificate when it agreed to the terms of the Warehouse Contract.

**\*312** Enclave allegedly failed to perform various obligations owed to HFG under the Warehouse Contract, and HFG sued Enclave in August 2006. Two months later, HFG subpoenaed documents from a number of third parties, including Weekley.

After reviewing several of the documents Weekley produced, HFG's counsel began asking Weekley about the possible existence of other potentially responsive documents relating to the subdivision. In response, Weekley eventually produced approximately 400 additional pages of documents in March 2007. According to HFG, information contained in the documents led it to believe Weekley had made a number of material misrepresentations in the Estoppel Certificate relating to Enclave's performance under the Builder Contract.

In June 2007, HFG added Weekley as a defendant to its pending suit against Enclave, seeking damages for common law fraud and fraudulent inducement, statutory fraud, fraud by nondisclosure, negligence per se, and negligent misrepresentation. In July and December 2007, HFG served Weekley with requests for production including requests that Weekley produce a broad variety of emails [3] to and from Weekley and its employees relating to Enclave, the subdivision, and the Builder Contract. HFG specifically requested emails between Enclave and Russell Rice (Weekley's Division President), Joe Vastano (Weekley's Area President), Scott Thompson (Weekley's Project Manager for the subdivision), and Biff Bailey (Weekley's Land Acquisitions Manager) (collectively "the Employees"), relating to Enclave and the Builder Contract. HFG received thirty-one responsive emails, one of which discussed a third-party engineering analysis (the Slope Stability Analysis) predating the Estoppel Certificate and Warehouse Contract and addressing the existence of multiple unsafe subdivision lots that required remedial measures. [4] Weekley produced a copy of the Slope Stability Analysis, but did not produce any additional communications to or from the Employees discussing it. Considering the safety issues HFG contends the Slope Stability Analysis highlighted, and that Weekley allegedly spent $92,000 to remedy those issues, HFG was unconvinced that there was only one email discussing the report.

HFG moved to compel Weekley to "search for any emails stored on servers or back up tapes or other media, [and] any email folders in the email accounts of [the Employees]." At the hearing on HFG's motion, John Burchfield, Weekley's General Counsel, testified that "each [Weekley] employee has an [email] inbox that's limited in size. And once you bump that size limit, you have to start deleting things off the inbox in order to be able to receive any more emails." Burchfield further testified that "[Weekley] forces [employees] to clear out [their] inbox[es] on a regular basis," so that deleted emails will only be saved if an employee "back[s] them up on [the employee's] own personal hard drive somehow." And while deleted emails are saved on backup tapes, they are only retained "[f]or a thirty-day cycle." The trial court denied HFG's motion.

 **\*313** Based upon information learned at the hearing, HFG filed a "Motion for Limited Access to [Weekley's] Computers" directing its discovery efforts at the Employees' hard drives. In essence the motion would, at HFG's expense, allow any two of four named PricewaterhouseCoopers forensic experts to access the Employees' computers "for the limited purpose of creating forensic images of the hard drives." According to the motion, the experts would "make an evidentiary image of the [hard drives] using a procedure that is generally accepted as forensically sound." Once the images are created, the experts would search the images for deleted emails from 2004, the relevant year, containing twenty-one specified terms: slope stability, retaining wall, Holigan, HFG, fence, mow!, landscap!, screening wall, LSI, limited site, Alpha, entry, earnest money, Legacy, defective, lot 1, lot 8, grading, substantial completion, letter of credit, and Site Concrete. Once the responsive documents had been identified, extracted, and copied to some form of electronic media by the experts, Weekley would have the right to review the extracted data

> and designate which documents or information [Weekley] claims are not relevant, not discoverable, or are subject to any claim of privilege or immunity from which they are withheld under such claims, identifying such withheld documents by page identification number, directory and subdirectory identification, statement of claimed privilege or immunity from discovery, and brief description of the information in question as is required by Tex.R. Civ. Pro. 193.3.

After reviewing the extracted data, Weekley would be required to furnish HFG with any responsive documents that were not being withheld. According to the Motion, should HFG, its counsel, or the experts incidentally observe privileged or confidential information, the information would be maintained in strict confidence and otherwise valid

privileges or confidentiality rights would not be waived. Failure to comply with the order's confidentiality provisions would subject the violator to penalties and contempt of court.

At the hearing on HFG's motion, Weekley complained about the intrusiveness of the suggested protocol, pointing out that the forensic experts would have access to private conversations, trade secrets, and privileged communications stored on the Employees' hard drives. Weekly also complained that requiring the Employees' hard drives to be "taken out of commission" for imaging would be burdensome and disruptive. And Weekley complained that HFG failed to show the feasibility of "obtain[ing] data that may have been deleted in 2004" using the protocol set forth in the Motion. [5]

The trial court granted HFG's motion, and Weekley sought mandamus relief from the court of appeals. In a brief memorandum opinion, the court of appeals denied Weekley's petition. 295 S.W.3d 346. We granted oral argument in this case to determine whether the trial court abused its discretion by allowing forensic experts direct access to Weekley's Employees' electronic storage devices for imaging and searching.

## II. Analysis

### A. Rule 196.4's Application

#### 1. Emails are electronic information

Texas Rule of Civil Procedure 192.3(b) provides for discovery of documents, defined **\*314** to include electronic information that is relevant to the subject matter of the action. *See* TEX.R. CIV. P. 192.3(b) cmt.—1999. Rule 196 governs requests for production of documents, and Rule 196.4 applies specifically to requests for production of "data or information that exists in electronic or magnetic form." As a threshold matter, Weekley contends the trial court abused its discretion because HFG did not comply with Texas Rule of Civil Procedure 196.4 governing requests for production of electronic or magnetic data. HFG responds that Rule 196.4 does not apply because deleted emails are simply documents governed by the general discovery rules. According to HFG, Rule 196.4 only applies to spreadsheets and statistics, not emails and deleted emails.

[1] We see nothing in the rule that would support HFG's interpretation. Emails and deleted emails stored in electronic or magnetic form (as opposed to being printed out) are clearly "electronic information." *See* Conference of Chief Justices, Guidelines for State Courts Regarding Discovery of Electronically–Stored Information v (2006), *available at* http://www.ncsconline. org/images/ EDisCCJGuidelinesFinal.pdf. Accordingly, we look to Rule 196.4 in analyzing HFG's requests.

### B. Rule 196.4's Requirements

#### 1. Specificity

[2] [3] Weekley argues that HFG failed to comply with Rule 196.4 because it never specifically requested production of "deleted emails." Rule 196.4 provides that, "[t]o obtain discovery of data or information that exists in electronic or magnetic form, the requesting party must specifically request production of electronic or magnetic data and specify the form in which the requesting party wants it produced." TEX.R. CIV. P. 196.4. As we have said, email communications constitute "electronic data," and their characterization as such does not change when they are deleted from a party's inbox. Thus, deleted emails are within Rule 196.4's purview and their production was implied by HFG's request. However, for parties unsophisticated in electronic discovery, such an implication might be easily missed. Rule 196.4 requires specificity, and HFG did not specifically request deleted emails. HFG counters that it did not know how Weekley's computer system and electronic information storage worked, and thus did not know what to ask for. But it is a simple matter to request emails that have been deleted; knowledge as to the particular method or means of retrieving them is not necessary at the requesting stage of discovery. Once a specific request is made the parties can, and should, communicate as to the particularities of a party's computer storage system and potential methods of retrieval to assess the feasibility of their recovery. [6] But even though it was not stated in HFG's written request that deleted emails were included within its scope, that HFG thought they were and was seeking this form of electronic information became abundantly clear in the course of discovery and before the hearing on the motion to compel. The purpose of Rule 196.4's specificity requirement is to ensure that requests for electronic information are clearly understood and disputes avoided. Because the scope of HFG's requests **\*315** was understood before trial court

intervention, Weekley was not prejudiced by HFG's failure to follow the rule and the trial court did not abuse its discretion by ordering production of the deleted emails. To ensure compliance with the rules and avoid confusion, however, parties seeking production of deleted emails should expressly request them.

 **[4]** Weekley additionally complains that HFG's "Motion for Limited Access to [Weekley's] Computers" is not a permissible discovery device. We agree with HFG, however, that the motion was, in effect, a motion to compel and the trial court properly treated it as such.

### C. The Trial Court Abused Its Discretion in Allowing Access to Weekley's Hard Drives on this Record

#### 1. The appropriate procedures under the rules

 **[5]** Weekley next contends that, even if a motion to compel may be used to access another party's hard drives, the trial court abused its discretion by permitting the experts to rummage through the Employees' computers in search of deleted emails that may no longer exist. Such an invasive procedure is only permissible, Weekley argues, when the requesting party has produced some evidence of good cause or bad faith, together with some evidence that the information sought exists and is retrievable. According to Weekley, HFG failed to make such a demonstration. HFG responds that inconsistencies and discrepancies in a party's production justify granting access to a party's hard drives. Additionally, HFG claims it was not required to show the feasibility of retrieval because it is well-settled that deleted emails can, at least in some cases, be retrieved from computer hard drives. Once again, we turn to Rule 196.4 for guidance.

When a specific request for electronic information has been lodged, Rule 196.4 requires the responding party to either produce responsive electronic information that is "reasonably available to the responding party in its ordinary course of business," or object on grounds that the information cannot through reasonable efforts be retrieved or produced in the form requested. Once the responding party raises a Rule 196.4 objection, either party may request a hearing at which the responding party must present evidence to support the objection. TEX.R. CIV. P. 193.4(a). To determine whether requested information is reasonably available in the ordinary course of business, the trial court may order discovery, such as requiring the responding party to sample or inspect

the sources potentially containing information identified as not reasonably available. *See* TEX.R. CIV. P. 193.4(a); *cf.* TEX.R. CIV. P. 196.7 & cmts.—1999; *accord* FED.R.CIV.P. 26(b)(2)(b) notes of the advisory committee to the 2006 amendments. The trial court may also allow deposition of witnesses knowledgeable about the responding party's information systems. *See* TEX.R. CIV. P. 195.1. Because parties' electronic systems, electronic storage, and retrieval capabilities will vary in each case, trial courts should assess the reasonable availability of information on a case-by-case basis.

Should the responding party fail to meet its burden, the trial court may order production subject to the discovery limitations imposed by Rule 192.4. If the responding party meets its burden by demonstrating that retrieval and production of the requested information would be overly burdensome, the trial court may nevertheless order targeted production upon a showing by the requesting party that the benefits of ordering production outweigh the costs. TEX.R. CIV. P. 192.4. Like assessing the reasonable availability of information, determining the scope of production may require **\*316** some focused discovery, "which may include sampling of the sources, to learn more about what burdens and costs are involved in accessing the information, what the information consists of, and how valuable it is for the litigation in light of information that can be obtained by exhausting other opportunities for discovery." FED.R.CIV.P. 26(b)(2)(b) notes of the advisory committee to the 2006 amendments; *see also* TEX.R. CIV. P. 196.7. To the extent possible, courts should be mindful of protecting sensitive information and should choose the least intrusive means of retrieval. And when the court orders production of not-reasonably-available information, the court "must also order that the requesting party pay the reasonable expenses of any extraordinary steps required to retrieve and produce the information." TEX.R. CIV. P. 196.4.

Because HFG did not initially specifically request deleted emails as Rule 196.4 requires, Weekley had no obligation to object in its response that deleted emails were not "reasonably available ... in its ordinary course of business." *Id.* However, because HFG's motion to compel clarified the scope of its original request, Weekley was required in its response to HFG's motion and at the subsequent hearing to make the Rule 196.4 showing. Our limited record does not reflect whether Weekley met its burden. [7] However, the trial court's ultimate decision to order imaging of the Employees' hard drives and forensic examination implies a finding that the

deleted emails were not reasonably available and required extraordinary steps for their retrieval and production. We must decide, then, whether the measures the trial court crafted for retrieving the Employees' deleted emails were proper under the circumstances presented. Although Rule 196.4 does not provide express guidelines for the manner or means by which electronic information that is not reasonably available in the ordinary course of business may be ordered produced, the federal rules and courts applying them offer some guidance.

### 2. The federal rules

Beginning in 2000, the federal Committee on Rules of Practice and Procedure began intensive work on the subject of computer-based discovery because of growing confusion in the area. *See* Comm. on Rules of Practice and Procedure, Summary of the Report of the Judicial Conference 22 (2005), *available at* http://www.uscourts.gov/rules/Reports/ST09–2005.pdf. The Committee's purpose was to "determine whether changes could be effected to reduce the costs of discovery, to increase its efficiency, to increase uniformity of practice, and to encourage the judiciary to participate more actively in case management when appropriate." *Id.* at 24. In 2005, the Committee proposed amendments to the Federal Rules to better accommodate electronic discovery. *Id.* at 22. The amendments were supported by The American Bar Association Section on Litigation, the Federal Bar Council, the New York State Bar Association Commercial and Federal Litigation Section, and the Department of Justice, and most of the amendments were unanimously approved by the Committee. *Id.* at 25. The amendments were ultimately approved by the Judicial Conference and the United States Supreme Court, and have been in effect since December 1, 2006. Although we have not amended our rules to mirror the federal language, our rules as written are **\*317** not inconsistent with the federal rules or the case law interpreting them.

Under Federal Rule of Civil Procedure 26(b)(2)(B), a trial court may order production of information that is not reasonably available only "if the requesting party shows good cause." In determining whether the requesting party has demonstrated "good cause," the court must consider, among other factors, whether

> the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

FED.R.CIV.P. 26(b)(2)(C)(iii). The Texas rules do not expressly require a "good cause" showing before production of not-reasonably-available electronic information may be ordered, but they do require a trial court to limit discovery when

> the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

TEX.R. CIV. P. 192.4(b). Thus, both the federal rule and ours require trial courts to weigh the benefits of production against the burdens imposed when the requested information is not reasonably available in the ordinary course of business. We see no difference in the considerations that would apply when weighing the benefits against the burdens of electronic-information production; therefore we look to the federal rules for guidance.

Providing access to information by ordering examination of a party's electronic storage device is particularly intrusive and should be generally discouraged, just as permitting open access to a party's file cabinets for general perusal would be. The comments to the federal rules make clear that, while direct "access [to a party's electronic storage device] might be justified in some circumstances," the rules are "not meant to create a routine right of direct access." FED.R.CIV.P. 34 notes of the advisory committee to the 2006 amendments. When allowing such access, the comments to Rule 34 warn courts to "guard against undue intrusiveness." *Id.*

### 3. Federal case law

Since the 2006 amendments to the federal rules were promulgated, federal case law has established some basic principles regarding direct access to a party's electronic storage device. As a threshold matter, the requesting party must show that the responding party has somehow defaulted in its obligation to search its records and produce the requested data. *See The Scotts Co. v. Liberty Mut. Ins. Co.,* Civil Action 2:06–CV–899, 2007 WL 1723509, at *2, 2007 U.S. Dist. LEXIS 43005, at *5 (S.D. Ohio June 12, 2007); *Diepenhorst v. City of Battle Creek,* Case No. 1:05–CV–734, 2006 WL 1851243, at *3, 2006 U.S. Dist. LEXIS 48551, at *10 (W.D. Mich. June 30, 2006) (citing *In re Ford Motor Co.,* 345 F.3d 1315 (11th Cir.2003)); *Powers v. Thomas M. Cooley Law Sch.,* Case No. 5:05–CV–117, 2006 WL 2711512, at *5, 2006 U.S. Dist. LEXIS 67706, at *14 (W.D.Mich. Sept. 21, 2006). The requesting party should also show that the responding party's production "has been inadequate and that a search of the opponent's [electronic storage device] could recover deleted relevant materials." *Diepenhorst,* 2006 WL 1851243, at *3, 2006 U.S. Dist. LEXIS 48551, at *9 (citing *Simon Prop. Group LP v. mySimon, Inc.,* 194 F.R.D. 639, 640–641 (S.D.Ind.2000)). Courts have been reluctant to rely on **\*318** mere skepticism or bare allegations that the responding party has failed to comply with its discovery duties. *The Scotts Co.,* 2007 WL 1723509, at *2, 2007 U.S. Dist. LEXIS 43005, at *6; *Powers,* 2006 WL 2711512, at *5, 2006 U.S. Dist. LEXIS 67706, at *15;[8] *cf. Balfour Beatty Rail, Inc. v. Vaccarello,* Case No. 3:06–CV–551–J–20MCR, 2007 WL 169628, at *3, 2007 U.S. Dist. LEXIS 3581, at *7 (M.D.Fl. Jan. 18, 2007) (denying access to responding party's hard drives where requesting party failed to demonstrate responding party's non-compliance with its discovery duties); *see also McCurdy Group v. Am. Biomedical Group, Inc.,* 9 Fed.Appx. 822, 831 (10th Cir.2001) (noting that skepticism alone is not sufficient to permit direct access to an opponent's electronic storage device).

Even if the requesting party makes this threshold showing, courts should not permit the requesting party itself to access the opponent's storage device; rather, only a qualified expert should be afforded such access, *Diepenhorst,* 2006 WL 1851243, at *2, 2006 U.S. Dist. LEXIS 48851, at *7; *accord In re Honza,* 242 S.W.3d 578, 583 n. 8 (Tex.App.-Waco 2008, pet. denied) (noting that "the expert's qualifications are of critical importance when access to another party's

computer hard drives or similar data storage is sought"), and only when there is some indication that retrieval of the data sought is feasible. *See Calyon v. Mizuho Sec. USA Inc.,* 07 Civ. 02241(RO)(DF), 2007 WL 1468889, at *5, 2007 U.S. Dist. LEXIS 36961, at *17–18 (S.D.N.Y. May 18, 2007); *Antioch Co. v. Scrapbook Borders, Inc.,* 210 F.R.D. 645, 652 (D.Minn.2002) (citing *Playboy Enters. v. Welles,* 60 F.Supp.2d 1050, 1055 (S.D.Cal.1999)). Due to the broad array of electronic information storage methodologies, the requesting party must become knowledgeable about the characteristics of the storage devices sought to be searched in order to demonstrate the feasibility of electronic retrieval in a particular case. And consistent with standard prohibitions against "fishing expeditions," *see, e.g., In re CSX Corp.,* 124 S.W.3d 149, 153 (Tex.2003); *Texaco, Inc. v. Sanderson,* 898 S.W.2d 813, 815 (Tex.1995), a court may not give the expert carte blanche authorization to sort through the responding party's electronic storage device. *See Thielen v. Buongiorno USA, Inc.,* Case No. 1:06–CV–16, 2007 WL 465680, at *2, 2007 U.S. Dist. LEXIS 8998, at *7–8 (W.D.Mich. Feb. 8, 2007). Instead, courts are advised to impose reasonable limits on production. *See In re CSX Corp.,* 124 S.W.3d at 152; *The Scotts Co.,* 2007 WL 1723509, at *2, 2007 U.S. Dist. LEXIS 43005, at *5; *see also Ford,* 345 F.3d at 1317 (noting the importance of establishing protocols for the forensic search of a party's hard drives, such as designating search terms to restrict the search). Courts must also address privilege, privacy, and confidentiality concerns. *Calyon,* 2007 WL 1468889, at *4, 2007 U.S. Dist. LEXIS 36961, at *14; **\*319** *Frees, Inc. v. McMillian,* Civil Action No. 05–1979, 2007 WL 184889, at *3, 2007 U.S. Dist. LEXIS 4343, *9 (W.D.La. Jan. 22, 2007).

Finally, federal courts have been more likely to order direct access to a responding party's electronic storage devices when there is some direct relationship between the electronic storage device and the claim itself. *See Cenveo Corp. v. Slater,* No. 06–CV–2632, 2007 WL 442387, at *2, 2007 U.S. Dist. LEXIS 8281, at *4 (E.D.Penn. Feb. 2, 2007); *Frees,* 2007 WL 184889, at *3, 2007 U.S. Dist. LEXIS 4343, at *9; *Ameriwood Indus., Inc. v. Liberman,* No. 4:06CV524–DJS, 2006 WL 3825291, at *1, 2006 U.S. Dist. LEXIS 93380, at *5 (E.D.Mo. Dec. 27, 2006); *Balboa Threadworks, Inc. v. Stucky,* Case No. 05–1157–JTM–DWB, 2006 WL 763668, at *4, 2006 U.S. Dist. LEXIS 29265, *12 (D.Kan. Mar.24, 2006). For example, in *Ameriwood Industries*, Ameriwood sued several former employees claiming they improperly used Ameriwood's computers, confidential files, and confidential information to sabotage Ameriwood's business by forwarding

its customer information and other trade secrets from Ameriwood's computers to the employees' personal email accounts. 2006 WL 3825291, at *1, *3, 2006 U.S. Dist. LEXIS 93380, at *2, *9. Based in part on the close relationship between Ameriwood's claims and the employees' computer equipment, the trial court justified "allowing an expert to obtain and search a mirror image of [the employee] defendants" hard drives. *Id.,* 2006 WL 3825291, at *1, 2006 U.S. Dist. LEXIS 93380, at *6. Similarly, in *Cenveo Corp.*, Cenveo sued several former employees for improperly using its computers, confidential trade information, and trade secrets to divert business from Cenveo to themselves. 2007 WL 442387, at *1, 2007 U.S. Dist. LEXIS 8281, at *1. Borrowing from *Ameriwood,* the district court authorized a similar order "[b]ecause of the close relationship between plaintiff's claims and defendants' computer equipment." *Id.,* 2007 WL 442387, at *2, 2007 U.S. Dist. LEXIS 8281, at *4. Finally, in *Frees,* a former employee was sued for using company computers to remove certain proprietary information. 2007 WL 184889, at *1, 2007 U.S. Dist. LEXIS 4343, at *2. Noting that the employee's computers would be "among the most likely places [the employee] would have downloaded or stored the data allegedly missing," *id.,* 2007 WL 184889, at *2, 2007 U.S. Dist. LEXIS 4343, at *5, the court allowed direct access to the employee's work and home computers. *Id.*

### 4. HFG did not make the necessary showing

In this case, HFG's motion relied primarily upon discrepancies and inconsistencies in Weekley's production. According to HFG, Weekley only produced "a handful of emails from Russell Rice, and one email from Biff Bailey," Weekley's Division President and Land Acquisitions Manager respectively, while producing "no emails from the email accounts of Scott Thompson or Joe Vastano, both of whom ... were very involved with the [s]ubdivision." Additionally, HFG expressed concern about the limited number of emails relating to the Slope Stability Analysis it received despite the importance of that report. Beyond Weekley's meager document production, HFG relied upon Burchfield's testimony that Weekley employees do not save deleted emails to their hard drives, and that Burchfield had "no earthly idea ... whether [the deleted emails are] something a forensic specialist could go in and retrieve."

From this testimony, the trial court could have concluded that HFG made a showing that Weekley did not search for relevant deleted emails that HFG requested. But it does not follow that a search of **\*320** the Employees' hard drives would likely reveal deleted emails or, if it would, that they would be reasonably capable of recovery. HFG's conclusory statements that the deleted emails it seeks "must exist" and that deleted emails are in some cases recoverable is not enough to justify the highly intrusive method of discovery the trial court ordered, which afforded the forensic experts "complete access to all data stored on [the Employees'] computers." The missing step is a demonstration that the particularities of Weekley's electronic information storage methodology will allow retrieval of emails that have been deleted or overwritten, and what that retrieval will entail. A complicating factor is the some two-and-a-half years that passed between the time any responsive emails would have been created and the time HFG requested them. Under these circumstances, it is impossible to determine whether the benefit of the forensic examination the trial court ordered outweighs the burden that such an invasive method of discovery imposed. *Compare Honza,* 242 S.W.3d at 583 n. 8.

### 5. This case differs from *Honza*

We understand the trial court's predicament, as state law in this area is not clearly defined and the parties' discovery postures shed more heat than light upon the situation. That being the case, the trial court apparently followed the protocol set forth in the only Texas case to address a similar situation. *See Honza,* 242 S.W.3d 578. In *Honza,* A & W Development, L.L.C. assigned to Wesley F. Honza and Robert A. Honza the right to purchase a tract of land under a real estate contract. *Id.* at 579. Under the terms of the assignment, A & W retained the right to purchase a portion of the assigned tract for construction of a street. *Id.* According to A & W, an earlier version of the assignment made no mention of a purchase price upon exercise of the right because the consideration negotiated for the partial assignment included what the Honzas should receive for the street. *Id.* When A & W decided to exercise its right, the Honzas demanded that A & W pay additional consideration. *Id.* at 580. A & W sued the Honzas seeking declaratory relief and alleging various theories of recovery. In the course of discovery, the Honzas produced two drafts of the partial assignment in electronic form. *Id.* at 580, 583. However, they did not produce or otherwise make available metadata[9] associated with those documents. *Id.* at 580. The first trial resulted in a mistrial, after which A & W moved to gain access to the Honzas hard drives to obtain the metadata necessary to identify the points in time

when the partial assignment draft was modified. *Id.* The trial court granted A & W's motion, crafting a protocol similar to the one ordered in this case. The court of appeals affirmed the trial court's order, *id.* at 579, and we denied mandamus relief.

Despite the undeniable similarities between the *Honza* order and the one presented here, there are several important distinctions concerning the contexts in which the two orders were granted. First, in *Honza,* A & W sought metadata associated with two documents that had already been shown to exist; indeed, the Honzas produced those documents in electronic form in response to discovery requests propounded before the first trial. *Id.* at 580, 583. Because the Honzas were required to preserve that evidence once it had been requested, there was a reasonable **\*321** likelihood that a search of the Honzas' computers would reveal the information A & W sought. In this case, on the other hand, the potential for successful recovery of the Employees' deleted emails over a two-and-a-half-year period is much less clear.

Moreover, in *Honza* there was a direct relationship between the hard drives sought and A & W's claims. As the court of appeals noted, identification of the points in time when the partial assignment draft was modified directly concerned "the issue of whether [the Honzas] altered the partial assignment after the parties concluded their agreement but before the document was presented for execution." *Id.* at 580. In contrast, although the deleted emails HFG seeks in this case might reveal circumstantial evidence that the representations Weekley made in the Estoppel Certificate were misleading, there is no claim that the Estoppel Certificate itself was tampered with. While we recognize that a more tenuous link between the electronic storage device and the claim itself is not dispositive, it is a factor trial courts should consider.

Finally, in *Honza* there was extensive testimony from A & W's expert about his experience and qualifications before access to the Honzas' computers was ordered. *Id.* at 583 n. 8. Although Weekley does not directly challenge the qualifications of HFG's forensic experts, nothing was presented to show that the experts were qualified to perform the search given the particularities of the specific storage devices at issue, or that the search methodology would likely allow retrieval of relevant deleted emails. Absent some indication that the experts are familiar with the particularities of the Employees' hard drives, that they are qualified to search those hard drives, and that the proposed methodology for searching those hard drives is reasonably likely to yield the information sought, *Honza* does not support the trial court's order. We conclude

that by ordering forensic examination of Weekley's hard drives without such information, the trial court abused its discretion. *See In re CSX Corp.,* 124 S.W.3d at 152; *In re Am. Optical Corp.,* 988 S.W.2d 711, 714 (Tex.1998).

Because the trial court abused its discretion by granting HFG's motion without the requisite showing, we need not reach Weekley's alternative arguments that the search terms the trial court ordered are overly broad, or that the trial court's order improperly requires Weekley to create the equivalent of a "privilege log" as to irrelevant documents that the search might produce. However, because trial courts should be mindful of protecting sensitive information and utilize the least intrusive means necessary to facilitate discovery of electronic information, the trial court should consider these arguments on remand.

### D. Summary of Rule 196.4 Procedure

 **[6]**    A fundamental tenet of our discovery rules is cooperation between parties and their counsel, and the expectation that agreements will be made as reasonably necessary for efficient disposition of the case. TEX.R. CIV. P. 191.2. Accordingly, prior to promulgating requests for electronic information, parties and their attorneys should share relevant information concerning electronic systems and storage methodologies so that agreements regarding protocols may be reached or, if not, trial courts have the information necessary to craft discovery orders that are not unduly intrusive or overly burdensome. The critical importance of learning about relevant systems early in the litigation process is heavily emphasized in the federal rules. Due to the "volume and dynamic nature of electronically stored information," **\*322**  failure to become familiar with relevant systems early on can greatly complicate preservation issues, increase uncertainty in the discovery process, and raise the risk of disputes. FED.R.CIV.P. 26(f) notes of the advisory committee to the 2006 amendments.

 **[7]   [8]   [9]**    With these overriding principles in mind, we summarize the proper procedure under Rule 196.4:

— the party seeking to discover electronic information must make a specific request for that information and specify the form of production. TEX.R. CIV. P. 196.4.

— The responding party must then produce any electronic information that is "responsive to the request and ...

reasonably available to the responding party in its ordinary course of business." *Id.*

— If "the responding party cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested," the responding party must object on those grounds. *Id.*

— The parties should make reasonable efforts to resolve the dispute without court intervention. TEX.R. CIV. P. 191.2.

— If the parties are unable to resolve the dispute, either party may request a hearing on the objection, TEX.R. CIV. P. 193.4(a), at which the responding party must demonstrate that the requested information is not reasonably available because of undue burden or cost, TEX.R. CIV. P. 192.4(b).

— If the trial court determines the requested information is not reasonably available, the court may nevertheless order production upon a showing by the requesting party that the benefits of production outweigh the burdens imposed, again subject to Rule 192.4's discovery limitations.

— If the benefits are shown to outweigh the burdens of production and the trial court orders production of information that is not reasonably available, sensitive information should be protected and the least intrusive means should be employed. TEX.R. CIV. P. 192.6(b). The requesting party must also pay the reasonable expenses of any extraordinary steps required to retrieve and produce the information. TEX.R. CIV. P. 196.4.

— Finally, when determining the means by which the sources should be searched and information produced, direct access to another party's electronic storage devices is discouraged, and courts should be extremely cautious to guard against undue intrusion.

### E. Is Mandamus Appropriate?

**[10] [11]** Mandamus relief is available when the trial court compels production beyond the permissible bounds of discovery. *See Am. Optical,* 988 S.W.2d at 714 (no adequate appellate remedy existed where the trial court ordered overly broad discovery). Intrusive discovery measures—such as ordering direct access to an opponent's electronic storage device—require, at a minimum, that the benefits of the discovery measure outweigh the burden imposed upon the discovered party. TEX.R. CIV. P. 196.4, 192.4. *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135–36 (Tex.2004). "If an appellate court cannot remedy a trial court's discovery error, then an adequate appellate remedy does not exist." *In re Dana Corp.,* 138 S.W.3d 298, 301 (Tex.2004).

**[12]** In this case, HFG failed to make the good-cause showing necessary to justify the trial court's order. The harm **\*323** Weekley will suffer from being required to relinquish control of the Employees' hard drives for forensic inspection, and the harm that might result from revealing private conversations, trade secrets, and privileged or otherwise confidential communications, cannot be remedied on appeal. *See Walker v. Packer,* 827 S.W.2d 833, 843 (Tex.1992) (noting that a party will not have an adequate remedy by appeal when a trial court's order "imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party") (citing *Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558 (Tex.1992)); *Gen. Motors Corp. v. Lawrence,* 651 S.W.2d 732, 733 (Tex.1983). Accordingly, Weekley is entitled to mandamus relief.

### III. Conclusion

We conditionally grant the writ of mandamus and order the trial court to vacate its Order. We are confident the trial court will comply, and our writ will issue only if it does not. We note that HFG is not precluded from seeking to rectify the deficiencies we have identified.

**All Citations**

295 S.W.3d 309, 52 Tex. Sup. Ct. J. 1231

---

**Footnotes**

1   In the real estate development context, a take-down schedule is an agreement between a developer and a home builder under which the homebuilder agrees to purchase a number of developed lots over a scheduled period of time. *See, e.g., Medallion Homes, Inc. v. Thermar Inv., Inc.,* 698 S.W.2d 400, 402 (Tex.App.-Houston [14th Dist.] 1985, no pet. h.), *overruled by Ojeda de Toca v. Wise,* 748 S.W.2d 449 (Tex.1988).

2   HFG is a lot warehouser. According to HFG,

Lot warehousing is a sophisticated financing enterprise wherein a real estate developer (typically a business that obtains acreage, subdivides it, installs streets and utilities, thereby creating lots available for sale to homebuilders) conveys vacant lots to a lot warehouser. In turn, the lot warehouser holds the lots and then sells them to one or more pre-arranged homebuilders. By virtue of this agreement, the developer is assured of having money in hand for the lots on a more immediate basis than it would had it sold the lots over time on a take-down basis to the builders.

3   In some requests, Weekley asked for "documents," which the requests defined to include "electronic or email messages." In others, Weekley specifically asked for emails.

4   In response to HFG's First Motion to Compel, Weekley contested the relevance of the Slope Stability Analysis contending it only discussed lots that Weekley had already purchased from Enclave pursuant to the Builder Contract and prior to the Warehouse Agreement. However, Weekley does not request mandamus relief on that basis.

5   Weekley does not contend that the relevant computers or hard drives are unavailable, so access to the actual hard drives in use by the Employees during the relevant time period is not an issue.

6   The federal rules recognize the importance of early communication between parties on how electronic information is stored. *See* FED.R.CIV.P. 16(b), 26(f). While the Texas rules have no counterpart, early discussions between the parties or early discovery directed toward learning about an opposing party's electronic storage systems and procedures is encouraged.

7   The court reporter's record from the hearing on HFG's First Motion to Compel is absent from the record.

8   *See also White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc.,* Civil Action No. 07–2319–CM, 2009 WL 722056, at *4, 2009 U.S. Dist. LEXIS 22068, at *13 (D.Kan. Mar. 18, 2009) (allowing direct access where requesting party's expert noted discrepancies in the metadata of certain produced emails); *Matthews v. Baumhaft,* Case No. 06–11618, 2008 WL 2224126, at *2, 2008 U.S. Dist. LEXIS 42396, at *5 (E.D.Mich. May 29, 2008) (allowing direct access upon a showing of responding party's discovery misconduct); *Ferron v. Search Cactus, L.L.C.,* Case No. 2:06–CV–327, 2008 WL 1902499, at *2, 2008 U.S. Dist. LEXIS 34599, at *8 (S.D.Ohio Apr. 28, 2008) (allowing direct access where responding party "failed to fulfill his 'duty to preserve information because of pending or reasonably anticipated litigation' ") (quoting FED.R.CIV.P. 37 notes of the advisory committee to the 2006 amendments).

9   According to the federal rules advisory committee, metadata is "[i]nformation describing the history, tracking, or management of an electronic file." FED.R.CIV.P. 26(f) notes of the advisory committee to the 2006 amendments.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB I:
# Compilation of Statutes, Regulations, and Rules


KeyCite Yellow Flag

Proposed Regulation

Texas Administrative Code
  Title 28. Insurance
    Part 1. Texas Department of Insurance
      Chapter 7. Corporate and Financial Regulation
        Subchapter B. Insurance Holding Company Systems

28 TAC § 7.204

§ 7.204. Transactions Subject to Prior Notice

Currentness

(a) Prior approval and notice.

(1) The prior written approval of the commissioner is required for the transactions specified in the Act, § 823.102. This section only applies to sales, purchases, exchanges, loans or extensions of credit or guarantees, or investments, including an amendment or modification of an affiliate agreement previously filed under this section.

(2) The following transactions under the Act, § 823.103, including any amendments or modification of an agreement as previously filed between a domestic insurer and any person in its holding company system may not be entered into unless the insurer has notified the commissioner in writing of its intention to enter into any like transaction at least 30 days prior, or a shorter period as the commissioner may permit, and the commissioner has not disapproved it within the period:

(A) sales, purchases, exchanges, loans or extensions of credit or guarantees, or investments;

(B) reinsurance agreements, including reinsurance treaties, or pooling agreements, or any amendments or modification to any agreement, and those agreements that may require as consideration the transfer of assets from an insurer to a nonaffiliate, if an agreement or understanding exists between the insurer and nonaffiliate that any portion of the assets will be transferred to one or more affiliates of the insurer;

(C) any contract, agreement, or arrangement for the furnishing or receiving of services or facilities on a regular or systematic basis; or

(D) management or service agreements, cost sharing agreements, rental or leasing agreements must at a minimum, to the extent not inconsistent with applicable law or regulation, and as applicable:

(i) identify the person providing services and the nature of the services;

(ii) set forth the methods to allocate costs to include Insurance Code § 823.101(e);

(iii) require timely settlement, at least every 90 days, and compliance with the requirements in the Accounting Practices and Procedures Manual published by the National Association of Insurance Commissioners;

(iv) prohibit advancement of funds by the insurer to the affiliate except to pay for services defined in the agreement;

(v) state that the insurer will maintain oversight for functions provided to the insurer by the affiliate and that the insurer will monitor services annually for quality assurance;

(vi) define books and records of the insurer to include all books and records developed or maintained under or related to the agreement;

(vii) specify that all books and records of the insurer are and remain the property of the insurer and are subject to control of the insurer;

(viii) state that all funds and invested assets of the insurer are the exclusive property of the insurer, held for the benefit of the insurer and are subject to the control of the insurer;

(ix) include standards for termination of the agreement with and without cause;

(x) include indemnifying the insurer in the event of gross negligence or willful misconduct by the affiliate providing the services;

(xi) specify that, if the insurer is placed in receivership or seized by the commissioner under Insurance Code Chapter 443:

(I) all of the rights of the insurer under the agreement extend to the receiver or commissioner; and

(II) all books and records will immediately be made available to the receiver or the commissioner, and must be turned over to the receiver or commissioner immediately upon the receiver or the commissioner's request;

(xii) specify that the affiliate has no automatic right to terminate the agreement if the insurer is placed in receivership under Insurance Code Chapter 443; and

(xiii) specify that the affiliate will continue to maintain any systems, programs, or other infrastructure notwithstanding a seizure by the commissioner under Insurance Code Chapter 443, and will make them available to the receiver, for so long as the affiliate continues to receive timely payment for services rendered;

(E) agreements to consolidate federal income tax returns, which agreements must provide that a domestic insurer will be adequately indemnified in the event the Internal Revenue Service levies upon the insurance company's assets for unpaid taxes in excess of the amount paid under the agreement;

(F) transactions with affiliated financial institutions, other than fully insured deposits;

(G) participation in an investment pool by a property and casualty insurer under Insurance Code Chapter 424; and

(H) any material transactions which the commissioner has determined after notice may adversely affect the interest of the insurer's policyholders or of the public.

(3) A domestic insurer may not enter into transactions that are part of a plan or series of similar transactions with persons within the holding company system to avoid the statutory threshold amount and avoid review. If the commissioner determines that the transactions were entered into over any 12-month period for that purpose, the commissioner may consider the series of transactions with regard to their cumulative effect and may apply the applicable statutory thresholds or the commissioner may apply sanctions under the Code.

(4) Nothing in this rule will authorize or permit any transactions which, in the case of a noncontrolled insurer, would be otherwise contrary to law.

(5) The commissioner, in reviewing transactions, must consider whether the transactions comply with the standards set forth in subsection (c) of this section and whether they may adversely affect the interest of policyholders. Any disapproval by the commissioner of any of the transactions must set forth the specific reasons for the disapproval.

(6) The approval of any transaction under this subsection is deemed an amendment under § 7.203(e) of this title (relating to Registration of Insurers) to an insurer's registration statement without further filing.

(b) Transactions. An insurer required to request approval of transactions under subsection (a)(1) of this section and give notices of proposed transactions under subsection (a)(2) of this section, must furnish the required information on Form D (relating to Prior Notice of a Transaction) including the applicable filing fee provided for in § 7.1301(d)(23) of this title (relating to Regulatory Fees). The descriptions must in all cases include at least the following: the nature and purpose of the transaction; the nature and amounts of any payments or transfers of assets between the parties; the identities of all parties to the transactions; whether any officers or directors of a party are pecuniarily interested, and copies of any proposed contracts, agreements, or memoranda of understanding between the parties relating to the transaction along with sufficient competent documentation evidencing compliance with the standards specified in Insurance Code § 823.101, and evidencing that the transaction will not adversely affect the interest of policyholders. Proposed contracts, agreements, or memoranda of understanding must provide for settlement within 90 days. No request or notice is deemed filed with the commissioner until the date all of the material has been provided.

(c) Transactions with affiliates and others. Material transactions by registered insurers with their holding companies, subsidiaries, or affiliates are subject to the standards specified in the Act, § 823.101.

(d) Extraordinary dividends and other distributions.

(1) An insurer subject to registration under § 7.203(a) of this title must not pay any extraordinary dividend or make any other extraordinary distribution to its shareholders until:

(A) 30 days after the commissioner has received written notice in accord with § 7.213 of this title (relating to Form E) of the declaration, including the applicable filing fee under § 7.1301(d)(23) of this title, provided the commissioner has not disapproved the payment; or

(B) the commissioner approves the payment within the 30-day period. The written notice required under this paragraph will be deemed filed with the commissioner only when all material sufficient to constitute a complete filing, including documentation to support each of the standards set forth in the Act, § 823.008, and the payment of any required filing fee under § 7.1301(d)(23) of this title have been provided.

(2) For purposes of these sections:

(A) an extraordinary dividend or distribution includes any dividend or distribution of cash or other property, whose fair market value together with that of other dividends or distributions made within the preceding 12 months under the Act, § 823.107;

(B) an extraordinary dividend or distribution must not include pro rata distributions of any class of an insurer's own securities;

(C) in determining the 12-month cumulative amount for dividends or distributions, the calculation must be based on the payment date(s) of the dividends or distributions.

(3) Notwithstanding any other provision of law, an insurer may declare an extraordinary dividend or distribution under the conditions specified in the Act, § 823.107.

(e) Adequacy of surplus. For the purposes of these sections, in determining whether an insurer's surplus as regards policyholders is reasonable in relation to the insurer's outstanding liabilities and adequate to its financial needs, the factors specified in the Act, § 823.008, among others, must be considered.

**Credits**
**Source:** The provisions of this §7.204 adopted to be effective January 1, 1976; amended to be effective November 30, 1984, 9 TexReg 5926; amended to be effective April 29, 1988, 13 TexReg 1761; amended to be effective April 13, 1992, 17 TexReg 2273; amended to be effective July 14, 1994, 19 TexReg 5098; amended to be effective May 15, 1996, 21 TexReg 3798; amended to be effective May 5, 2002, 27 TexReg 3559; amended to be effective May 26, 2013, 38 TexReg 3033.

Current through 50 Tex.Reg. No. 2130, dated March 21, 2025, as effective on or before March 28, 2025. Some sections may be more current. See credits for details.

28 TAC § 7.204, 28 TX ADC § 7.204

**End of Document** 

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.001

§ 443.001. Construction and Purpose

Currentness

(a) This chapter may be cited as the Insurer Receivership Act.

(b) This chapter may not be interpreted to limit the powers granted the commissioner under other provisions of law.

(c) This chapter shall be liberally construed to support the purpose stated in Subsection (e).

(d) All powers and authority of a receiver under this chapter are cumulative and are in addition to all powers and authority that are available to a receiver under law other than this chapter.

(e) The purpose of this chapter is to protect the interests of insureds, claimants, creditors, and the public generally, through:

(1) early detection of any potentially hazardous condition in an insurer and prompt application of appropriate corrective measures;

(2) improved methods for conserving and rehabilitating insurers;

(3) enhanced efficiency and economy of liquidation, through clarification of the law, to minimize legal uncertainty and litigation;

(4) apportionment of any unavoidable loss in accordance with the statutory priorities set out in this chapter;

(5) lessening the problems of interstate receivership by:

(A) facilitating cooperation between states in delinquency proceedings; and

(B) extending the scope of personal jurisdiction over debtors of the insurer located outside this state;

(6) regulation of the business of insurance by the impact of the law relating to delinquency procedures and related substantive rules; and

(7) providing for a comprehensive scheme for the receivership of insurers and those subject to this chapter as part of the regulation of the business of insurance in this state because proceedings in cases of insurer insolvency and delinquency are deemed an integral aspect of the business of insurance and are of vital public interest and concern.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.001 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.001, TX INS § 443.001

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Insurance Code
        Title 4. Regulation of Solvency (Refs & Annos)
            Subtitle C. Delinquent Insurers
                Chapter 443. Insurer Receivership Act
                    Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.002

§ 443.002. Conflicts of Law

Currentness

This chapter and the state law governing insurance guaranty associations constitute this state's insurer receivership laws and shall be construed together in a manner that is consistent. In the event of a conflict between the insurer receivership laws and the provisions of any other law, the insurer receivership laws prevail.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.002 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007.

Notes of Decisions (7)

V. T. C. A., Insurance Code § 443.002, TX INS § 443.002
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**	© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.003

§ 443.003. Covered Persons

Currentness

The provisions of this chapter apply to all:

(1) insurers who are doing or have done an insurance business in this state and against whom claims arising from that business may exist now or in the future and to all persons subject to examination by the commissioner;

(2) insurers who purport to do an insurance business in this state;

(3) insurers who have insureds resident in this state;

(4) other persons organized or doing insurance business, or in the process of organizing with the intent to do insurance business in this state;

(5) nonprofit health corporations and all fraternal benefit societies subject to Chapters 844 and 885, respectively;

(6) title insurance companies subject to Title 11; [1]

(7) health maintenance organizations subject to Chapter 843; and

(8) surety and trust companies subject to Chapter 7, general casualty companies subject to Chapter 861, statewide mutual assessment companies subject to Chapter 881, mutual insurance companies subject to Chapter 882 or 883, local mutual aid associations subject to Chapter 886, burial associations subject to Chapter 888, farm mutual insurance companies subject to Chapter 911, county mutual insurance companies subject to Chapter 912, Lloyd's plans subject to Chapter 941, reciprocal or interinsurance exchanges subject to Chapter 942, and fidelity, guaranty, and surety companies.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.003 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007.

---

**Footnotes**

1        V.T.C.A., Insurance Code § 2501.001 et seq.

V. T. C. A., Insurance Code § 443.003, TX INS § 443.003

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.004

§ 443.004. Definitions

Currentness

(a) For the purposes of this chapter:

(1) "Affiliate," "control," and "subsidiary" have the meanings assigned by Chapter 823.

(2) "Alien insurer" means an insurer incorporated or organized under the laws of a jurisdiction that is not a state.

(3) "Creditor" or "claimant" means a person having any claim against an insurer, whether the claim is matured or not, liquidated or unliquidated, secured or unsecured, absolute, fixed, or contingent.

(4) "Delinquency proceeding" means any proceeding instituted against an insurer for the purpose of liquidating, rehabilitating, or conserving the insurer, and any proceeding under Section 443.051.

(5) "Doing business," including "doing insurance business" and the "business of insurance," includes any of the following acts, whether effected by mail, electronic means, or otherwise:

(A) the issuance or delivery of contracts of insurance, either to persons resident or covering a risk located in this state;

(B) the solicitation of applications for contracts described by Paragraph (A) or other negotiations preliminary to the execution of the contracts;

(C) the collection of premiums, membership fees, assessments, or other consideration for contracts described by Paragraph (A);

(D) the transaction of matters subsequent to the execution of contracts described by Paragraph (A) and arising out of those contracts; or

(E) operating as an insurer under a certificate of authority issued by the department.

(6) "Domiciliary state" means the state in which an insurer is incorporated or organized or, in the case of an alien insurer, its state of entry.

(7) "Foreign insurer" means an insurer domiciled in another state.

(8) "Formal delinquency proceeding" means any rehabilitation or liquidation proceeding.

(9) "General assets" includes:

(A) all property of the estate that is not:

(i) subject to a secured claim or a valid and existing express trust for the security or benefit of specified persons or classes of persons; or

(ii) required by the insurance laws of this state or any other state to be held for the benefit of specified persons or classes of persons; and

(B) all property of the estate and the proceeds of that property in excess of the amount necessary to discharge any secured claims described by Paragraph (A).

(10) "Good faith" means honesty in fact and intention, and for the purposes of Subchapter F [1] also requires the absence of:

(A) information that would lead a reasonable person in the same position to know that the insurer is financially impaired or insolvent; and

(B) knowledge regarding the imminence or pendency of any delinquency proceeding against the insurer.

(11) "Guaranty association" means any mechanism mandated by Chapter 462, 463, or 2602 or other laws of this state or a similar mechanism in another state that is created for the payment of claims or continuation of policy obligations of financially impaired or insolvent insurers.

(12) "Impaired" means that an insurer does not have admitted assets at least equal to all its liabilities together with the minimum surplus required to be maintained under this code.

(13) "Insolvency" or "insolvent" means an insurer:

(A) is unable to pay its obligations when they are due;

(B) does not have admitted assets at least equal to all its liabilities; or

(C) has a total adjusted capital that is less than that required under:

(i) Chapter 822, 841, or 843, as applicable; or

(ii) applicable rules or guidelines adopted by the commissioner under Section 822.210, 841.205, or 843.404.

(14) "Insurer" means any person that has done, purports to do, is doing, or is authorized to do the business of insurance in this state, and is or has been subject to the authority of or to liquidation, rehabilitation, reorganization, supervision, or conservation by any insurance commissioner. For purposes of this chapter, any other persons included under Section 443.003 are insurers.

(15) "Netting agreement" means a contract or agreement, including terms and conditions incorporated by reference in a contract or agreement, and a master agreement (which master agreement, together with all schedules, confirmations, definitions, and addenda to the agreement and transactions under the agreement, schedules, confirmations, definitions, or addenda, are to be treated as one netting agreement) that documents one or more transactions between the parties to the contract or agreement for or involving one or more qualified financial contracts and that, among the parties to the netting agreement, provides for the netting or liquidation of qualified financial contracts, present or future payment obligations, or payment entitlements under the contract or agreement, including liquidation or close-out values relating to the obligations or entitlements.

(16) "New value" means money, money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to the transferee in a transaction that is neither void nor voidable by the insurer or the receiver under any applicable law, including proceeds of the property. The term does not include an obligation substituted for an existing obligation.

(17) "Party in interest" means the commissioner, a 10 percent or greater equity security holder in the insolvent insurer, any affected guaranty association, any nondomiciliary commissioner for a jurisdiction in which the insurer has outstanding claims liabilities, and any of the following parties that have filed a request for inclusion on the service list under Section 443.007:

(A) an insurer that ceded to or assumed business from the insolvent insurer; and

(B) an equity shareholder, policyholder, third-party claimant, creditor, and any other person, including any indenture trustee, with a financial or regulatory interest in the receivership proceeding.

(18) "Person" means individual, aggregation of individuals, partnership, corporation, or other entity.

(19) "Policy" means a written contract of insurance, written agreement for or effecting insurance, or the certificate for or effecting insurance, by whatever name. The term includes all clauses, riders, endorsements, and papers that are a part of the contract, agreement, or certificate. The term does not include a contract of reinsurance.

(20) "Property of the insurer" or "property of the estate" includes:

(A) all right, title, and interest of the insurer in property, whether legal or equitable, tangible or intangible, choate or inchoate, and includes choses in action, contract rights, and any other interest recognized under the laws of this state;

(B) entitlements that:

(i) existed prior to the entry of an order of rehabilitation or liquidation; and

(ii) may arise by operation of the provisions of this chapter or other provisions of law allowing the receiver to avoid prior transfers or assert other rights; and

(C) all records and data that are otherwise the property of the insurer, in whatever form maintained, within the possession, custody, or control of a managing general agent, third-party administrator, management company, data processing company, accountant, attorney, affiliate, or other person, including:

(i) claims and claim files;

(ii) policyholder lists;

(iii) application files;

(iv) litigation files;

(v) premium records;

(vi) rate books and underwriting manuals;

(vii) personnel records; and

(viii) financial records or similar records.

(21) "Qualified financial contract" means a commodity contract, forward contract, repurchase agreement, securities contract, swap agreement, and any similar agreement that the commissioner determines by rule to be a qualified financial contract for the purposes of this chapter.

(22) "Receiver" means liquidator, rehabilitator, or ancillary conservator, as the context requires.

(23) "Receivership" means any liquidation, rehabilitation, or ancillary conservation, as the context requires.

(24) "Receivership court" refers to the court in which a delinquency proceeding is pending, unless the context requires otherwise.

(25) "Reinsurance" means transactions or contracts by which an assuming insurer agrees to indemnify a ceding insurer against all, or a part, of any loss that the ceding insurer might sustain under the policy or policies that it has issued or will issue.

(26) "Secured claim" means any claim secured by an asset that is not a general asset. The term includes the right to set off as provided in Section 443.209. The term does not include a claim arising from a constructive or resulting trust, a special deposit claim, or a claim based on mere possession.

(27) "Special deposit" means a deposit established pursuant to statute for the security or benefit of a limited class or limited classes of persons.

(28) "Special deposit claim" means any claim secured by a special deposit. The term does not include any claim secured by the general assets of the insurer.

(29) "State" means any state, district, or territory of the United States.

(30) "Transfer" includes the sale and every other and different mode, direct or indirect, of disposing of or of parting with property or with an interest in property, including a setoff, or with the possession of property or of fixing a lien upon property or upon an interest in property, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings. The retention of a security title in property delivered to an insurer is deemed a transfer suffered by the insurer.

(31) "Unauthorized insurer" means an insurer doing the business of insurance in this state that has not received from this state a certificate of authority or some other type of authority that allows for doing the business of insurance in this state.

(b) For purposes of this chapter, "admitted assets" and "liabilities" have the meanings assigned by the department in rules relating to risk-based capital.

(c) For purposes of Subsection (a)(21):

(1) "Commodity contract" means:

(A) a contract for the purchase or sale of a commodity for future delivery on or subject to the rules of a board of trade designated as a contract market by the Commodity Futures Trading Commission under the Commodity Exchange Act (7 U.S.C. Section 1 et seq.) or a board of trade outside the United States;

(B) an agreement that is subject to regulation under Section 19, Commodity Exchange Act (7 U.S.C. Section 23), and that is commonly known to the commodities trade as a margin account, margin contract, leverage account, or leverage contract; or

(C) an agreement or transaction that is subject to regulation under Section 4c(b), Commodity Exchange Act (7 U.S.C. Section 6c(b)), and that is commonly known to the commodities trade as a commodity option.

(2) "Forward contract" means a contract, other than a commodity contract, with a maturity date more than two days after the date the contract is entered into, that is for the purchase, sale, or transfer of a commodity, as defined by Section 1a, Commodity Exchange Act (7 U.S.C. Section 1a), or any similar good, article, service, right, or interest that is presently or in the future becomes the subject of dealing in the forward contract trade or product or byproduct of the contract. The term includes a repurchase transaction, reverse repurchase transaction, consignment, lease, swap, hedge transaction, deposit, loan, option, allocated transaction, unallocated transaction, or a combination of these or option on any of them.

(3) "Repurchase agreement" includes a reverse repurchase agreement and means an agreement, including related terms, that provides for the transfer of certificates of deposit, eligible bankers' acceptances, or securities that are direct obligations of or that are fully guaranteed as to principal and interest by the United States against the transfer of funds by the transferee of the certificates of deposit, eligible bankers' acceptances, or securities with a simultaneous agreement by the transferee to transfer to the transferor certificates of deposit, eligible bankers' acceptances, or securities as described in this subdivision, on demand or at a date certain not later than one year after the transfers, against the transfer of funds. For the purposes of this subdivision, the items that may be subject to a repurchase agreement:

(A) include mortgage-related securities and a mortgage loan and an interest in a mortgage loan; and

(B) do not include any participation in a commercial mortgage loan unless the commissioner determines by rule to include the participation within the meaning of the term.

(4) "Securities contract" means a contract for the purchase, sale, or loan of a security, including an option for the repurchase or sale of a security, certificate of deposit, or group or index of securities or an interest in the group or index or based on the value of the group or index, an option entered into on a national securities exchange relating to foreign currencies, or the guarantee of a settlement of cash or securities by or to a securities clearing agency. For the purposes of this subdivision, the term "security" includes a mortgage loan, a mortgage-related security, and an interest in any mortgage loan or mortgage-related security.

(5) "Swap agreement" means an agreement, including the terms and conditions incorporated by reference in an agreement, that is a rate swap agreement, basis swap, commodity swap, forward rate agreement, interest rate future, interest rate option, forward foreign exchange agreement, spot foreign exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement, currency swap agreement, cross-currency rate swap agreement, currency future, or currency option or any other similar agreement. The term includes any combination agreements described by this subdivision and an option to enter into any agreement described by this subdivision.

(d) The definitions under this section apply only to this chapter unless the context of another law requires otherwise.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.004 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(b), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(b), eff. Sept. 1, 2007.

---

**Footnotes**

1       V.T.C.A., Insurance Code § 443.251 et seq.

V. T. C. A., Insurance Code § 443.004, TX INS § 443.004

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   7

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.005

§ 443.005. Jurisdiction and Venue

Currentness

(a) Except as authorized by Section 203(e)(3), Pub. L. No. 111-203, a delinquency proceeding may not be commenced under this chapter by a person other than the commissioner, and a court does not have jurisdiction to entertain, hear, or determine any delinquency proceeding commenced by any other person.

(b) A court of this state does not have jurisdiction, other than in accordance with this chapter, to entertain, hear, or determine any complaint praying for:

(1) the liquidation, rehabilitation, seizure, sequestration, conservation, or receivership of any insurer; or

(2) a stay, injunction, restraining order, or other relief preliminary, incidental, or relating to proceedings described by Subdivision (1).

(c) The receivership court, as of the commencement of a delinquency proceeding under this chapter, has exclusive jurisdiction of all property of the insurer, wherever located, including property located outside the territorial limits of the state. The receivership court has original but not exclusive jurisdiction of all civil proceedings arising:

(1) under this chapter; or

(2) in or related to delinquency proceedings under this chapter.

(d) In addition to other grounds for jurisdiction provided by the law of this state, a court having jurisdiction of the subject matter has jurisdiction over a person served pursuant to Rules 21 and 21a, Texas Rules of Civil Procedure, or other applicable provisions of law in an action brought by the receiver if the person served:

(1) is or has been an agent, or other person who, at any time, has written policies of insurance for or has acted in any manner on behalf of an insurer against which a delinquency proceeding has been instituted, in any action resulting from or incident to such a relationship with the insurer;

(2) is or has been an insurer or reinsurer who, at any time, has entered into a contract of reinsurance with an insurer against which a delinquency proceeding has been instituted, or who is an agent of or for the reinsurer, in any action on or incident to the reinsurance contract;

(3) is or has been an officer, director, manager, trustee, organizer, promoter, or other person in a position of comparable authority or influence over an insurer against which a delinquency proceeding has been instituted, in any action resulting from or incident to such a relationship with the insurer;

(4) at the time of the institution of the delinquency proceeding against the insurer, is or was holding assets in which the receiver claims an interest on behalf of the insurer in any action concerning the assets; or

(5) is obligated to the insurer in any way, in any action on or incident to the obligation.

(e) If, on motion of any party, the receivership court finds that any action, as a matter of substantial justice, should be tried in a forum outside this state, the receivership court may enter an appropriate order to stay further proceedings on the action in this state. Except as to claims against the estate, nothing in this chapter deprives a party of any contractual right to pursue arbitration. A party in arbitration may bring a claim or counterclaim against the estate, but the claim or counterclaim is subject to this chapter.

(f) Service must be made upon the person named in the petition in accordance with Rules 21 and 21a, Texas Rules of Civil Procedure. In lieu of such service, upon application to the receivership court, service may be made in any manner the receivership court directs if it is satisfactorily shown by affidavit:

(1) in the case of a corporation, that the officers of the corporation cannot be served because they have departed from the state or otherwise concealed themselves with intent to avoid service;

(2) in the case of a Lloyd's plan or reciprocal or interinsurance exchange, that the individual attorney in fact or the officers of the corporate attorney in fact cannot be served because of departure or concealment; or

(3) in the case of an individual, that the person cannot be served because of the individual's departure or concealment.

(g) An action authorized by this section must be brought in a district court in Travis County.

(h) At any time after an order is entered pursuant to Section 443.051, 443.101, or 443.151, the commissioner or receiver may transfer the case to the county of the principal office of the person proceeded against. In the event of transfer, the court in which the proceeding was commenced, upon application of the commissioner or receiver, shall direct its clerk to transmit the court's file to the clerk of the court to which the case is to be transferred. The proceeding, after transfer, shall be conducted in the same manner as if it had been commenced in the court to which the matter is transferred.

(i) A person may not intervene in any delinquency proceeding in this state for the purpose of seeking or obtaining payment of any judgment, lien, or other claim of any kind. The claims procedure set forth in this chapter constitutes the exclusive means

for obtaining payment of claims from the receivership estate. This provision is not intended to affect the rights conferred on the guaranty associations by Section 443.008(l).

(j) The foregoing provisions of this section notwithstanding, the provisions of this chapter do not confer jurisdiction on the receivership court to resolve coverage disputes between guaranty associations and those asserting claims against them resulting from the initiation of a delinquency proceeding under this chapter. The determination of any dispute with respect to the statutory coverage obligations of any guaranty association by a court or administrative agency or body with jurisdiction in the guaranty association's state of domicile is binding and conclusive as to the parties in a delinquency proceeding initiated in the receivership court, including the policyholders of the insurer. With respect to a guaranty association's obligations under a rehabilitation plan, the receivership court has jurisdiction only if the guaranty association expressly consents to the jurisdiction of the court.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.005 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(c), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(c), eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 193 (S.B. 1433), § 1, eff. Sept. 1, 2011.

Notes of Decisions (23)

V. T. C. A., Insurance Code § 443.005, TX INS § 443.005

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.006

§ 443.006. Exemption from Fees

Currentness

The receiver may not be required to pay any filing, recording, transcript, or authenticating fee to any public officer in this state.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.006 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.006, TX INS § 443.006
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.007

§ 443.007. Notice, Hearing, and Appeal on Matters Submitted by Receiver for Receivership Court Approval

Currentness

(a) Upon written request to the receiver, a person must be placed on the service list to receive notice of matters filed by the receiver. It is the responsibility of the person requesting notice to inform the receiver in writing of any changes in the person's address or to request that the person's name be deleted from the service list. The receiver may require that the persons on the service list provide confirmation that they wish to remain on the service list. Any person who fails to confirm the person's intent to remain on the service list may be purged from the service list. Inclusion on the service list does not confer standing in the delinquency proceeding to raise, appear, or be heard on any issue.

(b) Except as otherwise provided by this chapter, notice and hearing of any matter submitted by the receiver to the receivership court for approval under this chapter must be conducted in accordance with Subsections (c)-(g).

(c) The receiver shall file an application explaining the proposed action and the basis of the proposed action. The receiver may include any evidence in support of the application. If the receiver determines that any documents supporting the application are confidential, the receiver may submit them to the receivership court under seal for in camera inspection.

(d) The receiver shall provide notice of the application to all persons on the service list and any other parties as determined by the receiver. Notice may be provided by first class mail postage paid, electronic mail, or facsimile transmission, at the receiver's discretion. For purposes of this section, notice is deemed to be given on the date that it is deposited with the U.S. Postmaster or transmitted, as applicable, to the last known address as shown on the service list.

(e) Any party in interest objecting to the application must file an objection specifying the grounds for the objection not later than the 20th day after the date of the notice of the filing of the application or within another period as the receivership court may set, and must serve copies on the receiver and any other persons served with the application within the same period. An objecting party has the burden of showing why the receivership court should not authorize the proposed action.

(f) If no objection to the application is timely filed, the receivership court may enter an order approving the application without a hearing, or hold a hearing to determine if the receiver's application should be approved. The receiver may request that the receivership court enter an order or hold a hearing on an expedited basis.

(g) If an objection is timely filed, the receivership court may hold a hearing. If the receivership court approves the application and, upon a motion by the receiver, determines that the objection was frivolous or filed merely for delay or for another improper

purpose, the receivership court shall order the objecting party to pay the receiver's reasonable costs and fees of defending the action.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.007 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.007, TX INS § 443.007

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Insurance Code
        Title 4. Regulation of Solvency (Refs & Annos)
            Subtitle C. Delinquent Insurers
                Chapter 443. Insurer Receivership Act
                    Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.008

§ 443.008. Injunctions and Orders

Currentness

(a) The receivership court may issue any order, process, or judgment, including stays, injunctions, or other orders, as necessary or appropriate to carry out the provisions of this chapter or an approved rehabilitation plan.

(b) This chapter may not be construed to limit the ability of the receiver to apply to a court other than the receivership court in any jurisdiction to carry out any provision of this chapter or for the purpose of pursuing claims against any person.

(c) Except as provided by Subsection (e) or as otherwise provided by this chapter and subject to Subsection (g), the commencement of a delinquency proceeding under this chapter operates as a stay, applicable to all persons, of:

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the insurer, including an arbitration proceeding, that was or could have been commenced before the commencement of the delinquency proceeding under this chapter, or to recover a claim against the insurer that arose before the commencement of the delinquency proceeding under this chapter;

(2) the enforcement against the insurer or against property of the insurer of a judgment obtained before the commencement of the delinquency proceeding under this chapter;

(3) any act to obtain or retain possession of property of the insurer or of property from the insurer or to exercise control over property or records of the insurer;

(4) any act to create, perfect, or enforce any lien against property of the insurer;

(5) any act to collect, assess, or recover a claim against the insurer that arose before the commencement of a delinquency proceeding under this chapter;

(6) the commencement or continuation of an action or proceeding against a reinsurer of the insurer, by the holder of a claim against the insurer, seeking reinsurance recoveries that are contractually due to the insurer; and

(7) except as provided by Subsection (e)(1), the commencement or continuation of an action or proceeding by a governmental unit to terminate or revoke an insurance license.

(d) Except as provided in Subsection (e) or as otherwise provided by this chapter, the commencement of a delinquency proceeding under this chapter operates as a stay, applicable to all persons, of any judicial, administrative, or other action or proceeding, including the enforcement of any judgment, against any insured that was or could have been commenced before the commencement of the delinquency proceeding under this chapter, or to recover a claim against the insured that arose before or after the commencement of the delinquency proceeding under this chapter and for which the insurer is or may be liable under a policy of insurance or is obligated to defend a party. The stay provided by this subsection terminates 90 days after the date of appointment of the receiver, unless, for good cause shown, the stay is extended by order of the receivership court after notice to any affected parties and any hearing the receivership court determines is appropriate.

(e) Notwithstanding Subsection (c), the commencement of a delinquency proceeding under this chapter does not operate as a stay of:

(1) regulatory actions not described by Subsection (c)(7) that are taken by the commissioners of nondomiciliary states, including the suspension of licenses;

(2) criminal proceedings;

(3) any act to perfect or to maintain or continue the perfection of an interest in property to the extent that the act is accomplished within any relation back period under applicable law;

(4) set off as permitted by Section 443.209;

(5) pursuit and enforcement of nonmonetary governmental claims, judgments, and proceedings;

(6) presentment of a negotiable instrument and the giving of notice and protesting dishonor of the instrument;

(7) enforcement of rights against single beneficiary trusts established pursuant to and in compliance with laws relating to credit for reinsurance;

(8) termination, liquidation, and netting of obligations under qualified financial contracts as provided for in Section 443.261;

(9) discharge by a guaranty association of statutory responsibilities under any law governing guaranty associations; or

(10) any of the following actions:

(A) an audit by a governmental unit to determine tax liability;

(B) the issuance to the insurer by a governmental unit of a notice of tax deficiency;

(C) a demand for tax returns; or

(D) the making of an assessment for any tax and issuance of a notice and demand for payment of the assessment.

(f) Except as provided by Subsection (h):

(1) the stay of an act against property of the insurer under Subsection (c) continues until the property is no longer property of the receivership estate; and

(2) the stay of any other act under Subsection (c) continues until the earlier of the time the delinquency proceeding is closed or dismissed.

(g) Notwithstanding the provisions of Subsection (c), claims against the insurer that arose before the commencement of the delinquency proceeding under this chapter may be asserted as a counterclaim in any judicial, administrative, or other action or proceeding initiated by or on behalf of the receiver against the holder of the claims.

(h) On request of a party in interest and after notice and any hearing the receivership court determines is appropriate, the receivership court may grant relief from the stay of Subsection (c) or (d), such as by terminating, annulling, modifying, or conditioning the stay:

(1) for cause as described by Subsection (i); or

(2) with respect to a stay of an act against property under Subsection (c) if:

(A) the insurer does not have equity in the property; and

(B) the property is not necessary to an effective rehabilitation plan.

(i) For purposes of Subsection (h), "cause" includes the receiver canceling a policy, surety bond, or surety undertaking if the creditor is entitled, by contract or by law, to require the insured or the principal to have a policy, surety bond, or surety undertaking and the insured or the principal fails to obtain a replacement policy, surety bond, or surety undertaking not later than the later of:

(1) the 30th day after the date the receiver cancels the policy, surety bond, or surety undertaking; or

(2) the time permitted by contract or law.

(j) In any hearing under Subsection (h), the party seeking relief from the stay has the burden of proof on each issue, which must be established by clear and convincing evidence.

(k) The estate of an insurer that is injured by any wilful violation of a stay provided by this section is entitled to actual damages, including costs and attorney's fees. In appropriate circumstances, the receivership court may impose additional sanctions.

(l) Any guaranty association or its designated representative may intervene as a party as a matter of right or otherwise appear and participate in any court proceeding concerning a delinquency proceeding if the association is or may become liable to act as a result of the rehabilitation or liquidation of the insurer. Exercise by any guaranty association or its designated representative of the right to intervene conferred under this subsection does not constitute grounds to establish general personal jurisdiction by the courts of this state. The intervening guaranty association or its designated representative are subject to the receivership court's jurisdiction for the limited purpose for which it intervenes.

(m) Notwithstanding any other provision of law, bond may not be required of the commissioner or receiver in relation to any stay or injunction under this section.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.008 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(d), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(d), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.008, TX INS § 443.008
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.009

§ 443.009. Statutes of Limitations

Currentness

(a) If applicable law, an order, or an agreement fixes a period within which the insurer may commence an action, and this period has not expired before the date of the filing of the initial petition in a delinquency proceeding, the receiver may commence an action only before the later of:

(1) the end of the period, including any suspension of the period occurring on or after the filing of the initial petition in a delinquency proceeding; or

(2) four years after the later of the date of entry of an order for either rehabilitation or liquidation.

(b) Except as provided by Subsection (a), if applicable law, an order, or an agreement fixes a period within which the insurer may file any pleading, demand, notice, or proof of claim or loss, cure a default in a case or proceeding, or perform any other similar act, and the period has not expired before the date of the filing of the petition initiating formal delinquency proceedings, the receiver may file, cure, or perform, as the case may be, only before the later of:

(1) the end of the period, including any suspension of the period occurring on or after the filing of the initial petition in the delinquency proceeding; or

(2) 60 days after the later of the date of entry of an order for either rehabilitation or liquidation.

(c) If applicable law, an order, or an agreement fixes a period for commencing or continuing a civil action in a court other than the receivership court on a claim against the insurer, and the period has not expired before the date of the initial filing of the petition in a delinquency proceeding, then the period does not expire until the later of:

(1) the end of the period, including any suspension of the period occurring on or after the filing of the initial petition in the delinquency proceeding; or

(2) 30 days after termination or expiration of the stay under Section 443.008 with respect to the claim.

(d) If the otherwise applicable limitations period has not expired prior to the initial filing of the petition commencing a delinquency proceeding, any other action or proceeding filed by a receiver may be commenced at any time within four years after the date upon which the cause of action accrues or four years after the date on which the receiver is appointed, whichever is later.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.009 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(e), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(e), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.009, TX INS § 443.009

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.010

§ 443.010. Cooperation of Officers, Owners, and Employees

Currentness

(a) Any present or former officer, manager, director, trustee, owner, employee, or agent of any insurer, or any other persons with authority over or in charge of any segment of the insurer's affairs, shall cooperate with the commissioner or receiver in any proceeding under this chapter or any investigation preliminary to the proceeding. For purposes of this section:

(1) "person" includes any person who exercises control directly or indirectly over activities of the insurer through any holding company or other affiliate of the insurer; and

(2) "cooperate" includes:

(A) replying promptly in writing to any inquiry from the commissioner or receiver requesting the reply; and

(B) promptly making available to the commissioner or receiver any books, accounts, documents, or other records or information or property of or pertaining to the insurer and in the person's possession, custody, or control.

(b) A person may not obstruct or interfere with the commissioner or receiver in the conduct of any delinquency proceeding or any preliminary or incidental investigation.

(c) This section may not be construed to abridge otherwise existing legal rights, including the right to resist a petition for liquidation or other delinquency proceedings, or other orders.

(d) Any person described by Subsection (a) who fails to cooperate with the commissioner or receiver, or any person who obstructs or interferes with the commissioner or receiver in the conduct of any delinquency proceeding or any preliminary or incidental investigation, or who violates any order validly issued under this chapter:

(1) commits an offense; and

(2) is subject to the imposition by the commissioner of an administrative penalty not to exceed $10,000 and subject to the revocation or suspension of any licenses issued by the commissioner in accordance with Chapters 82 and 84.

(e) An offense under Subsection (d) is punishable by a fine not exceeding $10,000 or imprisonment for not more than one year, or both fine and imprisonment.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.010 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.010, TX INS § 443.010

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.011

§ 443.011. Actions by and Against Receiver

Currentness

(a) An allegation by the receiver of improper or fraudulent conduct against any person may not be the basis of a defense to the enforcement of a contractual obligation owed to the insurer by a third party, unless the conduct is found to have been materially and substantially related to the contractual obligation for which enforcement is sought.

(b) A prior wrongful or negligent action of any present or former officer, manager, director, trustee, owner, employee, or agent of the insurer may not be asserted as a defense to a claim by the receiver under a theory of estoppel, comparative fault, intervening cause, proximate cause, reliance, mitigation of damages, or otherwise, except that the affirmative defense of fraud in the inducement may be asserted against the receiver in a claim based on a contract, and a principal under a surety bond or a surety undertaking is entitled to credit against any reimbursement obligation to the receiver for the value of any property pledged to secure the reimbursement obligation to the extent that the receiver has possession or control of the property or that the insurer or its agents commingled or otherwise misappropriated the property. Evidence of fraud in the inducement is admissible only if the evidence is contained in the records of the insurer.

(c) An action or inaction by the department or the insurance regulatory authorities in any state may not be asserted as a defense to a claim by the receiver.

(d) Except as provided by Subsection (e), a judgment or order entered against an insured or the insurer in contravention of any stay or injunction under this chapter, or at any time by default or collusion, may not be considered as evidence of liability or of the amount of damages in adjudicating claims filed in the estate arising out of the subject matter of the judgment or order.

(e) Subsection (d) does not apply to guaranty associations' claims for amounts paid on settlements and judgments in pursuit of their statutory obligations.

(f) The receiver may not be deemed a governmental entity for the purposes of any state law awarding fees to a litigant who prevails against a governmental entity.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.011 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007.

Notes of Decisions (61)

V. T. C. A., Insurance Code § 443.011, TX INS § 443.011
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.012

§ 443.012. Unrecorded Obligations and Defenses of Affiliates

Currentness

(a) In any proceeding or claim by the receiver, an affiliate, controlled or controlling person, or present or former officer, manager, director, trustee, or shareholder of the insurer may not assert any defense, unless evidence of the defense was recorded in the books and records of the insurer at or about the time the events giving rise to the defense occurred and, if required by statutory accounting practices and procedures, was timely reported on the insurer's official financial statements filed with the department.

(b) An affiliate, controlled or controlling person, or present or former officer, manager, director, trustee, or shareholder of the insurer may not assert any claim, unless the obligations were recorded in the books and records of the insurer at or about the time the obligations were incurred and, if required by statutory accounting practices and procedures, were timely reported on the insurer's official financial statements filed with the department.

(c) Claims by the receiver against any affiliate, controlled or controlling person, or present or former officer, manager, director, trustee, or shareholder of the insurer based on unrecorded or unreported transactions are not barred by this section.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.012 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.012, TX INS § 443.012
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.013

§ 443.013. Executory Contracts and Unexpired Leases

Currentness

(a) The receiver may assume or reject any executory contract or unexpired lease of the insurer.

(b) Neither the filing of a petition commencing delinquency proceedings under this chapter nor the entry of an order for a delinquency proceeding constitutes a breach or anticipatory breach of any contract or lease of the insurer.

(c) If there has been a default in an executory contract or unexpired lease of the insurer, the receiver may not assume the contract or lease unless, at the time of the assumption of the contract or lease, the receiver:

  (1) cures or provides adequate assurance that the receiver will promptly cure the default; and

  (2) provides adequate assurance of future performance under the contract or lease.

(d) Subsection (c) does not apply to a default that is a breach of a provision relating to:

  (1) the insolvency or financial condition of the insurer at any time before the closing of the delinquency proceeding;

  (2) the appointment of or taking possession by a receiver in a case under this chapter or a custodian before the commencement of the delinquency proceeding; or

  (3) the satisfaction of any penalty rate or provision relating to a default arising from any failure of the insurer to perform nonmonetary obligations under the executory contract or unexpired lease.

(e) A claim arising from the rejection, under this section or a plan of rehabilitation, of an executory contract or unexpired lease of the insurer that has not been assumed shall be determined, treated, and classified as if the claim had arisen before the date of the filing of a successful petition commencing the delinquency proceeding.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.013 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.013, TX INS § 443.013

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.0135

§ 443.0135. Contracts for Special Deputies

Currentness

(a) Except as provided by Subsection (c), the receiver shall use a competitive bidding process in the selection of any special deputies appointed under Section 443.102 or 443.154. The process must include procedures to promote the participation of historically underutilized businesses that have been certified by the comptroller under Section 2161.061, Government Code.

(b) A proposal submitted in connection with a bid solicitation under Subsection (a) must describe the efforts that have been made to include historically underutilized businesses as subcontractors and the plan for using the historically underutilized businesses in the administration of the receivership estate. A special deputy appointed under Section 443.102 or 443.154 shall make a good faith effort to implement the plan and shall report to the receiver the special deputy's efforts to identify and subcontract with historically underutilized businesses.

(c) In the event of an emergency, the receiver may appoint a special deputy without soliciting competitive bids. For the purposes of this subsection, an emergency exists if:

  (1) a court has made a determination described by Section 202(a)(1)(A)(iv)(I), Pub. L. No. 111-203; or

  (2) the receiver concludes that the competitive bidding process would delay the appointment of a special deputy and that the delay could be hazardous to the insurer's policyholders or creditors or the general public.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.0135 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 9.004(f), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(f), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 937, § 1.98, eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 193 (S.B. 1433), § 2, eff. Sept. 1, 2011.

V. T. C. A., Insurance Code § 443.0135, TX INS § 443.0135
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.014

§ 443.014. Immunity and Indemnification of Receiver and Assistants

Currentness

(a) For the purposes of this section, the persons entitled to immunity and indemnification and those entitled to immunity only, as applicable, are:

(1) all present and former receivers responsible for the conduct of a delinquency proceeding under this chapter;

(2) all of the receiver's present and former assistants, including:

(A) all present and former special deputies and assistant special deputies engaged by contract or otherwise;

(B) all persons whom the receiver, special deputies, or assistant special deputies have employed to assist in a delinquency proceeding under this chapter; and

(C) any state employees acting with respect to a delinquency proceeding under this chapter; and

(3) all of the receiver's present and former contractors, including all persons with whom the receiver, special deputies, or assistant special deputies have contracted to assist in a delinquency proceeding under this chapter, including attorneys, accountants, auditors, actuaries, investment bankers, financial advisors, and any other professionals or firms who are retained or contracted with by the receiver as independent contractors and all employees of the contractors.

(b) The receiver, the receiver's assistants, and the receiver's contractors have immunity under this chapter, as described by Subsections (c) and (d).

(c) The receiver, the receiver's assistants, and the receiver's contractors are immune from suit and liability, both personally and in their representative capacities, for any claim for damage to or loss of property or personal injury or other civil liability caused by or resulting from any alleged act, error, or omission of the receiver or any assistant or contractor that arises out of or by reason of their duties or employment or is taken at the direction of the receivership court, providing that the alleged act, error, or omission is performed in good faith.

(d) Any immunity granted by this section is in addition to any immunity granted by other law.

(e) The receiver and the receiver's assistants are entitled to indemnification under this chapter, as described by Subsections (f)-(l).

(f) If any legal action is commenced against the receiver or any assistant, whether against the receiver or assistant personally or in their official capacity, alleging property damage, property loss, personal injury, or other civil liability caused by or resulting from any alleged act, error, or omission of the receiver or any assistant arising out of or by reason of their duties or employment, the receiver and any assistant are indemnified from the assets of the insurer for all expenses, attorney's fees, judgments, settlements, decrees, or amounts due and owing or paid in satisfaction of or incurred in the defense of the legal action, unless it is determined upon a final adjudication on the merits that the alleged act, error, or omission of the receiver or assistant giving rise to the claim:

   (1) did not arise out of or by reason of their duties or employment; or

   (2) was caused by intentional or wilful and wanton misconduct.

(g) Attorney's fees and any and all related expenses incurred in defending a legal action for which immunity or indemnity is available under this section must be paid from the assets of the insurer, as the fees and expenses are incurred, and in advance of the final disposition of the legal action upon receipt of an agreement by or on behalf of the receiver or assistant to repay the attorney's fees and expenses, if it is ultimately determined upon a final adjudication on the merits that the receiver or assistant is not entitled to immunity or indemnity under this section.

(h) Any indemnification for expense payments, judgments, settlements, decrees, attorney's fees, surety bond premiums, or other amounts paid or to be paid from the insurer's assets pursuant to this section are an administrative expense of the insurer.

(i) In the event of any actual or threatened litigation against a receiver or any assistant for whom immunity or indemnity may be available under this section, a reasonable amount of funds, which in the judgment of the receiver may be needed to provide immunity or indemnity, must be segregated and reserved from the assets of the insurer as security for the payment of indemnity until:

   (1) all applicable statutes of limitation have run;

   (2) all actual or threatened actions against the receiver or any assistant have been completely and finally resolved; and

   (3) all obligations under this section have been satisfied.

(j) Instead of segregating and reserving funds under Subsection (i), the receiver may, in the receiver's discretion, obtain a surety bond or make other arrangements that will enable the receiver to secure fully the payment of all obligations under this section.

(k) If any legal action against an assistant for whom indemnity may be available under this section is settled prior to final adjudication on the merits, the receiver must pay the settlement amount on behalf of the assistant, or indemnify the assistant for the settlement amount, unless the receiver determines that the claim:

(1) did not arise out of or by reason of the assistant's duties or employment; or

(2) was caused by the intentional or wilful and wanton misconduct of the assistant.

(l) In any legal action in which a claim is asserted against the receiver, that portion of any settlement relating to the alleged act, error, or omission of the receiver is subject to the approval of the receivership court. The receivership court may not approve that portion of the settlement if it determines that the claim:

(1) did not arise out of or by reason of the receiver's duties or employment; or

(2) was caused by the intentional or wilful and wanton misconduct of the receiver.

(m) Nothing contained or implied in this section may operate or be construed or applied to deprive the receiver, the receiver's assistants, or receiver's contractors of any immunity, indemnity, benefits of law, rights, or defense otherwise available.

(n) The immunity and indemnification provided to the receiver's assistants and the immunity provided to the receiver's contractors under this section do not apply to any action by the receiver against that person.

(o) Subsection (b) applies to any suit based in whole or in part on any alleged act, error, or omission that takes place on or after September 1, 2005.

(p) Subsections (e)-(l) apply to any suit that is pending on or filed after September 1, 2005, without regard to when the alleged act, error, or omission took place.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.014 by Acts 2007, 80th Leg., ch. 730, § 9.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.014, TX INS § 443.014
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.015

§ 443.015. Approval and Payment of Expenses

Currentness

(a) The receiver may pay any expenses under contracts, leases, employment agreements, or other arrangements entered into by the insurer prior to receivership, as the receiver deems necessary for the purposes of this chapter. The receiver is not required to pay any expenses that the receiver determines are not necessary, and may reject any contract pursuant to Section 443.013.

(b) Receivership expenses other than those described in Subsection (a) must be paid in accordance with Subsections (c)-(f).

(c) The receiver shall submit to the receivership court an application pursuant to Section 443.007 to approve:

(1) the terms of compensation of each special deputy or contractor with respect to which the total amount of the compensation is reasonably expected by the receiver for the duration of the delinquency proceeding to exceed $250,000, or another amount established by the receivership court; and

(2) any other anticipated expense in excess of $25,000, or another amount established by the receivership court.

(d) The receiver may, as the receiver deems appropriate, submit an application to approve any compensation, anticipated expenses, or incurred expenses not described by Subsection (c)(1).

(e) The receiver may pay any expenses not requiring receivership court approval and any expenses approved by the rehabilitation or liquidation order as the expenses are incurred.

(f) The approval of expenses by the receivership court does not prejudice the right of the receiver to seek any recovery, recoupment, disgorgement, or reimbursement of fees based on contract or causes of action recognized in law or in equity.

(g) On a quarterly basis, or as otherwise provided by the receivership court, the receiver shall submit to the receivership court a report summarizing the expenses incurred during the period.

(h) Receivership court approval may not be required to pay expenses incurred by the receiver in connection with the appeal of an order of the receivership court.

(i) All expenses of receivership shall be paid from the assets of the insurer, except as provided by this subsection. In the event that the property of the insurer does not contain sufficient cash or liquid assets to defray the expenses incurred, the commissioner may advance funds from the account established under Section 443.304(c). Any amounts advanced shall be repaid to the account out of the first available money of the insurer.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.015 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(g), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(g), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.015, TX INS § 443.015

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**　　　　　© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.016

§ 443.016. Financial Reporting

Currentness

(a) Not later than the 120th day after the date of entry of an order of receivership by the receivership court, and at least quarterly after that date, the receiver shall file a financial report with the receivership court. A financial report filed under this subsection at a minimum, must include:

(1) a statement of the assets and liabilities of the insurer;

(2) the changes in those assets and liabilities; and

(3) all funds received or disbursed by the receiver during the period covered by the report.

(b) The receivership court shall require a financial report filed under Subsection (a) to comply with all receivership financial reporting requirements specified by the National Association of Insurance Commissioners and adopted in this state by rule by the commissioner.

(c) Not later than the 120th day after the date of entry of an order of liquidation by the receivership court, and at least quarterly after that date, or at other intervals as may be agreed to between the liquidator and the guaranty associations, but in no event less than annually, each affected guaranty association shall file reports with the liquidator. The reports must be in a format compatible with that specified by the National Association of Insurance Commissioners. Reports under this subsection shall be filed with the receivership court.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.016 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.016, TX INS § 443.016
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter A. General Provisions

V.T.C.A., Insurance Code § 443.017

§ 443.017. Records

Currentness

(a) Upon entry of an order of rehabilitation or liquidation, the receiver is vested with title to all of the books, documents, papers, policy information, and claim files, and all other records of the insurer, of whatever nature, in whatever medium, and wherever located, regardless of whether the records are in the custody and control of a third-party administrator, managing general agent, attorney, or other representative of the insurer. The receiver may immediately take possession and control of all of the records of the insurer, and of the premises where the records are located. A third-party administrator, managing general agent, attorney, or other representative of the insurer shall release all records described by this subsection to the receiver, or the receiver's designee, at the request of the receiver. A guaranty association that has or may have obligations under a policy issued by the insurer has the right, with the receiver's approval, to take actions as are necessary to obtain directly from any third-party administrator, managing general agent, attorney, or other representative of the insurer all records described by this section that pertain to the insurer's business and that are appropriate or necessary for the guaranty association to fulfill the association's statutory obligations.

(b) The receiver has the authority to certify the records of a delinquent insurer described by Subsection (a) and the records of the receiver's office created and maintained in connection with a delinquent insurer, as follows:

(1) records of a delinquent insurer may be certified by the receiver in an affidavit stating that the records:

(A) are true and correct copies of records of the insurer; and

(B) were received from the custody of the insurer or found among its effects; and

(2) records created by or filed with the receiver's office in connection with a delinquent insurer may be certified by the receiver's affidavit stating that the records are true and correct copies of records maintained by the receiver's office.

(c) Original books, documents, papers, and other records, or copies of original records certified under Subsection (b), when admitted in evidence, are prima facie evidence of the facts disclosed.

(d) The records of a delinquent insurer held by the receiver may not be considered records of the department for any purposes, and Chapter 552, Government Code, does not apply to those records.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.017 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(A), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(A), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.017, TX INS § 443.017

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document** 

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter B. Proceedings

V.T.C.A., Insurance Code § 443.051

§ 443.051. Receivership Court's Seizure Order

Currentness

(a) The commissioner may file in a district court of Travis County a petition with respect to an insurer domiciled in this state, an unauthorized insurer, or, pursuant to Section 443.401, a foreign insurer:

(1) alleging that grounds exist that would justify a court order for a formal delinquency proceeding against the insurer under this chapter;

(2) alleging that the interests of policyholders, creditors, or the public will be endangered by delay; and

(3) setting forth the contents of a seizure order deemed to be necessary by the commissioner.

(b) Upon a filing under Subsection (a), the receivership court may issue, ex parte and without notice or hearing, the requested seizure order directing the commissioner to take possession and control of all or a part of the property, books, accounts, documents, and other records of an insurer, and of the premises occupied by it for transaction of its business, and until further order of the receivership court, enjoining the insurer and its officers, managers, agents, and employees from disposition of its property and from the transaction of its business except with the written consent of the commissioner. Any person having possession or control of and refusing to deliver any of the books, records, or assets of a person against whom a seizure order has been issued commits an offense. An offense under this subsection is punishable in the manner described by Section 443.010(e).

(c) A petition that prays for injunctive relief must be verified by the commissioner or the commissioner's designee, but need not plead or prove irreparable harm or inadequate remedy at law. The commissioner shall provide only the notice as the receivership court may require.

(d) The receivership court shall specify in the seizure order the duration of the seizure order, which shall be a period the receivership court deems necessary for the commissioner to ascertain the condition of the insurer. On motion of the commissioner or the insurer, or the court's own motion, the receivership court may, from time to time, hold hearings as it deems desirable after notice as it deems appropriate, and may extend, shorten, or modify the terms of the seizure order. The receivership court shall vacate the seizure order if the commissioner fails to commence a formal delinquency proceeding under this chapter after having had a reasonable opportunity to do so. An order of the receivership court pursuant to a formal proceeding under this chapter vacates the seizure order.

(e) Entry of a seizure order under this section does not constitute a breach or an anticipatory breach of any contract of the insurer.

(f) An insurer subject to an ex parte seizure order under this section may petition the receivership court at any time after the issuance of a seizure order for a hearing and review of the seizure order. The receivership court shall hold the hearing and conduct the review not later than the 15th day after the date of the request. A hearing under this subsection may be held privately in chambers, and a hearing shall be held privately in chambers if the insurer proceeded against so requests.

(g) If, at any time after the issuance of a seizure order, it appears to the receivership court that any person whose interest is or will be substantially affected by the seizure order did not appear at the hearing and has not been served, the receivership court may order that notice be given to the person. An order that notice be given does not stay the effect of any seizure order previously issued by the receivership court.

(h) Whenever the commissioner makes any seizure as provided by Subsection (b), on the demand of the commissioner, the sheriff of any county and the police department of any municipality shall furnish the commissioner with the deputies, patrolmen, or officers as may be necessary to assist the commissioner in making and enforcing the seizure order.

(i) In all proceedings and judicial reviews under this section, all records of the insurer, department files, court records and papers, and other documents, so far as they pertain to or are a part of the record of the proceedings, are confidential, and all papers filed with the clerk of the court shall be held by the clerk in a confidential file as permitted by law, except to the extent necessary to obtain compliance with any order entered in connection with the proceedings, unless and until:

    (1) the court, after hearing argument in chambers, orders otherwise;

    (2) the insurer requests that the matter be made public; or

    (3) the commissioner applies for an order under Section 443.057 .

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.051 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(B), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(B), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(h), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(h), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.051, TX INS § 443.051
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter B. Proceedings

V.T.C.A., Insurance Code § 443.052

§ 443.052. Commencement of Formal Delinquency Proceeding

Currentness

(a) Except as authorized by Section 203(e)(3), Pub. L. No. 111-203, any formal delinquency proceeding against a person shall be commenced by filing a petition in the name of the commissioner or department.

(b) The petition must state the grounds upon which the proceeding is based and the relief requested and may include a prayer for restraining orders and injunctive relief as described in Section 443.008. On the filing of the petition or order, a copy shall be forwarded by first class mail or electronic communication as permitted by the receivership court to the insurance regulatory officials and guaranty associations in states in which the insurer did business.

(c) Any petition that prays for injunctive relief must be verified by the commissioner or the commissioner's designee, but need not plead or prove irreparable harm or inadequate remedy at law. The commissioner shall provide only the notice as the receivership court may require.

(d) If any temporary restraining order is prayed for:

(1) the receivership court may issue an initial order containing the relief requested;

(2) the receivership court shall set a time and date for the return of summons, not later than 10 days after the time and date of the issuance of the initial order, at which time the person proceeded against may appear before the receivership court for a summary hearing;

(3) the order must state the time and date of its issuance; and

(4) the order may not continue in effect beyond the time and date set for the return of summons, unless the receivership court expressly enters one or more orders extending the restraining order.

(e) If a temporary restraining order is not requested, the receivership court shall cause summons to be issued. The summons must specify a return date not later than the 30th day after the date of issuance and that an answer must be filed at or before the return date.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.052 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(B), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(B), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(i), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(i), eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 193 (S.B. 1433), § 3, eff. Sept. 1, 2011.

V. T. C. A., Insurance Code § 443.052, TX INS § 443.052

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
Insurance Code
Title 4. Regulation of Solvency (Refs & Annos)
Subtitle C. Delinquent Insurers
Chapter 443. Insurer Receivership Act
Subchapter B. Proceedings

V.T.C.A., Insurance Code § 443.053

§ 443.053. Return of Summons and Summary Hearing

Currentness

(a) The receivership court shall hold a summary hearing at the time and date for the return of summons on a petition to commence a formal delinquency proceeding.

(b) If a person is not served with summons on a petition to commence a formal delinquency proceeding and fails to appear for the summary hearing, the receivership court shall:

(1) continue the summary hearing not more than 10 days;

(2) provide for alternative service of summons upon the person; and

(3) extend any restraining order.

(c) Upon a showing of good faith efforts to effect personal service upon a person who has failed to appear for a continued summary hearing, the receivership court shall order notice of the petition to commence a formal delinquency proceeding to be published. The order and notice shall specify a return date not less than 10 or later than 20 days after the date of publication and that the restraining order has been extended to the continued hearing date.

(d) If a person fails to appear for a summary hearing on a petition to commence a formal delinquency proceeding after service of summons, the receivership court shall enter judgment in favor of the commissioner against that person.

(e) A person who appears for the summary hearing on a petition to commence a formal delinquency proceeding shall file the person's answer at the hearing, and the receivership court shall:

(1) determine whether to extend any temporary restraining orders pending final judgment; and

(2) set the case for trial on a date not later than 10 days after the date of the summary hearing.

(f) The receivership court may not grant a continuance for filing an answer.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.053 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(B), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(B), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.053, TX INS § 443.053

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
 Insurance Code
  Title 4. Regulation of Solvency (Refs & Annos)
   Subtitle C. Delinquent Insurers
    Chapter 443. Insurer Receivership Act
     Subchapter B. Proceedings

V.T.C.A., Insurance Code § 443.054

§ 443.054. Proceedings for Expedited Trial: Continuances, Discovery, Evidence

Currentness

(a) The receivership court shall proceed to hear the case on the petition to commence a formal delinquency proceeding at the time and date set forth for trial. To the extent practicable, the receivership court shall give precedence to the matter over all other matters. To the extent authorized by law, the receivership court may assign the matter to other judges if necessary to comply with the need for expedited proceedings under this chapter.

(b) Continuances for trial may be granted only in extreme circumstances.

(c) The receivership court shall admit into evidence, as self-authenticated, certified copies of any of the following when offered by the commissioner:

  (1) the financial statements made by the insurer or an affiliate;

  (2) examination reports of the insurer or an affiliate made by or on behalf of the commissioner; and

  (3) any other document filed with any insurance department by the insurer or an affiliate.

(d) The facts contained in any examination report of the insurer or an affiliate made by or on behalf of the commissioner are presumed to be true as of the date of the hearing if the examination was made as of a date not more than 270 days before the date the petition was filed. The presumption is rebuttable, and shifts the burden of production and persuasion to the insurer.

(e) Discovery is limited to grounds alleged in the petition and shall be concluded on an expedited basis.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.054 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(B), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(B), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.054, TX INS § 443.054

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Insurance Code
      Title 4. Regulation of Solvency (Refs & Annos)
         Subtitle C. Delinquent Insurers
            Chapter 443. Insurer Receivership Act
               Subchapter B. Proceedings

V.T.C.A., Insurance Code § 443.055

§ 443.055. Decision and Appeals

Currentness

(a) The receivership court shall enter judgment on the petition to commence formal delinquency proceedings not later than the 15th day after the date of conclusion of the evidence.

(b) The judgment is final when entered. Any appeal must be prosecuted on an expedited basis and must be taken not later than the fifth day after the date of entry of the judgment. A request for reconsideration, review, or appeal, or posting of a bond does not dissolve or stay the judgment.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.055 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(B), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(B), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.055, TX INS § 443.055
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
Insurance Code
Title 4. Regulation of Solvency (Refs & Annos)
Subtitle C. Delinquent Insurers
Chapter 443. Insurer Receivership Act
Subchapter B. Proceedings

V.T.C.A., Insurance Code § 443.056

§ 443.056. Confidentiality

Currentness

(a) The commissioner, rehabilitator, or liquidator may share documents, materials, or other information in the possession, custody, or control of the department without regard to the confidentiality of those documents, materials, or information, pertaining to an insurer that is the subject of a proceeding under this chapter with other state, federal, and international regulatory agencies, with the National Association of Insurance Commissioners and its affiliates and subsidiaries, with state, federal, and international law enforcement authorities, with an auditor appointed by the receivership court in accordance with Section 443.355, and, pursuant to Section 443.105, with representatives of guaranty associations that may have statutory obligations as a result of the insolvency of the insurer, provided that the recipient agrees to maintain the confidentiality, if any, of the documents, material, or other information. Nothing in this section limits the power of the commissioner to disclose information under other applicable law.

(b) A domiciliary receiver shall permit a commissioner of another state or a guaranty association to obtain a listing of policyholders and certificate holders residing in the requestor's state, including current addresses and summary policy information, provided that the commissioner of the other state or the guaranty association agrees to maintain the confidentiality of the records and agrees that the records will be used only for regulatory or guaranty association purposes. Access to records may be limited to normal business hours. In the event that the domiciliary receiver believes that certain information is sensitive and that disclosure may cause a diminution in recovery, the receiver may apply for a protective order imposing additional restrictions on access.

(c) The Texas Workers' Compensation Commission [1] shall report to the department any information that a workers' compensation insurer has committed acts that indicate that the insurer is impaired or insolvent. A report made under this subsection is confidential under this section.

(d) The confidentiality obligations imposed by this section end upon the entry of an order of liquidation against the insurer, unless otherwise agreed to by the parties or pursuant to an order of the receivership court.

(e) A waiver of any applicable privilege or claim of confidentiality does not occur as a result of any disclosure, or any sharing of documents, materials, or other information, made pursuant to this section.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.056 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(B), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(B), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(j), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(j), eff. Sept. 1, 2007.

---

**Footnotes**

[1] A reference to the Texas Worker's Compensation Commission means the division of workers' compensation of the Texas Department of Insurance pursuant to V.T.C.A., Labor Code § 401.025 and Acts 2005, 79th Leg., ch. 265, § 8.019(a).

V. T. C. A., Insurance Code § 443.056, TX INS § 443.056

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter B. Proceedings

V.T.C.A., Insurance Code § 443.057

§ 443.057. Grounds for Conservation, Rehabilitation, or Liquidation

Currentness

A petition with respect to an insurer domiciled in this state or an unauthorized insurer for an order of rehabilitation or liquidation may be filed on any one or more of the following grounds:

(1) the insurer is impaired;

(2) the insurer is insolvent;

(3) the insurer is about to become insolvent, with "about to become insolvent" being defined as reasonably anticipated that the insurer will not have liquid assets to meet its next 90 days' current obligations;

(4) the insurer has neglected or refused to comply with an order of the commissioner to make good within the time prescribed by law any deficiency, whenever its capital and minimum required surplus, if a stock company, or its surplus, if a company other than stock, has become impaired;

(5) the insurer, its parent company, its subsidiaries, or its affiliates have converted, wasted, or concealed property of the insurer or have otherwise improperly disposed of, dissipated, used, released, transferred, sold, assigned, hypothecated, or removed the property of the insurer;

(6) the insurer is in a condition such that it could not meet the requirements for organization and authorization as required by law, except as to the amount of the original surplus required of a stock company under Title 6, [1] and except as to the amount of the surplus required of a company other than a stock company in excess of the minimum surplus required to be maintained;

(7) the insurer, its parent company, its subsidiaries, or its affiliates have concealed, removed, altered, destroyed, or failed to establish and maintain books, records, documents, accounts, vouchers, and other pertinent material adequate for the determination of the financial condition of the insurer by examination under Chapter 401 or has failed to properly administer claims or maintain claims records that are adequate for the determination of its outstanding claims liability;

(8) at any time after the issuance of an order under Section 404.003 or Chapter 441, or at the time of instituting any proceeding under this chapter, it appears to the commissioner that, upon good cause shown, it would not be in the best interest of the policyholders, creditors, or the public to proceed with the conduct of the business of the insurer;

(9) the insurer is in a condition such that the further transaction of business would be hazardous financially, according to Subchapter A, Chapter 404, [2] or otherwise, to its policyholders, creditors, or the public;

(10) there is reasonable cause to believe that there has been embezzlement from the insurer, wrongful sequestration or diversion of the insurer's property, forgery or fraud affecting the insurer, or other illegal conduct in, by, or with respect to the insurer that, if established, would endanger assets in an amount threatening the solvency of the insurer;

(11) control of the insurer is in a person who is:

(A) dishonest or untrustworthy; or

(B) so lacking in insurance company managerial experience or capability as to be hazardous to policyholders, creditors, or the public;

(12) any person who in fact has executive authority in the insurer, whether an officer, manager, general agent, director, trustee, employee, shareholder, or other person, has refused to be examined under oath by the commissioner concerning the insurer's affairs, whether in this state or elsewhere or if examined under oath, refuses to divulge pertinent information reasonably known to the person; and after reasonable notice of the fact, the insurer has failed promptly and effectively to terminate the employment and status of the person and all the person's influence on management;

(13) after demand by the commissioner under Chapter 401 or under this chapter, the insurer has failed promptly to make available for examination any of its own property, books, accounts, documents, or other records, or those of any subsidiary or related company within the control of the insurer or of any person having executive authority in the insurer, so far as they pertain to the insurer;

(14) without first obtaining the written consent of the commissioner, the insurer has transferred, or attempted to transfer, in a manner contrary to Chapter 823 or any law relating to bulk reinsurance, substantially its entire property or business, or has entered into any transaction the effect of which is to merge, consolidate, or reinsure substantially its entire property or business in or with the property or business of any other person;

(15) the insurer or its property has been or is the subject of an application for the appointment of a receiver, trustee, custodian, conservator, sequestrator, or similar fiduciary of the insurer or its property otherwise than as authorized under the insurance laws of this state;

(16) within the previous five years, the insurer has wilfully and continuously violated its charter, articles of incorporation or bylaws, any insurance law of this state, or any valid order of the commissioner;

(17) the insurer has failed to pay within 60 days after the due date any obligation to any state or political subdivision of a state or any judgment entered in any state, if the court in which the judgment was entered had jurisdiction over the subject matter, except that nonpayment is not a ground until 60 days after any good faith effort by the insurer to contest the obligation has been terminated, whether it is before the commissioner or in the courts;

(18) the insurer has systematically engaged in the practice of reaching settlements with and obtaining releases from claimants, and then unreasonably delayed payment, failed to pay the agreed-upon settlements, or systematically attempted to compromise with claimants or other creditors on the ground that it is financially unable to pay its claims or obligations in full;

(19) the insurer has failed to file its annual report or other financial report required by statute within the time allowed by law;

(20) the board of directors or the holders of a majority of the shares entitled to vote, or a majority of those individuals entitled to the control of those entities specified by Section 443.003, request or consent to rehabilitation or liquidation under this chapter;

(21) the insurer does not comply with its domiciliary state's requirements for issuance to it of a certificate of authority, or its certificate of authority has been revoked by its state of domicile;

(22) when authorized by department rules; or

(23) a court has made a determination described by Section 202(a)(1)(A)(iv)(I), Pub. L. No. 111-203.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.057 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(B), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(B), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(k), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(k), eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 193 (S.B. 1433), § 4, eff. Sept. 1, 2011.

---

**Footnotes**

1      V.T.C.A., Insurance Code § 801.001 et seq.

2      V.T.C.A., Insurance Code § 404.001 et seq.

V. T. C. A., Insurance Code § 443.057, TX INS § 443.057

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   3

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter B. Proceedings

V.T.C.A., Insurance Code § 443.058

§ 443.058. Entry of Order

Currentness

If any of the grounds provided in Section 443.057 are established, the receivership court shall grant the petition and issue the order of rehabilitation or liquidation requested in the petition.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.058 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(B), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(B), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(l), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(l), eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 193 (S.B. 1433), § 5, eff. Sept. 1, 2011.

V. T. C. A., Insurance Code § 443.058, TX INS § 443.058
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Insurance Code
        Title 4. Regulation of Solvency (Refs & Annos)
            Subtitle C. Delinquent Insurers
                Chapter 443. Insurer Receivership Act
                    Subchapter B. Proceedings

V.T.C.A., Insurance Code § 443.059

§ 443.059. Effect of Petition or Order on Contract or Lease

Currentness

Neither the filing of a petition under this chapter nor the entry of any order of seizure, rehabilitation, or liquidation constitutes a breach or an anticipatory breach of any contract or lease of the insurer.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.059 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(B), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(B), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.059, TX INS § 443.059
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
　Insurance Code
　　Title 4. Regulation of Solvency (Refs & Annos)
　　　Subtitle C. Delinquent Insurers
　　　　Chapter 443. Insurer Receivership Act
　　　　　Subchapter C. Rehabilitation

V.T.C.A., Insurance Code § 443.101

§ 443.101. Rehabilitation Orders

Currentness

(a) An order to rehabilitate the business of an insurer must appoint the commissioner and the commissioner's successors in office as the rehabilitator and must direct the rehabilitator to take possession of the property of the insurer wherever located and to administer it subject to this chapter. The rehabilitator is entitled to request the receivership court to appoint a single judge to supervise the rehabilitation and hear any cases or controversies arising out of or related to the rehabilitation. Rehabilitation proceedings are exempt from any dormancy or similar program maintained by the receivership court for the early closure of civil actions. The filing or recording of the order with the clerk of the court or recorder of deeds of the county in which the principal business of the company is conducted, or, in the case of real estate, the county in which its principal office or place of business is located, imparts the same notice as a deed, bill of sale, or other evidence of title filed or recorded with the recorder of deeds would impart. The order to rehabilitate the insurer must, by operation of law, vest title to all property of the insurer in the rehabilitator.

(b) Any order issued under this section must require accountings to the receivership court by the rehabilitator. Accountings must be at the intervals specified by the receivership court in its order, but not less frequently than semi-annually. Each accounting must include a report concerning the rehabilitator's opinion as to the likelihood that a plan under Section 443.103 will be prepared by the rehabilitator and the timetable for doing so.

(c) In recognition of the need for a prompt and final resolution for all persons affected by a plan of rehabilitation, any appeal from an order of rehabilitation or an order approving a plan of rehabilitation must be heard on an expedited basis. A stay of an order of rehabilitation or an order approving a plan of rehabilitation may not be granted unless the appellant demonstrates that extraordinary circumstances warrant delaying the recovery under the plan of rehabilitation of all other persons, including policyholders. If the plan provides an appropriate mechanism for adjustment in the event of any adverse ruling from an appeal, a stay may not be granted.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.101 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(C), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(C), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(m), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(m), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.101, TX INS § 443.101

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Vernon's Texas Statutes and Codes Annotated
    Insurance Code
        Title 4. Regulation of Solvency (Refs & Annos)
            Subtitle C. Delinquent Insurers
                Chapter 443. Insurer Receivership Act
                    Subchapter C. Rehabilitation

V.T.C.A., Insurance Code § 443.102

§ 443.102. Powers and Duties of Rehabilitator

Currentness

(a) The rehabilitator may appoint one or more special deputies. A special deputy serves at the pleasure of the rehabilitator and has all the powers and responsibilities of the rehabilitator granted under this section, unless specifically limited by the rehabilitator. The rehabilitator may employ or contract with legal counsel, actuaries, accountants, appraisers, consultants, clerks, assistants, and other personnel as may be deemed necessary. Any special deputy or any other person with whom the rehabilitator contracts under this subsection may act on behalf of the commissioner only in the commissioner's capacity as rehabilitator. Any person with whom the rehabilitator contracts under this subsection is not considered an agent of the state, and any contract entered into under this subsection does not constitute a contract with the state. The provisions of any law governing the procurement of goods and services by the state does not apply to any contract entered into by the commissioner as rehabilitator. The compensation of any special deputies, employees, and contractors and all expenses of taking possession of the insurer and of conducting the rehabilitation shall be fixed by the rehabilitator, with the approval of the receivership court in accordance with Section 443.015, and shall be paid out of the property of the insurer. The persons appointed under this subsection serve at the pleasure of the rehabilitator. If the rehabilitator deems it necessary to the proper performance of the rehabilitator's duties under this chapter, the rehabilitator may appoint an advisory committee of policyholders, claimants, or other creditors, including guaranty associations. The advisory committee serves at the pleasure of the rehabilitator and without compensation or reimbursement for expenses. The rehabilitator or the receivership court in rehabilitation proceedings conducted under this chapter may not appoint another committee of any nature.

(b) The rehabilitator may take action as the rehabilitator deems necessary or appropriate to reform and revitalize the insurer, including canceling policies, insurance and reinsurance contracts other than life or health insurance or annuities, or surety bonds or surety undertakings or transferring policies, insurance and reinsurance contracts, or surety bonds or surety undertakings to a solvent assuming insurer, with court approval. The rehabilitator has all the powers of the directors, officers, and managers of the insurer, whose authority is suspended, except as redelegated by the rehabilitator. The rehabilitator has full power to direct and manage, hire and discharge employees, and deal with the property and business of the insurer.

(c) If it appears to the rehabilitator that there has been criminal or tortious conduct or breach of any contractual or fiduciary obligation detrimental to the insurer by any officer, manager, agent, broker, employee, affiliate or other person, the rehabilitator may pursue all appropriate legal remedies on behalf of the insurer.

(d) The rehabilitator may assert all defenses available to the insurer as against third persons, including statutes of limitations, statutes of frauds, and the defense of usury. A waiver of any defense by the insurer after a petition under this chapter has been filed does not bind the rehabilitator.

(e) The enumeration, in this section, of the powers and authority of the rehabilitator may not be construed as a limitation upon the rehabilitator, nor shall it exclude in any manner the right to do other acts not specifically enumerated or otherwise provided for, as may be necessary or appropriate for the accomplishment of or in aid of the purpose of rehabilitation.

(f) The rehabilitator may exercise all powers:

(1) possessed on August 31, 2005, by a receiver appointed for the purpose of rehabilitating an insurer; or

(2) conferred on a rehabilitator after that date by the laws of this state that are not inconsistent with this chapter.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.102 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(C), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(C), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(n), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(n), eff. Sept. 1, 2007. Amended by Acts 2011, 82nd Leg., ch. 193 (S.B. 1433), § 6, eff. Sept. 1, 2011.

V. T. C. A., Insurance Code § 443.102, TX INS § 443.102
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter C. Rehabilitation

V.T.C.A., Insurance Code § 443.103

§ 443.103. Rehabilitation Plans

Currentness

(a) The rehabilitator shall prepare and file a plan to effect rehabilitation with the receivership court not later than the first anniversary of the entry of the rehabilitation order or another further time as the receivership court may allow. Upon application of the rehabilitator for approval of the plan, and after the notice and hearings the receivership court may prescribe, the receivership court may approve or disapprove the proposed plan or may modify it and approve it as modified. Any plan approved under this section must be, in the judgment of the receivership court, fair and equitable to all parties concerned. If the plan is approved, the rehabilitator shall carry out the plan. A plan for a life insurer may propose imposition of a moratorium upon loan and cash surrender rights under policies, for a period not to exceed one year from the entry of the rehabilitation order approving the rehabilitation plan, unless the receivership court, for good cause shown, extends the moratorium.

(b) Once a plan has been filed, any party in interest may object to the plan.

(c) A plan must:

(1) except as provided by Subsection (e), provide no less favorable treatment of a claim or class of claims than would occur in liquidation, unless the holder of a particular claim or interest agrees to a less favorable treatment of that particular claim or interest;

(2) provide adequate means for the plan's implementation;

(3) contain information concerning the financial condition of the insurer and the operation and effect of the plan, as far as is reasonably practicable in light of the nature and history of the insurer, the condition of the insurer's books and records, and the nature of the plan; and

(4) provide for the disposition of the books, records, documents, and other information relevant to the duties and obligations covered by the plan.

(d) A plan may include any other provision not inconsistent with the provisions of this chapter, including:

(1) payment of distributions;

(2) assumption or reinsurance of all or a portion of the insurer's remaining liabilities by, and transfer of assets and related books and records to, an authorized insurer or other entity;

(3) to the extent appropriate, application of insurance company regulatory market conduct standards to any entity administering claims on behalf of the receiver or assuming direct liabilities of the insurer;

(4) contracting with a state guaranty association or any other qualified entity to perform the administration of claims;

(5) annual independent financial and performance audits of any entity administering claims on behalf of the receiver that is not otherwise subject to examination pursuant to state insurance law; and

(6) termination of the insurer's liabilities other than those under policies of insurance as of a date certain.

(e) A plan may designate and separately treat one or more separate subclasses of claims consisting only of claims within the subclasses that are for or reduced to de minimis amounts. For purposes of this subsection, a "de minimis amount" means any amount equal to or less than a maximum de minimis amount approved by the receivership court as being reasonable and necessary for administrative convenience.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.103 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(C), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(C), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.103, TX INS § 443.103
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
　Insurance Code
　　Title 4. Regulation of Solvency (Refs & Annos)
　　　Subtitle C. Delinquent Insurers
　　　　Chapter 443. Insurer Receivership Act
　　　　　Subchapter C. Rehabilitation

V.T.C.A., Insurance Code § 443.104

§ 443.104. Termination of Rehabilitation

Currentness

(a) When the rehabilitator believes further attempts to rehabilitate an insurer would substantially increase the risk of loss to creditors, policyholders, or the public or would be futile, the rehabilitator may move for an order of liquidation. In accordance with Section 443.105, the rehabilitator or the rehabilitator's designated representative shall coordinate with the guaranty associations that may become liable as a result of the liquidation and any national association of guaranty associations to plan for transition to liquidation.

(b) Because the protection of the interests of insureds, claimants, and the public requires the timely performance of all insurance policy obligations, if the payment of policy obligations is suspended in substantial part for a period of six months at any time after the appointment of the rehabilitator and the rehabilitator has not filed an application for approval of a plan under Section 443.103, the rehabilitator shall petition the receivership court for an order of liquidation.

(c) The rehabilitator or the directors of the insurer may at any time petition the receivership court for, or the receivership court on its own motion may enter, an order terminating rehabilitation of an insurer. Subject to the provisions of Section 443.351, if the receivership court finds that rehabilitation has been accomplished and that grounds for rehabilitation under Section 443.057 no longer exist, it shall order that the insurer be restored to title and possession of its property and the control of the business.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.104 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(C), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(C), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(o), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(o), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.104, TX INS § 443.104
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter C. Rehabilitation

V.T.C.A., Insurance Code § 443.105

§ 443.105. Coordination with Guaranty Associations

Currentness

(a) The receiver shall notify any potentially obligated guaranty association or the guaranty association's representative concerning the entry of a rehabilitation order and shall update the guaranty association or its representative regarding significant developments that impact efforts to rehabilitate the insurer. On a determination by the rehabilitator that rehabilitation efforts may not be successful, the rehabilitator shall participate in cooperative efforts with the potentially obligated guaranty associations. To facilitate an orderly transition to liquidation, the rehabilitator shall make available to the guaranty associations the information necessary to discharge their responsibilities upon becoming statutorily obligated. To the extent that information is available, or as it becomes available, the rehabilitator shall provide appropriate information to guaranty associations in the states in which the insurer transacted business.

(b) For the purposes of Subsection (a), "appropriate information" may include the following for lines of business written by the insurer, whether covered or not covered by guaranty associations:

  (1) a general description of the different types of business written or assumed by the insurer;

  (2) claim counts and policy counts by state and by line of business;

  (3) claim and policy reserves;

  (4) account values and cash surrender values;

  (5) policy loans;

  (6) interest crediting history;

  (7) premiums and mode of payment;

  (8) unpaid claims and amounts;

(9) sample policies and endorsements;

(10) a listing of different locations of claim files;

(11) if third-party administrators were used, copies of executed contracts and a description of the contractual arrangements; and

(12) information concerning claims in litigation or dispute, including a listing of claims with assigned defense counsel for those claims going to trial in the near future after a possible liquidation date.

(c) For the purposes of Subsection (a), "appropriate information" also includes information concerning states in which the insurer is or was licensed and periods for which the insurer is or was licensed and other information reasonably requested by a guaranty association necessary for the guaranty association to fulfill its statutory duties.

(d) In the case of a property and casualty insurer, the rehabilitator, in cooperation with the guaranty associations, shall make all reasonable efforts to prepare the insurer's electronic policy and claims data so that, upon the entry of an order of liquidation, the data will be ready for transmission using the Uniform Data Standards as promulgated by the National Association of Insurance Commissioners.

(e) The list of what appropriate information includes under Subsections (b) and (c) is not necessarily an exclusive list. Other information may be necessary to ensure that an orderly transition to liquidation occurs, and that information may be appropriately provided by the receiver.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.105 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(C), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(C), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.105, TX INS § 443.105
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter D. Liquidation

V.T.C.A., Insurance Code § 443.151

§ 443.151. Liquidation Orders

Currentness

(a) An order to liquidate the business of an insurer shall appoint the commissioner and any successor in office as the liquidator and shall direct the liquidator to take possession of the property of the insurer and to administer it subject to this chapter. The liquidator is entitled to request the receivership court to appoint a single judge to supervise the liquidation and to hear any cases or controversies arising out of or related to the liquidation. Liquidation proceedings are exempt from any dormancy or similar program maintained by the receivership court for the early closure of civil actions. As of the entry of the final order of liquidation, the liquidator is vested by operation of law with the title to all of the property, contracts, rights of action, and books and records of the insurer ordered liquidated, wherever located. The filing or recording of the order with the clerk of the court and the recorder of deeds of the county in which the insurer's principal office or place of business is located or, in the case of real estate, the county where the property is located, imparts the same notice as a deed, bill of sale, or other evidence of title filed or recorded with that recorder of deeds would impart.

(b) Upon issuance of the order of liquidation, the rights and liabilities of the insurer and of its creditors, policyholders, shareholders, members, and all other persons interested in its estate become fixed as of the date of entry of the order of liquidation, except as provided by Sections 443.152 and 443.255, unless otherwise fixed by the court.

(c) An order to liquidate the business of an alien insurer in this state must be in the same terms and has the same legal effect as an order to liquidate a domestic insurer.

(d) At the time of petitioning for an order of liquidation, or at any time after petitioning, the commissioner may petition the receivership court for a judicial declaration of insolvency. After providing the notice and hearing as it deems proper, the receivership court may make the declaration of insolvency.

(e) In the event an order of liquidation is set aside on appeal, the company may not be released from delinquency proceedings except in accordance with Section 443.351.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.151 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(D), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(D), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(p), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(p), eff. Sept. 1, 2007.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Notes of Decisions (6)

V. T. C. A., Insurance Code § 443.151, TX INS § 443.151
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter D. Liquidation

V.T.C.A., Insurance Code § 443.152

§ 443.152. Continuance of Coverage

Currentness

(a) Notwithstanding any policy or contract language or any other statute, all reinsurance contracts by which the insurer has assumed the insurance obligations of another insurer are canceled upon entry of an order of liquidation.

(b) Notwithstanding any policy or contract language or any other statute, all policies, insurance contracts other than reinsurance by which the insurer has ceded insurance obligations to another person, and surety bonds or surety undertakings, other than life or health insurance or annuities, in effect at the time of issuance of an order of liquidation, unless further extended by the receiver with the approval of the receivership court, continue in force only until the earlier of:

(1) the 30th day after the date of entry of the liquidation order;

(2) the date of expiration of the policy coverage;

(3) the date the insured has replaced the insurance coverage with equivalent insurance with another insurer or otherwise terminated the policy;

(4) the date the liquidator has effected a transfer of the policy obligation pursuant to Section 443.154(h); or

(5) the date proposed by the liquidator and approved by the receivership court to cancel coverage.

(c) An order of liquidation under Section 443.151 must terminate coverages at the time specified by Subsections (a) and (b) for purposes of any other statute.

(d) Policies of life or health insurance or annuities covered by a guaranty association and any portion of policies of life or health insurance or annuities covered by a guaranty association continue in force for the period and under the terms provided for by any applicable guaranty association law. Policies of life or health insurance or annuities not covered by a guaranty association and any portion of policies of life or health insurance or annuities not covered by a guaranty association terminate under Subsection (b), except to the extent the liquidator proposes and the receivership court approves the use of property of the estate, consistent with Section 443.301, for the purpose of continuing the contracts or coverage by transferring them to an assuming reinsurer.

(e) The cancellation of any bond or surety undertaking does not release any cosurety or guarantor.

(f) The obligations of the insolvent insurer's reinsurers are not released or discharged by a cancellation under this section.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.152 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(D), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(D), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(q), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(q), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.152, TX INS § 443.152
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter D. Liquidation

V.T.C.A., Insurance Code § 443.153

§ 443.153. Sale or Dissolution of Insurer's Corporate Entity

Currentness

(a) Notwithstanding the entry of a liquidation order, the liquidator may apply for an order to sell or dissolve the corporate entity or charter of a domestic insurer or the United States branch of an alien insurer domiciled in this state at any time after an order of liquidation of the insurer has been granted, consistent with the provisions of this section.

(b) Upon an application to sell the corporate entity or charter, with notice as prescribed in this chapter, the receivership court may enter an order:

(1) separating the corporate entity or charter, together with any of its licenses to do business and the assets the liquidator deems appropriate to the transaction, from the remaining estate in liquidation and all of the remaining estate's assets and the claims or interests of all claimants, creditors, policyholders, and stockholders;

(2) canceling all outstanding stock and other securities of and other equity interests in the corporate entity or charter, provided that the cancellation may not affect any claim against the estate by a holder of an equity interest;

(3) authorizing the issuance and sale of new stock or other securities for the purpose of transferring to one or more buyers control and ownership of the corporate entity or charter; and

(4) authorizing the sale of the corporate entity or charter, together with any of its authorizations or licenses to do business and the general assets of the estate the liquidator deems to be appropriate to the transaction, free and clear from the claims or interest of all claimants, creditors, policyholders, and stockholders.

(c) The sale of the corporate entity or charter may be made in the manner and on the terms and conditions applied for by the liquidator and ordered by the receivership court. Any sale is subject to the domiciliary state's laws regarding acquisition of an insurer, Chapter 823, and any other law regarding the transfer of control of insurers. The proceeds from the sale of the corporate entity or charter become a part of the property of the estate in liquidation. The separate corporate entity or charter, together with any of its authorizations or licenses to do business and such assets as the liquidator deems appropriate to the transaction, are, following the sale of the corporate entity or charter, free and clear from the claims or interest of all claimants, creditors, policyholders, and stockholders of the corporation in liquidation.

(d) This section shall be liberally construed to accomplish its purposes to:

(1) provide an expeditious and effective procedure to realize the maximum proceeds possible from the sale of a corporate entity or charter separated from an estate in liquidation; and

(2) ensure that the purchasers receive clear and marketable titles.

(e) If permission to sell the corporate entity or charter is not granted prior to discharge of the liquidator, in accordance with this section or otherwise with receivership court approval:

(1) the receivership court may order dissolution of the corporate entity or charter;

(2) dissolution shall be deemed complete by operation of law upon the discharge of the liquidator if the insurer is insolvent; or

(3) dissolution may be ordered by the receivership court upon the discharge of the liquidator if the insurer is under a liquidation order for some other reason.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.153 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(D), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(D), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.153, TX INS § 443.153
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter D. Liquidation

V.T.C.A., Insurance Code § 443.154

§ 443.154. Powers of Liquidator

Currentness

(a) The liquidator may appoint a special deputy or deputies to act for the liquidator under this chapter and employ or contract with legal counsel, actuaries, accountants, appraisers, consultants, clerks, assistants, and other personnel the liquidator may deem necessary to assist in the liquidation. A special deputy has all powers of the liquidator granted by this section, unless specifically limited by the liquidator, and serves at the pleasure of the liquidator. A special deputy or any other person with whom the liquidator contracts under this subsection may act on behalf of the commissioner only in the commissioner's capacity as liquidator. Any person with whom the liquidator contracts is not considered to be an agent of the state and any contract under this subsection is not a contract with the state. The provisions of any law governing the procurement of goods and services by the state do not apply to any contract entered into by the commissioner as liquidator. This subsection does not waive any immunity granted by Section 443.014 or create any cause of action against the state.

(b) The liquidator may determine the reasonable compensation for any special deputies, employees, or contractors retained by the liquidator as provided in Subsection (a) and pay compensation in accordance with Section 443.015.

(c) The liquidator may appoint, with the approval of the receivership court, an advisory committee of policyholders, claimants, or other creditors, including guaranty associations, if the committee be deemed necessary. The advisory committee serves at the pleasure of the liquidator, and the decision to appoint an advisory committee is at the sole discretion of the liquidator. The advisory committee serves without compensation or reimbursement for expenses. The liquidator or the receivership court in liquidation proceedings conducted under this chapter may not appoint another committee of any nature.

(d) The liquidator may hold hearings, subpoena witnesses to compel their attendance, administer oaths, examine any person under oath, compel any persons to subscribe to their testimony after it has been correctly reduced to writing, and, in connection with a power under this subsection, require the production of any books, papers, records, or other documents that the liquidator deems relevant to the inquiry.

(e) The liquidator may audit the books and records of all agents of the insurer to the extent that those books and records relate to the business activities of the insurer.

(f) The liquidator may collect all debts and moneys due and claims belonging to the insurer, wherever located, and may:

  (1) institute action in other jurisdictions, in order to forestall garnishment and attachment proceedings against the debts;

(2) do other acts as necessary or expedient to collect, conserve, or protect the insurer's property, including the power to sell, compromise, or assign debts for purposes of collection upon such terms and conditions as the liquidator deems consistent with this chapter; and

(3) pursue any creditor's remedies available to enforce the insurer's claims.

(g) The liquidator may conduct public and private sales of the property of the insurer.

(h) The liquidator may use property of the estate of an insurer under a liquidation order to transfer to a solvent assuming insurer policy obligations or the insurer's obligations under surety bonds and surety undertakings as well as collateral held by the insurer with respect to the reimbursement obligations of the principals under those surety bonds and surety undertakings, if the transfer can be arranged without prejudice to applicable priorities under Section 443.301. If all insureds, principals, third-party claimants, and obligees under the policies, surety bonds, and surety undertakings consent or if the receivership court so orders, the estate has no further liability under the transferred policies, surety bonds, or surety undertakings after the transfer is made.

(i) The liquidator may, subject to Subsection (y), acquire, hypothecate, encumber, lease, improve, sell, transfer, abandon, or otherwise dispose of or deal with any property of the estate at its market value or upon terms and conditions that are fair and reasonable. The liquidator also has the power to execute, acknowledge, and deliver any and all deeds, assignments, releases, and other instruments necessary or proper to effectuate any sale of property or other transaction in connection with the liquidation.

(j) The liquidator may borrow money on the security of the property of the estate or without security and execute and deliver all documents necessary to that transaction for the purpose of facilitating the liquidation. Any funds borrowed under this subsection may be repaid as an administrative expense and have priority over any other claims in Class 1 under the priority of distribution.

(k) The liquidator may enter into contracts as necessary to carry out the order to liquidate and, subject to the provisions of Section 443.013, may assume or reject any executory contract or unexpired lease to which the insurer is a party.

(l) The liquidator may continue to prosecute and institute in the name of the insurer or in the liquidator's own name any and all suits and other legal proceedings, in this state or elsewhere, and abandon the prosecution of claims the liquidator deems unprofitable to pursue further. If the insurer is dissolved under Section 443.153, the liquidator has the power to apply to any court in this state or elsewhere for leave to substitute the liquidator for the insurer as a party.

(m) The liquidator may prosecute any action that may exist on behalf of the creditors, members, policyholders, shareholders of the insurer, or the public against any person, except to the extent that a claim is personal to a specific creditor, member, policyholder, or shareholder and recovery on such claim would not inure to the benefit of the estate. This subsection does not infringe or impair any of the rights provided to a guaranty association pursuant to its enabling statute or otherwise.

(n) The liquidator may take possession of the records and property of the insurer as may be convenient for the purposes of efficient and orderly execution of the liquidation. Guaranty associations must be allowed reasonable access to the records of the insurer as is necessary for the guaranty associations to carry out their statutory obligations.

(o) The liquidator may deposit in one or more banks in this state the amounts that are required for meeting current administration expenses and dividend distributions.

(p) The liquidator may invest all amounts not currently needed, unless the receivership court orders otherwise.

(q) The liquidator may file any necessary documents for record in the office of any recorder of deeds or record office in this state or elsewhere where property of the insurer is located.

(r) The liquidator may assert all defenses available to the insurer as against third persons, including statutes of limitation, statutes of frauds, and the defense of usury. A waiver of any defense by the insurer after a petition is filed under this chapter does not bind the liquidator. When a guaranty association has an obligation to defend any suit, the liquidator shall defer to the association's obligation.

(s) The liquidator may exercise and enforce all the rights, remedies, and powers of any creditor, shareholder, policyholder, or member, including any power to avoid any transfer or lien that may be avoidable under this chapter or otherwise.

(t) The liquidator may intervene in any proceeding wherever instituted that might lead to the appointment of a receiver or trustee and act as the receiver or trustee whenever the appointment is offered.

(u) The liquidator may enter into agreements with any receivers or commissioners of any other states.

(v) The liquidator may exercise all powers held by receivers on August 31, 2005, or conferred on receivers after that date by the laws of this state not inconsistent with this chapter.

(w) The liquidator is vested with all the rights of the entity or entities in receivership.

(x) The enumeration, in this section, of the powers and authority of the liquidator may not be construed as a limitation upon the liquidator, nor may it exclude in any manner the right to do other acts not specifically enumerated or otherwise provided for, to the extent necessary or appropriate for the accomplishment of or in aid of the purpose of liquidation.

(y) The liquidator may hypothecate, encumber, lease, sell, transfer, abandon, or otherwise dispose of or deal with any property of the insurer, settle or resolve any claim brought by the liquidator on behalf of the insurer, or commute or settle any claim of reinsurance under any contract of reinsurance, as follows:

(1) if the property or claim has a market or settlement value that does not exceed the lesser of $1 million or 10 percent of the general assets of the estate as shown on the receivership's financial statements, the liquidator may take action at the liquidator's discretion, provided that the receivership court may, upon petition of the liquidator, increase the threshold upon a showing that compliance with this requirement is burdensome to the liquidator in administering the estate and is unnecessary to protect the material interests of creditors;

(2) in all instances other than those described in Subdivision (1), the liquidator may take the action only after obtaining approval of the receivership court as provided by Section 443.007;

(3) the liquidator may, at the liquidator's discretion, request the receivership court to approve a proposed action as provided by Section 443. 007 if the value of the property or claim appears to be less than the threshold provided by Subdivision (1) but cannot be ascertained with certainty, or for any other reason as determined by the liquidator; and

(4) after obtaining approval of the receivership court as provided in Section 443.007, the liquidator may, subject to Subsection (z), transfer rights to payment under ceding reinsurance agreements covering policies to a third-party transferee.

(z) The transferee of a right to payment under Subsection (y)(4) has the rights to collect and enforce collection of the reinsurance for the amount payable to the ceding insurer or to its receiver, without diminution because of the insolvency or because the receiver has failed to pay all or a portion of the claim, based on the amounts paid or allowed pursuant to Section 443.211. The transfer of the rights does not give rise to any defense regarding the reinsurer's obligations under the reinsurance agreement regardless of whether an agreement or other applicable law prohibits the transfer of rights under the reinsurance agreement. Except as provided in this subsection, any transfer of rights pursuant to Subsection (y) (4) does not impair any rights or defenses of the reinsurer that existed prior to the transfer or that would have existed in the absence of the transfer. Except as otherwise provided in this subsection, any transfer of rights pursuant to Subsection (y)(4) does not relieve the transferee or the liquidator from obligations owed to the reinsurer pursuant to the reinsurance or other agreement.

(aa) The liquidator is not obligated to defend any action against the insurer or insured. Any insureds not defended by a guaranty association may provide their own defense, and include the cost of the defense as part of their claims, if the defense was an obligation of the insurer. The right of the liquidator to contest coverage on a particular claim is preserved without the necessity for an express reservation of rights.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.154 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(D), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(D), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(r), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(r), eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 193 (S.B. 1433), § 7, eff. Sept. 1, 2011.

V. T. C. A., Insurance Code § 443.154, TX INS § 443.154

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Insurance Code
        Title 4. Regulation of Solvency (Refs & Annos)
            Subtitle C. Delinquent Insurers
                Chapter 443. Insurer Receivership Act
                    Subchapter D. Liquidation

V.T.C.A., Insurance Code § 443.155

§ 443.155. Notice to Creditors and Others

Currentness

(a) Unless the receivership court otherwise directs, the liquidator shall give or cause to be given notice of the liquidation order as soon as possible:

(1) by first class mail or electronic communication as permitted by the receivership court to:

(A) any guaranty association that is or may become obligated as a result of the liquidation and any national association of guaranty associations;

(B) all the insurer's agents, brokers, or producers of record with current appointments or current licenses to represent the insurer and all other agents, brokers, or producers as the liquidator deems appropriate at their last known address; and

(C) all persons or entities known or reasonably expected to have claims against the insurer, at their last known address as indicated by the records of the insurer, and all state and federal agencies with an interest in the proceeding; and

(2) by publication in a newspaper of general circulation in the county in which the insurer has its principal place of business and in any other locations as the liquidator deems appropriate.

(b) The notice of the entry of an order of liquidation must contain or provide directions for obtaining the following information:

(1) a statement that the insurer has been placed in liquidation;

(2) a statement that certain acts are stayed under Section 443.008 and describe any additional injunctive relief ordered by the receivership court;

(3) a statement whether, and to what extent, the insurer's policies continue in effect;

(4) to the extent applicable, a statement that coverage by state guaranty associations may be available for all or part of policy benefits in accordance with applicable state guaranty laws;

(5) a statement of the deadline for filing claims, if established, and the requirements for filing a proof of claim pursuant to Section 443.251 on or before that date;

(6) a statement of the date, time, and location of any initial status hearing scheduled at the time the notice is sent;

(7) a description of the process for obtaining notice of matters before the receivership court; and

(8) any other information the liquidator or the receivership court deems appropriate.

(c) If notice is given in accordance with this section, the distribution of property of the insurer under this chapter is conclusive with respect to all claimants, whether or not they received notice.

(d) Notwithstanding the other provisions of this section, the liquidator has no duty to locate any persons or entities if no address is found in the records of the insurer or if mailings are returned to the liquidator because of inability to deliver at the address shown in the insurer's books and records. In these circumstances the notice by publication as required by this chapter or actual notice received is sufficient notice. Written certification by the liquidator or other knowledgeable person acting for the liquidator that the notices were deposited in the United States mail, postage prepaid, or that the notices have been electronically transmitted is prima facie evidence of mailing and receipt. All claimants shall keep the liquidator informed of any changes of address.

(e) Notwithstanding Subsection (a)(1)(C), upon application of the liquidator, the receivership court may:

(1) find that notice by publication as required in this section is sufficient notice to those persons holding an occurrence policy that expired more than four years prior to the entry of the order of liquidation and under which there are no pending claims; or

(2) order other notice to persons described by Subdivision (1) as it deems appropriate.

(f) The liquidator shall notify the Texas Workers' Compensation Commission [1] upon the entry of the liquidation order if the insurer has issued workers' compensation coverage in effect in this state. Upon request of the liquidator, the Texas Workers' Compensation Commission shall submit a list of active cases pending before the commission that relate to workers' compensation coverage issued by the insurer.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.155 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(D), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(D), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(s), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(s), eff. Sept. 1, 2007.

**Footnotes**

1      A reference to the Texas Worker's Compensation Commission means the division of workers' compensation of the Texas Department of Insurance pursuant to V.T.C.A., Labor Code § 401.025 and Acts 2005, 79th Leg., ch. 265, § 8.019(a).

V. T. C. A., Insurance Code § 443.155, TX INS § 443.155

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter D. Liquidation

V.T.C.A., Insurance Code § 443.156

§ 443.156. Duties of Agents

Currentness

(a) Every person who represented the insurer as an agent and receives notice in the form prescribed in Section 443.155 that the insurer is the subject of a liquidation order, not later than the 30th day after the date of the notice, shall provide to the liquidator, in addition to the information the agent may be required to provide pursuant to Section 443.010, the information in the agent's records related to any policy issued by the insurer through the agent and any policy issued by the insurer through an agent under contract to the agent. For purposes of this subsection, a policy is issued through an agent if the agent has a property interest in the expiration of the policy or if the agent has had in the agent's possession a copy of the declarations of the policy at any time during the life of the policy, except where the ownership of the expiration of the policy has been transferred to another.

(b) Any agent failing to provide information to the liquidator as required in Subsection (a) may be subject to payment of an administrative penalty under Chapter 84 of not more than $1,000. In addition, the agent's license may be suspended under Chapter 4005.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.156 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(D), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(D), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(t), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(t), eff. Sept. 1, 2007; Acts 2021, 87th Leg., ch. 355 (H.B. 4030), § 1, eff. Sept. 1, 2021.

V. T. C. A., Insurance Code § 443.156, TX INS § 443.156
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.201

§ 443.201. Turnover of Assets

Currentness

(a) If the receiver determines that funds or property in the possession of another person are rightfully the property of the estate, the receiver shall deliver to the person a written demand for immediate delivery of the funds or property, referencing this section by number and the court and docket number of the receivership action, and notifying the person that any claim of right to the funds or property by the person must be presented to the receivership court not later than the 20th day after the date of the written demand. Any person who holds funds or other property belonging to an entity subject to an order of receivership under this chapter shall deliver the funds or other property to the receiver on demand. Should the person allege any right to retain the funds or other property, the person, not later than the 20th day after the date of receipt of the demand that the funds or property be delivered to the receiver, shall file with the receivership court a pleading setting out that right. The person shall serve a copy of the pleading on the receiver. The pleading must inform the receivership court as to the nature of the claim to the funds or property, the alleged value of the property or amount of funds held, and what action, pending determination of the dispute, has been taken by the person to preserve and protect the property or to preserve any funds. The relinquishment of possession of funds or property by any person who has received a demand pursuant to this section does not constitute a waiver of a right to make a claim in the receivership.

(b) If requested by the receiver, the receivership court shall hold a hearing to determine where and under what conditions the person shall hold the property or funds pending determination of the dispute. The receivership court may impose conditions as it may deem necessary or appropriate for the preservation of the property or funds until the receivership court can determine the validity of the person's claim to the property or funds. If any property or funds are allowed to remain in the possession of the person after demand made by the receiver, that person is strictly liable to the estate for any waste, loss, or damage to or diminution of value of the property or funds retained.

(c) If a person has filed a pleading alleging any right to retain funds or property as provided by Subsection (a), the receivership court shall hold a subsequent hearing to determine the entitlement of the person to the funds or property claimed by the receiver.

(d) If a person fails to deliver the funds or property or to file the pleading described by Subsection (a) within the period described by Subsection (a), the receivership court may, upon petition of the receiver and upon a copy of the petition being served by the receiver to that person, issue its summary order directing the immediate delivery of the funds or property to the receiver and finding that the person has waived all claims of right to the funds or property.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.157 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.201, TX INS § 443.201

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.202

§ 443.202. Recovery from Affiliates

Currentness

(a) The receiver has a right to recover from any affiliate of the insurer any property of the insurer transferred to or for the benefit of the affiliate, or the property's value, if the transfer was made within the two years preceding the initial petition for receivership.

(b) A transfer is not recoverable under Subsection (a) if the affiliate shows that, when the transfer was made:

  (1) the insurer was solvent;

  (2) the transfer was lawful; and

  (3) neither the insurer nor the affiliate knew or reasonably should have known that the transfer, under then-applicable statutory accounting standards, would:

    (A) place the insurer:

      (i) in violation of applicable capital or surplus requirements;

      (ii) below the applicable minimum risk-based capital level; or

      (iii) in violation of writing ratios under Article 1.32 or analogous requirements under Section 843.406; or

    (B) cause the insurer's filed financial statements not to present fairly the capital and surplus of the insurer.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.202 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.202, TX INS § 443.202
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.203

§ 443.203. Unauthorized Post-Petition Transfers

Currentness

(a) Except as provided by this section, the receiver may avoid any transfer of an interest of the insurer in property or any obligation incurred by the insurer that:

(1) was made or occurred after the petition for receivership was filed; and

(2) is not authorized by the receiver and approved by the receivership court or otherwise authorized in accordance with this chapter.

(b) Except to the extent that a transfer or obligation avoidable under Subsection (a) is otherwise voidable under this chapter, a transferee or obligee of a transfer or obligation avoided under Subsection (a) that takes for value and in good faith, at the option of the receivership court, has a lien or may retain any interest transferred or enforce any obligation incurred, as applicable, to the extent that the transferee or obligee gave value to the insurer in exchange for the transfer or obligation.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.203 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.203, TX INS § 443.203
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Insurance Code
        Title 4. Regulation of Solvency (Refs & Annos)
            Subtitle C. Delinquent Insurers
                Chapter 443. Insurer Receivership Act
                    Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.204

§ 443.204. Voidable Preferences and Liens

Currentness

(a) A "preference" is a transfer of any interest in property of an insurer that:

(1) is made to or for the benefit of a creditor and for or on account of an antecedent debt and is made or suffered by the insurer within two years preceding the filing of a successful petition commencing delinquency proceedings; and

(2) enables the creditor to receive more than the creditor would receive if the insurer were liquidated under this chapter, the transfer had not been made, and the creditor was entitled to receive payment of the debt to the extent provided by this chapter.

(b) Any preference may be avoided by the receiver if:

(1) the insurer was insolvent at the time of the transfer;

(2) the transfer was made within 120 days before the date of filing of the petition commencing delinquency proceedings;

(3) the creditor receiving the transfer or to be benefited by the transfer, or the creditor's agent acting with reference to the transfer, had, at the time the transfer was made, reasonable cause to believe that the insurer was insolvent or was about to become insolvent; or

(4) the creditor receiving the transfer was:

(A) an officer or director of the insurer;

(B) an employee, attorney, or other person who was in fact in a position to effect a level of control or influence over the actions of the insurer comparable to that of an officer or director, without regard to whether the person held that position; or

(C) an affiliate.

(c) The receiver may not avoid a transfer under this section:

(1) to the extent that the transfer was:

(A) intended by the insurer and the creditor to or for whose benefit the transfer was made to be a contemporaneous exchange for new value given to the insurer and in fact was a substantially contemporaneous exchange; or

(B) made in the ordinary course of business or financial affairs between the insurer and the transferee and made according to ordinary business terms in payment of a debt incurred by the insurer in the ordinary course of business or financial affairs of the insurer and the transferee; or

(2) to or for the benefit of a creditor, to the extent that, after the transfer, the creditor gave new value to or for the benefit of the insurer that was:

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the insurer did not make an otherwise unavoidable transfer to or for the benefit of the creditor.

(d) For purposes of this section:

(1) a transfer of property other than real property is deemed to be made or suffered at the time the transfer becomes so far perfected that any subsequent lien obtainable by legal or equitable proceedings on a simple contract could not become superior to the rights of the transferee;

(2) a transfer of real property is deemed to be made or suffered when the transfer is so far perfected that a subsequent bona fide purchaser from the insurer could not obtain rights superior to the rights of the transferee;

(3) a transfer that creates an equitable lien is not deemed to be perfected if there are available means by which a legal lien could be created; and

(4) a transfer not perfected prior to the filing of a petition for receivership is deemed to be made immediately before the filing commencing delinquency proceedings.

(e) The provisions of this section apply without regard to whether there are or were creditors who might have obtained liens or persons who might have become bona fide purchasers.

(f) Within the meaning of Subsection (d), "a lien obtainable by legal or equitable proceedings on a simple contract" is a lien arising in the ordinary course of proceedings upon the entry or docketing of a judgment or decree, or upon attachment,

garnishment, execution, or similar process, whether before, upon, or after judgment or decree and whether before or upon levy. The term does not include liens that under applicable law are given a special priority over other liens that are prior in time.

(g) Within the meaning of Subsection (d), a lien obtainable by legal or equitable proceedings could become superior to the rights of a transferee, or a purchaser could obtain rights superior to the rights of a transferee if the consequences would follow only from the lien or purchase itself, or from the lien or purchase followed by any step wholly within the control of the respective lienholder or purchaser, with or without the aid of ministerial action by public officials. A lien could not, however, become superior and a purchase could not create superior rights for the purpose of Subsection (d) through any acts subsequent to the obtaining of the lien or subsequent to the purchase that require the agreement or concurrence of any third party or that require any further judicial action or ruling.

(h) A transfer of property for or on account of a new and contemporaneous consideration that is deemed under Subsection (d) to be made or suffered after the transfer because of delay in perfecting the transfer does not become a transfer for or on account of an antecedent debt if any acts required by the applicable law to be performed to perfect the transfer against liens or bona fide purchasers' rights are performed within 21 days or any period expressly allowed by the law, whichever is less. A transfer to secure a future loan, if the loan is actually made, or a transfer that becomes security for a future loan, has the same effect as a transfer for or on account of a new and contemporaneous consideration.

(i)(1) If any lien deemed voidable under Subsection (b) has been dissolved by the furnishing of a bond or other obligation, the surety on which has been indemnified directly or indirectly by the transfer of or the creation of a lien upon any property of an insurer before the filing of a petition commencing delinquency proceedings under this chapter, the indemnifying transfer or lien is also deemed voidable.

(2) The property affected by any lien deemed voidable under Subsection (b) and Subdivision (1) is discharged from the lien, and that property and any of the indemnifying property transferred to or for the benefit of a surety passes to the receiver, except that the receivership court may on due notice order any lien deemed voidable under this section to be preserved for the benefit of the estate and may direct that a conveyance be executed as may be proper or adequate to evidence the title of the receiver.

(3) Reasonable notice of any hearing in the proceeding shall be given to all parties as required by law, including the obligee of a releasing bond or other like obligation. If an order is entered for the recovery of indemnifying property in kind or for the avoidance of an indemnifying lien, the receivership court may in the same proceeding ascertain the value of the property or lien. If the value of the property or lien is less than the amount for which the property is indemnified or than the amount of the lien, the transferee or lienholder may elect to retain the property or lien upon payment to the receiver of its value, as determined by the receivership court, within a reasonable time determined by the receivership court.

(4) The liability of the surety under a releasing bond or other similar obligation shall be discharged to the extent of the value of the indemnifying property recovered or the indemnifying lien nullified and avoided by the receiver, or if the property is retained under Subdivision (3) to the extent of the amount paid to the receiver.

(j) This section may not be construed to prejudice any other claim by the receiver against any person.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.204 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007.

Notes of Decisions (1)

V. T. C. A., Insurance Code § 443.204, TX INS § 443.204

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.205

§ 443.205. Fraudulent Transfers and Obligations

Currentness

(a) The receiver may avoid any transfer of an interest of the insurer in property, any reinsurance transaction, or any obligation incurred by an insurer that was made or incurred on or within two years before the date of the initial filing of a petition commencing delinquency proceedings under this chapter, if the insurer voluntarily or involuntarily:

(1) made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any person to which it was or became indebted on or after the date that the transfer was made or the obligation was incurred; or

(2) received less than a reasonably equivalent value in exchange for the transfer or obligation.

(b) Except to the extent that a transfer or obligation voidable under this section is voidable under other provisions of this chapter, a transferee or obligee that takes for value and in good faith a voidable transfer or obligation has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that the transferee or obligee gave value to the insurer in exchange for the transfer or obligation.

(c) For purposes of this section, a transfer is made when the transfer is so perfected that a subsequent bona fide purchaser from the insurer cannot acquire an interest in the property transferred that is superior to the interest in the property of the transferee, but if the transfer is not so perfected before the commencement of the delinquency proceeding, the transfer is deemed to have been made immediately before the date of the initial filing of the petition commencing delinquency proceedings.

(d) For purposes of this section, "value" means property or satisfaction or securing of a present or antecedent debt of the insurer.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.205 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007.

Notes of Decisions (1)

V. T. C. A., Insurance Code § 443.205, TX INS § 443.205

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

                                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.206

§ 443.206. Receiver as Lien Creditor

Currentness

(a) The receiver may avoid any transfer of or lien upon the property of, or obligation incurred by, an insurer that the insurer or a policyholder, creditor, member, or stockholder of the insurer may have avoided without regard to any knowledge of the receiver, the commissioner, the insurer, or any policyholder, creditor, member, or stockholder of the insurer regardless of whether such a policyholder, creditor, member, or stockholder exists.

(b) The receiver is deemed a creditor without knowledge for purposes of pursuing claims under the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or similar provisions of state or federal law.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.206 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007

V. T. C. A., Insurance Code § 443.206, TX INS § 443.206
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.207

§ 443.207. Liability of Transferee

Currentness

(a) Except as otherwise provided in this section, to the extent that the receiver obtains an order under Section 443.201 or avoids a transfer under Section 443.202, 443.203, 443.204, 443.205, or 443.206, the receiver may recover the property transferred, or the value of the property, from:

(1) the initial transferee of the transfer or the entity for whose benefit the transfer was made; or

(2) any immediate or mediate transferee of the initial transferee.

(b) The receiver may not recover under Subsection (a)(2) from:

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of the transferee.

(c) Any transfer avoided in accordance with this chapter is preserved for the benefit of the receivership estate, but only with respect to property of the insurer.

(d) In addition to the remedies specifically provided under Sections 443.201-443.206 and Subsection (a), if the receiver is successful in establishing a claim to the property or any part of the property, the receiver is entitled to recover judgment for:

(1) rental for the use of the tangible property from the later of the entry of the receivership order or the date of the transfer;

(2) in the case of funds or intangible property, the greater of:

(A) the actual interest or income earned by the property; or

(B) interest at the statutory rate for judgments from the later of the date of the entry of the receivership order or the date of the transfer; and

(3) except as to recoveries from guaranty associations, all costs, including investigative costs and other expenses necessary to the recovery of the property or funds, and reasonable attorney's fees.

(e) In any action under this section, the receivership court may allow the receiver to seek recovery of the property involved or the property's value.

(f) In any action under Sections 443.201-443.206, the receiver has the burden of proving the avoidability of a transfer, and the person against whom recovery or avoidance is sought has the burden of proving the nature and extent of any affirmative defense.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.207 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(u), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(u), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.207, TX INS § 443.207

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.208

§ 443.208. Claims of Holders of Void or Voidable Rights

Currentness

(a) A claim of a creditor who has received or acquired a preference, lien, conveyance, transfer, assignment, or encumbrance voidable under this chapter may not be allowed unless the creditor surrenders the preference, lien, conveyance, transfer, assignment, or encumbrance. If the avoidance is effected by a proceeding in which a final judgment has been entered, the claim may not be allowed unless the money is paid or the property is delivered to the receiver not later than the 30th day after the date of the entering of the final judgment, except that the receivership court may allow further time if there is an appeal or other continuation of the proceeding.

(b) A claim allowable under Subsection (a) by reason of the avoidance, whether voluntary or involuntary, or a preference, lien, conveyance, transfer, assignment, or encumbrance, may be filed as an excused late filing under Section 443.251(b) if filed not later than the 30th day after the date of the avoidance, or within the further time allowed by the receivership court under Subsection (a).

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.208 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(v), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(v), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.208, TX INS § 443.208
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.209

§ 443.209. Setoffs

Currentness

(a) All mutual debts or mutual credits, whether arising out of one or more contracts between the insurer and another person in connection with any action or proceeding under this chapter, must be set off and only the balance shall be allowed or paid, except as provided by Subsection (b).

(b) A setoff may not be allowed in favor of any person if:

(1) the obligation of the insurer to the person:

(A) would not, at the date of the commencement of the delinquency proceeding, entitle the person to share as a claimant in the assets of the insurer; or

(B) was purchased by or transferred to the person:

(i) after the commencement of the delinquency proceeding; or

(ii) for the purpose of increasing setoff rights;

(2) the obligation of the insurer is owed to an affiliate of the person, or any other entity or association other than the person;

(3) the obligation of the person:

(A) is as a trustee or fiduciary; or

(B) is to pay:

(i) an assessment levied against the members of a mutual insurer, reciprocal or interinsurance exchange, or Lloyd's plan; or

(ii) a balance upon a subscription to the capital stock of a capital stock insurance company; or

(4) the obligations between the person and the insurer arise from reinsurance transactions in which either the person or the insurer has assumed risks and obligations from the other party and then has ceded back to that party substantially the same risks and obligations.

(c) The receiver shall provide an interested person with accounting statements identifying all debts that are due and payable. If a person owes the insurer amounts that are due and payable against which the person asserts a setoff of mutual credits that, in the future, may become due and payable from the insurer, the person shall promptly pay the amounts due and payable to the receiver. Notwithstanding any other provision of this chapter, the receiver shall promptly and fully refund, to the extent of a person's prior payments under this section, any mutual credits that become due and payable to the person by the insurer.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.209 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.209, TX INS § 443.209
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.210

§ 443.210. Assessments

Currentness

(a) As soon as practicable, but not later than the fourth anniversary of the date of an order of receivership of an insurer issuing assessable policies, the receiver shall make a report to the receivership court setting forth:

(1) the reasonable value of the assets of the insurer;

(2) the insurer's probable total liabilities;

(3) the probable aggregate amount of the assessment necessary to pay all claims of creditors and expenses in full, including expenses of administration and costs of collecting the assessment; and

(4) a recommendation as to whether an assessment should be made and in what amount.

(b) Upon the basis of the report provided in Subsection (a), including any supplements and amendments to the report, the receivership court may approve, solely on application by the receiver, one or more assessments against all members of the insurer who are subject to assessment. The order approving the assessment shall provide instructions regarding notice of the assessment, deadlines for payment, and other instructions to the receiver regarding collection of the assessment.

(c) Subject to any applicable legal limits on ability to assess, the aggregate assessment must be for the amount that the sum of the probable liabilities, the expenses of administration, and the estimated cost of collection of the assessment, exceeds the value of existing assets, with due regard being given to assessments that cannot be collected economically.

(d) After levy of assessment under Subsection (b), the receiver shall petition the receivership court for an order directing each member who has not paid the assessment pursuant to the levy to show cause why a judgment for the assessment should not be entered.

(e) At least 20 days before the return day of the order to show cause, the receiver shall give notice of the order to show cause to each member liable on the assessment. Notice must be given by first class mail mailed to the member's last known address as it appears on the insurer's records, by publication, or by another method of notification as directed by the receivership court.

Failure of the member or subscriber to receive the notice of the assessment or of the order, within the time specified in the assessment or order or at all, is not a defense in a proceeding to collect the assessment.

(f) If a member does not appear and serve verified objections upon the receiver on or before the return day of the order to show cause under Subsection (d), the receivership court shall make an order adjudging the member liable for the amount of the assessment against the member under Subsection (d) together with costs, and the receiver shall have a judgment against the member for the amount of the assessment and costs in the order.

(g) If on or before the return day of the order to show cause, the member appears and serves verified objections upon the receiver, the receivership court may hear and determine the matter or may appoint a referee to hear it and make an order as the facts warrant. In the event that the receiver determines that the objections do not warrant relief from assessment, the member may request the receivership court to review the matter and vacate the order to show cause.

(h) The receiver may enforce any order or collect any judgment under Subsection (f) by any lawful means.

(i) Any assessment of a subscriber or member of an insurer made by the receiver pursuant to the order of receivership court fixing the aggregate amount of the assessment against all members or subscribers and approving the classification and formula made by the receiver under this section is prima facie correct.

(j) Any claim filed by an assessee who fails to pay an assessment, after the conclusion of any legal action by the assessee objecting to the assessment, is deemed a late filed claim under Section 443.251.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.210 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(w), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(w), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.210, TX INS § 443.210
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Insurance Code
        Title 4. Regulation of Solvency (Refs & Annos)
            Subtitle C. Delinquent Insurers
                Chapter 443. Insurer Receivership Act
                    Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.211

§ 443.211. Reinsurer's Liability

Currentness

(a) If the receiver has claims under policies covered by reinsurance, the liability of the reinsurer to the receiver under the policies reinsured may not be diminished because of the insolvency of the insurer, regardless of any provisions in the reinsurance contract to the contrary, except under the following circumstances:

(1) a contract or other written agreement entered into before the delinquency proceeding that is otherwise permitted by law specifically provides another payee of the reinsurance in the event of the insolvency of the ceding insurer;

(2) the assuming insurer, under an assumption reinsurance agreement and with the consent of the direct insured, has assumed, as direct obligations of the assuming insurer, the policy obligations of the ceding insurer to the payees under policies and in substitution for the obligations of the ceding insurer to those payees; or

(3) a life and health insurance guaranty association has made the election to succeed to the rights and obligations of the insolvent insurer under a contract of reinsurance in accordance with the life and health guaranty association laws of this state or its domiciliary state or another applicable law, rule, order, or assignment contract, in which case payments shall be made directly to or at the direction of the guaranty association.

(b) Except as provided by Subsection (a), any reinsurance shall be payable to the receiver under a policy reinsured by the assuming insurer on the basis of claims:

(1) allowed under Section 443.253; or

(2) paid under:

(A) Chapter 462, 463, or 2602; or

(B) the guaranty associations of other states.

(c) The liquidator or receiver, as applicable, shall give written notice to affected reinsurers of the pendency of a claim against the receiver under a reinsured policy within a reasonable time after the claim is filed in the delinquency proceeding. During the pendency of the claim any affected reinsurer may:

(1) investigate the claim; and

(2) intervene, at the reinsurer's own expense, in any proceeding where the claim is to be adjusted and assert any defense or defenses which it may deem available to the delinquent company, the liquidator, or the receiver.

(d) Subject to court approval, an expense incurred under Subsection (c)(1) or (2) shall be chargeable against the delinquent company as part of the expense of liquidation, to the extent of a proportionate share of the benefit which may accrue to the delinquent company solely as a result of the defense undertaken by the assuming insurer.

(e) If two or more assuming insurers are involved in the same claim and a majority in interest elect to intervene and assert a defense to a claim described by Subsection (c), an expense incurred under Subsection (c)(1) or (2) shall be apportioned in accordance with the terms of the reinsurance agreement as though the expense had been incurred by the ceding insurer.

(f) Nothing in this chapter shall be construed as authorizing the receiver, or other entity, to compel payment from a non-life reinsurer on the basis of estimated incurred but not reported losses or outstanding reserves, except outstanding reserves with respect to claims made pursuant to Section 443.255 and approved workers compensation claims filed under Section 443.252(d).

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.211 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(x), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(x), eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 193 (S.B. 1433), § 8, eff. Sept. 1, 2011.

V. T. C. A., Insurance Code § 443.211, TX INS § 443.211
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.212

§ 443.212. Recovery of Premiums Owed

Currentness

(a) An insured shall pay, either directly to the receiver or to any agent that has paid or is obligated to pay the receiver on behalf of the insured, any unpaid earned premium or retrospectively rated premium due the insurer based on the termination of coverage under Section 443.152. Premium on surety business is deemed earned at inception if a policy term cannot be determined. All other premium is deemed earned and is prorated equally over the determined policy term, regardless of any provision in the bond, guaranty, contract or other agreement.

(b) Any person, other than the insured, shall turn over to the receiver any unpaid premium due and owing as shown on the records of the insurer, including any amount representing commissions, for the full policy term due the insurer at the time of the entry of the receivership order, whether earned or unearned, based on the termination of coverage under Section 443. 152. The unpaid premium due the receiver from any person other than the insured excludes any premium not collected from the insured and not earned based on the termination of coverage under Section 443.152.

(c) Any person, other than the insured, responsible for the remittance of a premium, shall turn over to the receiver any unearned commission of the person based on the termination of coverage under Section 443.152. Credits, setoffs, or both may not be allowed to an agent, broker, premium finance company, or any other person for any amounts advanced to the insurer by the person on behalf of, but in the absence of a payment by, the insured, or for any other amount paid by the person to any other person after the entry of the order of receivership.

(d) Persons that collect premium or finance premium under a premium finance contract that is due the insurer in receivership are deemed to hold that premium in trust as fiduciaries for the benefit of the insurer and to have availed themselves of the laws of this state, regardless of any provision to the contrary in any agency contract or other agreement.

(e) Any premium finance company is obligated to pay any amounts due the insurer from premium finance contracts, whether the premium is earned or unearned. The receiver has the right to collect any unpaid financed premium directly from the premium finance company or directly from the insured that is a party to the premium finance contract.

(f) Upon satisfactory evidence of a violation of this section by a person other than an insured, the commissioner may pursue one or more of the following courses of action:

  (1) suspend, revoke, or refuse to renew the licenses of the offending party or parties; and

(2) impose:

(A) an administrative penalty under Chapter 84 of not more than $1,000 for each act in violation of this section by the party or parties; and

(B) any other sanction or penalty authorized by Chapter 82.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.212 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(y), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(y), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.212, TX INS § 443.212
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter E. Asset Recovery

V.T.C.A., Insurance Code § 443.213

§ 443.213. Administration of Deductible Agreements and Policyholder Collateral

Currentness

(a) Any collateral held to secure the obligations of a policyholder under a deductible agreement with an insurer subject to a delinquency proceeding under this chapter must be maintained and administered as provided in this section. For purposes of this section, a "deductible agreement" is any combination of one or more policies, endorsements, contracts, or security agreements that:

(1) provide for the policyholder to bear the risk of loss within a specified amount per claim or occurrence covered under a policy of insurance; and

(2) may be subject to an aggregate limit of policyholder reimbursement obligations.

(b) This section applies to any collateral described by Subsection (a), regardless of whether the collateral is held by, for the benefit of, or assigned to the insurer under a deductible agreement. The collateral shall be used to secure the policyholder's obligation to fund or reimburse claims payments within the agreed deductible amount, subject to this section.

(c) If the contract between the policyholder and the insurer allows the policyholder to fund claims within the deductible amount through a third-party administrator or otherwise, the receiver shall allow that funding arrangement to continue, except as prohibited by Title 5, Labor Code. [1] If a policyholder funds claims within the deductible amount, the receiver or any guaranty association has no obligation to pay claims for the amount funded by the policyholder, and the policyholder or its third-party administrator is not obligated to reimburse a guaranty association for any amount funded. A charge of any kind may not be made against a guaranty association based on the funding of claims payments by a policyholder under this subsection.

(d) If the receiver is holding collateral provided by a policyholder to secure both a deductible agreement and other obligations of the policyholder, the receiver shall:

(1) allocate the collateral among these obligations in accordance with the deductible agreement; or

(2) in the absence of an allocation provision in the deductible agreement and with the approval of the receivership court, allocate the collateral equitably among these obligations.

(e) If, under Subsection (d), the collateral secures reimbursement obligations under more than one line of insurance, the receiver shall equitably allocate the collateral among the various lines based on the estimated ultimate exposure within the deductible amount for each line.

(f) If a guaranty association is obligated to pay claims under a policy under Subsection (d), the receiver shall give notice to the guaranty associations of any allocation under this section.

(g) Once all claims covered by the collateral have been paid and the receiver is satisfied that no new claims may be presented, the receiver shall release any remaining collateral to the policyholder in accordance with the provisions of the contract and of this chapter.

(h) To the extent a guaranty association is required by applicable law to pay any claims for which the insurer would have been entitled to reimbursement from the policyholder, the following provisions apply:

(1) The receiver shall promptly invoice the policyholder for the reimbursement due under the agreement, and the policyholder is obligated to pay the amount invoiced to the receiver for the benefit of the guaranty associations that paid the claims. Neither the insolvency of the insurer nor the insurer's inability to perform any obligations under the deductible agreement is a defense to the policyholder's reimbursement obligation under the deductible agreement. At the time the policyholder reimbursements are collected, the receiver shall promptly forward those amounts to the guaranty association, based on the claims paid by the guaranty association that were subject to the deductible.

(2) If the collateral is insufficient to reimburse the guaranty association for claims paid within the deductible, the receiver shall use any existing collateral to make a partial reimbursement to the guaranty association, subject to any allocation under Subsection (d), (e), or (f). If more than one guaranty association has a claim against the same collateral, the receiver shall prorate payments to each guaranty association based on the amount of the claims each guaranty association has paid.

(3) The receiver is entitled to deduct from reimbursements owed to a guaranty association or collateral to be returned to a policyholder reasonable actual expenses incurred in fulfilling the receiver's responsibilities under this section. Expenses incurred to collect reimbursements for the benefit of a guaranty association are subject to the approval of the guaranty association. Any remaining expenses that are not deducted from the reimbursements are payable subject to Section 443.015.

(4) The receiver shall provide any affected guaranty associations with a complete accounting of the receiver's deductible billing and collection activities on a quarterly basis, or at other intervals as may be agreed to between the receiver and the guaranty associations. Accountings under this subdivision must include copies of the policyholder billings, the reimbursements collected, the available amounts and use of collateral for each account, and any prorating of payments.

(5) If the receiver fails to make a good faith effort to collect reimbursements due from a policyholder under a deductible agreement within 120 days of receipt of claims payment reports from a guaranty association, the guaranty association may, after notice to the receiver, collect the reimbursements that are due, and, in so doing, the guaranty association shall have the same rights and remedies as the receiver. A guaranty association shall report any amounts collected under this subdivision and expenses incurred in collecting those amounts to the receiver.

(6) The receiver shall periodically adjust the collateral held as the claims subject to the deductible agreement are paid, provided that adequate collateral is maintained. The receiver is not required to adjust the collateral more than once a year. The receiver shall inform the guaranty associations of all collateral reviews, including the basis for the adjustment.

(7) Reimbursements received or collected by a guaranty association under this section may not be considered a distribution of the insurer's assets. A guaranty association shall provide the receiver with an accounting of any amounts it has received or collected under this section and any expenses incurred in connection with that receipt or collection. The amounts received, net of any expenses incurred in connection with collection of the amounts, must be set off against the guaranty association's claim filed under Section 443.251 for the payments that were reimbursed.

(8) To the extent that a guaranty association pays a claim within the deductible amount that is not reimbursed by either the receiver or by policyholder payments, the guaranty association has a claim for those amounts in the delinquency proceeding in accordance with Section 443.251.

(9) Nothing in this section limits any rights of a guaranty association under applicable law to obtain reimbursement for claims payments made by the guaranty association under policies of the insurer or for the association's related expenses.

(i) If a claim that is subject to a deductible agreement and secured by collateral is not covered by any guaranty association, the following provisions apply:

(1) The receiver is entitled to retain as an asset of the estate any collateral or deductible reimbursements obtained by the receiver.

(2) If a policyholder fails to assume an obligation under a deductible agreement to pay a claim, the receiver shall use the collateral to adjust and pay the claim to the extent that the available collateral, after any allocation under Subsection (d), (e), or (f), is sufficient to pay all outstanding and anticipated claims within the deductible. If the collateral is exhausted and all reasonable means of collection against the insured have been exhausted, the remaining claims shall be subject to the provisions of Sections 443.251 and 443.301.

(3) The receiver is entitled to deduct from collateral reasonable actual expenses incurred in fulfilling the receiver's responsibilities under this section. Any remaining expenses that are not deducted from the reimbursements are payable subject to Section 443.015.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.213 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(E), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(E), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(z), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(z), eff. Sept. 1, 2007.

**Footnotes**

1      V.T.C.A., Labor Code § 401.001 et seq.

V. T. C. A., Insurance Code § 443.213, TX INS § 443.213

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter F. Claims

V.T.C.A., Insurance Code § 443.251

§ 443.251. Filing of Claims

Currentness

(a) Except as provided by this subsection, proof of all claims must be filed with the liquidator in the form required by Section 443.252 on or before the last day for filing specified in the notice required under Section 443.155, which date may not be later than 18 months after entry of the order of liquidation, unless the receivership court, for good cause shown, extends the time, except that proofs of claims for cash surrender values or other investment values in life insurance and annuities and for any other policies insuring the lives of persons need not be filed unless the liquidator expressly so requires. The receivership court, only upon application of the liquidator, may allow alternative procedures and requirements for the filing of proofs of claim or for allowing or proving claims. Upon application, if the receivership court dispenses with the requirements of filing a proof of claim by a person or a class or group of persons, a proof of claim for the person, class, or group is deemed to have been filed for all purposes, except that the receivership court's waiver of proof of claim requirements does not impact guaranty association proof of claim filing requirements or coverage determinations to the extent the guaranty fund statute or filing requirements are inconsistent with the receivership court's waiver of proof.

(b) The liquidator shall permit a claimant that makes a late filing to share ratably in distributions, whether past or future, as if the claim were not filed late, to the extent that the payment will not prejudice the orderly administration of the liquidation, under the following circumstances:

  (1) the eligibility to file a proof of claim was not known to the claimant, and the claimant filed a proof of claim not later than the 90th day after the date of first learning of the eligibility;

  (2) a transfer to a creditor was avoided under Section 443.202, 443.203, 443.204, or 443.206, or was voluntarily surrendered under Section 443.208, and the filing satisfies the conditions of Section 443.208; or

  (3) the valuation under Section 443.260, of security held by a secured creditor shows a deficiency, and the claim for the deficiency is filed not later than the 30th day after the valuation.

(c) The liquidator may petition the receivership court to set a date before which all late claims under Subsection (b) must be filed.

(d) The liquidator shall permit guaranty associations to file claims late and to receive a ratable share of distributions, whether past or future, as if the claims were not late.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.251 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(F), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(F), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(aa), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(aa), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.251, TX INS § 443.251

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter F. Claims

V.T.C.A., Insurance Code § 443.252

§ 443.252. Proof of Claim

Currentness

(a) Proof of claim consists of a statement signed by the claimant or on behalf of the claimant that includes all of the following, as applicable:

(1) the particulars of the claim, including the consideration given for it;

(2) the identity and amount of the security on the claim;

(3) the payments, if any, made on the debt;

(4) that the sum claimed is justly owing and that there is no setoff, counterclaim, or defense to the claim;

(5) any right of priority of payment or other specific right asserted by the claimant;

(6) the name and address of the claimant and the attorney, if any, who represents the claimant; and

(7) the claimant's social security or federal employer identification number.

(b) The liquidator may require that:

(1) a prescribed form be used; and

(2) other information and documents be included.

(c) At any time the liquidator may:

(1) require the claimant to present information or evidence supplementary to that required under Subsection (a); and

(2) take testimony under oath, require production of affidavits or depositions, or otherwise obtain additional information or evidence.

(d) Any guaranty association must be permitted to file a single omnibus proof of claim for all claims of the association in connection with payment of claims of the insurer. The omnibus proof of claim may be periodically updated by the association, and the association may be required to submit a reasonable amount of documentation in support of the claim. A guaranty association's claim under this subsection may include amounts for anticipated payments after the closing of the receivership including incurred but not reported claims.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.252 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(F), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(F), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.252, TX INS § 443.252
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

| | |
|---|---|
| **End of Document** | © 2025 Thomson Reuters. No claim to original U.S. Government Works. |

Vernon's Texas Statutes and Codes Annotated
    Insurance Code
        Title 4. Regulation of Solvency (Refs & Annos)
            Subtitle C. Delinquent Insurers
                Chapter 443. Insurer Receivership Act
                    Subchapter F. Claims

V.T.C.A., Insurance Code § 443.253

§ 443.253. Allowance of Claims

Currentness

(a) Except as provided in Subsections (i) and (l), the liquidator shall review all claims duly filed in the liquidation proceeding and shall further investigate as the liquidator considers necessary. Consistent with the provisions of this chapter, the liquidator may allow, disallow, or compromise the amount for which claims will be recommended to the receivership court, unless the liquidator is required by law to accept claims as settled by a person or organization, including a guaranty association, subject to any statutory or contractual rights of the affected reinsurers to participate in the claims allowance process. No claim under a policy of insurance may be allowed for an amount in excess of the applicable policy limits.

(b) Pursuant to the review, the liquidator shall provide written notice of the claim determination by any means authorized by Section 443.007 to the claimant or the claimant's attorney and may provide notice to any reinsurer that is or may be liable in respect of the claim. The notice must set forth the amount of the claim allowed by the liquidator, if any, and the priority class of the claim as established in Section 443.301.

(c) Not later than the 45th day after the mailing of the notice as set forth in Subsection (b), those noticed may submit written objections to the liquidator. Any submitted objections must clearly set out all facts and the legal basis, if any, for the objections and the reasons why the claim should be allowed at a different amount or in a different priority class. If no timely objection is filed, the determination is final.

(d) A claim that has not become mature as of the coverage termination date established under Section 443.201 because payment on the claim is not yet due may be allowed as if it were mature. A claim that is allowed under this subsection may be discounted to present value based upon a reasonable estimated date of the payment, if the liquidator determines that the present value of the payment is materially less than the amount of the payment.

(e) A judgment or order against an insured or the insurer entered after the date of the initial filing of a successful petition for receivership, or within 120 days before the initial filing of the petition, or a judgment or order against an insured or the insurer entered at any time by default or by collusion need not be considered as evidence of liability or of the amount of damages.

(f) Claims under employment contracts by directors, officers, or persons in fact performing similar functions or having similar powers are limited to payment for services rendered prior to any order of receivership, unless explicitly approved in writing by:

(1) the commissioner prior to an order of receivership;

(2) the rehabilitator before the entry of an order of liquidation; or

(3) the liquidator after the entry of an order of liquidation.

(g) The total liability of the insurer to all claimants arising out of the same act or policy may not be greater than the insurer's total liability would have been were the insurer not in liquidation.

(h) The liquidator shall disallow claims for de minimis amounts as determined by the receivership court as being reasonable and necessary for administrative convenience.

(i) A claim that does not contain all the applicable information required by Section 443.252 need not be further reviewed or adjudicated, and may be denied or disallowed by the liquidator subject to the notice and objection procedures in this section.

(j) The liquidator may reconsider a claim on the basis of additional information and amend the recommendation to the receivership court. The claimant must be afforded the same notice and opportunity to be heard on all changes in the recommendation as in its initial determination. The receivership court may amend its allowance or disallowance as appropriate.

(k) The liquidator is not required to process claims for any class until it appears reasonably likely that property will be available for a distribution to that class. If there are insufficient assets to justify processing all claims for any class listed in Section 443.301, the liquidator shall report the facts to the receivership court and make such recommendations as may be appropriate for handling the remainder of the claims.

(l) Any claim by a lessor for damages resulting from the termination of a lease of real property shall be disallowed to the extent that the claim exceeds:

(1) the rent reserved by the lease, without acceleration, for the longer of one year or 15 percent of the remaining term of the lease, not to exceed three years, following the earlier of:

(A) the date of the filing of the petition; or

(B) the date on which the lessor repossessed or the lessee surrendered the leased property; and

(2) any unpaid rent due under the lease, without acceleration, on the earlier of the dates described by Subdivision (1).

(m) If a claim is fully covered by a guaranty association, the liquidator has no obligation to process the claim in accordance with this section and may refuse to process the claim in accordance with this section.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.253 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(F), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(F), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(bb), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(bb), eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 193 (S.B. 1433), § 9, eff. Sept. 1, 2011.

V. T. C. A., Insurance Code § 443.253, TX INS § 443.253

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Insurance Code
      Title 4. Regulation of Solvency (Refs & Annos)
         Subtitle C. Delinquent Insurers
            Chapter 443. Insurer Receivership Act
               Subchapter F. Claims

V.T.C.A., Insurance Code § 443.254

§ 443.254. Claims Under Occurrence Policies, Surety Bonds, and Surety Undertakings

Currentness

(a) Subject to the provisions of Section 443.253, any insured has the right to file a claim for the protection afforded under the insured's policy, regardless of whether a claim is known at the time of filing, if the policy is an occurrence policy.

(b) Subject to the provisions of Section 443.253, an obligee under a surety bond or surety undertaking has the right to file a claim for the protection afforded under the surety bond or surety undertaking issued by the insurer under which the obligee is the beneficiary, regardless of whether a claim is known at the time of filing.

(c) After a claim is filed under Subsection (a) or (b), at the time that a specific claim is made by or against the insured or by the obligee, the insured or the obligee shall supplement the claim, and the receiver shall treat the claim as a contingent or unliquidated claim under Section 443.255.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.254 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(F), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(F), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(cc), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(cc), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.254, TX INS § 443.254
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter F. Claims

V.T.C.A., Insurance Code § 443.255

§ 443.255. Allowance of Contingent and Unliquidated Claims

Currentness

(a) A claim of an insured or third party may be allowed under Section 443.253, regardless of the fact that the claim was contingent or unliquidated, if any contingency is removed in accordance with Subsection (b) and the value of the claim is determined. For purposes of this section, a claim is contingent if:

(1) the accident, casualty, disaster, loss, event, or occurrence insured, reinsured, or bonded or reinsured against occurred on or before the date fixed under Section 443.151; and

(2) the act or event triggering the insurer's obligation to pay has not occurred as of the date fixed under Section 443.151.

(b) Unless the receivership court directs otherwise, a contingent claim may be allowed if the claimant has presented proof reasonably satisfactory to the liquidator of the insurer's obligation to pay or the claim was based on a cause of action against an insured of the insurer and:

(1) it may be reasonably inferred from proof presented upon the claim that the claimant would be able to obtain a judgment; and

(2) the person has furnished suitable proof, unless the receivership court for good cause shown otherwise directs, that no further valid claims can be made against the insurer arising out of the cause of action other than those already presented.

(c) The liquidator may petition the receivership court to set a date before which all claims under this section are final. In addition to the notice requirements of Section 443.007, the liquidator shall give notice of the filing of the petition to all claimants with claims that remain contingent or unliquidated under this section.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.255 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(F), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(F), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(dd), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(dd), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.255, TX INS § 443.255

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

	© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter F. Claims

V.T.C.A., Insurance Code § 443.256

§ 443.256. Special Provisions for Third-Party Claims

Currentness

(a) When any third party asserts a cause of action against an insured of an insurer in liquidation, the third party may file a claim with the liquidator on or before the last day for filing claims.

(b) Whether or not the third party files a claim, the insured may file a claim on the insured's own behalf in the liquidation.

(c) The liquidator may make recommendations to the receivership court for the allowance of an insured's claim after consideration of the probable outcome of any pending action against the insured on which the claim is based, the probable damages recoverable in the action, and the probable costs and expenses of defense. After allowance by the receivership court, the liquidator shall withhold any distribution payable on the claim, pending the outcome of litigation and negotiation between the insured and the third party. The liquidator may reconsider the claim as provided in Section 443.253(j). As claims against the insured are settled or barred, the insured or third party, as appropriate, shall be paid from the amount withheld the same percentage distribution as was paid on other claims of like priority, based on the lesser of the amount actually due from the insured by action or paid by agreement plus the reasonable costs and expense of defense, or the amount allowed on the claims by the receivership court. After all claims are settled or barred, any sum remaining from the amount withheld shall revert to the undistributed property of the insurer.

(d) If several claims founded upon one policy are timely filed under this section, whether by third parties or as claims by the insured, and the aggregate amount of the timely filed allowed claims exceeds the aggregate policy limits, the liquidator may:

(1) apportion the policy limits ratably among the timely filed allowed claims; or

(2) give notice to the insured, known third parties, and affected guaranty associations that the aggregate policy limits have been exceeded. On and after the 30th day after the date of the liquidator's notice, further amounts may not be allowed, the policy limits shall be apportioned ratably among the timely filed allowed claims, and any additional claims shall be rejected.

(e) Claims by the insured under Subsection (d) must be evaluated as described by Subsection (c). If any insured's claim is subsequently reduced under Subsection (c), the amount freed by the reduction must be apportioned ratably among the claims which have been reduced under Subsection (d).

(f) A claim may not be allowed under this section to the extent the claim is covered by any guaranty association.

(g) A claimant may withdraw a proof of claim with the liquidator's approval. The liquidator may approve the withdrawal only upon a showing of good cause and after giving notice of the withdrawal to the insured.

(h) The filing of a proof of claim in connection with a claim against an insured has the following effect on the rights of the claimant and the insured:

(1) By filing a proof of claim, a claimant waives any right to pursue the personal assets of the insured with respect to the claim, to the extent of the coverage or policy limits provided by the insurer, and agrees that to the extent of the coverage or policy limits provided by the insurer, the claimant will seek satisfaction of the claim against the insured solely from distributions paid by the liquidator on the claim and from any payments that a guaranty association may pay on account of the claim, except as provided in this section.

(2) The waiver provided under this section is conditioned upon the cooperation of the insured with the liquidator and any applicable guaranty association in the defense of the claim. The waiver provided under this section does not operate to:

(A) discharge the guaranty association from any of the association's responsibilities and duties;

(B) release the insured with respect to any claim in excess of the coverage or policy limits provided by the insurer or any other responsible party; or

(C) release the insured with respect to any claim by a guaranty association for reimbursement under the law applicable to the guaranty association.

(3) The waiver provided under this section is void if:

(A) a claimant withdraws the claimant's proof of claim under Subsection (g); or

(B) the liquidator avoids insurance coverage in connection with a proof of the claim.

(4) The liquidator shall provide, where applicable, notice of the election of remedies provision in this section on any proof of claim form the liquidator distributes. The notice must be inserted above the claimant's signature line in typeface not smaller than the typeface of the rest of the notice and, in any event not smaller than a 14-point font, and must include a statement substantially similar to the following: "I understand by filing this claim in the estate of the insurer I am waiving any right to pursue the personal assets of the insured to the extent that there are policy limits or coverage provided by the now insolvent insurer."

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.256 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(F), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(F), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(ee), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(ee), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.256, TX INS § 443.256

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter F. Claims

V.T.C.A., Insurance Code § 443.257

§ 443.257. Disputed Claims

Currentness

(a) When objections to the liquidator's proposed treatment of a claim are filed and the liquidator does not alter the determination of the claim as a result of the objections, the liquidator shall ask the receivership court for a hearing pursuant to Section 443.007.

(b) The provisions of this section are not applicable to disputes with respect to coverage determinations by a guaranty association as part of the association's statutory obligations.

(c) The final disposition by the receivership court of a disputed claim is deemed a final judgment for purposes of appeal.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.257 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(F), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(F), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(ff), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(ff), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.257, TX INS § 443.257
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter F. Claims

V.T.C.A., Insurance Code § 443.258

§ 443.258. Liquidator's Recommendations to Receivership Court

Currentness

The liquidator shall present to the receivership court, for approval, reports of claims settled or determined by the liquidator under Section 443.253. The reports must be presented from time to time as determined by the liquidator and must include information identifying the claim and the amount and priority class of the claim.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.258 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(F), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(F), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(gg), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(gg), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.258, TX INS § 443.258
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter F. Claims

V.T.C.A., Insurance Code § 443.259

§ 443.259. Claims of Codebtors

Currentness

If a creditor does not timely file a proof of the creditor's claim, an entity that is liable to the creditor together with the insurer, or that has secured the creditor, may file a proof of the claim.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.259 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(F), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(F), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.259, TX INS § 443.259
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter F. Claims

V.T.C.A., Insurance Code § 443.260

§ 443.260. Secured Creditors' Claims

Currentness

(a) The value of any security held by a secured creditor must be determined in one of the following ways:

(1) by converting the same into money according to the terms of the agreement pursuant to which the security was delivered to the creditor; or

(2) by agreement or litigation between the creditor and the liquidator.

(b) If a surety has paid any losses or loss adjustment expenses under its own surety instrument before any petition initiating a delinquency proceeding is filed and the principal to the instrument has posted collateral that remains available to reimburse the losses or loss adjustment expenses at the time the petition is filed and that collateral has not been credited against the payments made, then the receiver has the first priority to use the collateral to reimburse the surety for any pre-petition losses and expenses.

(c) If the principal under a surety bond or surety undertaking has pledged any collateral, including a guaranty or letter of credit, to secure the principal's reimbursement obligation to the insurer issuing the bond or undertaking, the claim of any obligee, or subject to the discretion of the receiver, of any completion contractor under the surety bond or surety undertaking must be satisfied first out of the collateral or its proceeds.

(d) In making any distribution to an obligee or completion contractor under Subsection (c), the receiver shall retain a sufficient reserve for any other potential claim against that collateral.

(e) If collateral is insufficient to satisfy in full all potential claims against it under Subsections (c) and (g), the claims against the collateral must be paid on a pro rata basis, and an obligee or completion contractor under Subsection (c) has a claim, subject to allowance under Section 443.253, for any deficiency.

(f) If the time to assert claims against a surety bond or a surety undertaking has expired, and all claims described by this section have been satisfied in full, any remaining collateral pledged under the surety bond or surety undertaking must be returned to the principal under the bond or undertaking.

(g) To the extent that a guaranty association has made a payment relating to a claim against a surety bond, the guaranty association shall first be reimbursed for that payment and related expenses out of the available collateral or proceeds related to the surety bond. To the extent that the collateral is sufficient, the guaranty association shall be reimbursed 100 percent of its payment. If the collateral is insufficient to satisfy in full all potential claims against the collateral under Subsection (c) and this subsection, a guaranty association that has paid claims on the surety bond is entitled to a pro rata share of the available collateral in accordance with Subsection (e), and the guaranty association has claims against the general assets of the estate in accordance with Section 443.253 for any deficiency. Any payment made to a guaranty association under this subsection from collateral may not be deemed early access or otherwise deemed a distribution out of the general assets or property of the estate, and the guaranty association receiving payment shall subtract any payment from the collateral from the association's final claims against the estate.

(h) An amount determined under Subsection (a) shall be credited upon the secured claim, and the claimant may file a proof of claim, subject to all other provisions of this chapter for any deficiency, which must be treated as an unsecured claim. If the claimant surrenders the claimant's security to the liquidator, the entire claim is treated as if unsecured.

(i) The liquidator may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving or disposing of the property to the extent of any benefit to the holder of such claim.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.260 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(F), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(F), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(hh), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(hh), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.260, TX INS § 443.260
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter F. Claims

V.T.C.A., Insurance Code § 443.261

§ 443.261. Qualified Financial Contracts

Currentness

(a) Notwithstanding any other provision of this chapter, including any other provision of this chapter permitting the modification of contracts, or other law of this state, a person may not be stayed or prohibited from exercising:

(1) a contractual right to terminate, liquidate, or close out any netting agreement or qualified financial contract with an insurer because of:

(A) the insolvency, financial condition, or default of the insurer at any time, provided that the right is enforceable under applicable law other than this chapter; or

(B) the commencement of a formal delinquency proceeding under this chapter;

(2) any right under a pledge, security, collateral, or guarantee agreement, or any other similar security arrangement or credit support document, relating to a netting agreement or qualified financial contract; or

(3) subject to any provision of Section 443.209(b), any right to set off or net out any termination value, payment amount, or other transfer obligation arising under or in connection with a netting agreement or qualified financial contract where the counterparty or its guarantor is organized under the laws of the United States or a state or foreign jurisdiction approved by the Securities Valuation Office of the National Association of Insurance Commissioners as eligible for netting.

(b) Upon termination of a netting agreement, the net or settlement amount, if any, owed by a nondefaulting party to an insurer against which an application or petition has been filed under this chapter shall be transferred to, or on the order of the receiver for, the insurer, even if the insurer is the defaulting party and notwithstanding any provision in the netting agreement that may provide that the nondefaulting party is not required to pay any net or settlement amount due to the defaulting party upon termination. Any limited two-way payment provision in a netting agreement with an insurer that has defaulted is deemed to be a full two-way payment provision as against the defaulting insurer. Any such property or amount is, except to the extent it is subject to one or more secondary liens or encumbrances, a general asset of the insurer.

(c) In making any transfer of a netting agreement or qualified financial contract of an insurer subject to a proceeding under this chapter, the receiver shall either:

(1) transfer to one party, other than an insurer subject to a proceeding under this chapter, all netting agreements and qualified financial contracts between a counterparty or any affiliate of the counterparty and the insurer that is the subject of the proceeding, including:

(A) all rights and obligations of each party under each netting agreement and qualified financial contract; and

(B) all property, including any guarantees or credit support documents, securing any claims of each party under each netting agreement and qualified financial contract; or

(2) transfer none of the netting agreements, qualified financial contracts, rights, obligations, or property referred to in Subdivision (1), with respect to the counterparty and any affiliate of the counterparty.

(d) If a receiver for an insurer makes a transfer of one or more netting agreements or qualified financial contracts, the receiver shall use its best efforts to notify any person who is party to the netting agreements or qualified financial contracts of the transfer not later than noon, the receiver's local time, on the business day following the transfer. For purposes of this subsection, "business day" means a day other than a Saturday, a Sunday, or any day on which either the New York Stock Exchange or the Federal Reserve Bank of New York is closed.

(e) Notwithstanding any other provision of this chapter, a receiver may not avoid a transfer of money or other property arising under or in connection with a netting agreement or qualified financial contract, or any pledge, security, or collateral or guarantee agreement or any other similar security arrangement or credit support document relating to a netting agreement or qualified financial contract, that is made before the commencement of a formal delinquency proceeding under this chapter. However, a transfer may be avoided under Section 443.205(a) if the transfer was made with actual intent to hinder, delay, or defraud the insurer, a receiver appointed for the insurer, or existing or future creditors.

(f) In exercising any of the receiver's powers under this chapter to disaffirm or repudiate a netting agreement or qualified financial contract, the receiver shall take action with respect to each netting agreement or qualified financial contract and all transactions entered into in connection with the agreement or contract in its entirety. Notwithstanding any other provision of this chapter, any claim of a counterparty against the estate arising from the receiver's disaffirmance or repudiation of a netting agreement or qualified financial contract that has not been previously affirmed in the liquidation or immediately preceding rehabilitation case must be determined and must be allowed or disallowed as if the claim had arisen before the date of the filing of the petition for liquidation or, if a rehabilitation proceeding is converted to a liquidation proceeding, as if the claim had arisen before the date of the filing of the petition for rehabilitation. The amount of the claim must be the actual direct compensatory damages determined as of the date of the disaffirmance or repudiation of the netting agreement or qualified financial contract. For purposes of this subsection, the term "actual direct compensatory damages" does not include punitive or exemplary damages, damages for lost profit or lost opportunity, or damages for pain and suffering but does include normal and reasonable costs of cover or other reasonable measures of damages utilized in the derivatives market for the contract and agreement claims.

(g) For purposes of this section, the term "contractual right" includes any right, whether or not evidenced in writing, arising under:

(1) statutory or common law;

(2) a rule or bylaw of a national securities exchange, national securities clearing organization, or securities clearing agency;

(3) a rule, bylaw, or resolution of the governing body of a contract market or its clearing organization; or

(4) law merchant.

(h) The provisions of this section do not apply to persons who are affiliates of the insurer that is the subject of the proceeding.

(i) All rights of counterparties under this chapter apply to netting agreements and qualified financial contracts entered into on behalf of the general account or separate accounts if the assets of each separate account are available only to counterparties to netting agreements and qualified financial contracts entered into on behalf of that separate account.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.261 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(F), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(F), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(ii), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(ii), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.261, TX INS § 443.261
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

Vernon's Texas Statutes and Codes Annotated
    Insurance Code
      Title 4. Regulation of Solvency (Refs & Annos)
        Subtitle C. Delinquent Insurers
          Chapter 443. Insurer Receivership Act
            Subchapter G. Distributions

V.T.C.A., Insurance Code § 443.301

§ 443.301. Priority of Distribution

Currentness

The priority of payment of distributions on unsecured claims must be in accordance with the order in which each class of claims is set forth in this section. Every claim in each class shall be paid in full, or adequate funds retained for their payment, before the members of the next class receive payment, and all claims within a class must be paid substantially the same percentage of the amount of the claim. Except as provided by Subsections (a)(2), (a)(3), (i), and (k), subclasses may not be established within a class. No claim by a shareholder, policyholder, or other creditor shall be permitted to circumvent the priority classes through the use of equitable remedies. The order of distribution of claims shall be:

(a) Class 1. (1) The costs and expenses of administration expressly approved or ratified by the liquidator, including the following:

(A) the actual and necessary costs of preserving or recovering the property of the insurer;

(B) reasonable compensation for all services rendered on behalf of the administrative supervisor or receiver;

(C) any necessary filing fees;

(D) the fees and mileage payable to witnesses;

(E) unsecured loans obtained by the receiver; and

(F) expenses, if any, approved by the rehabilitator of the insurer and incurred in the course of the rehabilitation that are unpaid at the time of the entry of the order of liquidation.

(2) The reasonable expenses of a guaranty association, including overhead, salaries and other general administrative expenses allocable to the receivership to include administrative and claims handling expenses and expenses in connection with arrangements for ongoing coverage, other than expenses incurred in the performance of duties under Section 462.002(3), 463.108, 463.111, 463.113, 463.353, or 2602.113 or similar duties under the statute governing a similar organization in another state. In the case of the Texas Property and Casualty Insurance Guaranty Association and other property and casualty guaranty associations, the expenses shall include loss adjustment expenses, including adjusting and other expenses and defense and

cost containment expenses. In the event that there are insufficient assets to pay all of the costs and expenses of administration under Subsection (a)(1) and the expenses of a guaranty association, the costs and expenses under Subsection (a)(1) shall have priority over the expenses of a guaranty association. In this event, the expenses of a guaranty association shall be paid on a pro rata basis after the payment of costs and expenses under Subsection (a)(1) in full.

(3) For purposes of Subsection (a)(1)(E), any unsecured loan obtained by the receiver, unless by its terms it otherwise provides, has priority over all other costs of administration. Absent agreement to the contrary, all claims in this subclass share pro rata.

(4) Except as expressly approved by the receiver, any expenses arising from a duty to indemnify the directors, officers, or employees of the insurer are excluded from this class and, if allowed, are Class 5 claims.

(b) Class 2. (1) All claims under policies of insurance, including third-party claims; claims under annuity contracts, including funding agreements, guaranteed investment contracts, and synthetic guaranteed investment contracts; claims under nonassessable policies for unearned premium; claims of obligees and, subject to the discretion of the receiver, completion contractors, under surety bonds and surety undertakings other than bail bonds, mortgage or financial guaranties, or other forms of insurance offering protection against investment risk; claims by principals under surety bonds and surety undertakings for wrongful dissipation of collateral by the insurer or its agents; and claims incurred during the extension of coverage provided for in Section 443.152. For purposes of this subdivision, "annuity contract," "funding agreement," "guaranteed investment contract," and "synthetic guaranteed investment contract" have the meanings assigned by Section 1154.003.

(2) All other claims incurred in fulfilling the statutory obligations of a guaranty association not included in Class 1, including indemnity payments on covered claims and, in the case of the Life, Accident, Health, and Hospital Service Insurance Guaranty Association or another life and health guaranty association, all claims as a creditor of the impaired or insolvent insurer for all payments of and liabilities incurred on behalf of covered claims or covered obligations of the insurer and for the funds needed to reinsure those obligations with a solvent insurer.

(3) Claims for benefits under a health care plan issued by a health maintenance organization.

(4) Claims under insurance policies or contracts for benefits issued by an unauthorized insurer.

(5) Notwithstanding any provision of this chapter, the following claims are excluded from Class 2 priority:

(A) obligations of the insolvent insurer arising out of reinsurance contracts;

(B) obligations, excluding unearned premium claims on policies other than reinsurance agreements, incurred after:

(i) the expiration date of the insurance policy;

(ii) the policy has been replaced by the insured or canceled at the insured's request; or

(iii) the policy has been canceled as provided by this chapter;

(C) obligations to insurers, insurance pools, or underwriting associations and their claims for contribution, indemnity, or subrogation, equitable or otherwise;

(D) any claim that is in excess of any applicable limits provided in the insurance policy issued by the insurer;

(E) any amount accrued as punitive or exemplary damages unless expressly covered under the terms of the policy;

(F) tort claims of any kind against the insurer and claims against the insurer for bad faith or wrongful settlement practices; and

(G) claims of the guaranty associations for assessments not paid by the insurer, which must be paid as claims in Class 5.

(c) Class 3. Claims of the federal government not included in Class 2.

(d) Class 4. Debts due employees for services or benefits to the extent that the debts do not exceed $5,000 or two months salary, whichever is the lesser, and represent payment for services performed within one year before the entry of the initial order of receivership. This priority is in lieu of any other similar priority that may be authorized by law as to wages or compensation of employees.

(e) Class 5. Claims of other unsecured creditors not included in Classes 1 through 4, including claims under reinsurance contracts, claims of guaranty associations for assessments not paid by the insurer, and other claims excluded from Class 2.

(f) Class 6. Claims of any state or local governments, except those specifically classified elsewhere in this section. Claims of attorneys for fees and expenses owed them by an insurer for services rendered in opposing a formal delinquency proceeding. In order to prove the claim, the claimant must show that the insurer that is the subject of the delinquency proceeding incurred the fees and expenses based on its best knowledge, information, and belief, formed after reasonable inquiry, indicating opposition was in the best interests of the insurer, was well grounded in fact, and was warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that opposition was not pursued for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of the litigation.

(g) Class 7. Claims of any state or local government for a penalty or forfeiture, but only to the extent of the pecuniary loss sustained from the act, transaction, or proceeding out of which the penalty or forfeiture arose, with reasonable and actual costs occasioned thereby. The balance of the claims must be treated as Class 9 claims under Subsection (i).

(h) Class 8. Except as provided in Sections 443.251(b) and (d), late filed claims that would otherwise be classified in Classes 2 through 7.

(i) Class 9. Surplus notes, capital notes or contribution notes or similar obligations, premium refunds on assessable policies, and any other claims specifically assigned to this class. Claims in this class are subject to any subordination agreements related to other claims in this class that existed before the entry of the liquidation order.

(j) Class 10. Interest on allowed claims of Classes 1 through 9, according to the terms of a plan proposed by the liquidator and approved by the receivership court.

(k) Class 11. Claims of shareholders or other owners arising out of their capacity as shareholders or other owners, or any other capacity, except as they may be qualified in Class 2, 5, or 10. Claims in this class are subject to any subordination agreements related to other claims in this class that existed before the entry of the liquidation order.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.301 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(G), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(G), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(jj), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(jj), eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 193 (S.B. 1433), § 10, eff. Sept. 1, 2011; Acts 2015, 84th Leg., ch. 1187 (S.B. 1196), § 1, eff. Sept. 1, 2015.

V. T. C. A., Insurance Code § 443.301, TX INS § 443.301

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Insurance Code
        Title 4. Regulation of Solvency (Refs & Annos)
            Subtitle C. Delinquent Insurers
                Chapter 443. Insurer Receivership Act
                    Subchapter G. Distributions

V.T.C.A., Insurance Code § 443.302

§ 443.302. Partial and Final Distributions of Assets

Currentness

(a) With the approval of the receivership court, the liquidator may declare and pay one or more distributions to claimants whose claims have been allowed. Distributions paid under this subsection must be paid at substantially the same percentage of the amount of the claim.

(b) In determining the percentage of distributions to be paid on these claims, the liquidator may consider the estimated value of the insurer's property, including estimated reinsurance recoverables in connection with the insurer's estimated liabilities for unpaid losses and loss expenses and for incurred but not reported losses and loss expenses, and the estimated value of the insurer's liabilities, including estimated liabilities for unpaid losses and loss expenses and for incurred but not reported losses and loss expenses.

(c) Distribution of property in kind may be made at valuations set by agreement between the liquidator and the creditor and approved by the receivership court.

(d) Notwithstanding the provisions of Subsection (a) and Subchapter D, [1] the liquidator is authorized to pay benefits under a workers' compensation policy after the entry of the liquidation order if:

(1) the insurer has accepted liability and no bona fide dispute exists;

(2) payments under the policy commenced before the entry of the liquidation order; and

(3) future or past indemnity or medical payments are due under the policy.

(e) Claim payments made under Subsection (d) may continue until the date that a guaranty association assumes responsibility for claim payments under the policy.

(f) Any claim payments made under Subsection (d) and any related expenses must be treated as early access payments under Section 443.303 to the guaranty association responsible for the claims.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.302 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(G), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(G), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(kk), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(kk), eff. Sept. 1, 2007.

---

**Footnotes**

1        V.T.C.A., Insurance Code § 443.151 et seq.

V. T. C. A., Insurance Code § 443.302, TX INS § 443.302

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter G. Distributions

V.T.C.A., Insurance Code § 443.303

§ 443.303. Early Access Payments

Currentness

(a) For purposes of this section, "distributable assets" means all general assets of the liquidation estate less:

(1) amounts reserved, to the extent necessary and appropriate, for the entire Section 443.301(a) expenses of the liquidation through and after its closure; and

(2) to the extent necessary and appropriate, reserves for distributions on claims other than those of the guaranty associations falling within the priority classes of claims established in Section 443.301(b).

(b) Early access payments to guaranty associations must be made as soon as possible after the entry of a liquidation order and as frequently as possible after the entry of the order, but at least annually if distributable assets are available to be distributed to the guaranty associations, and must be in amounts consistent with this section. Amounts advanced to an affected guaranty association pursuant to this section shall be accounted for as advances against distributions to be made under Section 443.302. Where sufficient distributable assets are available, amounts advanced are not limited to the claims and expenses paid to date by the guaranty associations; however, the liquidator may not distribute distributable assets to the guaranty associations in excess of the anticipated entire claims of the guaranty associations falling within the priority classes of claims established in Sections 443.301(a) and (b).

(c) Within 120 days after the entry of an order of liquidation by the receivership court, and at least annually after the entry of the order, the liquidator shall apply to the receivership court for approval to make early access payments out of the general assets of the insurer to any guaranty associations having obligations arising in connection with the liquidation or shall report that there are no distributable assets at that time based on financial reporting as required in Section 443.016. The liquidator may apply to the receivership court for approval to make early access payments more frequently than annually based on additional information or the recovery of material assets.

(d) Within 60 days after approval by the receivership court of the applications in Subsection (c), the liquidator shall make any early access payments to the affected guaranty associations as indicated in the approved application.

(e) Notice of each application for early access payments, or of any report required pursuant to this section, must be given in accordance with Section 443.007 to the guaranty associations that may have obligations arising from the liquidation. Notwithstanding the provisions of Section 443.007, the liquidator shall provide these guaranty associations with at least 30 days'

actual notice of the filing of the application and with a complete copy of the application prior to any action by the receivership court. Any guaranty association that may have obligations arising in connection with the liquidation has:

(1) the right to request additional information from the liquidator, who may not unreasonably deny such request; and

(2) the right to object as provided by Section 443.007 to any part of each application or to any report filed by the liquidator pursuant to this section.

(f) In each application regarding early access payments, the liquidator shall, based on the best information available to the liquidator at the time, provide, at a minimum, the following:

(1) to the extent necessary and appropriate, the amount reserved for the entire expenses of the liquidation through and after its closure and for distributions on claims falling within the priority classes of claims established in Sections 443.301(b) and (c);

(2) the computation of distributable assets and the amount and method of equitable allocation of early access payments to each of the guaranty associations; and

(3) the most recent financial information filed with the National Association of Insurance Commissioners by the liquidator.

(g) Each guaranty association that receives any payments pursuant to this section agrees, upon depositing the payment in any account to its benefit, to return to the liquidator any amount of these payments that may be required to pay claims of secured creditors and claims falling within the priority classes of claims established in Section 443.301(a), (b), or (c). No bond may be required of any guaranty association.

(h) Nothing in this section affects the method by which a guaranty association determines the association's statutory coverage obligations.

(i) Without the consent of the affected guaranty associations or an order of the receivership court, the liquidator may not offset the amount to be dispersed to any guaranty association by the amount of any specific deposit or any other statutory deposit or asset of the insolvent insurer held in that state unless the association has actually received the deposit.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.303 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(G), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(G), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(ll), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(ll), eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 193 (S.B. 1433), § 11, eff. Sept. 1, 2011.

V. T. C. A., Insurance Code § 443.303, TX INS § 443.303
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
Insurance Code
Title 4. Regulation of Solvency (Refs & Annos)
Subtitle C. Delinquent Insurers
Chapter 443. Insurer Receivership Act
Subchapter G. Distributions

V.T.C.A., Insurance Code § 443.304

§ 443.304. Unclaimed and Withheld Funds

Currentness

(a) If any funds of the receivership estate remain unclaimed after the final distribution under Section 443.302, the funds must be placed in a segregated unclaimed funds account held by the commissioner. If the owner of any of the unclaimed funds presents proof of ownership satisfactory to the commissioner before the second anniversary of the date of the termination of the delinquency proceeding, the commissioner shall remit the funds to the owner. The interest earned on funds held in the unclaimed funds account may be used to pay any administrative costs related to the handling or return of unclaimed funds.

(b) If any amounts held in the unclaimed funds account remain unclaimed on or after the second anniversary of the date of the termination of the delinquency proceeding, the commissioner may file a motion for an order directing the disposition of the funds in the court in which the delinquency proceeding was pending. Any costs incurred in connection with the motion may be paid from the unclaimed funds account. The motion shall identify the name of the insurer, the names and last known addresses of the persons entitled to the unclaimed funds, if known, and the amount of the funds. Notice of the motion shall be given as directed by the court. Upon a finding by the court that the funds have not been claimed before the second anniversary of the date of the termination of the delinquency proceeding, the court shall order that any claims for unclaimed funds and any interest earned on the unclaimed funds that has not been expended under Subsection (a) are abandoned and that the funds must be disbursed under one of the following methods:

(1) the amounts may be deposited in the general receivership expense account under Subsection (c);

(2) the amounts may be transferred to the comptroller, and deposited into the general revenue fund; or

(3) the amounts may be used to reopen the receivership in accordance with Section 443.353 and be distributed to the known claimants with approved claims.

(c) The commissioner may establish an account for the following purposes:

(1) to pay general expenses related to the administration of receiverships; and

(2) to advance funds to any receivership that does not have sufficient cash to pay its operating expenses.

(d) Any advance to a receivership under Subsection (c)(2) may be treated as a claim under Section 443.301 as agreed at the time the advance is made or, in the absence of an agreement, in the priority determined to be appropriate by the court.

(e) If the commissioner determines at any time that the funds in the account exceed the amount required, the commissioner may transfer the funds or any part of the funds to the comptroller, and the transferred funds must be deposited into the general revenue fund.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.304 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(G), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(G), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(mm), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(mm), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.304, TX INS § 443.304

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter H. Discharge

V.T.C.A., Insurance Code § 443.351

§ 443.351. Condition on Release from Delinquency Proceedings

Currentness

Until all payments of or on account of the insurer's contractual obligations by all guaranty associations, along with all expenses of the obligations and interest on all the payments and expenses, are repaid to the guaranty associations, unless otherwise provided in a plan approved by the guaranty association, an insurer that is subject to any formal delinquency proceedings may not:

(1) solicit or accept new business or request or accept the restoration of any suspended or revoked license or certificate of authority;

(2) be returned to the control of its shareholders or private management; or

(3) have any of its assets returned to the control of its shareholders or private management.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.351 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(H), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(H), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.351, TX INS § 443.351
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter H. Discharge

V.T.C.A., Insurance Code § 443.352

§ 443.352. Termination of Liquidation Proceedings

Currentness

When all property justifying the expense of collection and distribution has been collected and distributed under this chapter, the liquidator shall apply to the receivership court for an order discharging the liquidator and terminating the proceeding. The receivership court may grant the application and make any other orders, including orders to transfer any remaining funds that are uneconomic to distribute, or pursuant to Section 443.302(c), assign any assets that remain unliquidated, including claims and causes of action, as may be deemed appropriate.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.352 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(H), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(H), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(nn), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(nn), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.352, TX INS § 443.352
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter H. Discharge

V.T.C.A., Insurance Code § 443.353

§ 443.353. Reopening Receivership

[Currentness](#)

After the liquidation proceeding has been terminated and the liquidator discharged, the commissioner or other interested party may at any time petition the court to reopen the delinquency proceeding for good cause, including the discovery of additional property. If the court is satisfied that there is justification for reopening, it shall so order.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.353 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(H), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(H), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.353, TX INS § 443.353
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter H. Discharge

V.T.C.A., Insurance Code § 443.354

§ 443.354. Disposition of Records During and After Termination of Receivership

Currentness

(a) When it appears to the receiver that the records of the insurer in receivership are no longer useful, the receiver may recommend to the receivership court and the receivership court shall direct what records should be destroyed.

(b) If the receiver determines that any records should be maintained after the closing of the delinquency proceeding, the receiver may reserve property from the receivership estate for the maintenance of the records, and any amounts so retained are administrative expenses of the estate under Section 443.301(a). Any records retained pursuant to this subsection must be transferred to the custody of the commissioner, and the commissioner may retain or dispose of the records as appropriate, at the commissioner's discretion. Any records of a delinquent insurer that are transferred to the commissioner may not be considered records of the department for any purposes, and Chapter 552, Government Code, does not apply to those records.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.354 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(H), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(H), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(oo), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(oo), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.354, TX INS § 443.354
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter H. Discharge

V.T.C.A., Insurance Code § 443.355

§ 443.355. External Audit of the Receiver's Books

Currentness

(a) The receivership court may, as it deems desirable, order audits to be made of the books of the receiver relating to any receivership established under this chapter. A report of each audit shall be filed with the commissioner and with the receivership court.

(b) The books, records, and other documents of the receivership must be made available to the auditor at any time without notice.

(c) The expense of each audit shall be considered a cost of administration of the receivership.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.355 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(H), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(H), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.355, TX INS § 443.355
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Insurance Code
        Title 4. Regulation of Solvency (Refs & Annos)
            Subtitle C. Delinquent Insurers
                Chapter 443. Insurer Receivership Act
                    Subchapter I. Interstate Relations

V.T.C.A., Insurance Code § 443.401

§ 443.401. Ancillary Conservation of Foreign Insurers

Currentness

(a) The commissioner may initiate an action against a foreign insurer pursuant to Section 443.051 on any of the grounds stated in that section or on the basis that:

(1) any of the foreign insurer's property has been sequestered, garnished, or seized by official action in its domiciliary state or in any other state;

(2) the foreign insurer's certificate of authority to do business in this state has been revoked or was never issued and there are residents of this state with unpaid claims or in-force policies; or

(3) initiation of the action is necessary to enforce a stay under Section 462.309, 463.404, or 2602.259.

(b) If a domiciliary receiver has been appointed, the commissioner may initiate an action against a foreign insurer under Subsection (a)(1) or (a)(2) only with the consent of the domiciliary receiver.

(c) An order entered pursuant to this section must appoint the commissioner as conservator. The conservator's title to assets must be limited to the insurer's property and records located in this state.

(d) Notwithstanding Section 443.201(c), the conservator shall hold and conserve the assets located in this state until the commissioner in the insurer's domiciliary state is appointed its receiver or until an order terminating conservation is entered under Subsection (g). Once a domiciliary receiver is appointed, the conservator shall turn over to the domiciliary receiver all property subject to an order under this section.

(e) The conservator may liquidate property of the insurer as necessary to cover the costs incurred in the initiation or administration of a proceeding under this section.

(f) The court in which an action under this section is pending may issue a finding of insolvency or an ancillary liquidation order. The court may enter an ancillary liquidation order only for the limited purposes of:

(1) liquidating assets in this state to pay costs under Subsection (e); or

(2) activating relevant laws applicable to guaranty associations to pay valid claims that are not being paid by the insurer.

(g) The conservator may at any time petition the receivership court for an order terminating an order entered under this section.

**Credits**

Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.401 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(I), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(I), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(pp), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(pp), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.401, TX INS § 443.401

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 4. Regulation of Solvency (Refs & Annos)
      Subtitle C. Delinquent Insurers
        Chapter 443. Insurer Receivership Act
          Subchapter I. Interstate Relations

V.T.C.A., Insurance Code § 443.402

§ 443.402. Domiciliary Receivers Appointed in Other States

Currentness

(a) A domiciliary receiver appointed in another state is vested by operation of law with title to, and may summarily take possession of, all property and records of the insurer in this state. Notwithstanding any other provision of law regarding special deposits, special deposits held in this state shall be, upon the entry of an order of liquidation with a finding of insolvency, distributed to the guaranty associations in this state as early access payments subject to Section 443.303, in relation to the lines of business for which the special deposits were made. The holder of any special deposit shall account to the domiciliary receiver for all distributions from the special deposit at the time of the distribution. The statutory provisions of another state and all orders entered by courts of competent jurisdiction in relation to the appointment of a domiciliary receiver of an insurer and any related proceedings in another state must be given full faith and credit in this state. For purposes of this section, "another state" means any state other than this state. This state shall treat any other state than this state as a reciprocal state.

(b) Upon appointment of a domiciliary receiver in another state, the commissioner shall, unless otherwise agreed by the receiver, immediately transfer title to and possession of all property of the insurer under the commissioner's control, including all statutory general or special deposits, to the receiver.

(c) Except as provided in Subsection (a), the domiciliary receiver shall handle special deposits and special deposit claims in accordance with federal law and the statutes pursuant to which the special deposits are required. All amounts in excess of the estimated amount necessary to administer the special deposit and pay the unpaid special deposit claims are deemed general assets of the estate. If there is a deficiency in any special deposit so that the claims secured by the special deposit are not fully discharged from the deposit, the claimants may share in the general assets of the insurer to the extent of the deficiency at the same priority as other claimants in their class of priority under Section 443.301, but the sharing must be deferred until the other claimants of their class have been paid percentages of their claims equal to the percentage paid from the special deposit. The intent of this provision is to equalize to this extent the advantage gained by the security provided by the special deposits.

**Credits**
Added by Acts 2005, 79th Leg., ch. 995, § 1, eff. Sept. 1, 2005. Redesignated from V.A.T.S. Insurance Code, art. 21A.402 by Acts 2007, 80th Leg., ch. 730, § 3B.004(a)(1)(I), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(a)(1)(I), eff. Sept. 1, 2007. Amended by Acts 2007, 80th Leg., ch. 730, § 3B.004(qq), eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 921, § 9.004(qq), eff. Sept. 1, 2007.

V. T. C. A., Insurance Code § 443.402, TX INS § 443.402

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.


KeyCite Yellow Flag

Proposed Regulation

Texas Administrative Code
 Title 28. Insurance
  Part 1. Texas Department of Insurance
   Chapter 7. Corporate and Financial Regulation
    Subchapter B. Insurance Holding Company Systems

28 TAC § 7.212

§ 7.212. Form D

[Currentness](#)

(a) Prior notice of a transaction. Prior notice of a transaction is required as follows.

**Figure: 28 TAC §7.212(a)**

Filed with the Texas Department of Insurance

by

_____
Name of Applicant

On behalf of the following Insurance Companies:

Name             Address

_____

_____

_____

_____

Date:_____, 20_____.

Name, title, address, email, and telephone number of individual to whom notices and

correspondence concerning this statement should be addressed:

_____

_____

_____

(b) Identity of parties to transaction. Furnish the following information for each of the parties to the transaction:

    (1) name;

    (2) home office address;

    (3) principal executive office address;

    (4) the organizational structure, i.e. corporation, partnership, individual, trust, etc.;

(5) a description of the nature of the parties' business operations;

(6) relationship, if any, of other parties to the transaction to the insurer filing the notice, including any ownership or debtor/creditor interest by any other parties to the transaction in the insurer seeking approval, or by the insurer filing the notice in the affiliated parties;

(7) where the transaction is with a non-affiliate, the name(s) of the affiliate(s) which will receive, in whole or in substantial part, the proceeds of the transaction.

(c) Description of the transaction. Furnish the following information for each transaction for which notice is given:

(1) a statement identifying the statute under which the transaction is filed;

(2) a statement of the nature of the transaction and the reasons for entering into or changing the transaction;

(3) a statement of how the transaction complies with Insurance Code § 823.101;

(4) the proposed effective date of the transaction; and

(5) the financial impact of the transaction on the domestic insurer.

(d) Sales, purchases, exchanges, loans, extensions of credit, guarantees or investments.

(1) Furnish a brief description of the amount and source of funds, securities, property, or other consideration for the sale, purchase, exchange, loan, extension of credit, guarantee, or investment, whether any provision exists for purchase by the insurer filing notice, by any party to the transaction, or by any affiliate of the insurer filing notice, a description of the terms of any securities being received, if any, and a description of any other agreements relating to the transaction such as contracts or agreements for services, consulting agreements, and the like. If the transaction involves other than cash, furnish a description of the consideration, its cost, and its fair market value, together with an explanation of the basis for evaluation.

(2) If the transaction involves a loan, extension of credit or a guarantee, furnish a description of the maximum amount the insurer will be obligated to make available under the loan, extension of credit, or guarantee, the date on which the credit or guarantee will terminate, and any provisions for the accrual of or deferral of interest.

(3) If the transaction involves an investment, guarantee, or other arrangement, state the period during which the investment, guarantee, or other arrangement will remain in effect, together with any provisions for extensions or renewals of the investments, guarantees, or arrangements. Furnish a brief statement as to the effect of the transaction upon the insurer's surplus.

(e) Loans or extensions of credit to a non-affiliate. If the transaction involves a loan or extension of credit to any person who is not an affiliate, furnish a brief description of the agreement or understanding through which the proceeds of the proposed transaction, in whole or in substantial part, are to be used to make loans or extensions of credit to, purchase the assets of, or make investments in, any affiliate of the insurer making loans or extensions of credit, and specify in what manner the proceeds are to be used to loan to, extend credit to, purchase assets of, or make investments in any affiliate. Describe the amount and source of funds, securities, property, or other consideration for the loan or extension of credit and, if the transaction is one involving consideration other than cash, a description of its cost and its fair market value together with an explanation of the basis for evaluation. Furnish a brief statement as to the effect of the transaction on the insurer's surplus.

(f) Reinsurance. If the transaction is a reinsurance agreement or modification or a reinsurance pooling agreement or modification described in Insurance Code § 823.103(a)(2), furnish a description of the known or estimated amount of liability to be ceded or assumed in each calendar year, the period the agreement will be in effect, and a statement whether an agreement or understanding exists between the insurer and non-affiliate that any portion of the assets constituting the consideration for the agreement will be transferred to one or more of the insurer's affiliates. Furnish a brief description of the consideration involved in the transaction, and a brief statement as to the effect of the transaction upon the insurer's surplus.

(g) Management agreements, service agreements, and cost sharing arrangements.

(1) For management and service agreements, furnish:

(A) a brief description of the managerial responsibilities or services to be performed;

(B) a brief description of the agreement, including a statement of its duration, together with brief descriptions of the basis for compensation and the terms under which payment or compensation is to be made.

(2) For cost-sharing arrangements, furnish:

(A) a brief description of the purpose of the agreement;

(B) a description of the period of time during which the agreement is to be in effect;

(C) a brief description of each party's expenses or costs covered by the agreement;

(D) a brief description of the accounting basis to be used in calculating each party's costs under the agreement;

(E) a brief statement as to the effect of the transaction upon the insurer's policyholder surplus;

(F) a statement regarding the cost allocation methods specifying whether proposed charges are cost or market based. If market based, include the rationale for using market instead of cost, including justification for the company's determination that amounts are fair and reasonable; and

(G) a statement regarding compliance with the NAIC Accounting Practices and Procedure Manual regarding expense allocation.

(h) Signature and certification. Signature and certification are required as follows.

Figure: 28 TAC §7.212(h)

SIGNATURE

Pursuant to the requirements of Insurance Code Chapter 823, the Applicant has caused

this Prior Notice of a Transaction Statement to be signed on its behalf in the City of

_____ and State of _____ on_____,

20_____.

_____
(Name of Applicant)

(Seal)

By: _____
     (Name)(Title)

Attest:

_____
(Signature of Officer)

_____
(Title)

CERTIFICATION

THE STATE OF _____

COUNTY OF _____

Before me, the undersigned authority, on this day personally appeared

_____ known to me to be the

_____, who, after being placed on his or her oath, stated that

he or she has read the preceding application and that the answers, exhibits and

attachments forming it are true and correct as to any factual statements contained.

_____
(Signature)

Sworn to and subscribed before me on _____, 20___ , to certify

which witness my hand and seal of office.

_____
Notary Public in and for

(Seal)

_____ County, _____

**Credits**
**Source:** The provisions of this §7.212 adopted to be effective May 26, 2013, 38 TexReg 3033.

Current through 50 Tex.Reg. No. 2130, dated March 21, 2025, as effective on or before March 28, 2025. Some sections may be more current. See credits for details.

28 TAC § 7.212, 28 TX ADC § 7.212

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 6. Organization of Insurers and Related Entities (Refs & Annos)
      Subtitle B. Organization of Regulated Entities
        Chapter 823. Insurance Holding Company Systems
          Subchapter C. Transactions of Registered Insurer

V.T.C.A., Insurance Code § 823.101

§ 823.101. Standards for Transaction Within an Insurance Holding Company System

Currentness

(a) This section applies only to a material transaction within an insurance holding company system to which an insurer subject to a registration under Section 823.052 is a party.

(b) The terms of the transaction shall be fair and equitable.

(b-1) An agreement, including an agreement for cost-sharing, services, or management, must include all provisions required by rule of the commissioner.

(c) The charges or fees for services performed shall be reasonable.

(d) The books, accounts, and records of each party to the transaction shall be maintained so that the precise nature and details of the transaction are clearly and accurately disclosed.

(e) The expenses incurred and payments received relating to the transaction shall be allocated to the registered insurer on an equitable basis in conformity with customary insurance accounting principles consistently applied.

(f) After a registered insurer pays a dividend or makes a distribution to a holding company or shareholder affiliate of the insurer, the insurer's policyholders' surplus shall be reasonable in relation to the insurer's outstanding liabilities and adequate to the insurer's financial needs.

**Credits**
Added by Acts 2001, 77th Leg., ch. 1419, § 1, eff. June 1, 2003. Amended by Acts 2011, 82nd Leg., ch. 922 (S.B. 1431), § 8, eff. Sept. 1, 2011; Acts 2011, 82nd Leg., ch. 922 (S.B. 1431), § 9, eff. Sept. 1, 2011.

Notes of Decisions (6)

V. T. C. A., Insurance Code § 823.101, TX INS § 823.101

Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 6. Organization of Insurers and Related Entities (Refs & Annos)
      Subtitle B. Organization of Regulated Entities
        Chapter 823. Insurance Holding Company Systems
          Subchapter C. Transactions of Registered Insurer

V.T.C.A., Insurance Code § 823.103

§ 823.103. Notice of and Commissioner's Decision on Specified Transactions

Currentness

(a) This section applies only to:

(1) a sale, purchase, exchange, loan or other extension of credit, or investment between a domestic insurer and any person in the insurer's insurance holding company system, including an amendment or modification of an affiliate agreement previously filed under this section, provided the transaction is not less than:

(A) with respect to nonlife insurers, the lesser of three percent of the insurer's admitted assets or 25 percent of the insurer's surplus as regards policyholders as of December 31 of the year preceding the year in which the transaction occurs; or

(B) with respect to life insurers, three percent of the insurer's admitted assets as of December 31 of the year preceding the year in which the transaction occurs;

(2) a loan or other extension of credit to a person who is not an affiliate if the insurer makes a loan or extension of credit with the agreement or understanding that the proceeds of the transaction, wholly or in substantial part, are to be used to make loans or extensions of credit to, to purchase assets of, or to make investment in, an affiliate of the insurer making the loan or extension of credit, provided the transaction is not less than:

(A) with respect to nonlife insurers, the lesser of three percent of the insurer's admitted assets or 25 percent of the insurer's surplus as regards policyholders as of December 31 of the year preceding the year in which the transaction occurs; or

(B) with respect to life insurers, three percent of the insurer's admitted assets as of December 31 of the year preceding the year in which the transaction occurs;

(3) a reinsurance agreement, including a reinsurance treaty or pooling agreement, or an amendment or modification of an agreement previously filed under this section, between a domestic insurer and any person in the insurer's holding company system;

(4) a rendering of services between a domestic insurer and any person in the insurer's holding company system on a regular or systematic basis, including a tax-allocation agreement, or an amendment or modification of an agreement previously filed under this section; or

(5) any material transaction between a domestic insurer and any person in the insurer's holding company system that is specified by rule and that the commissioner determines may adversely affect the interests of the insurer's policyholders or of the public, including an amendment or modification of an agreement previously filed under this section.

(b) Subsection (a)(3) includes a reinsurance agreement that requires as consideration a transfer of assets from an insurer to a nonaffiliate and in relation to which the insurer and nonaffiliate agree that any part of the transferred assets are to be transferred to one or more affiliates of the insurer.

(c) A domestic insurer shall give to the commissioner written notice of the insurer's intent to enter into a transaction to which this section applies before the 30th day preceding the date of the proposed transaction. The commissioner may authorize a shorter period of notice under this subsection.

(d) A domestic insurer may not enter into a transaction for which the insurer gives notice under Subsection (c) if the commissioner disapproves the proposed transaction during the period for notice.

(e) The notice described by Subsection (c) must include:

(1) the reasons for entering into or changing the transaction; and

(2) the financial impact of the transaction on the domestic insurer.

(f) Not later than the 30th day after the termination of a previously filed agreement, the domestic insurer shall give notice of the termination to the commissioner.

**Credits**
Added by Acts 2001, 77th Leg., ch. 1419, § 1, eff. June 1, 2003. Amended by Acts 2011, 82nd Leg., ch. 922 (S.B. 1431), § 11, eff. Sept. 1, 2011; Acts 2013, 83rd Leg., ch. 1087 (H.B. 3460), § 4, eff. June 14, 2013.

V. T. C. A., Insurance Code § 823.103, TX INS § 823.103
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Insurance Code
    Title 6. Organization of Insurers and Related Entities (Refs & Annos)
      Subtitle B. Organization of Regulated Entities
        Chapter 823. Insurance Holding Company Systems
          Subchapter C. Transactions of Registered Insurer

V.T.C.A., Insurance Code § 823.106

§ 823.106. Standards of Review; Reasons for Disapproval

Currentness

(a) In reviewing a transaction under this subchapter, the commissioner shall consider whether the transaction:

(1) complies with the standards provided by Section 823.101; and

(2) may adversely affect the interest of the insurer's policyholders.

(b) The commissioner shall set forth the specific reasons for the disapproval of a transaction reviewed under Subsection (a).

**Credits**
Added by Acts 2001, 77th Leg., ch. 1419, § 1, eff. June 1, 2003.

V. T. C. A., Insurance Code § 823.106, TX INS § 823.106
Current through legislation effective May 30, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part I. General Rules (Refs & Annos)

TX Rules of Civil Procedure, Rule 1

Rule 1. Objective of Rules

[Currentness](#)

The proper objective of rules of civil procedure is to obtain a just, fair, equitable and impartial adjudication of the rights of litigants under established principles of substantive law. To the end that this objective may be attained with as great expedition and dispatch and at the least expense both to the litigants and to the state as may be practicable, these rules shall be given a liberal construction.

**Credits**
Oct. 29, 1940, eff. Sept. 1, 1941.

Notes of Decisions (63)

**O'CONNOR'S CROSS REFERENCES**
See also *O'Connor's Texas Rules,* "Introduction to the Texas Rules," ch. 1-A, §1 et seq.

Vernon's Ann. Texas Rules Civ. Proc., Rule 1, TX R RCP Rule 1
Current with amendments received through April 1, 2025. Some rules may be more current, see credits for details.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 9. Evidence and Discovery (Refs & Annos)
        B. Discovery
          Rule 192. Permissible Discovery: Forms and Scope; Work Product; Protective Orders; Definitions (Refs & Annos)

TX Rules of Civil Procedure, Rule 192.3

192.3. Scope of Discovery

Currentness

(a) *Generally.* In general, a party may obtain discovery regarding any matter that is not privileged and is relevant to the subject matter of the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party. It is not a ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

(b) *Documents and Tangible Things.* A party may obtain discovery of the existence, description, nature, custody, condition, location, and contents of documents and tangible things (including papers, books, accounts, drawings, graphs, charts, photographs, electronic or videotape recordings, data, and data compilations) that constitute or contain matters relevant to the subject matter of the action. A person is required to produce a document or tangible thing that is within the person's possession, custody, or control.

(c) *Persons with Knowledge of Relevant Facts.* A party may obtain discovery of the name, address, and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case. A person has knowledge of relevant facts when that person has or may have knowledge of any discoverable matter. The person need not have admissible information or personal knowledge of the facts. An expert is "a person with knowledge of relevant facts" only if that knowledge was obtained first-hand or if it was not obtained in preparation for trial or in anticipation of litigation.

(d) *Trial Witnesses.* A party may obtain discovery of the name, address, and telephone number of any person who is expected to be called to testify at trial. This paragraph does not apply to rebuttal or impeaching witnesses the necessity of whose testimony cannot reasonably be anticipated before trial.

(e) *Testifying and Consulting Experts.* The identity, mental impressions, and opinions of a consulting expert whose mental impressions and opinions have not been reviewed by a testifying expert are not discoverable. A party may discover the following information regarding a testifying expert or regarding a consulting expert whose mental impressions or opinions have been reviewed by a testifying expert:

  (1) the expert's name, address, and telephone number;

  (2) the subject matter on which a testifying expert will testify;

  (3) the facts known by the expert that relate to or form the basis of the expert's mental impressions and opinions formed or made in connection with the case in which the discovery is sought, regardless of when and how the factual information was acquired;

(4) the expert's mental impressions and opinions formed or made in connection with the case in which discovery is sought, and any methods used to derive them;

(5) any bias of the witness;

(6) all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of a testifying expert's testimony;

(7) the expert's current resume and bibliography.

(f) *Indemnity and Insuring Agreements.* Except as otherwise provided by law, a party may obtain discovery of the existence and contents of any indemnity or insurance agreement under which any person may be liable to satisfy part or all of a judgment rendered in the action or to indemnify or reimburse for payments made to satisfy the judgment. Information concerning the indemnity or insurance agreement is not by reason of disclosure admissible in evidence at trial.

(g) *Settlement Agreements.* A party may obtain discovery of the existence and contents of any relevant portions of a settlement agreement. Information concerning a settlement agreement is not by reason of disclosure admissible in evidence at trial.

(h) *Statements of Persons with Knowledge of Relevant Facts.* A party may obtain discovery of the statement of any person with knowledge of relevant facts--a "witness statement"--regardless of when the statement was made. A witness statement is (1) a written statement signed or otherwise adopted or approved in writing by the person making it, or (2) a stenographic, mechanical, electrical, or other type of recording of a witness's oral statement, or any substantially verbatim transcription of such a recording. Notes taken during a conversation or interview with a witness are not a witness statement. Any person may obtain, upon written request, his or her own statement concerning the lawsuit, which is in the possession, custody or control of any party.

(i) *Potential Parties.* A party may obtain discovery of the name, address, and telephone number of any potential party.

(j) *Contentions.* A party may obtain discovery of any other party's legal contentions and the factual bases for those contentions.

**Credits**
Aug. 5, 1998 and amended Nov. 9, 1998, eff. Jan. 1, 1999.

Section 1 to Section 3, Rule 41 appear in this volume.

**Editors' Notes**

**COMMENT--1999**
*See comments following* Rule 192.7.

Notes of Decisions (374)

Vernon's Ann. Texas Rules Civ. Proc., Rule 192.3, TX R RCP Rule 192.3
Current with amendments received through April 1, 2025. Some rules may be more current, see credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
    Texas Rules of Civil Procedure
        Part II. Rules of Practice in District and County Courts
            Section 9. Evidence and Discovery (Refs & Annos)
                B. Discovery
                    Rule 205. Discovery from Nonparties (Refs & Annos)

TX Rules of Civil Procedure, Rule 205.3

205.3. Production of Documents and Tangible Things Without Deposition

Currentness

(a) *Notice; Subpoena.* A party may compel production of documents and tangible things from a nonparty by serving--a reasonable time before the response is due but no later than 30 days before the end of any applicable discovery period--the notice required in Rule 205.2 and a subpoena compelling production or inspection of documents or tangible things.

(b) *Contents of Notice.* The notice must state:

  (1) the name of the person from whom production or inspection is sought to be compelled;

  (2) a reasonable time and place for the production or inspection; and

  (3) the items to be produced or inspected, either by individual item or by category, describing each item and category with reasonable particularity, and, if applicable, describing the desired testing and sampling with sufficient specificity to inform the nonparty of the means, manner, and procedure for testing or sampling.

(c) *Requests for Production of Medical or Mental Health Records of Other Nonparties.* If a party requests a nonparty to produce medical or mental health records of another nonparty, the requesting party must serve the nonparty whose records are sought with the notice required under this rule. This requirement does not apply under the circumstances set forth in Rule 196.1(c)(2).

(d) *Response.* The nonparty must respond to the notice and subpoena in accordance with Rule 176.6.

(e) *Custody, Inspection and Copying.* The party obtaining the production must make all materials produced available for inspection by any other party on reasonable notice, and must furnish copies to any party who requests at that party's expense.

(f) *Cost of Production.* A party requiring production of documents by a nonparty must reimburse the nonparty's reasonable costs of production.

**Credits**
Aug. 5, 1998, Nov. 9, 1998 and Dec. 31, 1998, eff. Jan. 1, 1999.

Section 1 to Section 3, Rule 41 appear in this volume.

**Editors' Notes**

**COMMENT--1999**

Under this rule, a party may subpoena production of documents and tangible things from nonparties without need for a motion or oral or written deposition.

Notes of Decisions (9)

**O'CONNOR'S CROSS REFERENCES**

See also *O'Connor's Texas Rules,* "Securing discovery from nonparties," ch. 6-A, §9.2; *O'Connor's Texas Rules,* "Depositions," ch. 6-F, §1 et seq.; *O'Connor's Texas Rules,* "Securing Documents & Tangible Things," ch. 6-I, §1 et seq.; *O'Connor's Texas Forms,* FORM 6I:12.

**O'CONNOR'S ANNOTATIONS**

*In re University of Tex. Health Ctr.*, 198 S.W.3d 392, 397 (Tex.App.--Texarkana 2006, orig. proceeding). "By requiring notice of proposed testing and the manner and means of the proposed testing, the [TRCPs] clearly indicate production is available to test tangible objects beyond simple inspection. [¶] The rules expressly provide for production of a tangible item for testing, and one contemplated method by which that production may be accomplished is physically delivering possession of the item to the requesting party or that party's agent."

Vernon's Ann. Texas Rules Civ. Proc., Rule 205.3, TX R RCP Rule 205.3
Current with amendments received through April 1, 2025. Some rules may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 9. Evidence and Discovery (Refs & Annos)
        A. Evidence
          Rule 176. Subpoenas (Refs & Annos)

TX Rules of Civil Procedure, Rule 176.7

176.7. Protection of Person from Undue Burden and Expense

Currentness

A party causing a subpoena to issue must take reasonable steps to avoid imposing undue burden or expense on the person served. In ruling on objections or motions for protection, the court must provide a person served with a subpoena an adequate time for compliance, protection from disclosure of privileged material or information, and protection from undue burden or expense. The court may impose reasonable conditions on compliance with a subpoena, including compensating the witness for undue hardship.

**Credits**
Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999.

Section 1 to Section 3, Rule 41 appear in this volume.

**Editors' Notes**

**HISTORICAL COMMENTS--1999**
*See comments following 176.8.*

Notes of Decisions (1)

Vernon's Ann. Texas Rules Civ. Proc., Rule 176.7, TX R RCP Rule 176.7
Current with amendments received through April 1, 2025. Some rules may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.